# EXHIBIT 1

DECLARATION OF SEAN P. FLYNN IN SUPPORT OF  DEFENDANT IC SYSTEM, INC.'S
MOTION TO DISMISS PLAINTIFF'S COMPLAINT

PL 102-243, S 1462  105 Stat. 2394

LEGISLATIVE HISTORY OF THE

TELEPHONE CONSUMER PROTECTION ACT OF 1991.

PL 102-243

An act to amend the Communications Act of 1934 to prohibit certain practices involving the use of telephone equipment.

## CONGRESSIONAL MATERIALS

PL 102-243, 105 Stat. 2394 (Dec. 20, 1991) (PDF)

137 Cong. Rec. S18781-86 (daily ed. Nov. 27, 1991) (PDF)

137 Cong. Rec. H11307-15 (daily ed. Nov. 26, 1991) (PDF)

137 Cong. Rec. S18317-21 (daily ed. Nov. 26, 1991) (PDF)

137 Cong. Rec. E3940 (daily ed. Nov. 21, 1991) (PDF)

137 Cong. Rec. H10339-44 (daily ed. Nov. 18, 1991) (PDF)

HR 1304, 102d Cong., 1st Sess. (Nov. 18 (legislative day, Nov. 13), 1991) (PDF)

137 Cong. Rec. S16809-10 (daily ed. Nov. 15, 1991) (PDF)

HR 1304, 102d Cong., 1st Sess. (March 6, 1991, July 18, 1991, Nov. 15, 1991) (PDF)

H.Rep.No. 102-317, 102d Cong., 1st Sess. (Nov. 15, 1991) (PDF)

137 Cong. Rec. S16781-82 (daily ed. Nov. 14, 1991) (PDF)

137 Cong. Rec. S16779-81 (daily ed. Nov. 14, 1991) (PDF)

137 Cong. Rec. S16200-04 (daily ed. Nov. 7, 1991) (PDF)

137 Cong. Rec. S16294-95 (daily ed. Nov. 7, 1991) (PDF)

137 Cong. Rec. S16204-08 (daily ed. Nov. 7, 1991) (PDF)

137 Cong. Rec. S16295-96 (daily ed. Nov. 7, 1991) (PDF)

HR 3559, 102d Cong., 1st Sess. (Oct. 15, 1991) (PDF)

S 1462, 102d Cong., 1st Sess. (July 11 (legislative day, July 8), 1991, Oct. 8 (legislative day, Sept. 19), 1991) (PDF)

S.Rep.No. 102-177, 102d Cong., 1st Sess. (Oct. 8 (legislative day, Sept. 19), 1991) (PDF)

S.Rep.No. 102-178, 102d Cong., 1st Sess. (Oct. 8 (legislative day, Sept. 19), 1991) (PDF)

137 Cong. Rec. S13181-83 (daily ed. Sept. 17, 1991) (PDF)

S 1719, 102d Cong., 1st Sess. (Sept. 17 (legislative day, Sept. 10), 1991) (PDF)

137 Cong. Rec. S9874-75 (daily ed. July 11, 1991) (PDF)

S 1462, 102d Cong., 1st Sess. (July 11 (legislative day, July 8), 1991) (PDF)

137 Cong. Rec. S9497-98 (daily ed. July 10, 1991) (PDF)

S 1442, 102d Cong., 1st Sess. (July 10 (legislative day, July 8), 1991) (PDF)

137 Cong. Rec. S8991-93 (daily ed. June 27, 1991) (PDF)

S 1410, 102d Cong., 1st Sess. (June 27 (legislative day, June 11), 1991) (PDF)

S 1410, 102d Cong., 1st Sess. (June 27 (legislative day, June 11), 1991) (PDF)

137 Cong. Rec. H1918 (daily ed. March 21, 1991) (PDF)

HR 1589, 102d Cong., 1st Sess. (March 21, 1991) (PDF)

137 Cong. Rec. E793 (daily ed. March 6, 1991) (PDF)

HR 1304, 102d Cong., 1st Sess. (March 6, 1991) (PDF)

HR 2921, 101st Cong., 2d Sess. (August 1 (legislative day, July 10), 1990, Oct. 26 (legislative day, Oct. 2), 1990) (PDF)

HR 2921, 101st Cong., 2d Sess. (August 1 (legislative day, July 10), 1990) (PDF)

HR 2921, 101st Cong., 2d Sess. (August 1 (legislative day, July 10), 1990) (PDF)

136 Cong. Rec. H5818-22, 136 Cong. Rec. H5879 (daily ed. July 30, 1990) (PDF)

HR 2921, 101st Cong., 2d Sess. (July 18, 1989, July 27, 1990) (PDF)

H.Rep.No. 101-633, 101st Cong., 2d Sess. (July 27, 1990) (PDF)

135 Cong. Rec. E2549-2550 (daily ed. July 18, 1989) (PDF)

HR 2921, 101st Cong., 1st Sess. (July 18, 1989) (PDF)

135 Cong. Rec. E1839 (daily ed. May 23, 1989) (PDF)

135 Cong. Rec. E1462 (daily ed. May 2, 1989) (PDF)

135 Cong. Rec. E1475 (daily ed. May 2, 1989) (PDF)

HR 2184, 101st Cong., 1st Sess. (May 2, 1989) (PDF)

135 Cong. Rec. E1395 (daily ed. April 26, 1989) (PDF)

HR 2131, 101st Cong., 1st Sess. (April 26, 1989) (PDF)

HR 628, 101st Cong., 1st Sess. (Jan. 24, 1989) (PDF)

HR 4701, 100th Cong., 2d Sess. (May 26, 1988) (PDF)

## HEARINGS

S. Hrg. 102-918 Computerized Telephone Sales Calls and 900 Service, Comm. on Commerce, Science, and Transportation (Oct. 10 and 11, 1991) (PDF)

S. Hrg. 102-960 S. 1462, the Automated Telephone Consumer Protection Act of 1991; S. 1410, the Telephone Advertising Consumer Protection Act; and S. 857, Equal Billing for Long Distance Charges, Subcomm. on Communications of the Comm. on Commerce, Science, and Transportation (July 24, 1991) (PDF)

Telemarketing/Privacy Issues, Subcomm. on Telecommunications and Finance of the Comm. on Energy and Commerce (April 24, 1991) (PDF)

Telemarketing Practices, Subcomm. on Telecommunications and Finance of the Comm. on Energy and Commerce (May 24, 1989) (PDF)

## PRESIDENTIAL DOCUMENTS

27 Weekly Comp. Pres. Doc. 1877, Statement on Signing the Telephone Consumer Protection Act of 1991 (Dec. 20, 1991) (PDF)

© 2013 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 2

DECLARATION OF SEAN P. FLYNN IN SUPPORT OF  DEFENDANT IC SYSTEM, INC.'S
MOTION TO DISMISS PLAINTIFF'S COMPLAINT

I

100TH CONGRESS
2D SESSION

# H. R. 4701

To amend the Communications Act of 1934 to prohibit certain practices involving commercial uses of automatic telephone dialing systems.

---

## IN THE HOUSE OF REPRESENTATIVES

MAY 26, 1988

Mr. FRANK introduced the following bill; which was referred to the Committee on Energy and Commerce

---

# A BILL

To amend the Communications Act of 1934 to prohibit certain practices involving commercial uses of automatic telephone dialing systems.

1    *Be it enacted by the Senate and House of Representa-*

2  *tives of the United States of America in Congress assembled,*

3  That title II of the Communications Act of 1934 is amended

4  by inserting after section 224 (47 U.S.C. 224) the following

5  new section:

6    "RESTRICTIONS ON THE USE OF TELEPHONE

7             AUTODIALING SYSTEMS

8    "SEC. 225. (a) As used in this section the term 'auto-

9  matic telephone dialing system' means telephone terminal

10  equipment which has the capacity—

2

1    "(1) to store or produce numbers to be called,

2    using a random or sequential number generator;

3    "(2) to dial such numbers; and

4    "(3) to deliver a prerecorded message to the

5    number dialed, with or without manual assistance.

6    "(b) It shall be unlawful for any person, in the District

7    of Columbia or in interstate or foreign communications by

8    means of telephone—

9    "(1) to use any automatic telephone dialing

10    system to place any call to any person whose number

11    is listed by a common carrier pursuant to subsection (c)

12    as the telephone number of a person who objects to re-

13    ceiving messages from automatic telephone dialing sys-

14    tems; or

15    "(2) to use any automatic telephone dialing

16    system that does not comply with the technical stand-

17    ards prescribed under subsection (d).

18    "(c) Each common carrier shall maintain, in accordance

19    with regulations prescribed by the Commission, a list of the

20    telephone numbers of customers of that common carrier who

21    notify the carrier that they object to receiving messages from

22    automatic telephone dialing systems. Such regulations

23    shall—

3

1    "(1) specify the methods by which a customer

2    may give or revoke such notification to a common car-

3    rier;

4    "(2) prohibit any customer from being charged for

5    giving or revoking such notification or for being carried

6    on such list; and

7    "(3) specify the methods by which such list shall

8    be made available to users of automatic telephone dial-

9    ing systems and the costs to be recovered from such

10   users.

11   "(d) The Commission shall prescribe technical standards

12   for automatic telephone dialing systems. Such standards shall

13   require that such systems will, within 5 seconds after the

14   called party hangs up, automatically create a disconnect

15   signal or on-hook condition which allows the called party's

16   line to be released.

17   "(e) The regulations required by this section shall be

18   prescribed within 6 months after the date of enactment of this

19   section.

20   "(f) The requirements of this section shall take effect 30

21   days after the date that such regulations are prescribed.".

○

# EXHIBIT 3

DECLARATION OF SEAN P. FLYNN IN SUPPORT OF  DEFENDANT IC SYSTEM, INC.'S
MOTION TO DISMISS PLAINTIFF'S COMPLAINT

I

101ST CONGRESS
1ST SESSION

# H. R. 628

To amend the Communications Act of 1934 to prohibit certain practices involving
commercial uses of automatic telephone dialing systems.

---

## IN THE HOUSE OF REPRESENTATIVES

JANUARY 24, 1989

Mr. FRANK introduced the following bill; which was referred to the Committee on
Energy and Commerce

---

# A BILL

To amend the Communications Act of 1934 to prohibit certain
practices involving commercial uses of automatic telephone
dialing systems.

1   *Be it enacted by the Senate and House of Representa-*
2   *tives of the United States of America in Congress assembled,*
3   That title II of the Communications Act of 1934 is amended
4   by inserting after section 224 (47 U.S.C. 224) the following
5   new section:

6          "RESTRICTIONS ON THE USE OF TELEPHONE

7                  AUTODIALING SYSTEMS

8          "SEC. 225. (a) As used in this section the term 'auto-
9   matic telephone dialing system' means telephone terminal
10   equipment which has the capacity—

2

1    "(1) to store or produce numbers to be called,

2    using a random or sequential number generator;

3    "(2) to dial such numbers; and

4    "(3) to deliver a prerecorded message to the

5    number dialed, with or without manual assistance.

6    "(b) It shall be unlawful for any person, in the District

7    of Columbia or in interstate or foreign communications by

8    means of telephone—

9    "(1) to use any automatic telephone dialing

10   system to place any call to any person whose number

11   is listed by a common carrier pursuant to subsection (c)

12   as the telephone number of a person who objects to re-

13   ceiving messages from automatic telephone dialing sys-

14   tems; or

15   "(2) to use any automatic telephone dialing

16   system that does not comply with the technical stand-

17   ards prescribed under subsection (d).

18   "(c) Each common carrier shall maintain, in accordance

19   with regulations prescribed by the Commission, a list of the

20   telephone numbers of customers of that common carrier who

21   notify the carrier that they object to receiving messages from

22   automatic telephone dialing systems. Such regulations

23   shall—

3

1    "(1) specify the methods by which a customer

2    may give or revoke such notification to a common car-

3    rier;

4    "(2) prohibit any customer from being charged for

5    giving or revoking such notification or for being carried

6    on such list; and

7    "(3) specify the methods by which such list shall

8    be made available to users of automatic telephone dial-

9    ing systems and the costs to be recovered from such

10   users.

11   "(d) The Commission shall prescribe technical standards

12   for automatic telephone dialing systems. Such standards shall

13   require that such systems will, within 5 seconds after the

14   called party hangs up, automatically create a disconnect

15   signal or on-hook condition which allows the called party's

16   line to be released.

17   "(e) The regulations required by this section shall be

18   prescribed within 6 months after the date of enactment of this

19   section.

20   "(f) The requirements of this section shall take effect 30

21   days after the date that such regulations are prescribed.".

O

# EXHIBIT 4

DECLARATION OF SEAN P. FLYNN IN SUPPORT OF  DEFENDANT IC SYSTEM, INC.'S
MOTION TO DISMISS PLAINTIFF'S COMPLAINT

I

101st CONGRESS
1st SESSION

# H. R. 2131

To amend the Communications Act of 1934 to prohibit certain practices in the
use of automatic dialing devices, and for other purposes.

---

## IN THE HOUSE OF REPRESENTATIVES

APRIL 26, 1989

Mrs. ROUKEMA introduced the following bill; which was referred to the
Committee on Energy and Commerce

---

# A BILL

To amend the Communications Act of 1934 to prohibit certain
practices in the use of automatic dialing devices, and for
other purposes.

1    *Be it enacted by the Senate and House of Representa-*

2  *tives of the United States of America in Congress assembled,*

3  **SECTION 1. SHORT TITLE.**

4    This Act may be cited as the "Automated Telephone

5  Solicitation Protection Act of 1989".

6  **SEC. 2. AMENDMENT.**

7    Title II of the Communications Act of 1934 is amended

8  by inserting after section 224 the following new section:

2

1         "AUTOMATIC DIALING DEVICES

2       "SEC. 225. (a) DEFINITIONS.—As used in this sec-

3  tion—

4         "(1) the term 'automatic dialing device' means

5        telephone terminal equipment which has the capacity—

6             "(A) to store or produce numbers to be

7           called, using a random or sequential number gen-

8           erator;

9             "(B) to dial such numbers; and

10            "(C) to deliver a prerecorded message to the

11           number dialed, with or without manual assistance;

12           and

13            "(2) the term 'telephone solicitation' means

14           the unsolicited initiation of a telephone conversa-

15           tion for the purpose of encouraging a person to

16           purchase property, goods, or services.

17       "(b) RESTRICTIONS.—It shall be unlawful for any

18  person to use any automatic dialing device to make, in inter-

19  state or foreign communication, any telephone solicitation to

20  a telephone customer if—

21         "(1) the recorded message fails to state clearly

22         the name and telephone number of the person initiating

23         the call;

24         "(2) the dialer does not automatically and immedi-

25         ately terminate its connection with any telephone call

3

1    within five seconds after the person called fails to give

2    consent for the playing of the recorded message or

3    hangs up his or her telephone;

4        "(3) the automatic dialing device is used to make

5    calls to any emergency telephone line of any hospital,

6    medical physician or service office, health care facility,

7    fire protection, or law enforcement agency; or

8        "(4) such use is at a time other than between the

9    weekday hours of 9 a.m. and 5 p.m.

10   "(c) EXCEPTIONS.—Subsection (b) shall not prohibit

11   the use of an automatic dialing device if—

12       "(1) there is an existing business relationship be-

13   tween caller and recipient of the call; or

14       "(2) the calls are made or message given solely in

15   response to a specific request initiated by the person to

16   whom the call or message is directed.

17   "(d) EXEMPTION FROM LIMITATION ON FORFEITURE

18   PENALTIES.—The $5,000 limitation contained in subpara-

19   graph (B) of section 503(b)(2) of this Act shall not apply to

20   forfeiture penalties for violations of this section.

21   "(e) STATE PREEMPTION.—Nothing in this section

22   shall supersede or limit the applicability of any State law to

23   the use of automatic dialing devices.

24   "(f) STUDY.—The Commission and the Federal Trade

25   Commission shall conduct a joint study of the practicality and

4

1  constitutionality of a complete ban on the use of automatic

2  dialing devices to delivery telephone solicitations. The Com-

3  mission and the Federal Trade Commission shall submit a

4  report to the Congress not later than one year after the date

5  of enactment of this section on the results of such study, to-

6  gether with such recommendations for legislation as they

7  consider appropriate.''.

8  **SEC. 3. EFFECTIVE DATE.**

9      The amendment made by section 2 shall be effective 6

10  months after the date of enactment of this Act.

○

●HR 2131 IH

# EXHIBIT 5

DECLARATION OF SEAN P. FLYNN IN SUPPORT OF  DEFENDANT IC SYSTEM, INC.'S
MOTION TO DISMISS PLAINTIFF'S COMPLAINT

**United States General Accounting Office**

# GAO

# Congressional Record, 101st Congress, Extension of Remarks

| Bill  H.R.2131 | Date  Apr. 26, 1989 (49) | Page(s)  E1395 |
|---|---|---|

**Remarks:**  Introduced by Mrs. Roukema

## LEGISLATION TO CRACK DOWN ON RANDOM UNSOLICITED COMPUTER-GENERATED TELEMARKETING CALLS

### HON. MARGE ROUKEMA
OF NEW JERSEY

IN THE HOUSE OF REPRESENTATIVES

*Wednesday, April 26, 1989*

Mrs. ROUKEMA. Mr. Speaker, today I am introducing legislation to crack down on random, unsolicited, computer-generated telemarketing calls. This activity is an invasion of privacy, and it should be prohibited.

Many of us have been contacted by constituents who have rightly expressed their outrage at the inconveniences associated with these calls. Most disturbingly, automated dialer recorded message players [ADRMP's] do not distinguish between the phone numbers of homes, businesses, and health and safety agencies. Not only are they a nuisance, but they are also a potential hazard.

Health and safety officials have complained that once a call is made, it often fails to disconnect after the person called hangs up. This could mean the difference between life and death for a person in dire emergency.

In fact, last year, in New York, a mother unsuccessfully tried to call an ambulance from her home for her child who had collapsed. When she picked up her phone, all she could hear was an unsolicited automated sales pitch! After hanging up and trying to call again and again, she could not get a dial tone. She was forced to call for help from a neighbor's home. Luckily, the child survived.

My bill, the Automated Telephone Solicitation Protection Act, would correct these abuses. It would prohibit ADRMP's from making calls to the emergency line of any hospital, medical physician or service office, health care facility, or fire or law enforcement agency.

Under my bill, computer generated telemarketing calls would only be permitted in response to a specific request to a vendor by an individual who has a specific business relationship with the automated dialer. Businesses which would profit from automated dialing services would be permitted to receive these calls, but only if they chose to.

However, under my bill, even those individuals who solicit these services would be protected by a provision which would guarantee that a specifically undesired call would be terminated within 5 seconds after the person called hung up.

Mr. Speaker, at present the Federal Communications Commission has no authority to regulate this activity. Various States have passed laws to restrict this activity, albeit without any direction from the Federal Government. As many of these calls are interstate in nature, there is an appropriate Federal role in this policy area.

I hope all my colleagues join me as cosponsors of my legislation. I also call on the House Energy and Commerce Committee to take expeditious action on this legislation.

# EXHIBIT 6

DECLARATION OF SEAN P. FLYNN IN SUPPORT OF  DEFENDANT IC SYSTEM, INC.'S
MOTION TO DISMISS PLAINTIFF'S COMPLAINT

I

**101ST CONGRESS**
**1ST SESSION**

# H. R. 2184

To amend the Communications Act of 1934 to prohibit certain practices involving
commercial uses of telephone facsimile machines.

———————————

## IN THE HOUSE OF REPRESENTATIVES

MAY 2, 1989

Mr. MARKEY (for himself, Mr. RINALDO, Mr. SHAYS, Mr. FRANK, and Mr.
STARK) introduced the following bill; which was referred to the Committee
on Energy and Commerce

———————————

# A BILL

To amend the Communications Act of 1934 to prohibit certain
practices involving commercial uses of telephone facsimile
machines.

1    *Be it enacted by the Senate and House of Representa-*

2  *tives of the United States of America in Congress assembled,*

3  **SECTION 1. SHORT TITLE.**

4        This Act may be cited as the "Facsimile Advertising

5  Regulation Act".

6  **SEC. 2. AMENDMENT.**

7        Title II of the Communications Act of 1934 is amended

8  by inserting after section 224 (47 U.S.C. 224) the following

9  new section:

2

1 "RESTRICTIONS ON THE USE OF TELEPHONE FACSIMILE

2                                      MACHINES

3    "SEC. 225. (a) As used in this section—

4        "(1) the term 'telephone facsimile machine' means

5    equipment which has the capacity—

6            "(A) to transcribe text or images, or both,

7            from paper into an electronic signal and to trans-

8            mit that signal over a regular telephone line; and

9            "(B) to receive such signals over such a line

10           and to produce a copy of the transmitted text and

11           images; and

12       "(2) the term 'unsolicited advertisement' means

13   any material advertising the commercial availability or

14   quality of any property, goods, or services which is

15   transmitted to any person without that person's prior

16   express invitation or permission.

17       "(b) It shall be unlawful for any person, in the District

18   of Columbia or in interstate or foreign communications by

19   means of telephone, to use any telephone facsimile machine

20   or other electronic device to send any unsolicited advertise-

21   ment to the telephone facsimile machine of any person whose

22   number is listed by a common carrier pursuant to subsection

23   (c) as the telephone number of a person who objects to re-

24   ceiving unsolicited advertisements by telephone facsimile

25   machine.

3

1 "(c) Each common carrier shall maintain, in accordance

2 with regulations prescribed by the Commission, a list of the

3 telephone numbers of subscribers for telephone exchange

4 service of that common carrier who notify the carrier that

5 such subscriber objects to receiving unsolicited advertise-

6 ments by telephone facsimile machine. Such regulations

7 shall—

8  "(1) specify the methods by which a subscriber

9  may give or revoke such notification to a common car-

10  rier;

11  "(2) prohibit any subscriber from being charged

12  for giving or revoking such notification or for being

13  carried on such list; and

14  "(3) specify the methods by which such list shall

15  be made available to any person desiring to transmit

16  unsolicited advertisements by telephone facsimile ma-

17  chine and the costs to be recovered from such persons.

18 "(d) The Commission shall revise the regulations setting

19 technical and procedural standards for telephone facsimile

20 machines to require that any such machine which—

21  "(1) is manufactured after 6 months after the date

22  of enactment of this section; and

23  "(2) is used for the distribution of unsolicited

24  advertising,

4

1  be equipped to identify, in a margin at the top or bottom of

2  each transmitted page, the date and time sent, an identifica-

3  tion of the business sending the advertising, and the tele-

4  phone number of the sending machine.

5       "(e) The regulations required by this section shall be

6  prescribed within 6 months after the date of enactment of this

7  section.

8       "(f) The requirements of this section shall take effect 30

9  days after the date that such regulations are prescribed.".

○

# EXHIBIT 7

DECLARATION OF SEAN P. FLYNN IN SUPPORT OF  DEFENDANT IC SYSTEM, INC.'S
MOTION TO DISMISS PLAINTIFF'S COMPLAINT

United States General Accounting Office

# GAO

# Congressional Record, 101st Congress, Extension of Remarks

| Bill | | Date | | Page(s) | |
|------|--|------|--|---------|--|
| H.R.2184 | | May 2, 1989 (52) | | E1475 | |

**Remarks:** Introduced by Mr. Shays

### INTRODUCTION OF THE TAX REDUCTION ACT OF 1989

### HON. CHRISTOPHER SHAYS
OF CONNECTICUT

IN THE HOUSE OF REPRESENTATIVES

*Tuesday, May 2, 1989*

Mr. SHAYS. Mr. Speaker, today I join Mr. MARKEY, Mr. RINALDO, Mr. FRANK and Mr. STARK in introducing legislation to limit unsolicited fax advertisements.

I'm sure some of you have heard this complaint from your constituents: "We're even receiving 'junk mail' over our fax machines!" We want to put an end to the problem before it simply becomes unmanageable.

Specifically, the Facsimile Advertising Regulation Act requires common carrier companies to maintain lists of customers not wishing to receive fax advertisements and prohibits the use of the fax machine or any other electronic device to send unsolicited ads to these customers. In addition, any fax machine manufactured after the bill's enactment and used to distribute unsolicited advertising must identify the date and time of the transmission and the name and telephone number of the sender on each transmitted page.

Not only are unsolicited fax transmissions costly and annoying, but they are also an invasion of privacy. This legislation takes an important step toward protecting the rights of consumers who do not wish to receive these intrusive transmissions.

# EXHIBIT 8

DECLARATION OF SEAN P. FLYNN IN SUPPORT OF  DEFENDANT IC SYSTEM, INC.'S
MOTION TO DISMISS PLAINTIFF'S COMPLAINT

United States General Accounting Office

# GAO

# Congressional Record, 101st Congress, Extension of Remarks

| Bill | | Date | | Page(s) | |
|------|------|------|------|---------|------|
| H.R.2184 | | May 2, 1989 (52) | | E1462 | |

**Remarks:**  Introduced by Mr. Markey

## INTRODUCTION OF THE FACSIMILE ADVERTISING REGULATION ACT OF 1989

### HON. EDWARD J. MARKEY

OF MASSACHUSETTS

IN THE HOUSE OF REPRESENTATIVES

*Tuesday, May 2, 1989*

Mr. MARKEY. Mr. Speaker, I rise today to introduce the Facsimile Advertising Regulation Act of 1989, a bill to make it possible for businesses and individuals, who rely on telephone facsimile machines in their daily activities, to free themselves from the cost and intrusion of the unwanted advertising that is increasingly finding its way into their offices and homes.

Two years ago the telephone facsimile machine was an office oddity, today it is a necessity. According to the American Facsimile Association, this year alone, more than 2.5 million facsimile machines in this country will transmit and receive over 30 billion pages of information. FAX machine sales will top an estimated $2.5 billion and telephone line charges for FAX transmission will approach $4.8 billion. By any measure, FAX is big business and getting bigger. These numbers are expected to triple in the next 3 years as the cost of machines continues to decline. Certainly, a phenomenon called the "FAX explosion" is here and with it has come another phenomenon—"junk FAX".

Advertisers offering everything from FAX supplies to real estate deals have seized on the FAX machine as a high probability way to solicit potential clients. Coupled with a computer or automatic dialer, an advertiser's FAX machine can deliver tens of thousands of unsolicited messages a week to other FAX machines across the country. There is a burgeoning industry developing around the sales of computerized directories of FAX phone numbers and some enterprising advertisers are building their own national data bases of FAX numbers by offering gifts to people who provide them with other people's numbers.

Simply put, the problem is this: Unsolicited advertising is beginning to clog FAX lines, restricting the owners' ability to use their machines for the purposes they originally bought them for and generating operating costs the users can't control. Unlike junk mail, which can be discarded, or solicitation phone calls, which can be refused or hung up, junk FAX ties up the recipient's line until it has been received and printed. The recipient's machine is unavailable for business and he or she incurs the high cost for supplies before knowing whether the message is either wanted or needed.

This bill would not eliminate FAX advertising, for certainly we must acknowledge that telephone solicitation, when conducted properly, is an established, lawful marketing practice. But this bill would return a measure of control to FAX machine owners by giving them a mechanism to specify that they do not want to receive unsolicited advertising and requiring advertisers to honor that choice.

I urge my colleagues to examine and support this legislation, not as a restriction on commercial practices, but as an affirmation of an individual's right to choose to be free from unwanted intrusions.

# EXHIBIT 9

DECLARATION OF SEAN P. FLYNN IN SUPPORT OF  DEFENDANT IC SYSTEM, INC.'S
MOTION TO DISMISS PLAINTIFF'S COMPLAINT

**United States General Accounting Office**

# GAO

# Congressional Record, 101st Congress, Extension of Remarks

| Bill | | Date | | Page(s) | |
|------|---|------|---|---------|---|
| H.R.2184 | | May 23, 1989 (66) | | E1839 | |

**Remarks:**   Remarks by Mr. Stark

## FIX FAX FLOOD

# HON. FORTNEY PETE STARK

#### OF CALIFORNIA

#### IN THE HOUSE OF REPRESENTATIVES

*Tuesday, May 23, 1989*

Mr. STARK. Mr. Speaker, it began a few months ago, and appeared to be somewhat of a novelty or rare occurrence: Our fax machine would spontaneously spout a faxed commercial advertisement for office equipment or pitching discount prices for fax paper. Sometimes, an unsolicited fax advertisement for a pizza carryout or a sub shop came over the fax machine.

Admittedly, the early fax advertising was somewhat amusing.

Now, it's a royal pain in my backside. Misuse of junk fax advertising, initiated by irresponsible and notorious advertisers, threatens the current legislative environment in this new technology.

Just a few weeks ago, I joined my colleagues ED MARKEY, CHRISTOPHER SHAYS, BARNEY FRANK, and MATTHEW RINALDO in introducing legislation which would allow fax owners to effectively block junk fax advertising. The approach parallels efforts to encourage the regional telephone companies to allow blockage of "976" numbers and stop the intrusive dial-a-porn industry.

The following article outlines a very interesting perspective on the need for Federal junk fax advertising restrictions. I urge my colleagues to consider the article.

[From the Washington Post, May 23, 1989]

THE JUNK FAX ATTACK: WHY MARYLAND MAY
OUTLAW UNSOLICITED ADVERTISEMENTS

(By Jerry Knight)

When the history of facsimile transmission machines is written, Elliot Segal should be remembered as The Man Who Faxed Himself to Death.

Segal is a classic late 20th Century technopreneur, an innovator who ranks right up there with the inventors of phone sex, colorized movies and 900-numbers that tout video game tips to little kids.

He is also the reason that Maryland this week could become the second state in the union to outlaw "junk fax."

Fax machines, for those who blinked and missed the revolution, are the hottest tech since cellular phones. They send and receive copies (facsimiles) of documents by phone lines at the rate of a page a minute or less. At $8 a pop to send a letter across the country by Federal Express or across town by messenger, versus less than $1 a minute for a phone call, it doesn't take long to pay for a $799 fax machine. That's why the fax population has doubled—to 2.5 million—in the last year and could double again in the next.

Junk fax is the electronic equivalent of junk mail. More than a medium with a new message, it is a rave new world of marketing that literally uses the fax as an advertisement for itself. Unsolicited solicitations are an occupational hazard in the newspaper business; our fax machines generate missives with such fecundity that even Pawn Hall couldn't keep up with shredding them. Some papers—not this one—have decided that unsolicited fax are not fit to print, so they change their fax numbers frequently. But these are not junk fax messages. Junk fax is advertising.

Which brings us to the Elliot Segals of the world. His contributions to the trivialization of technology include transforming the fax machine into a vending device and paying bounties for lists of unlisted fax numbers.

Segal is VP for marketing for a California company called Mr. Fax. Two years ago he and President Steven Ridinger set out to become electronic Fuller Brush men, using fax machines to sell fax machine paper. Mr. Fax gets his foot in the door by sending out ads by fax. Your machine beeps and out belches an order form from Mr. Fax. You fill in the blanks, fax it back and your paper will be on the next truck.

And you get a free bonus! A Polaroid camera for every 100 new fax numbers you provide. Just make a copy of the fax line phone bill, fax it to us and the camera is in the mail. Thus junk fax spreads like a social disease, when someone you faxed with swaps your phone number for a Polaroid.

In this era of instantaneous communication, the backlash against junk fax was not long in coming. At latest count, the federal government and nine states were moving to curb junk fax.

House Telecommunications and Finance subcommittee chairman Ed Markey (D-mass.) will start hearings Wednesday on a bill that would require the phone company to help control junk fax. People who don't want to receive advertising on their fax could notify the phone company, which would publish lists of numbers that fax advertisers would have to avoid.

Aside from the aggravation, there are two complaints against junk fax. First, the recipient has to pay for it. Fax machines use special paper and that paper isn't cheap—3 to 5 cents a foot if you buy it at a discount from Mr. Fax—so receiving a junk fax is like getting junk mail with the postage due. Second, when someone is sending you a junk fax, you can't use the machine either to send or receive.

There are lots of jammed-with-junk-fax horror stories around, the best of them about the New York nuclear/submarine crisis. As the Associated Press tells it, New York Gov. Mario Cuomo was expecting a memo on nuclear power plants from state consumer protection chief Richard Kessel, but Kessel couldn't fax it because his machine was busy receiving a three-page menu from a local sub shop. That's one reason New York is considering a junk fax law.

Connecticut became the first state to legislate against junk fax thanks to our Mr. Segal and another of his ventures, an organization called the National Fax Users Committee. Ridinger said Mr. Fax organized the NFUC at the urging of customers, who fear that junk fax controls will not only outlaw advertising but also require all users to call for permission before they fax anything to anybody.

Threatened with the loss of the lucrative Connecticut junk fax market, the NFUC launched a fax attack to try to get Gov. William A. O'Neill to veto the bill. NFUC sent out several thousand faxes urging the faxees to refax the fax to the fax machines in the governor's office. They did. Unfortunately the fax flood coincided with a real one. As the governor was awaiting a flood condition report from the state Office of Emergency Management, the veto pleas came faxing in. Until that moment, the junk fax problem was not considered important enough to require a new law. After the industry faxed itself in the foot, junk fax victims in Connecticut can qualify for up to $200 in damages.

Then it was on to Annapolis, where the junk fax industry last week launched what Robert Iannucci, the governor's legislative director, called, "the most counterproductive lobbying effort I've ever seen."

For hours, Gov. William Donald Schaefer's machine churned out faxes on the fax bill, 343 of them, more than all the messages the governor's office has received on all the other 900 bills awaiting his signature. Most of the faxes came from out of state and most urged the governor to veto the bill. But roughly one faxer in five crossed out "veto" and wrote in "sign." Many of them added comments that cannot be printed in a family newspaper but used language Schaefer could relate to.

The governor says he will decide in the next few days whether to sign the bill. If you want to influence his decision, don't send a fax.

# EXHIBIT 10

DECLARATION OF SEAN P. FLYNN IN SUPPORT OF  DEFENDANT IC SYSTEM, INC.'S
MOTION TO DISMISS PLAINTIFF'S COMPLAINT

# TELEMARKETING PRACTICES

# HEARING

**BEFORE THE**

## SUBCOMMITTEE ON
## TELECOMMUNICATIONS AND FINANCE

**OF THE**

## COMMITTEE ON
## ENERGY AND COMMERCE
## HOUSE OF REPRESENTATIVES

### ONE HUNDRED FIRST CONGRESS

**FIRST SESSION**

**ON**

**H.R. 628, H.R. 2131, and H.R. 2184**

BILLS TO AMEND THE COMMUNICATIONS ACT OF 1934 TO PROHIBIT
CERTAIN PRACTICES INVOLVING AUTOMATIC TELEPHONE DIALING
SYSTEMS AND COMMERCIAL USES OF TELEPHONE FACSIMILE MA-
CHINES

---

MAY 24, 1989

---

## Serial No. 101–43

---

Printed for the use of the Committee on Energy and Commerce

U.S. GOVERNMENT PRINTING OFFICE

20-801≈                  WASHINGTON : 1989

F/W PL 102-243, 12-20-92

## COMMITTEE ON ENERGY AND COMMERCE

### JOHN D. DINGELL, Michigan, *Chairman*

JAMES H. SCHEUER, New York
HENRY A. WAXMAN, California
PHILIP R. SHARP, Indiana
JAMES J. FLORIO, New Jersey
EDWARD J. MARKEY, Massachusetts
THOMAS A. LUKEN, Ohio
DOUG WALGREN, Pennsylvania
AL SWIFT, Washington
MICKEY LELAND, Texas
CARDISS COLLINS, Illinois
MIKE SYNAR, Oklahoma
W.J. "BILLY" TAUZIN, Louisiana
RON WYDEN, Oregon
RALPH M. HALL, Texas
DENNIS E. ECKART, Ohio
BILL RICHARDSON, New Mexico
JIM SLATTERY, Kansas
GERRY SIKORSKI, Minnesota
JOHN BRYANT, Texas
JIM BATES, California
RICK BOUCHER, Virginia
JIM COOPER, Tennessee
TERRY L. BRUCE, Illinois
J. ROY ROWLAND, Georgia
THOMAS J. MANTON, New York

NORMAN F. LENT, New York
EDWARD R. MADIGAN, Illinois
CARLOS J. MOORHEAD, California
MATTHEW J. RINALDO, New Jersey
WILLIAM E. DANNEMEYER, California
BOB WHITTAKER, Kansas
THOMAS J. TAUKE, Iowa
DON RITTER, Pennsylvania
THOMAS J. BLILEY, JR., Virginia
JACK FIELDS, Texas
MICHAEL G. OXLEY, Ohio
HOWARD C. NIELSON, Utah
MICHAEL BILIRAKIS, Florida
DAN SCHAEFER, Colorado
JOE BARTON, Texas
SONNY CALLAHAN, Alabama
ALEX McMILLAN, North Carolina



Wm. Michael Kitzmiller, *Staff Director*
Margaret A. Durbin, *Minority Chief Counsel/Staff Director*

---

### Subcommittee on Telecommunications and Finance

#### EDWARD J. MARKEY, Massachusetts, *Chairman*

AL SWIFT, Washington
MICKEY LELAND, Texas
CARDISS COLLINS, Illinois
MIKE SYNAR, Oklahoma
W.J. "BILLY" TAUZIN, Louisiana
RALPH M. HALL, Texas
DENNIS E. ECKART, Ohio
BILL RICHARDSON, New Mexico
JIM SLATTERY, Kansas
JOHN BRYANT, Texas
RICK BOUCHER, Virginia
JIM COOPER, Tennessee
THOMAS J. MANTON, New York
RON WYDEN, Oregon
JOHN D. DINGELL, Michigan
(Ex Officio)

MATTHEW J. RINALDO, New Jersey
EDWARD R. MADIGAN, Illinois
CARLOS J. MOORHEAD, California
THOMAS J. TAUKE, Iowa
DON RITTER, Pennsylvania
THOMAS J. BLILEY, JR., Virginia
JACK FIELDS, Texas
MICHAEL G. OXLEY, Ohio
DAN SCHAEFER, Colorado
NORMAN F. LENT, New York
(Ex Officio)

Lawrence Sidman, *Chief Counsel/Staff Director*
R. Gerard Salemme, *Policy Analyst*
Terry Haines, *Minority Counsel*

(II)

page 31
Exhibit 10

# CONTENTS

|  | Page |
|---|---|
| Text of: | |
| H.R. 628 | 5 |
| H.R. 2131 | 8 |
| H.R. 2184 | 12 |
| Testimony of: | |
| Barton, Richard A., vice president, Direct Marketing Association | 27 |
| Ellis, Robert L., Indiana University School of Law | 43 |
| Frank, Hon. Barney, a Representative in Congress from the State of Massachusetts | 16 |
| Glynn, John M., Office of the People's Counsel of Maryland | 81 |
| Roukema, Hon. Marge, a Representative in Congress from the State of New Jersey | 17 |
| Seltzer, Steven S., president, Modern Communications Corp | 73 |
| Shays, Hon. Christopher, a Representative in Congress from the State of Connecticut | 21 |
| Material submitted for the record by: | |
| Bell Atlantic: Letter to Chairman Markey from Aubrey Sarvis, vice president, June 26, 1989 | 104 |
| Modern Communications Corp.: Letter to Chairman Markey from Steven S. Seltzer, president, June 12, 1989 | 107 |
| National Retail Merchants Association: Letter to Chairman Markey from Tracy Mullin, senior vice president, June 26, 1989 | 110 |
| New York State Consumer Protection Board: Letter to Chairman Markey from Richard M. Kessel, executive director, May 23, 1989 | 84 |
| NYNEX Government Affairs: Letter to Chairman Markey from Morrison DeS. Webb, vice president, June 23, 1989 | 114 |
| Southwestern Bell Corp.: Comments on H.R. 2184 | 119 |

(III)

# TELEMARKETING PRACTICES

WEDNESDAY, MAY 24, 1989

HOUSE OF REPRESENTATIVES,
COMMITTEE ON ENERGY AND COMMERCE,
SUBCOMMITTEE ON TELECOMMUNICATIONS AND FINANCE,
*Washington, DC.*

The subcommittee met, pursuant to notice, at 10:23 a.m., in room 2322, Rayburn House Office Building, Hon. Edward J. Markey (chairman) presiding.

Mr. MARKEY. The hearing will come to order.

Today we will hold a legislative hearing—please, the hearing will come to order. Today we will hold a legislative hearing on three bills affecting interstate telemarketing practices. In particular we will address proposed restrictions on the use of automatic dialers, recorded message players and telephone facsimile machines to convey unsolicited advertising.

The telephone resides in virtually every American home and business and has become an integral part of our daily lives. Its promises and problems affect us all. Telephone solicitation also offers us both promises and, unfortunately, problems.

Telemarketing, the use of the telephone to purchase or sell products and services, or obtain and give information, has been with us since the 1920's. It offers businessmen an opportunity to reach out cost-effectively to broader markets and to provide, fast efficient customer service information to those who need it. However, unsolicited telemarketing to consumers and businesses that are not familiar with either the company or its product or service increasingly crosses the line between helpful and unacceptably intrusive.

The telephone is an insistent master—when it rings we answer it—and many consumers complain bitterly that, when it rings to deliver unsolicited advertising, it is invading their privacy. Likewise, businesses, dependent on their telephone lines to carry the words, data and images that are so essential to the success of their enterprise, have come to decry the cost and interference with business activities of some forms of unsolicited advertising.

Today we consider the effects of two recent advances in telemarketing technology—automatic dialing systems and the facsimile machine.

In recent years a growing number of telephone solicitors have started to use automatic dialing systems. Each of these machines can automatically dial up to 1,000 phones per day to deliver a prerecorded message. According to industry officials, each day they are used by more than 180,0000 solicitors to call more than 7 million Americans.

(1)

2

Unfortunately, these machines are often programmed to dial sequentially whole blocks of numbers, including hospitals, fire stations, pagers and unlisted numbers. This not only makes the machine an equal opportunity nuisance, but an equal opportunity hazard, particularly in instances where the machine is not capable of releasing the called party's line once they hang up.

The two bills on automatic dialing systems before us today, introduced by my colleague from Massachusetts, Mr. Frank, and the Congresswoman from New Jersey, Mrs. Roukema, would each, in a different way, control the use of these systems. Mr. Frank's bill would allow consumers to have their telephone numbers excluded from automatic dialing and Mrs. Roukema's bill would invoke the time, place and manner of use restrictions on these automatic dialing machines. Importantly, both bills would require the machines to release a consumer's line after he or she hangs up.

The second and newest technology to gain popularity for delivering unsolicited advertising is the facsimile machine. An office oddity 2 years ago, the fax machine has rapidly become an office necessity in my office and more than two million others, delivering more than 30 billion pages of material each year. But, with the growth in fax machine numbers has come junk fax, the electronic equivalent of junk mail. To quote yesterday's Washington Post, "receiving a junk fax is like getting junk mail with the postage due."

Succinctly put, using a facsimile machine to send unsolicited advertising not only shifts costs from the advertiser to the recipient, but keeps an important business machine from being used for its intended purposes.

The bill I have introduced, together with the ranking minority member of the subcommittee, Mr. Rinaldo, and Mr. Shays, Mr. Frank and Mr. Stark, would return a measure of control over an important business asset to fax machine owners by allowing them to shield their fax machines from receiving unsolicited fax advertising.

As we consider these bills, our task is not to impose unreasonable burdens on telemarketers or to ban the appropriate uses of these machines, but rather to protect the legitimate privacy rights of consumers, to protect public safety, and to provide businesses and individuals appropriate tools for expressing their own choice about what they want to hear and read.

Time for opening statement from the Chair has expired. I recognize the ranking minority member, the gentleman from New Jersey, Mr. Rinaldo.

Mr. RINALDO. Thank you very much, Mr. Chairman. Before I begin, let me welcome all our witnesses, especially the distinguished members who will testify on our first panel. I particularly want to welcome Mrs. Roukema from my homestate of New Jersey and commend her for her legislation on the problems with automatic dialers.

The telephone and telecommunications are becoming more and more central to our lives. The telephone lines now are much more than voice channels. They're truly becoming lifelines for business as well as the average citizen.

More than ever, they also are highways of commerce to which millions of dollars of products and services are available. As a

result, problems associated with abuse of the telephone lines are multiplying. As we will hear today, abuses of the telephone lines not only are inconvenient and costly to consumers, they even could endanger the lives of our citizens.

Today the subcommittee investigates two problems that have received attention from the public and from Congress.

The use of automatic dialing machines, or auto-dialers, and the unauthorized sending of advertisements through fax machines. Auto-dialers typically call homes and play recorded advertising messages. These calls are entirely unsolicited and usually are made at random. I'm sure that every member of this committee could relate stories of the nuisance which devices are to our citizens.

You would think that the nuisance that auto-dialers pose is enough, but their use can pose more serious problems. Apparently auto-dialers often do not disconnect from the line after a person hangs up. Tying up the line in this matter can render any telephone useless, even those used for emergency purposes in hospitals and doctors' offices.

This situation clearly has the potential for disaster. There may be legitimate purposes for which auto-dialers can be used; however, they should not be permitted to endanger the usefulness of the telephone, which is a lifeline link for many Americans, especially senior citizens.

The bills introduced by Mrs. Roukema and Mr. Frank are serious efforts to deal with this difficult problem. I commend them for their interest, their diligence, and look forward to testimony on those bills from them and our industry representatives.

Another frustrating problem has arisen from the amazing popularity of fax machines. The so-called "junk fax". Fax machines are one of those inventions that it is now difficult to imagine life without. As any Member of Congress will tell you, they're becoming indispensable tools of modern business.

There are already over two and a half million fax machine in the United States, and soon they'll be placed in many automobiles as well. A wise man once said that every innovation breeds a new problem. No sooner did fax machines begin to be used generally than fax advertising, or junk fax, began to appear.

Junk fax is more than merely advertising. It is costly because the receiver has to pay for the junk fax. Also, like auto-dialers, unsolicited and unwanted faxes can tie up a machine for hours and thwart the receipt of legitimate and important messages.

A prime example of the problems with junk fax recently occurred in Connecticut. That State enacted a law against junk fax after Governor O'Neill was himself subjected to a fax attack. Junk fax machines urging him to vote against a particular bill, and it was that bill, as a matter of fact, that they were using to lobby him on. Unfortunately, the bill's opponent's "fax attack" happened at the same time that the Governor was awaiting an emergency flood condition report.

In Maryland, a similar bill is sitting on Governor Schaefer's desk. Over a dozen other States are considering legislation of this type. Regulation of our telephone network is divided between the States and the Federal Government. As a result, Federal legisla-

4

tion is necessary to ensure that this junk fax problem is curtailed in interstate transmission of fax messages.

That's why I'm the principal co-sponsor of H.R. 2184, introduced by my distinguished colleague, the subcommittee chairman, Mr. Markey. This legislation would bar unsolicited fax transmissions to any number which is on record as objecting to their receipt. It is an appropriate and narrowly tailored response to a problem which we cannot permit to grow out of control. It balances the first amendment rights of those who wish to send with those who do not wish to receive.

Some say that legislation of this type violates the first amendment rights of junk faxers. In response I should point out that the first amendment also guarantees to our citizens the choice not to listen. It's absurd to suggest that citizens who own fax machines must not only receive junk fax and advertisements of that type, but they must also pay for the privilege.

In conclusion, I will simply say that these abusive practices must stop. I look forward to working with the members and with the industry to make sure that they do.

Mr. MARKEY. The gentleman's time has expired.

Any other members wishing to make opening statements on either one of these subjects?

All time has expired for opening statements from members of the subcommittee.

[Testimony resumes on p. 16.]

[The following bills were submitted for the record:]

5

I

101st CONGRESS
1st Session

# H. R. 628

To amend the Communications Act of 1934 to prohibit certain practices involving
commercial uses of automatic telephone dialing systems.

## IN THE HOUSE OF REPRESENTATIVES

**January 24, 1989**

Mr. Frank introduced the following bill; which was referred to the Committee on
Energy and Commerce

## A BILL

To amend the Communications Act of 1934 to prohibit certain
practices involving commercial uses of automatic telephone
dialing systems.

1    *Be it enacted by the Senate and House of Representa-*

2    *tives of the United States of America in Congress assembled,*

3    That title II of the Communications Act of 1934 is amended

4    by inserting after section 224 (47 U.S.C. 224) the following

5    new section:

6        "RESTRICTIONS ON THE USE OF TELEPHONE

7                AUTODIALING SYSTEMS

8        "SEC. 225. (a) As used in this section the term 'auto-

9    matic telephone dialing system' means telephone terminal

10   equipment which has the capacity—

6

**2**

1      "(1) to store or produce numbers to be called,

2    using a random or sequential number generator;

3      "(2) to dial such numbers; and

4      "(3) to deliver a prerecorded message to the

5    number dialed, with or without manual assistance.

6  "(b) It shall be unlawful for any person, in the District

7 of Columbia or in interstate or foreign communications by

8 means of telephone—

9      "(1) to use any automatic telephone dialing

10    system to place any call to any person whose number

11    is listed by a common carrier pursuant to subsection (c)

12    as the telephone number of a person who objects to re-

13    ceiving messages from automatic telephone dialing sys-

14    tems; or

15      "(2) to use any automatic telephone dialing

16    system that does not comply with the technical stand-

17    ards prescribed under subsection (d).

18  "(c) Each common carrier shall maintain, in accordance

19 with regulations prescribed by the Commission, a list of the

20 telephone numbers of customers of that common carrier who

21 notify the carrier that they object to receiving messages from

22 automatic telephone dialing systems. Such regulations

23 shall—

7

3

1        "(1) specify the methods by which a customer
2    may give or revoke such notification to a common car-
3    rier;

4        "(2) prohibit any customer from being charged for
5    giving or revoking such notification or for being carried
6    on such list; and

7        "(3) specify the methods by which such list shall
8    be made available to users of automatic telephone dial-
9    ing systems and the costs to be recovered from such
10   users.

11   "(d) The Commission shall prescribe technical standards
12 for automatic telephone dialing systems. Such standards shall
13 require that such systems will, within 5 seconds after the
14 called party hangs up, automatically create a disconnect
15 signal or on-hook condition which allows the called party's
16 line to be released.

17   "(e) The regulations required by this section shall be
18 prescribed within 6 months after the date of enactment of this
19 section.

20   "(f) The requirements of this section shall take effect 30
21 days after the date that such regulations are prescribed.".

O

8

I

101st CONGRESS
1st Session

# H. R. 2131

To amend the Communications Act of 1934 to prohibit certain practices in the
use of automatic dialing devices, and for other purposes.

---

## IN THE HOUSE OF REPRESENTATIVES

APRIL 26, 1989

Mrs. ROUKEMA introduced the following bill; which was referred to the
Committee on Energy and Commerce

---

# A BILL

To amend the Communications Act of 1934 to prohibit certain
practices in the use of automatic dialing devices, and for
other purposes.

1    *Be it enacted by the Senate and House of Representa-*

2    *tives of the United States of America in Congress assembled,*

3    SECTION 1. SHORT TITLE.

4        This Act may be cited as the "Automated Telephone

5    Solicitation Protection Act of 1989".

6    SEC. 2. AMENDMENT.

7        Title II of the Communications Act of 1934 is amended

8    by inserting after section 224 the following new section:

9

2

1         "AUTOMATIC DIALING DEVICES

2     "SEC. 225. (a) DEFINITIONS.—As used in this sec-

3 tion—

4         "(1) the term 'automatic dialing device' means

5         telephone terminal equipment which has the capacity—

6             "(A) to store or produce numbers to be

7             called, using a random or sequential number gen-

8             erator;

9             "(B) to dial such numbers; and

10             "(C) to deliver a prerecorded message to the

11             number dialed, with or without manual assistance;

12             and

13             "(2) the term 'telephone solicitation' means

14             the unsolicited initiation of a telephone conversa-

15             tion for the purpose of encouraging a person to

16             purchase property, goods, or services.

17     "(b) RESTRICTIONS.—It shall be unlawful for any

18 person to use any automatic dialing device to make, in inter-

19 state or foreign communication, any telephone solicitation to

20 a telephone customer if—

21         "(1) the recorded message fails to state clearly

22         the name and telephone number of the person initiating

23         the call;

24         "(2) the dialer does not automatically and immedi-

25         ately terminate its connection with any telephone call

8

1      within five seconds after the person called fails to give

2      consent for the playing of the recorded message or

3      hangs up his or her telephone;

4          "(3) the automatic dialing device is used to make

5      calls to any emergency telephone line of any hospital,

6      medical physician or service office, health care facility,

7      fire protection, or law enforcement agency; or

8          "(4) such use is at a time other than between the

9      weekday hours of 9 a.m. and 5 p.m.

10    "(c) EXCEPTIONS.—Subsection (b) shall not prohibit

11  the use of an automatic dialing device if—

12         "(1) there is an existing business relationship be-

13      tween caller and recipient of the call; or

14         "(2) the calls are made or message given solely in

15      response to a specific request initiated by the person to

16      whom the call or message is directed.

17    "(d) EXEMPTION FROM LIMITATION ON FORFEITURE

18  PENALTIES.—The $5,000 limitation contained in subpara-

19  graph (B) of section 503(b)(2) of this Act shall not apply to

20  forfeiture penalties for violations of this section.

21    "(e) STATE PREEMPTION.—Nothing in this section

22  shall supersede or limit the applicability of any State law to

23  the use of automatic dialing devices.

24    "(f) STUDY.—The Commission and the Federal Trade

25  Commission shall conduct a joint study of the practicality and

11

**4**

1 constitutionality of a complete ban on the use of automatic

2 dialing devices to delivery telephone solicitations. The Com-

3 mission and the Federal Trade Commission shall submit a

4 report to the Congress not later than one year after the date

5 of enactment of this section on the results of such study, to-

6 gether with such recommendations for legislation as they

7 consider appropriate.".

8 SEC. 3. EFFECTIVE DATE.

9      The amendment made by section 2 shall be effective 6

10 months after the date of enactment of this Act.

O

12

I

101st CONGRESS
1st Session
# H. R. 2184

To amend the Communications Act of 1934 to prohibit certain practices involving
commercial uses of telephone facsimile machines.

---

## IN THE HOUSE OF REPRESENTATIVES

### MAY 2, 1989

Mr. MARKEY (for himself, Mr. RINALDO, Mr. SHAYS, Mr. FRANK, and Mr.
STARK) introduced the following bill; which was referred to the Committee
on Energy and Commerce

---

# A BILL

To amend the Communications Act of 1934 to prohibit certain
practices involving commercial uses of telephone facsimile
machines.

1    *Be it enacted by the Senate and House of Representa-*

2  *tives of the United States of America in Congress assembled,*

3  **SECTION 1. SHORT TITLE.**

4        This Act may be cited as the "Facsimile Advertising

5  Regulation Act".

6  **SEC. 2. AMENDMENT.**

7        Title II of the Communications Act of 1934 is amended

8  by inserting after section 224 (47 U.S.C. 224) the following

9  new section:

13

2

1  "RESTRICTIONS ON THE USE OF TELEPHONE FACSIMILE

2              MACHINES

3  "SEC. 225. (a) As used in this section—

4      "(1) the term 'telephone facsimile machine' means

5  equipment which has the capacity—

6          "(A) to transcribe text or images, or both,

7      from paper into an electronic signal and to trans-

8      mit that signal over a regular telephone line; and

9          "(B) to receive such signals over such a line

10     and to produce a copy of the transmitted text and

11     images; and

12         "(2) the term 'unsolicited advertisement' means

13  any material advertising the commercial availability or

14  quality of any property, goods, or services which is

15  transmitted to any person without that person's prior

16  express invitation or permission.

17     "(b) It shall be unlawful for any person, in the District

18  of Columbia or in interstate or foreign communications by

19  means of telephone, to use any telephone facsimile machine

20  or other electronic device to send any unsolicited advertise-

21  ment to the telephone facsimile machine of any person whose

22  number is listed by a common carrier pursuant to subsection

23  (c) as the telephone number of a person who objects to re-

24  ceiving unsolicited advertisements by telephone facsimile

25  machine.

14

3

1    "(c) Each common carrier shall maintain, in accordance

2   with regulations prescribed by the Commission, a list of the

3   telephone numbers of subscribers for telephone exchange

4   service of that common carrier who notify the carrier that

5   such subscriber objects to receiving unsolicited advertise-

6   ments by telephone facsimile machine. Such regulations

7   shall—

8      "(1) specify the methods by which a subscriber

9      may give or revoke such notification to a common car-

10     rier;

11      "(2) prohibit any subscriber from being charged

12     for giving or revoking such notification or for being

13     carried on such list; and

14      "(3) specify the methods by which such list shall

15     be made available to any person desiring to transmit

16     unsolicited advertisements by telephone facsimile ma-

17     chine and the costs to be recovered from such persons.

18   "(d) The Commission shall revise the regulations setting

19  technical and procedural standards for telephone facsimile

20  machines to require that any such machine which—

21      "(1) is manufactured after 6 months after the date

22     of enactment of this section; and

23      "(2) is used for the distribution of unsolicited

24     advertising,

15

4

1  be equipped to identify, in a margin at the top or bottom of
2  each transmitted page, the date and time sent, an identifica-
3  tion of the business sending the advertising, and the tele-
4  phone number of the sending machine.

5      "(e) The regulations required by this section shall be
6  prescribed within 6 months after the date of enactment of this
7  section.

8      "(f) The requirements of this section shall take effect 30
9  days after the date that such regulations are prescribed.".

O

We now turn to our panel, which consists of three distinguished Members of Congress, each of whom have very busy schedules and we appreciate the way in which you have accommodated the schedule of the subcommittee this morning.

We'll begin with Representative Barney Frank from Massachusetts, my long-time colleague.

### STATEMENT OF HON. BARNEY FRANK, A REPRESENTATIVE IN CONGRESS FROM THE STATE OF MASSACHUSETTS

Mr. FRANK. Thank you, Mr. Chairman.

I can be very brief, because the opening statements of yourself and the ranking minority member I think, covered this quite well. I am delighted to be here with my colleagues from New Jersey and Connecticut, and with you, dealing with a common problem. It is clearly within the technical capacity of these industries to work out a good solution. What they do is tell us, "Oh, this is much too complicated." But it wasn't too complicated for them to get into the automatic sending business, and into the automatic calling business. And, in fact, the technology to control these is at least as easy to do as the technology to develop them. So, the argument that it's technologically difficult, they don't believe it and neither should we.

The first amendment argument—I was glad that the gentleman from New Jersey mentioned it. I have spent a lot of time, in the time I've been elected to office, fighting about the first amendment. I am frequently amused when we get into a situation where we're trying to protect people's legitimate rights to privacy, when people who have probably never uttered the words "first amendment" in their lives, suddenly think that they're Thomas Jefferson or Louis Brandeis and come rushing forward because they insist on their right to bother people.

And their right to bother people has got no more to do with the first amendment than—well, I can't think of a proper analogy. It's just a stupid argument. And they don't mean it and they shouldn't say it. Anybody who comes up here and makes a first amendment argument probably ought to be asked automatically, "When is the last time you opposed anything on first amendment grounds?" And they probably won't be able to tell you.

Obviously people have a right to free speech. Obviously people have a right to publish. The right to impose physically on machinery owned by other people, particularly after they have gone to the trouble of saying they do not want to hear from you, is simply not a first amendment right; and, therefore, it seems to me we're in a very sound position.

We are not restricting anybody's rights to make phone calls. If they want to do them individually, or send faxes. We're not even saying that you can't get in touch with people who don't want to hear from you. We're saying that you can't use technology to burden other people. Receiving these phone calls; having phone calls on your answering machine which may use it up; the failure to disconnect; all these things are incredible intrusions on people.

Having to go and collect those faxes. Having your fax machine jammed up. Those are extraordinary intrusions on people. And, of

17

course, the phoniest argument of all is where they say, "Well, you don't need this bill because we do it anyway." If that was really case they wouldn't object to the bill. If they really were doing it anyway they wouldn't mind, so they're not doing it anyway.

These things don't automatically disconnect. They don't pay attention. And the example that the gentleman from New Jersey gave of these people objecting by automatic fax transmissions to a bill that would restrict them, is such a representation of a mentality that doesn't get the point; that obviously we have to legislate.

We're not putting anybody out of business. We are not interfering with anybody's rights. I would say having read the excellent memo, which your subcommittee staff circulated, and which you shared with us, it seems very clear to me that with the chairman and the ranking member and the others and the staffs, you have a full understanding of this bill. I am confident that you're going to come out with legislation both on automatic phone and the automatic fax issues, provided we deal with the problems.

I thank you and appreciate your taking the lead here.

Mr. MARKEY. I thank the gentleman very much. I'll turn now to Representative Roukema from New Jersey. Mrs. Roukema.

## STATEMENT OF HON. MARGE ROUKEMA, A REPRESENTATIVE IN CONGRESS FROM THE STATE OF NEW JERSEY

Mrs. ROUKEMA. Thank you, Mr. Chairman.

Before I begin my remarks, I would like to submit this as yet again another endorsement or evidence of endorsement of the need for your junk fax bill.

I wasn't exactly subjected to the same fax attack that the Governor of Connecticut was, but this came over my machine this morning along with others while we were waiting for news from the district and the State newspapers. I think you will be interested in noting this.

Mr. MARKEY. We will insert that on the record.

[The document referred to follows:]



MR. FAX declares war on high priced fax paper, and you're the winner! Many fax users are paying sky high prices for paper. But MR. FAX makes the finest fax rolls available at low, low prices. Check these special offers:

|  | 98 Feet | 164 Feet | 328 Feet |
| --- | --- | --- | --- |
|  | — — — Price Per Roll — — — | | |
| What Others Charge | $12.00 | $16.00 | $22.00 |
| MR. FAX Regular Price | $7.99 | $9.99 | $13.99 |

## "Price War" Specials:

| | 98 Feet | 164 Feet | 328 Feet |
| --- | --- | --- | --- |
| 6 Case | $3.99 | $5.99 | $8.99 |
| 3 Case | $4.99 | $6.99 | $9.99 |
| 1 Case | $5.99 | $7.99 | $10.99 |

Your Total Savings
1 Case—**$12.00**   3 Case—**$54.00**   6 Case—**$180.00**

### Why 40,000 Companies Choose MR. FAX:

**QUALITY**
Your paper is carefully inspected twice before shipment.

**SERVICE**
We ship same day from one of our warehouses near you.

**PRICE**
Because we are the manufacturer, we pass the "middleman" profit to you in the form of lower prices.

**GUARANTEE**
Send no money, we will bill you. If for any reason you are not delighted, we pick up the paper and you owe nothing.

**DON'T NEED PAPER YET?**
You may never again see fax paper prices this low. Since our paper stores for many years, you can order now for delivery any time in the next 30 days and "lock in" these 7 Day Sale prices. Just mark the date you want to receive the paper on our order form.

**FREE Igloo Cooler for Each 3 Cases Ordered!**

Hurry, "Price War" Specials End in 7 Days!

If you prefer not to receive MR. FAX information, please let us know. Fax us back at (714) 830-9864 with your fax number. MR. FAX will not contact you again.

· · · · · ·ORDER FORM· · · · · ·

☐ Send Me _____ Cases of paper at your Special "Price War" Savings.

☐ I am ordering 3 or more cases, send me one **FREE Igloo Little Playmate** for each 3 cases I have ordered.

☐ I don't need paper yet. Ship it to arrive _____ (Up to 30 Days from today)
(Month and Day)

**GUARANTEE**
**Send no money, we will bill you.** If for any reason you are not delighted, we will pick up the paper and you owe nothing.

If calling your order, please mention this flier number F-603 to get this special offer.

Freight and handling added to invoice. Prices are net after fast pay discount. Roll lengths nominal. Price per roll/6 rolls per case.

Complete Form and FAX to:
**(714) 830-9864**
Or Call Toll-Free            Inside CA Call
**1-800-262-8214   (714) 830-9861**

Name _____
Company _____
P.O. No. _____
Address _____
City _____ State _____
Zip _____
Fax No. _____
Telephone No. _____
Machine Brand _____
Model No. _____

**MR. FAX**
4 Vanderbilt, Irvine, CA 92718

F-603

**OFFER VALID FOR 7 DAYS**
©MR. FAX 1989

Mrs. ROUKEMA. Thank you. And I wish to thank Chairman Markey and the ranking minority member, my distinguished colleague from New Jersey, Mr. Rinaldo, for moving expeditiously to hold this hearing.

I also want to congratulate Congressman Frank before he leaves; he's my colleague on the Banking Committee, and I'm pleased to be working with him in this effort.

As you know, my bill, H.R. 2131, would prohibit unsolicited computer generated telemarketing calls. It includes explicit language preventing these calls from reaching the emergency line of any hospital, medical physician's office, health care facility, fire or law enforcement agency.

However, under my bill, a random sales pitch—as I call it— would only be permitted during business hours in response to a request to an automatic dialer by an individual who has a legitimate financial stake in the services the vendor is offering by phone.

Under my legislation, however, even those individuals who choose to receive these services would be protected by a guarantee that a specifically undesired call could be terminated within 5 seconds after the person who calls hangs up. I understand that Mr. Frank's bill has an identical provision, and I know that he shares my view and has just stated it, that one of the most frustrating aspects of these calls is that they so often fail to disconnect in a timely manner.

Under these limited circumstances, the caller would also have to identify himself or herself, or since we are focusing on impersonal computers, I suppose I should say "itself." I have been advised by those in the telephone industry that these restrictions represent reasonable technological standards which automatic dialers can easily meet.

As you can see, my bill represents a proposal which is somewhere between a strict limitation on these calls and an outright ban. To be candid, I personally would ban totally these unsolicited calls. And I support an outright ban, in concurrence with what Congressman Frank has just said, because they are a blatant violation of the right to privacy and the right to protection from harassment, which the courts have traditionally upheld.

I understand there may be those individuals who would argue against my bill from the perspective of the constitutional right to free speech. But nowhere in my reading of the first amendment do I find the right to invade privacy or harass. I would hope that the committee would take under consideration a total ban. Nevertheless, I was careful to propose a bill which would not violate either standard.

I must stress that Congress should not prejudge this possible constitutional conflict, which has yet to be tested in the courts. Our role, as legislators, demands that we concentrate on formulating good public policy. Our role is not to bicker about untested constitutional law. So let me say that what I would wholeheartedly welcome is a complete ban on all those calls and ask the committee to take such a ban under consideration.

At this point, Mr. Chairman, I would like to go through the rest of my statement and give some examples of the potential health

20

hazards associated with the computer generated telemarketing calls, as I have focused on them in the bill.

I would hope Ma Bell isn't turning over in her grave, but it is true the telephone has become a health hazard. Take for example the story last year of the New York woman, in a desperate rush to call an ambulance from her home for her child who had collapsed, she picked up her phone and all she could hear was an unsolicited automatic sales pitch which would not disconnect. After hanging up and trying to call again and again, she still could not get a dial tone. She was forced to call from a neighbor's home, and luckily the child survived.

I would suggest that Congress as an institution should act before we really have a tragedy on our hands.

I trust that the subcommittee would agree that legislation such as mine has strong grassroots support. For example, I've been contacted by a number of doctors in my district who have rightly complained that their office emergency lines, usually reserved for especially serious cases, have instead been clogged with unsolicited computer calls.

One of these doctors happens to be my husband, Dr. Richard W. Roukema, who has threatened not to vote for me next time if I don't see to it that this legislation is passed. It seriously has been a problem in his own office on a line that is reserved for emergency calls from the hospitals or in the cases of suicidal patients—that is the exact truth.

I've also been contacted by police and fire officials who have also expressed dismay about random phone calls which will not disconnect.

I'd like to share with you a letter from a constituent which stresses her frustration, "Dear Mrs. Roukema: I've had these calls early in the morning and as late as 9:30 at night. I have had surgery, and while home recuperating these calls were coming in. I volunteer at the hospital on Sunday at the information desk, and when I am there these computer calls would be coming in through two phones; one would come and after hanging up it would ring again and again." That's an excerpt from her letter. I think her letter gets to the heart of the problem.

Mr. Chairman, it's true that Congress and the States often find themselves in the difficult position of keeping pace with the fast, changing technological world. While various States have passed legislation on computer calls, the majority, like my State of New Jersey, are waiting for direction from The Federal Communications Commission.

While my bill would concern interstate calls, I submit that there is a compelling need to restrict intrastate calls. As many of these calls are intrastate in nature, I maintain there is an appropriate level for both the Federal role in this policy area as well as the States. So I would ask, in your consideration, that you weigh the question of applying this legislation to intrastate calls as well.

In conclusion, I believe that my bill would restore freedom of choice and the right to privacy to telephone use. It would protect health and safety institutions for which the lines of communication often mean the difference between life and death.

21

Automatic dialers would not longer be permitted to random dial and therefore would have to take pains to differentiate between health and safety agencies and those who wish to receive these calls, and those who don't.

Those who wish to receive the calls are able and open to request such services.

The bill is demanding, I admit, but it is a fair one. And I hope the subcommittee, after due consideration, will pass it or some expanded version of it, in consideration of our constituents and the communities which we serve.

Mr. MARKEY. Now let's turn to Christopher Shays from Connecticut who was an original co-sponsor of both of these pieces of legislation and who, along with Barney Frank, initially helped bring this issue to our attention. So, whenever you're ready, Chris.

## STATEMENT OF HON. CHRISTOPHER SHAYS, A REPRESENTATIVE IN CONGRESS FROM THE STATE OF CONNECTICUT

Mr. SHAYS. Thank you, Chairman Markey, and Mr. Rinaldo and other members of the Telecommunications and Finance Subcommittee.

There is little doubt "fax fever" is catching. According to the American Facsimile Association, the numbers are just going up and up and up in terms of use. Let's face it, fax machines are no longer elite technology, they are, as both of you have pointed, a fact of life. They're as common to offices and as depended upon by workers as copiers and computers. You have to wonder how we ever conducted business without them.

People in our district's now routinely list fax numbers on their business cards and stationery. Their customers fax orders for everything from food to flowers to Fortune 500 stocks. This year for the first time the government printing office's Congressional Directory lists our fax numbers next to our office telephone numbers—I'm not sure I like that too much.

Cars, boats, even airplanes have fax machines. I wonder if there's an end to the use of this magical machine. Regrettably, with these incredible uses come abuses. Like the postal service and the telephone, the fax machine has evolved from a communication tool to an advertising medium. Just as we receive annoying junk mail and intrusive telephone calls asking us to try this or buy that, we are now receiving junk transmissions over the fax. Like computer-dialed telephone ads, which my colleagues Barney Frank and Marge Roukema rightfully want to restrict, fax ads tie up our machines when we need to use them.

Moreover, fax advertisers use the recipients paper to print their ads, as you point out. I find that incredibly outrageous. Junk mail may be annoying, but the sender at least pays the cost of the stamp and the paper it's printed on. Unsolicited fax advertisements are not only annoying and costly to the recipient, but they also are an invasion of privacy. And unlike a telephone call, you can't hang up.

The Facsimile Advertising Regulation Act—H.R. 2184—takes an important step toward protecting the rights of consumers who do not wish to receive these intrusive transmissions. The bill requires local common carrier companies to maintain lists of customers not

22

wishing to receive fax advertisements, and prohibits use of fax machine and other electronic device to send unsolicited ads to these customers.

In addition, any fax machine manufactured 6 months after the bill's enactment and used to distribute unsolicited advertising must identify the date and time of the transmissions and the name and telephone numbers of the sender on each transmitted page.

Fax machines provide an important and invaluable service and the number of people who use them will continue to grow significantly. It seems to me we have an opportunity to deal with the problem of unsolicited ads in its early stages, and I think this is the point I really want to make to all of you. We have a chance to deal with this problem in its early stages before it gets out of hand. Our projections clearly indicate the use of fax and the opportunity to abuse it will only worsen. Let's just take care of it now before we have so many special interests that are going to be lobbying us to keep it.

Several States, including my home State of Connecticut, have enacted legislation to restrict intrastate fax advertising. There is no doubt in my mind that we must offer the consumer, who does not want to receive and pay for interstate ads, the same protection.

I urge you to do all you can to see that the Facsimile Advertising Regulation Act becomes law. Otherwise, you may enter your office one morning with a "fax attack" and have to wade through a sea of fax advertising to reach your desk and know that you supplied the machine and the paper.

Thank you.

Mr. MARKEY. Thank you.

Let me ask you this, Chris, or maybe Marge you can tell me, what is your view with regard to who should be responsible for the collection or the maintenance—the notification of the exclusion list of individuals?

Should it be in the hands of the local telephone company, or should some other private organization have that responsibility? Do either of you have any sense as to how that particular service should be constructed?

Mr. SHAYS. My preference, Mr. Chairman, would be the local carrier. I know the local carriers do not want that, and I think they would really have to demonstrate that it would be an inordinate disposition on them.

They clearly are making a significant amount of money because their phone lines are being used for fax messages. So they're making significant revenue from it, and I think they can absorb whatever cost they would incur by keeping this list. Obviously, they would like the direct marketing associations to keep a list. I'm just not sure we would achieve the results we want if we did that.

Mrs. ROUKEMA. Mr. Chairman, I take a contrary position. In my bill, as you will note, I charge the FCC with policing the direct dialers and also levying the fines. And I think levying fines against the automatic dialers is an important deterrent here. I think it is a proper role for the FCC. I believe that it would be a burden that perhaps, if it were the local carrier, would be indirectly passed on in the form of additional costs to the consumers. So I take the ap-

23

proach that it's the FCC's responsibility both for policing as well as levying the fines.

Mr. SHAYS. Mr. Chairman, I just want to make sure that we're in harmony here. Clearly, the FCC has to draw the regulations and take care of the penalties and make those recommendations. But in direct response to your question of who would keep the lists——

Mr. MARKEY. Right.

Mr. SHAYS. I would hope it would be the common carrier. I don't think we want the FCC to keep the list, so I think we are in agreement in terms of the penalty and the regulation.

Mr. MARKEY. You do agree with what Chris is saying now?

Mrs. ROUKEMA. Keeping the list—well, that's a little different than necessarily policing totally. It may be a combination that's necessary.

Mr. MARKEY. OK. I think that's what Chris is talking about.

What about the contention that is made by the FCC and others that this is more of a intrastate matter and that it's something that we really shouldn't be looking at our level? Can you characterize for us why you see these matters as interstate and that just individual States dealing with it may not be sufficient to deal with the problem?

Mrs. ROUKEMA. Mr. Chairman, perhaps I don't understand the full dimensions of your question. It seems self-evident to me that this is clearly an FCC matter because there are numerable instances where it is clearly interstate, and I think that's the charter of the FCC.

In my own opinion, I don't know whether there's anything more than that that needs to be said at this point.

Mr. SHAYS. If the FCC would guarantee to me that I'm not going to get any fax message that goes from one State to another, then they are right. But that's pretty absurd. The bottom line is that it's both—as my colleague has pointed out—it's both an intrastate problem and an interstate problem. And if we just let the States take care of what happens within the States, I can see a local firm sending messages through our New England, and we wouldn't be able to prevent that at all. So, they're wrong.

Mrs. ROUKEMA. It would create a tremendous loophole.

Mr. MARKEY. My time has expired. The Chair recognizes the gentleman from New Jersey, Mr. Rinaldo.

Mr. RINALDO. Thank you, Mr. Chairman. I just have one question. I believe that both of your bills, and correct me if I'm wrong, require calls from an auto-dialer to be disconnected within a certain period of time. My understanding is that time period is 5 seconds. Is that correct?

Mrs. ROUKEMA. In my bill it is, yes.

Mr. SHAYS. Mr. Chairman, I'm not sure.

Mr. RINALDO. All right. Well, if it is 5 seconds, telephone companies contend that their newest switches—the most modern, best ones they have—take 10 to 12 seconds to disconnect a call after the called party hangs up. And older switches, that are currently still out in the field, can require up to 30 seconds. In light of this technical difficulty, how should we approach this problem in legislation?

24

Mrs. ROUKEMA. Well, there seems to be contradictory evidence, Congressman Rinaldo. My sources of information have indicated that the technology is there and frequently in place. If there is a lag time here, in terms of bringing all the technology up to date, I suppose that is something that can be dealt with. But I would like to submit for your consideration background data that we used in determining that the 5 second rule was a reasonable one.

Mr. RINALDO. My understanding is that 5 second switches just aren't out in the field, that there's ten, twelve and thirty.

Mrs. ROUKEMA. I'll be happy to look into that, but I believe that we have—through staff and through sources of technical experts—been informed that 5 seconds was a reasonable time. But we will submit that to you to document the case.

Mr. SHAYS. Mr. Rinaldo, in terms of the fax bill, the thrust of the bill is really to prevent a message from being sent in the first place; to give the recipient the opportunity clearly to put his name and register his name so he doesn't have the problem of any cut off. He would like, or she would like, the ability to say "I don't want any advertising at all" and that's really the thrust of the fax bill.

Mr. RINALDO. I have no further questions.

Mrs. ROUKEMA. Mr. Rinaldo, we will get the information to you in written form, but I have been told that New Jersey Bell has indicated that this technology is not only available, but fairly widely spread. But we will—if there's differences in information here, we'll have to prepare the data.

Mr. RINALDO. We have to bear in mind that we're talking about a national problem.

Mrs. ROUKEMA. Yes. I understand.

Mr. SHAYS. Mr. Chairman, if I might, could I just make one last comment?

Mr. RINALDO. Sure.

Mr. SHAYS. The form that Representative Roukema received in the mail today, to me is just the beginning of a new age of advertising. I just can't emphasize enough how important it is. I think that clearly you have expressed that interest, but I just want to emphasize the importance of dealing with this problem today. I think with every day that passes you're going to have more and more people who are going to start up businesses looking to advertise over the fax that are going to develop a significant support and become a strong lobbying force. It just seems to me that we clearly have got to address this as soon as possible.

Mr. MARKEY. The Chair recognizes the gentleman from Tennessee, Mr. Cooper.

Mr. COOPER. I thank the Chair. I'll be very brief. I'd first like to announce that I'm going to co-sponsor these bills. I think you've made a very persuasive case, and I congratulate you on your hard work.

Second, lest anyone think that only Yankees are interested in this measure, I'd like to assure you that plenty of people below the Mason-Dixon line and out in the west are interested in it, too.

Thank you very much.

Mr. SHAYS. Thank you.

25

Mr. MARKEY. I thank the gentleman very much. And we thank both of you.

I'm sorry, I didn't note the presence of the gentleman from Pennsylvania. He's recognized for a round of questions.

Mr. RITTER. Thank you, Mr. Chairman. I think both of you are on the right track. It's interesting, I have had a fax machine in my home for approximately a year, and I've never got one of these. But I shouldn't say that too loudly.

Mrs. ROUKEMA. You will.

Mr. RITTER. Wherever the list is, put me down. I guess my question would be, how pervasive is this? Do we have any understanding of the density of this problem—the concentration—is it located more in certain States than in certain other States. Do we have any kind of, other than anecdotal, understanding of this?

Mr. SHAYS. We at least start off with the fact that fax machines are doubling. In terms of the fax bill, the use of them is doubling every 2 years. Excuse me, by 1991 it's going to double again as it doubled over the last 2 years. So we're just seeing an incredible increase in the use of these machines. And we're just carrying logical extension beyond that.

We're starting to see the advertising. There's not a lot yet. But we're starting to see it and we have a pretty good idea of where we're headed.

Mr. RITTER. Could I ask, then what was the basis of the data gathering for the drafting of your bill? Obviously, it seems like this has tremendous potential for egregious. Violation of telecommunication's privacy. But how did you get to the point where you decided that there would be a bill necessary?

Mr. SHAYS. In my case, we had a few constituents, and when we got the second letter like that, we began to look into it and found that we were starting to get advertising ourself. And I began to think, hell, that's one heck of a good business to get into. And I thought if I could think that way, I'm sure a lot of people with more brains than I are already into it. So it was just the logic of——

Mr. RITTER. But on the other hand, the base line that you have going into this bill is three letters?

Mr. SHAYS. The base line to generate our interest was the mail we received. What we're seeing now is the use of these machines and we're starting to see—I'm just starting to notice on my own machine that I'm getting advertising now. And, very honestly, it bugs the hell out of me to think that my machine is tied up getting this ad and my paper is being used to do it.

The point I tried to make to the chairman, which I just can't emphasize strongly enough is that, it's not a problem now. It's simply not a problem. If we want to do what we do in Congress typically, and wait until it becomes a crisis, then we can wait a few years. But if we have the foresight to act now, I think we can nip it in the bud.

Mr. MARKEY. If the gentleman would yield.

Mr. RITTER. If I could ask the chairman, since he is the author of the bill, what his—and I can see that it could be down the road not too long from now, given the explosion of fax machines——

26

Mr. SHAYS. I want your number at your home, because I want to just give you a little illustration.

Mr. RITTER. Let's see, if you have an unlisted number, you can't get this, is that correct?

Mrs. ROUKEMA. Oh yes you can. In the same way that——

Mr. RITTER. You can auto-dial.

Mrs. ROUKEMA. Yes, auto-dialing, random auto-dialing. That's the same problem as I understand with the fax as it is with the telephone, which is how they get access to my husband's private line—the private emergency lines of these health groups.

Mr. RITTER. The fax attack.

Mr. MARKEY. We have, for the gentleman's information, a witness from the University of Indiana, who will be coming up immediately after this panel explaining to us the full depth of the problem. You have to understand now, we're upwards of thirty billion pages now a year. They expect it to double, and then double again, almost each year goes by. And, in terms of their ability to gain access to your unlisted number, one of these companies here, which contends that they now provide 35 percent of all the fax paper in America.

They'll give one of your friends a $50 Polaroid Cool Camera if they'll give your private, unlisted number to this company so they can send their fax to you. So once you're number is out there to any of your friends and they've got a hundred other numbers like it, if they're willing to trade in your privacy for a $60 GE answering machine, a $50 Polaroid Cool Camera or a $40 Casio printing calculator—your privacy will be invaded. So you just have to wonder whether your privacy balancing against a $50 Polaroid is where your privacy's going to come out.

Mr. RITTER. I will yield to the gentleman from New Jersey.

Mr. RINALDO. Let me give you a perfect example of what's happening. Yesterday, and I don't even know if it's the first time or not. I was walking past the fax machine in our office and we received a multi-paged letter from a lobbyist in opposition to a particular piece of legislation.

More interestingly, at the bottom they said we will be contacting you again in a few days to determine your position, and I don't know whether that means I get another fax letter, I get a telephone call or I get a visit. Certainly if it means another fax letter, they might just force me over the edge and get me to vote exactly opposite from the way they want me to vote.

Mr. RITTER. Mr. Chairman, just in closing, I think that we're really on to something. I think that you and the sponsors are on to something. I think we need to be careful about what you mentioned, the locus of responsibility. Who actually is going to get strapped with this?

It seems to me that those who are the violators of the privacy should be the ones who get strapped with the responsibilities of their violations and then somehow that not all of the burden is going to fall on phone companies who are simply kind of operating the toll road as these armored car with machine guns come tearing down the road, attacking the privacy of the American people.

But thank you very, very much. Mr. Chairman, I yield back. Thank you.

Mr. MARKEY. I thank the gentleman very much, and I thank both of you. There is a roll call on the floor right now, you know, and we promise you we're going to move quickly on this type of legislation. Thank you. Let's now turn to our first panel—rather our second panel, and try to get through the opening statements of them.

It consists of Mr. Richard Barton, who is the Senior Vice President for Government Affairs of Direct Marketing Association, Incorporated; Professor Robert Ellis from the School of Law of the Indiana University; Mr. Steven Seltzer, who is President of Modern Communications Corporation; and Mr. John M. Glynn, who is from the Office of People's Counsel of Baltimore, Maryland, representing the National Association of State Utility Consumer Advocates.

We would ask each of you if you could to please keep your opening statements down to 5 minutes or less. I promise you you'll be given plenty of opportunity during the question and answer period to elaborate on your major points. I'd like to begin with you, Mr. Barton, if we could.

Again, please try to abide by the 5 minute opening statement guideline, and whenever you feel comfortable, please begin your testimony.

## STATEMENT OF RICHARD A. BARTON, VICE PRESIDENT, DIRECT MARKETING ASSOCIATION; ROBERT L. ELLIS, INDIANA UNIVERSITY SCHOOL OF LAW; STEVEN S. SELTZER, PRESIDENT, MODERN COMMUNICATIONS CORP., AND JOHN M. GLYNN, OFFICE OF THE PEOPLE'S COUNSEL OF MARYLAND

Mr. BARTON. Thank you, Mr. Chairman. It's a pleasure to be here today—at least I think it's a pleasure; I'll see at the end of the hearing—to testify on the three bills that are now pending before the subcommittee. I'm Richard Barton and I'm the Senior Vice President, as you mentioned, of Government Affairs for the Direct Marketing Association, which is an international trade association with around 3,500 corporations involved in all forms of direct marketing, of which the marketing through fax is a brand new and rather untested waters for us. We're involved in telemarketing, direct mail, space advertising. You name it and we're in it.

We're very sympathetic to the concerns that are expressed by all three of these bills. Our sympathy, in fact, has been expressed as you may know in our own guidelines, particularly in the telemarketing area. We don't have any specific ones for fax, which in fact almost directly reflects Mrs. Roukema's bill.

We also agree that marketing should not be used. A sequential dialer should not be used for any marketing purposes, that what we call ADRMP's should not be used for marketing purposes, which are automatic dialing machine with a recorded message programs. Our guidelines for ethical business practice call for immediate disconnect when a person hangs up on the phone.

We have many other ethical concerns and good business practice concerns which are reflected in these bills. So I say we're ambivalent, because we also have some concerns with a few of the general principles as they apply to direct marketing generally in these bills.

28

I want to emphasize here something that was emphasized by the previous witnesses a bit, but a little bit different twist to it. Both of these are new technologies. Automatic dialing machines are essentially new in the marketing area, and certainly the use of fax is new. We believe that this indicates that in fact we should not have immediate rush to regulation because we really do not know at this point, particularly in the area of fax, about how the marketplace will treat fax.

There are many people in the direct marketing business who believe that unsolicited fax is going to be a very, very short-lived technology. We're not sure, but we think that we really do not have enough evidence. It's all anecdotal to regulate at this point. It's too early to say whether there's a need for regulation in these technologies.

We would strongly suggest that these subjects be submitted to both the Federal Communications Commission and the Federal Trade Commission for further study as to the nature of the regulation in fact that is necessary. Particularly in the case of regulation aimed at the use of new technologies, there are broader concerns.

We would not quite as easily dismiss the free speech concerns that Representative Frank dismisses so easily. But we don't know at this point what the first amendment concerns are and what the situation is. Second, we believe strongly—and I think we can get witnesses to tell you—that there is a technological fix to this.

Representative Frank quite accurately pointed out that there is technology to resolve this problem. I am not sure he knew which technologies we're talking about, because there is developing technologies, the ability for people to block phone calls from coming into their fax machines and into their telephones, and we think that we should give a chance for this technology to develop and it may solve the problem in itself.

In the bills that are pending before you, just a couple of general comments. First, we in the business have a very difficult time defining what is unsolicited and think that this we're charting, getting in uncharted waters about what an unsolicited advertisement or any kind of unsolicited mail or whatever it is.

Second, we are the only people I think in the country who have an experience in keeping a national list of people who want to get off of mailing lists and off of telemarketing lists. It is a difficult thing to do. I think that if Mr. Frank's bill passed and Mr. Markey's bill passed exactly as its read, you would have a very, very difficult thing to administer.

We're not talking about one phone company. We're not talking about one list. We're talking about over 1,000 lists that companies would have to keep up with. It's very difficult for companies to keep up with thousands of lists. We have even considered offering to the subcommittee and I'll consider offering it to you today, setting up a third program. We have a program for getting off of national telephone lists and a program for getting off of national mailing lists.

We would like to consider also setting up a national, what we would call fax preference service, to give people an opportunity to get off of national fax lists. I think that it's going to be very difficult to administer a bill which requires companies throughout the

country to keep up with 1,000 or more different do not call lists for fax.

These are just some general comments. We do want to work with the subcommittee, Federal Trade Commission, Federal Communications Commission, because we recognize that the fax and the automatic dialing machines provide some peculiar problems which must be resolved in the marketing field. Thank you, Mr. Chairman.

[Testimony resumes on p. 43.]

[The prepared statement of Mr. Barton follows:]

30

TESTIMONY OF

RICHARD A. BARTON
SENIOR VICE PRESIDENT
DIRECT MARKETING ASSOCIATION

Good morning.  My name is Richard A. Barton, and I am the
Senior Vice President, Government Affairs, for the Direct
Marketing Association.

The DMA welcomes this opportunity to testify relative to H.R.
2184, commercial uses of telephone facsimile machines and
H.R. 628 and H.R. 2131, prohibiting certain practices in the
use of automatic dialing devices.

The Direct Marketing Association is the oldest and largest
trade association in the broad-based field of direct
marketing.  Established in 1917, DMA has over 3,500 member
companies including member companies in the United States and
in approximately 40 other countries.

The DMA's members include catalog firms, publishers,
business/industrial marketers, list brokers, advertising
agencies, manufacturers, educational and financial institu-
tions, insurance companies, non-profit organizations, fund
raisers, consultants and others who use direct marketing or
are suppliers to the field.

The DMA sponsors a number of important consumer programs.
The Mail Preference Service (MPS), established in 1971,
enables people to reduce the volume of advertising mail they
receive at home by having their names removed from many
national mailing lists.  The Telephone Preference Service

- 2 -

(TPS) was launched in 1985, offering consumers the same kind of name removal program for national telephone solicitation lists.  The Mail Order Action Line (MOAL), also dating from 1971, helps consumers who have an unresolved problem with a mail order transaction.  These are just a few of the educational programs the DMA sponsors.

The DMA also works closely and cooperatively with consumer organizations, such as the National Consumer League, and regulatory agencies at the federal and state level such as the Federal Trade Commission, Federal Communications Commission, National Association of Attorneys General and others in order to find mutually acceptable solutions to common problems affecting the marketers and the American public.  Our membership is well aware that the well-being of our industries depend upon consumer acceptance of our marketing practices and consumer satisfaction with the products and services that we offer.

In furtherance of our effort to respond to the legitimate interest and concerns of consumers, the DMA maintains a strong self-regulation program.  The DMA's Committee on Ethical and Business Practice was established specifically to investigate and examine offerings and marketing techniques throughout the direct marketing field.  This is done to increase good business practices within the direct marketing

32

- 3 -

industry as well as to provide consumers with a system of securing satisfaction.  The activities of the Committee, and of the DMA generally, have led to the development of ethical guidelines which govern many of the marketing practices that DMA members are encouraged to follow.  In addition, the DMA produces a number of pamphlets designed to assist consumers in their dealings with direct marketers.

Accordingly, the DMA approaches the legislation being considered by this Committee with an awareness of the needs and interests of the consumers and a conviction--based upon long experience--that self-regulation and the natural workings of the marketplace provide answers to problems that may exist or arise in the future.

A.   H.R.  2184--FAX  LEGISLATION.   We recognize that solicitation by fax may raise problems which do not arise in other forms of direct marketing.   We at DMA are just beginning to analyze the impact of fax use upon customers including the effects of the use of customers' paper and the customers' machine.   Frankly, we have little idea about the extent to which fax is used or of the burdens which it imposes upon fax subscribers.   Nor does anyone else.   The "evidence" so far is anecdotal.   We are willing to work with the Subcommittee and other prospective regulators to find out

33

- 4 -

what the legitimate problems are and how they may best be remedied.

The FCC's Office of Informal Complaints reports that, in 1988, it received only 20 complaints--out of a total of 8,000--with respect to fax machines. Although it is true that fax machines have proliferated in this country over the past several years, it is also true that the technology is evolving rapidly. It is thus possible that, in the very near future, fax subscribers will be able to screen the transmissions which they receive and accept only those which they wish to receive. This is a matter which we believe the Congress might investigate more thoroughly before enacting legislation.

For the same reason, the extent to which fax machines can and will be used for direct marketing purposes remains to be seen. Fax machines are being used for many purposes, including ordering lunch. A presidential candidate, Representative Richard Gephardt, used the fax machine to enter the race when he almost missed the filing deadline. Portable fax machines were in constant use on candidate planes during the presidential election. A Boston radio station accepts contest entries by fax--and notifies winners the same way. Similarly, fax transmissions for commercial purposes can take a number of forms:

34

- 5 -

1.   An <u>agenda</u> faxed prior to a sales call;

2.   A <u>follow-up letter</u> detailing points raised during a presentation, faxed by the seller upon return to his or her office;

3.   An <u>answer</u> faxed by salesperson to a question raised during a telephone conversation to advance the selling process;

4.   <u>A response to an objection</u> faxed in a timely manner to a prospective customer to close the sale.

5.   A <u>revised price list</u> faxed by a seller to keep customers informed;

6.   A <u>thank you</u> note for a sale; or

7.   <u>Any unsolicited</u> faxed document which promotes the sale of products or services.

In these circumstances, legislative options available to lawmakers to control unsolicited faxes are problematic for a number of reasons. Some of these include: 1) many terms inherently defy workable definitions; 2) procedures can become convoluted; and 3) marketers already have incentives

35

- 6 -

to avoid consumer complaints with the result that overly broad legislation may face First Amendment challenges.

1.    <u>Difficulty with Arriving at Workable Definitions</u>.  H.R. 2184 is addressed to "unsolicited" facsimile transmissions. But that leaves open the very important question of the meaning of the term "unsolicited."   The suggestion has been made that these definitional problems can be dealt with by excluding from the reach of the legislation unsolicited fax transmissions to recipients with whom the sender has a preexisting business relationship; but that only compounds the definitional difficulty because it then becomes necessary to attempt to define the term preexisting relationship.

There are similar problems in the effort to define a "advertisement" or "promotion."   Fax messages often have multiple purposes, for example, to confirm the receipt of a purchase order and, at the same time, to make the fax recipient aware of other products and services offered by the sending company.  The status of these messages under the bill are unclear, at best.

2.    <u>The Procedures Can Become Convoluted</u>.    The bill contemplates that subscribers will notify their local telephone company if they do not wish to receive unsolicited fax transmissions and would require marketers and others

36

- 7 -

wishing to send unsolicited messages to purge their lists of the names of individuals who do not wish to receive those messages.

The bill assumes certain conditions which simply do not exist in the infancy of the fax industry.  Although there are now several directories of fax numbers publicly available, none can be said to be entirely comprehensive or up to date and new fax numbers are being added daily.  It will therefore be difficult and costly to both the telephone company and the marketer to attempt to comply with the requirements of the bill.  The cost of administration of this system is an important factor because the bill proposes that subscribers sending the notice that they do not wish to receive unsolicited fax will not be charged; this means that someone else, in all probability all telephone users, will be required to bear the cost.  It seems unfair to require all telephone users to subsidize costs which are incurred on behalf of a few, especially if there are other more efficient and less restrictive means of satisfying the interests of the few subscribers who do object to receipt of unsolicited fax transmissions.

3.  <u>The Broader Concerns</u>.  Underlying these legislative difficulties are two broader and fundamental concerns.  It must be kept firmly in mind that advertising by facsimile is

37

- 8 -

simply a technology used in connection with commercial speech. It is urged, therefore, that any attempt to legislate, or regulate in this area take account of and properly reflect the protections accorded by the First Amendment to speech in all of its richness and forms. Put another way, the rights of the sender, no less than the recipient must be recognized. This requires, first, that there be some clear showing of need for governmental intrusion upon advertisers and second--if such a need exists- -that any restrictions imposed upon communicators be as narrowly drawn as possible.

The DMA believes that the single best arbiter of the appropriate balancing of the interests of marketers and consumers is neither law makers or regulators, but the marketplace itself. The object of unsolicited fax messages, like all advertising, is to promote the sale of goods and services. If this marketing technique proves unacceptable to the consumer, it will not long be used in which event there is no need for legislation; conversely, to the extent that advertising by fax proves acceptable to consumers, there is no reason to restrict it. This is precisely why the Constitution protects the free marketplace of ideas.

For these reasons, the DMA urges this Committee to move slowly before enacting fax legislation. The Committee is

38

- 9 -

urged to refrain from the imposition of a regulatory scheme upon this new technology until a determination can be made whether there is a need for this type of legislation and how such legislation can be shaped so that it does the least possible harms to the considerations of free speech, the needs and interests of consumers and the operation of the marketplace.   The Congress is urged to request the Federal Communications Commission to conduct a study of the facsimile marketplace in order to ascertain whether and to what extent there is a problem with this technology requiring redress, to determine how a regulatory regime (if any is needed) should be fashioned and to ascertain whether such problems as may exist can be most effectively resolved through the evolving technology of facsimile itself.

B.   **H.R. 628 AND 2131--AUTO DIALERS**.   Turning now to the issues raised in H.R. 628 and H.R. 2131, designed to prohibit certain practices in the use of automatic dialing devices, the DMA believes legislation in this area is too early.   In its "Guidelines for Telephone Marketing", under Article 5, the DMA urges:

> When a marketer places a call to an individual as part of a solicitation process, and desires to deliver a recorded message to that individual, permission should be obtained from the individual

- 10 -

by a live "operator" before the recorded message is
delivered.

The guidelines further provide that:

No telephone marketers should solicit sales using
automatic dialing equipment unless the telephone
immediately releases the line when the called party
disconnects.

Telephone marketers should not use such devices as
automatic dialers and pre-recorded messages when in
violation of tariffs, state or local laws, or these
Guidelines.

Thus, the DMA has made efforts toward self-regulation in this
area.  The essential purposes of H.R. 628 and H.R. 2131 are
simply to permit subscribers the opportunity to hang up on a
pre-recorded message telephone dialing system.  Our
guidelines attempt to serve the same purpose and further
require live operator intervention and permission before a
recorded message is delivered.

At the same time, our voluntary approach avoids some of the
difficulties which inhere in the proposed legislation.  For
example, H. R. 628 defines an automatic telephone dialing

40

- 11 -

system as "telephone terminal equipment."  But, the capacity
to generate telephone numbers does not necessarily reside in
the terminal equipment itself; it can exist in a computer or
modem which lies behind the terminal equipment.  Thus, the
provisions of the bill which require the FCC to prescribe
"technical standards" for automatic telephone dialing systems
may, however inadvertently, require that agency to impose
circuitry   obligations   upon   manufacturers   of   computing
equipment generally merely because this equipment has the
potential for interconnection with the telephone network.
The FCC has, on several occasions, addressed the question
whether its existing equipment registration program should be
extended to modems and computers and has concluded that the
cost of compliance far exceeds any public benefits to be
achieved.

Similarly, H.R. 628 seemingly governs any equipment which
stores or produces numbers to be called using a "random" or
"sequential" generator.   There is, however, a sharp
technological distinction between "random" or "sequential"
number generation and "programmable" number generation.
Programmable equipment is used in many business applications
including, nowadays, facsimile transmission.   Programmable
equipment enables a business to transmit a standard,
sometimes referred to as "broadcast," message quickly to a
large number of telephone subscribers who may urgently need

41

- 12 -

or want to receive a message or with whom the sender has a prior business relationship and who will therefore benefit from its receipt.

Moreover, auto dialers are frequently used when there is no pre-programmed message.  In this context, the dialer is simply an efficiency measure reducing advertising costs and therefore the cost of the goods and products sold by telephone.  There is a need to fully understand the diversity of uses of automatic telephone dialing equipment and the public benefits which inhere in this technology.  There seems no reason to legislate with regard to unsolicited calls in which a live operator delivers the message or obtains permission from the recipient before the recorded message is delivered.

H.R. 2131 attempts to deal with certain of these concerns. But it poses other problems.  For example, it restricts the use of automatic dialing devices to weekday hours between 9 a.m. and 5 p.m.  This assumes that no consumer in the United States wishes to receive unsolicited messages except between "normal business hours".  The assumption is almost certainly incorrect.  The "business hours" of farmers, for example, are very different than those of urban dwellers.  The effect of this blanket rule may very well be to deprive the agricultural community of the opportunity to learn of

**42**

- 13 -

products and goods which they need for the conduct of their businesses and for their personal lives merely because the marketing campaign involves a particular technology. Ironically, the technology was created to make the cost of advertising cheaper and therefore drive down the cost of the product or goods being sold. This is why the DMA guidelines urge that <u>all</u> telemarketing calls be made during "reasonable hours", leaving it to the marketplace--the interaction between marketer and consumer--to determine what is reasonable in any particular context.

For these reasons, we think the Congress should tread slowly in its study of legislation of the sort contained in H.R. 628 and H.R. 2131. Voluntary action by marketers and the inter-action between marketers and consumers--the marketplace--is a more effective way to deal with these sorts of problems. Moreover, Congress should attempt to learn more about the ways in which automatic dialing devices are used and the benefits as well as the perceived detriments of this technology. Thus, Congress should urge the Federal Communication and Federal Trade Commissions to undertake a joint study of the technology involved in automatic dialers, the extent to which the use of these dialers causes problems and whether legislation or regulations can be fashioned which addresses such problems as may be found to exist without impairing the very considerable benefits which this technology brings to the American public as a whole.

43

Mr. MARKEY. Thank you, Mr. Barton. I'll tell you what. There is a roll call on the floor right now, which I have to make. Mr. Cooper will be returning here in a couple of minutes. He left earlier to make it, so I would ask you to all stay close right there because I would expect that the hearing would begin in the next couple of minutes and we will continue on with the opening statement.

[Brief recess.]

Mr. MARKEY. The subcommittee will return to order. Will the witnesses please take their seats? The next witness will be Mr.—Professor Robert L. Ellis of the School of Law, Indiana University, Indianapolis. Professor Ellis.

## STATEMENT OF ROBERT L. ELLIS

Mr. ELLIS. Well, since you asked everyone to keep their comments brief, I can do that because I don't represent anyone. I'm a practicing attorney as well as an instructor at IU Law School, but our law firm does not represent Mr. Fax or anyone connected with watchmans or walkmans or anything else. My interest in this bill began a couple of weeks ago and the copies of my written testimony, which I understand has—did successfully get faxed to you—have been reproduced.

An interesting thing last night. We tried to fax it to you and your machine ran out of paper. So I wasn't sure if you were trying to battle my long fax or it was a normal technical error.

The bill—the resolutions 2184 and 628 I think are two different approaches to a common problem. My concern, which I expressed in the written testimony, is that 2184 is a good idea but sweeps with too broad a brush. It should never be the case when normal business correspondence is put under chilling effect, penalizes or put under doubt or made the context of litigation.

Congressman Rinaldo mentioned that he received a multi-page letter and that multi-page letter he got via fax may sway him a little bit. But I'm not sure if that's the type of correspondence that we ought to be looking at. There's such a thing as junk mail, junk fax and so forth. The objection to most fax messages, it seems to me, are the ones that are cold call auto-dialed messages.

If a business with whom I might be interested in doing business sends me a long advertisement via fax, I may enjoy it if it's an offer to sell me things at a very good price. But I may not enjoy it if it's just a cold call advertisement. I probably won't buy anything. So therefore I think that to some extent the market has got to be self-regulating.

In addition, legislation such as this—it's happened—the legislative activity both in the Federal and State level has happened very quickly, more quickly than the fax revolution itself, which is about 4 years old. I think the market hasn't had a chance to self-regulate itself. So basically my objections to the bill, and I think in general the concept is a good idea.

I would change it to be less broad in what it prohibits. I would encourage some changes that be made to lessen the administrative burden, and I would narrow the scope of the bill so that the industry can to some extent regulate itself. What I've suggested in my written testimony is simply to eliminate the listings or the asterisk

44

list of people who don't want calls, because of its chilling effect, and instead prohibit the use of auto dialers to cold call fax advertisements. It would be in a sense a combination of 2184 and 628. Thank you.

[Testimony resumes on p. 73.]

[The prepared statement of Mr. Ellis follows:]

45

**REGULATING ADVERTISEMENT VIA FAX MACHINE:**

**CONSTITUTIONAL AND PRACTICAL ASPECTS**


**Comments on H.R. 2184 - May 23, 1989**


Robert L. Ellis[*]


**I.   BACKGROUND**


Although fax machines have been in use for more than four decades,[1]
what may be called the "fax revolution" has happened in less than
four years.   The first commercial fax machine, using postwar
technology, was marketed in 1966.   That machine required six
minutes to transmit one (barely legible) page.[2] As late as 1978 the
average fax machine cost between $7500 to $10,000, and transmission

---

[*]      Instructor of Law, Indiana University School of Law at
Indianapolis; of counsel, Sellman & Boone, Columbus, Ohio.
Admitted in Ohio and the District of Columbia.   Neither Mr. Ellis
nor Sellman & Boone represents the interests of any person or
entity connected with advertising via fax.

[1]      The first facsimile transmission machine (for images
written on a wax cylinder and sent over telegraph lines) was
patented by Alexander Bain in 1846.   In 1924 Western Union adapted
that technology to form "Telepix" to transmit photographs by wire
to newspapers.   *Indianapolis News*, Feb. 21, 1989, p. C-6.   The
first general-purpose facsimile transmission machine was developed
by RCA for the Atomic Energy Commission after the end of World War
II.   See Radio Corporation of America, RCA Victor Division, *Report
on Remote Facsimile Duplicator Equipment Developed for U.S. Atomic
Energy Commission* (1951). According to Merriam Webster's *Ninth New
Collegiate Dictionary*, the word "fax" (as referring to a facsimile
machine) dates from 1946.   Virtually all of the world's fax
machines are currently manufactured in Japan.

[2]      *Los Angeles Times*, October 17, 1987, part 1, at 1, col.
1.  That machine was developed by Magnavox.

46

speed had hardly improved.[3]  By the early 1980s the price had dropped to around $4000.[4]  As prices dropped, more machines were sold:  70,000 in 1983,[5] 157,000 in 1985,[6] and 192,000 in 1986[7]. Transmittal speed increased until the so-called "Group 3" standard (10 seconds per page and worldwide compatibility) was introduced in 1986 and prices dropped below $2000.[8]  At that point sales skyrocketed:  465,000 in 1987,[9] 475,000 in 1987,[10] and about a million in 1988.[11]  This year sales are again expected to double.[12] It is estimated that more than thirty billion pages of information will be transmitted by means of fax machines in 1989.[13]

---

[3]     *High Technology*, March 1987, at 60.

[4]     *Id.*

[5]     *Crane's Chicago Business*, Sept. 12, 1988, at T1.

[6]     *Marketing & Media Decisions*, July 1988, at 127.

[7]     *Boston Globe*, Apr. 12, 1989, at 49.

[8]     *High Technology*, Mar. 1987, at 60.

[9]     *Business Week*, Mar. 21, 1988, at 136.

[10]     *Chicago Tribune*, Nov. 20, 1988, at 13.

[11]     *Chicago Tribune*, Apr. 14, 1989, at 80; *Boston Globe*, Apr. 12, 1989, at 49.

[12]     *Chicago Tribune*, Nov. 20, 1988, at 13.

[13]     *Boston Globe*, May 4, 1989, at 3.

2

Approximately   4.2   million   faxes   are   in   use   worldwide,[14] approximately half of those in the U.S.[15]

The upsurge of sentiment and legislative activity regarding the use of fax machines for direct marketing has happened even faster than the fax revolution itself.  Earlier this year there was virtually nothing on the legislative landscape, and now not only Congress but at least thirteen states[16] have either enacted or have pending legislation dealing with the phenomenon.   The list of states jumping on the regulation bandwagon grows almost daily.  Personal preferences about the proper use of fax machines, as well as annoyances experienced by fax owners at receiving advertising[17] may be the impetus for this wave of proposed legislation.

Fax advertising, like other types of telephone solicitation, is-- thus far--demonstrably effective.[18]

---

14      *Chicago Tribune*, Nov. 20, 1988, at 13.

15      *Boston Globe*, May 4, 1989, at 3.   An interesting consequence of the fax revolution is apparently the corresponding decline in the use of telex equipment.   The number of telex messages fell by half in the United States between 1984 and 1987. *Business Week*, Mar. 21, 1988, at 136.

16      Arkansas, California, Connecticut, Florida, New Mexico, New York, North Carolina, Maryland, Michigan, Oregon, Rhode Island, Texas, Washington, and West Virginia.

17      See note 35, *infra*.

18      The phenomenon as reported in the press seems to be limited largely to a claimed 8%-12% response rate by Mr. Fax, one of the major fax advertisers, and to a number of restaurants which accept take-out lunch orders via fax. *See, e.g., Fortune*, Feb. 27,

3

The suddenness with which both fax technology and its use for marketing purposes have spread means that no common law has developed to identify and focus the legal issues involved. Indeed, as of May 1989, there was only one reported case in the nation which substantively dealt with the facsimile phenomenon.[19]

This commentary will address the broad constitutional issue of the extent to which advertising via fax can be regulated, as well as the narrower issues raised by H.R. 2184.

## II. CONSTITUTIONAL ASPECTS OF REGULATING ADVERTISING VIA FAX MACHINE

### A. Commercial speech and the First Amendment.

Advertisements for goods and services, whether they arrive at their intended recipient via fax machine or by some other means, are quintessential examples of commercial speech. Commercial speech has been distinguished from other types of speech in that

---

1989, at 12.

19    That case, *Calabrese v. Springer Personnel of New York, Inc.*, 141 Misc. 2d 566, 534 N.Y.S.2d 83 (N.Y. Civ. Ct. 1988), held service by fax to be proper in New York under CPLR 2103(b)(3).

4

the former does "no more than propose a commercial transaction."[20]
Commercial speech has been defined as "expression related solely
to the economic interests of the speaker and its audience."[21]

The extension of First Amendment protection to commercial
speech is a relatively recent phenomenon. Prior to 1975,
commercial advertisements for goods or services were considered to
be outside the scope of the First Amendment's free speech
doctrine.[22] That view was substantially eroded by *Bigelow v.
Virginia*[23], and discarded by *Virginia Pharmacy Board v. Virginia
Citizens Consumer Council.*[24] It is now well-established that
commercial speech is protected under the First Amendment, although
it enjoys less protection than noncommercial speech and is thus

---

    20    *Pittsburgh Press Co. v. Human Relations Comm'n*, 413
U.S. 376, 385 (1973).

    21    *Central Hudson Gas & Elect. Corp. v. Public Service
Comm'n*, 447 U.S. 557, 561 (1980). The latter definition is not
completely satisfactory. Justice Stevens, in his concurring
opinion, pointed out that a labor leader's exhortation to strike
and an economist's dissertation on the money supply would be
encompassed by this definition. The *Pittsburgh Press* definition
has enjoyed more widespread acceptance. As Justice Rehnquist
pointed out, "We have not discarded the 'common-sense' distinction
between speech proposing a commercial transaction, which occurs in
an area traditionally subject to government regulation, and other
varieties of speech." 447 U.S. at 589 (Rehnquist, J., dissenting)
(quoting *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 455-456
(1978).

    22    See, *e.g.*, *Valentine v. Chrestensen*, 316 U.S. 52
(1942).

    23    421 U.S. 809 (1975).

    24    425 U.S. 748 (1976).

5

more subject to regulation.   "[T]he Constitution accords less protection to commercial speech than to other constitutionally-safeguarded forms of expression."[25]   "[The Supreme] Court's decisions on commercial expression have rested on the premise that such speech, although meriting some protection, is of less constitutional moment than other forms of speech."[26] The Court has "afforded commercial speech a limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values, while allowing modes of regulation that might be impermissible in the realm of noncommercial expression."[27]

## B.   Determining whether a restriction on commercial speech is constitutionally permissible: The *Central Hudson* test

Less than a decade ago the Supreme Court, in *Central Hudson Gas & Electric Corp. v. Public Service Commission,*[28] set forth a four-pronged test which is now routinely used in determining the

---

25      *Bolger v. Young's Drug Products Corp.*, 463 U.S. 60, 64-45 (1983).

26      *Central Hudson Gas & Elect. Corp. v. Public Service Comm'n,* 447 U.S. 557, 562 n.5 (1980).

27      *Ohralik v. Ohio State Bar Ass'n.,* 436 U.S. 447, 456 (1978).

28      447 U.S. 557 (1980).

6

extent to which a particular type of commercial speech enjoys First Amendment protections:

> At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than necessary to serve that interest.[29]

### The first prong

Like any other advertising, that done via fax can easily fall within the threshold test regarding lawfulness and accuracy, and thus enjoys some degree of First Amendment protection. Therefore, the proposed legislation must be scrutinized in light of the remaining three prongs.

---

29    *Id.* at 566.

7

The second prong

The second prong in *Central Hudson*, whether there is a substantial government interest, refers to "the strength of the government's interest in restricting the speech."[30]  Although the fax machine is a new and unique medium of communication, precedent indicates that the governmental interest in regulating fax-based commercial speech would, if challenged, be found to be sufficiently substantial to meet the requirements of the second *Central Hudson* prong:

> [The Supreme] Court has often faced the problem of applying the broad principles of the First Amendment to unique forums of expression.  See, *e.g.*, *Consolidated Edison Co. v. Public Service Comm'n*, 447 U.S. 530 (billing envelope inserts); *Carey v. Brown*, 447 U.S. 455 (1980) (picketing in residential areas); *Schaumberg v. Citizens for a Better Environment*, 444 U.S. 620 (1980) (door-to-door and on-street solicitation); *Greer v. Spock*, 424 U.S. 828 (1976) (Army bases); *Erznoznik v. City of Jacksonville*, 422 U.S. 205 (1975) (outdoor movie theaters); *Lehman v. City of Shaker Heights*, 418 U.S. 298 (1974) (advertising space within city-owned transit systems).  Even a cursory reading of these opinions

---

30      *Posadas de Puerto Rico Assoc. v. Tourism Co.*, 478 U.S. 328,   (1986).

8

reveals that at times First Amendment values must yield to other societal interests.[31]

Indeed, the unique method of communication made possible by the fax machine may spawn a new, separate category of First Amendment jurisprudence.   Justice White, in his plurality opinion in *Metromedia, Inc. v. City of San Diego*, noted what he termed

the cogency of Justice Jackson's remark in *Kovacs v. Cooper*, 336 U.S. 77, 97 (1949):   Each method of communicating ideas is "a law unto itself" and that law must reflect the "differing natures, values, abuses and dangers" of each method.   The uniqueness of each medium of expression has been a frequent refrain:   See, *e.g.*, *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 557 (1975) ("Each medium *of* expression . . . must be assessed for First Amendment purposes by standards suited to it, for each may present its own problems"); *FCC v. Pacifica Foundation*, 438 U.S. 726, 748 (1978) ("We have long recognized that each medium of expression presents special First Amendment problems'); *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 503 (1952) ("Each method tends to present its own particular problems").[32]

---

31    *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 500-501 (1981) (parallel citations omitted).

32    453 U.S. at 501 and n.8.

9

54

There are several "unique problems" associated with the medium of fax in general--and advertising via fax in particular--which would probably cause a court to find that the governmental interest in regulation is sufficiently significant to satisfy the second prong in *Central Hudson*. Some of these problems are summed up by Ken Jacobsen, an Oregon legislator who introduced a bill to ban unsolicited advertising in his state: "You get a message you didn't want from people you don't know on paper they didn't buy."[33] Although there is probably no governmental interest in preventing anyone from receiving messages from people they don't know, Representative Jacobsen's other concerns merit further analysis.

The concern about unwanted messages is the one most frequently voiced in both the press and among those who own fax machines. Most fax machines are currently used in businesses rather than private homes,[34] and business owners are virtually[35] unanimous in

---

    33    *Los Angeles Times*, February 27, 1989, Part 4, p. 9, col. 1.

    34    The future probability that fax machines will be routinely used in homes as well as offices presents an infant issue for First Amendment jurisprudence:  Some decisions which have upheld bans on certain telemarketing practices have pointed out that applying the *Central Hudson* test (discussed *infra*) to in-person solicitation, where pressure may be a tactic, is not the same as applying it to automated message players.   *Nat'l Funeral Svcs., Inc. v. Rockefeller*, 870 F.2d 136, 143 n.13 (4th Cir. 1989).  Advertising sent to homes via fax may be unobjectionable by comparison.

    35    Extensive research has revealed no case of a company (other than those advertising via fax) which opposes legislation restricting advertising via fax.

10

55

their view that they do not want their fax lines tied up by advertisers trying to send messages. Richard Kessel, a New York state official, moved two of that state's lawmakers to introduce that state's bill to ban unsolicited fax advertising after he was unable to send a document to the Governor's office because the fax there was tied up with an incoming advertisement. "The last thing you want when you're trying to meet a deadline, or trying to get a memo to your boss . . . is to be disturbed by someone trying to sell draperies or submarine sandwiches."[36]

Companies and interest groups which oppose restrictions on advertising via fax point out that an incoming fax ad does not tie up a machine for very long:

It takes only 15 to 45 seconds to transmit a one page fax. This is the amount of time that an unsolicited message would tie up a machine. Assuming that the average business receives 2-3 unsolicited faxes per week . . . this amounts to 0.007% - 0.03% of a 5 day week that a fax machine would be tied up by fax advertisements . . . .[37]

---

[36]   *Newsday*, Mar. 22, 1989, City p. 31.

[37]   Patrick Seaman, "Some Arguments Against House Bill 2227," presented to the Oregon Legislative Assembly on February 28, 1989, at 3.

11

The shortcoming of such arguments is that they are based on statistics which are outdated even as they are compiled. The facsimile advertising phenomenon has only begun. Mr. Fax, Inc., the Irvine, California company which is often thought of as having originated the phenomenon of nationwide advertising via fax, has already compiled a database of about 500,000 fax numbers and is already routinely sending 60,000 fax advertisements per week.[38] Zoom Telephonics in Boston has designed a modem that can be programmed to randomly dial thousands of numbers, hunting for response tones characteristic of fax machines ready to receive. The "hits" are stored in a database for later use.[39]

Various methods heretofore employed by business to prevent unwanted fax messages generally serve to diminish the utility of the machines. For example, fax machines are currently available which will not accept incoming messages unless the caller knows a predetermined access code, which is fine for in-house faxing within large companies but an onerous limitation for businesses which wish to receive purchase orders via fax. Another countermeasure, unpublished fax numbers, poses similar problems for companies which want their fax numbers publicized for potential customers to use. Of course there is always the possibility of turning off the device

---

38      *New York Times*, Jan. 20, 1989, Sec. B, p. 2. col. 1.

39      *Forbes*, January 23, 1989, at 82.

12

during non-working hours. In Japan, many companies have resorted to doing just that due to the large number of ads.[40]  Such a solution likewise diminishes the usefulness of having a fax machine, since many businesses communicate via fax at night when rates are lower.

The governmental interest to be asserted under the second prong of *Central Hudson*, then, would be that of protecting commerce by preventing a diversion of fax machines from the purposes intended by their owners.[41]  "The First Amendment . . . does not prohibit the state from insuring that the stream of commercial information flow cleanly as well as freely."[42]

In asserting its interest in regulating unsolicited fax advertisements, Congress can draw an analogy with its interest in regulating the broadcast media: resource scarcity. "The Supreme Court's determination to allow greater government intrusion into the affairs of broadcasters rests on the physical scarcity of

---

40      *The Detroit News*, Feb. 26, 1989.

41      Another "public sector" aspect of the same governmental interest is involved where a governmental entity has installed a fax machine.  A number of state and federal courts, as well as many state and local administrative bodies, have installed fax machines to accept documents for filing.  The Circuit Administrator for the Eleventh Circuit has already asked to have the court's fax number stricken from directories out of fear that fax advertising would interfere with death penalty appeals. *National Law Journal*, Mar. 6, 1989, at 1.

42      *Virginia Pharmacy Board v. Virginia Citizens Consumer Council*, 425 U.S. 748,    (1976).

13

58

radiowaves; the electromagnetic spectrum simply *is physically incapable of carrying all the messages of all who wish to use the medium.*"[43]   The scarcity rationale has been adapted to other contexts as well.   Justice Powell, in *Pacific Gas & Electric Co. v. P.U.C. of California*[44], pointed out that "[i]n the last paragraph of the opinion [in *Miami Herald Publishing Co. v. Tornillo*[45]], the Court concluded that an *independent* ground for invalidating the [right-of-reply] statute was its effect on editors' allocation of scarce newspaper space."[46]   A company's fax machine is likewise a scarce resource.   Many companies have only one fax machine, and because such machines are designed to operate unattended, companies obviously wish to maximize the availability of their fax equipment for customers and others with whom they do business.   Few businesses would wish to see their customers compete with advertisers' autodialers when trying to get through by fax.

Because of these well-established principles enabling regulation of commercial speech in various contexts, Congress can be confident that the second prong in *Central Hudson* is satisfied

---

43      *Preferred Communications, Inc. v. City of Los Angeles*, 754 F.2d 1396,1403 (9th Cir. 1985) (emphasis supplied), citing *Century Federal, Inc. v. City of Palo Alto*, 579 F.Supp. 1553, 1563 (N.D. Cal. 1984).

44      475 U.S. 1, * n.7 (1986).

45      418 U.S. 241, 258 (1974).

46      Emphasis in original.

14

and can form a basis for imposing some sort of restrictions with respect to fax machine use.

### The third prong

The third prong of the *Central Hudson* test is whether the regulation in question "directly advances the governmental interest asserted."[47] Courts seem inclined to use a reasonableness test for this prong. Chief Justice Rehnquist has already done so,[48] and has pointed out that Justice White, in *Metromedia Inc. v. City of San Diego*,[49] had found the "third prong of *Central Hudson* . . . satisfied where legislative judgment [was] 'not manifestly unreasonable.'" H.R. 2184 would prohibit the transmission of unsolicited advertisements to any person who objects to receiving such transmissions. It would further require common carriers to maintain lists of persons who notify the carrier of such objections and make such lists available to would-be fax advertisers. Such provisions, if enacted, would directly advance the governmental interest asserted, and would thus be permissible under the third prong.

---

47      447 U.S. at 566.

48      See *Posadas de Puerto Rico Assoc. v. Tourism Co.*, 478 U.S. 328,      (1986).

49      453 U.S. 490, 509 (1981).

15

/        The fourth prong

The final prong of the *Central Hudson* test is whether the restriction on speech is "more extensive than necessary to serve [the governmental] interest."[50]  The test for whether the statute sweeps more broadly than is necessary to uphold the governmental interests is not a "least restrictive alternative" test. "Rather, a provision should be upheld as long as the state has chosen a reasonable means of regulation that is not excessive in view of its legitimate interests."[51]

Restrictions on commercial speech, if they are to be considered "not excessive," must regulate its form, such as the time, place, and manner, rather than its content. One recent case, in which the Court found a restriction aimed at curbing certain sales tactics in the funeral business to be content-based and therefore invalid, contained the following analysis:

> The essence of time, place, and manner restrictions is content neutrality. The disregard of content is why such restrictions are given more deferential review than are other speech restraints.   Their intent is not to influence what a speaker has to say, only when, where,

---

50      447 U.S. at 566.

51      *Nat'l Funeral Svcs., Inc. v. Rockefeller*, 870 F.2d 136, 145 (4th Cir. 1989) (citation omitted).

16

61

or how he says it.  Their focus is on the effects of the
act of speaking, not on the information conveyed by the
speech.  In one sense, the restrictions in question do
not regulate the content of appellant's solicitation--it
may make any sales pitch it pleases--they merely dictate
where and how appellant may make its pitch.[52]

Time, place, and manner restrictions which leave open
alternative channels for communicating the same information are
more likely to be found constitutionally permissible than
restrictions which cut off the ability to communicate.  Courts have
consistently held that "restrictions on the time, place, or manner
of expression are permissible provided that 'they are justified
without reference to the content of the regulated speech, that they
serve a significant governmental interest, and that in so doing
they leave open ample alternative channels for communication of the
information.'"[53]     If  unsolicited  advertising  via  fax  were
proscribed, many alternative channels (all means which were in use
prior to the advent of the fax machine) would be available for
communicating the same information.  Such channels as direct mail
or newspaper advertising might not be as effective or advantageous
to those sellers who promote their goods and services via fax
advertising.  Such concerns, however, are unlikely to give rise to

---

52     *Id.* at 141 (citations omitted).

53     *Friedman v. Rogers*, 440 U.S. 1, 9 (1979), citing
*Virginia Pharmacy*, 425 U.S. at 771.

17

20-801 - 89 - 3

doubts about the constitutionality of otherwise-valid restrictions. In an older case upholding a ban on door-to-door solicitation where other sales methods remained open, the Court remarked: "That such methods do not produce as much business as house-to-house canvassing is, constitutionally, immaterial . . . ."[54]

H.R. 2184, which would ban unsolicited advertising via fax, regulates the form of communication rather than its content, and thus would not be objectionable under the fourth prong of *Central Hudson*.

## II. PRACTICAL ASPECTS OF REGULATING ADVERTISING VIA FAX MACHINE

Although, as explained above, there is no constitutional difficulty with prohibiting unsolicited advertising via fax, there are a number of practical difficulties, many of which are left unaddressed by H.R. 2184 in its present form.

---

[54]    *Breard v. City of Alexandria*, 341 U.S. 622, 638 (1951).

18

63

## A.    Definitional problems

One of the core phrases used by H.R. 2184 is "unsolicited advertisement," which is defined[55] as "any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission." This definition is problematic for several reasons. First, it begs the question of what "unsolicited" means. When, for example, does a prior business contact constitute "express invitation or permission"? Who can give the invitation or permission? The following examples[56] serve to illustrate the problem:

> Example 1:
>
> Using publicly-available directories, a restaurant supply company compiles a list of the names, addresses, phone numbers, and fax numbers of all restaurants in the nation which it believes may be interested in buying packets of curried ketchup. It then faxes to each such restaurant an offer to sell such ketchup packets at a particular price.

---

55      P. 2, line 12.

56      All examples here assume that the fax recipient has notified the common carrier, pursuant to subsection (c) of the proposed statute, that it objects to receiving unsolicited advertisements via fax.

19

**64**

The above example illustrates that there are some types of faxed advertising which businesses may <u>want</u> to receive, because such advertising involves the recipient's major area of business.

> **Example 2:**
> A representative of the restaurant supply company gets into a discussion with Joe Smith, a fast-food executive, at a trade show.  They exchange business cards which include fax numbers.  The supply company rep later faxes to the fast food company an offer to sell ketchup packets at a particular price.

In other words, does giving out a business card constitute an invitation to send fax advertising?

> **Example 3:**
> Same as Example 2, except instead of faxing an offer to sell ketchup, the representative offers a Hawaiian vacation deal in connection with a sales promotion.

If providing a business card is an invitation to send fax advertising, does that permission extend to all forms of advertising?

20

65

### Example 4:

Same as Example 3, except that the supplier hires a promoter, who makes the vacation offer.

Does an invitation to send advertising extend to agents of the invitee?

### Example 5:

Joe Smith gets the oil in his company car changed at Mr. Quick Oil Change, Inc. every few months. In the past, Mr. Quick has mailed reminder cards to its customers. To save time and money, it has started faxing the reminders. Mr. Quick faxes a reminder to Joe Smith that it's time to get another oil change.

This example illustrates another problem: Where a business has an existing, ongoing relationship with a customer, yet the customer has not given explicit permission to fax solicitations, should fax solicitation be proscribed?

### Example 6:

A consulting firm Joe Smith chose to help start up his company's condiment packaging plant sends a fax stating, "we were pleased to work with you in setting up your new plant in Fremont. We hope you will think of us for your future projects."

21

**66**

In other words, when does a thank you note or other routine
business correspondence become an "unsolicited advertisement"?

> Example 7:
>
> The restaurant supply company representative, who works out
> of Denver, says to Joe Smith, who works out of Charleston,
> "I'll get in touch, ok?" and Joe says "ok." Six months later
> the fast food headquarters in Dallas gets a faxed
> advertisement from the supply company's headquarters in
> Minneapolis.

If permission or an invitation is given, how explicit must it be?
To whom is the permission granted--to one individual or to that
individual's entire organization? When does the permission lapse?

> Example 8:
>
> The restaurant supply representative calls the receptionist
> at Joe Smith's company and says, "I'd like to send your
> company some information on our current product line. Whom
> do I send it to?" The receptionist gives Joe's name, thinking
> that the information will be mailed. Instead it is faxed--
> all thirty pages.

In other words, does permission or invitation to use one medium
constitute permission or invitation to use any medium?

22

### Example 9:

Joe Smith calls a computer vendor to inquire about replacing his old computer with a faster one.   The vendor says, "how about if I fax you some information?" and Joe says, "ok." From that point on, Joe regularly gets faxed advertisements from the computer vendor.

Once permission has been granted or an invitation to send extended, can it be withdrawn?

### Example 10:

An employee at a local delicatessen is supposed to fax today's menu to a regular customer at 987-654-3210 and instead accidentally sends it to another business at 987-654-3120. The unintended recipient is furious, and demands the statutory remedy.

How is the law to deal with innocent violations?

### Example 11:

A mail order house order form includes a clause which states: "Purchaser agrees to permit seller to send facsimile ('fax') advertising to purchaser in the future.   Seller's right in this regard shall be assignable."

23

68

This example illustrates the type of things which clever lawyers may well do with the statute.   Can permission to send fax advertising be granted via "boilerplate" language in a standardized set of terms and conditions?  The next example is a variant on the same theme.

### Example 12:

A mailed advertisement says:   "Free telephone just for answering this ad via your fax"--and the ad contains fine print that says "sending a facsimile message in response to this ad constitutes permission for us to send advertising messages to sender's fax machine."

### B.  Problems of Enforceability

Any attempt to provide legal remedies or penalties for sending unsolicited fax advertising may be fraught with problems of enforceability.

### Example 13:

Go For It, Inc., a shell corporation and fax boiler room, has assets of $500 cash plus one fax machine.  It sends out 75,000 unsolicited facsimile advertisements and gets hit with 75,000 civil lawsuits.   It ceases business, and doesn't bother to

24

file an answer to any of the complaints.   In the meantime, Go For It 2, Inc. has been started.

Example 14:

Company A's purchaser verbally ok's a fax transmission. Company B faxes its info in the form of an ad.   Company A denies that it gave permission.

Example 15:

Company B faxes its info without permission, but insists that it received permission.

The above fifteen examples are non-exhaustive illustrations of the Pandora's box which would be opened by the legislation as it is now drafted.   Additional dangers include the possibility of spawning a large amount of small-stakes litigation and the concomitant drain on judicial system resources.

Also, because H.R. 2184 and the events leading up to it have happened so quickly, the industry has not had time to develop many of the self-regulatory practices which have emerged in more mature industries.   The Direct Marketing Association's "Mail Preference Service," which collects, maintains, and disseminates information about persons who do not wish to receive mail solicitation, is an example of such a self-regulatory innovation.   It is obviously in

25

the interest of the fax ad industry to exercise self-restraint, so that restraint not be exercised for it by legislative bodies.

Nonetheless, there are reasonable modifications which could be made to H.R. 2184 so as to make it far less problematic, while at the same time curbing the types of practices which so many fax machine owners find objectionable.

### C.   Suggestions for modifications to H.R. 2184

The aspect of unsolicited fax advertising which most businesses seem to find objectionable is the mass-market, cold-call type of advertising.   Other types of unsolicited advertising, as illustrated in the examples above, are not only unproblematic, but in fact would probably be desired by most businesses.   Therefore, H.R. 2184 would probably do a better job of addressing the problem which gave rise to the legislative activity in the first place, by taking a somewhat less broad-brush approach.

Rather than prohibiting all unsolicited advertising via fax, Congress should consider prohibiting only computer-driven or other types of automated mass advertising via fax.   Individualized business correspondence, whether it includes advertising or not, should never be subjected to the chilling effect of criminalization. Accordingly, subsection (b) of proposed section 225 should be changed to read:

26

> (b) It shall be unlawful for any person, in the
> District of Columbia or in interstate or foreign
> communications by means of telephone, to use
> automated telephone dialing equipment to send any
> unsolicited advertisement to the telephone facsimile
> machine of any person . . . . [etc.]

A suitable definition of "automated telephone dialing equipment"
should be added as subsection (a)(3):

> (3) the term 'automated dialing
> equipment' means any device or combination of
> devices capable of calling multiple telephone
> numbers sequentially, randomly, or selectively,
> without the need for a person to manually dial
> or enter the digits of the telephone number to
> be called at the time the number is called.

This latter definition is somewhat broader than that contained
in Sec. 225(a) of H.R. 628 (which proposes to restrict certain
practices involving commercial uses of automatic telephone dialing
systems). The definition of 'automatic telephone dialing system'
contained in H.R. 628 is quite limited: it only includes systems
which dial numbers sequentially or at random. That definition does
not include newer equipment which is capable of dialing numbers

27

gleaned from a database.  Advertising via fax machine seems to be almost exclusively database-oriented, i.e., targeted at specific telephone numbers which previously have been determined to be fax numbers.

Making such changes to the wording of H.R. 2184 would also eliminate any need for the requirement that common carriers maintain lists of persons who object to receiving fax advertising, thus greatly simplifying the administrative burden of implementing the statute if it were enacted.

Respectfully submitted,

Robert L. Ellis
Indiana University Law School

28

73

Mr. Cooper [presiding]. Our next speaker will be Steven Seltzer, the president of Modern Communications Corporation of Altoona, Pennsylvania, representing Telocator.

## STATEMENT OF STEVEN S. SELTZER

Mr. Seltzer. Thank you Mr. Cooper and members of the committee. My name again is Steven Seltzer and I'm President of Modern Communications. We're a family-owned radio common carrier business, headquartered in Altoona, Pennsylvania. Our business operates not only in Pennsylvania but also in Western Maryland, and we have operations also in West Virginia and Delaware.

It's very rare that I have the occasion to feel comfortable addressing you, telling you that I represent the concerns of the radio paging and the cellular carriers nationwide. But I have that comfort level today. In over 18 years in this industry, I have never heard a common carrier speak favorably about auto dialers and the impact that they have on radio common carrier systems.

Gentlemen, you have my written testimony and it clearly states our industry's position with regard to the use of auto dialers and with respect to what that can do to our facilities and to our customers. My address to you today is to assure you that the problems that I have reported to you, both in the testimony and in my summary, are real and that they're happening today, this year and in 1989.

I'm here to tell you about a paging system that serves about 1,000 customers in central West Virginia, and the effects that auto dialers have had on that system and the five communities that it serves three times so far this year. The problems for us first began on Tuesday, February 28 at 8:30 a.m. For the next 3 hours, virtually without interruption, until exactly 11:30 a.m., an auto dialer dialed almost 500 numbers at a rate of one number every 20 seconds until it reached the end of our number block.

When this problem was brought to our attention, we immediately called our C&P telephone ICSC, that's inter-carrier service center unit in Silver Spring, Maryland. We were referred to over a dozen individuals at C&P, including representatives at the local central office and in C&P's security department.

We were finally told at the end of the 3 hours if it happens again, give us a call. Well gentlemen, it happened again 10 days later. Friday, March 10, beginning that morning at 9:01 a.m., the auto dialer spent another 3 hours and 3 minutes, until 12:03 p.m., going through 500 Morgantown, West Virginia numbers. During this 3-hour period, service was interrupted to almost 1,000 customers, including hospitals, law enforcement, life page customers, etcetera.

Computers are a wonderful thing and we all know they don't lie and I brought with me today printouts showing all of the numbers, all of the dates, all of the times that these dialers hit our system on this date and the other dates that I'm going to tell you about.

We took C&P up on their offer and we called them back and we got a response, "sorry, we can't help you. We lack the equipment necessary to trace this type of call." Well, C&P did come back to us

74

a few days later and advise us that if the problem happens again, they would be ready to investigate.

Did it happen again? You bet. Just 17 days later, on March 27, a Monday, 8 a.m. through 11:02 a.m., the auto dialer dialed 499 numbers—it missed one—again rendering our system virtually useless to those who needed it most.

C&P couldn't help us this time because of legalities. That's what they told us. Eventually, they did put a tracer on some of our numbers and I'm happy to say that the problem has been discontinued. Now we don't know why they didn't tell us. I don't know whether they found the source of the problem or whether we've been fortunate and that it's gone away.

These types of telemarketing abuses should not be allowed to continue. Aside from the negative effect that it has on the public switch telephone network, and certainly on our system as carriers, our customers don't want these types of calls and they're paying to receive them.

Much like a customer pays for the paper and the phone line for fax, our customers are billed message-sensitive rates and they're paying in some cases 15 cents a call over a limit or in cases of cellular, it could be upwards of 50 cents a minute everytime somebody dials that number.

Ladies and gentlemen, on behalf of the Telocator's 650 members, the life page subscribers of the companies that I represent and most of all speaking on behalf of over seven and a half million paging subscribers, over two million cellular and conventional mobile telephone subscribers, I urge you to press forward with this legislation patterned along the lines of H.R. 628. I feel it's a reasonable, responsible solution to the numerous problems that are being caused by auto dialers.

I also urge you to consider including the necessary wording giving the local telephone companies the authority they need to break through the legalities, as C&P put it, and help stop auto dialers from accessing our numbers. I also urge you to consider stiff penalties for those companies that use auto dialers and fail to block restricted numbers from being accessed.

I appreciate the time you've given me today of addressing your subcommittee, and I'll be glad to answer any questions.

[The prepared statement of Mr. Seltzer follows:]

STATEMENT OF STEVEN S. SELTZER

PRESIDENT, MODERN COMMUNICATIONS CORPORATION

before the

SUBCOMMITTEE ON TELECOMMUNICATIONS AND FINANCE

of the

COMMITTEE ON ENERGY AND COMMERCE

UNITED STATES HOUSE OF REPRESENTATIVES

on

AUTOMATIC TELEPHONE DIALING SYSTEMS

May 24, 1989

Mr. Chairman, Members of the Subcommittee.  Thank you for this opportunity to appear before you this morning on the problems and dangers caused by automatic telephone dialing systems.

My name is Steven S. Seltzer.  I am President of Modern Communications Corpora-tion and Personal Communications, Inc., family-owned and operated businesses that provide radiotelephone and paging services to more than 3,000 customers in Penn-sylvania, Maryland and West Virginia.  Our companies are headquartered in Altoona, Pennsylvania and trace their roots back to 1954.  We have been in the radio communications business for almost 30 years, and have invested over $2 million in equipment and systems to serve our customers.

In addition to running these companies, I also serve as a member of the Board of Directors of Telocator, the national trade association representing the mobile telecommunications industry.  Telocator's more than 650 members include common carriers providing cellular telephone, paging and conventional radio telephone

**76**

-2-

services.  I am also the President of RCC of Pa. (Radio Common Carriers), the
statewide association of mobile telephone and paging companies.  In addition, I
am past president of the Mid-Atlantic RCC Association representing carriers in
Pennsylvania, New Jersey, Maryland, Delaware, Virginia, West Virginia and the
District of Columbia.  I am also a member of the West Virginia RCC Association.

I am here today because our companies and Telocator share the Subcommittee's
concerns about the growing problems caused by automatic telephone dialer systems.
Computerized telephone solicitations have become an ever increasing source of
inconvenience, cost and disruption to the American public and our Nation's essen-
tial telecommunications services.  Indeed, without proper safeguards, such
telemarketing activities pose a particularly serious threat to the 7.5 million
paging customers and almost 2 million cellular subscribers currently served by
the mobile communications industry.

As you know, automatic telephone dialer systems can be programmed to dial a
sequential range of telephone numbers, and then transmit a voice-recorded
message.  In addition, personal computers can be programmed to perform a similar
function.  Both activities not only increase the incidence of unsolicited tele-
phone calls, but these programmed calls also run through blocks of telephone
numbers assigned to mobile users, unnecessarily setting off pagers and producing
unwanted calls to cellular subscribers.  Furthermore, these machines frequently
tie up mobile paging facilities by not immediately releasing the lines once the
message has played.  Thus, they can effectively block mobile and paging users
from receiving desired services.

77

-3-

Mobile telecommunications users and service providers are uniquely vulnerable to automatic telephone dialer systems in four respects: First, calls generated by telemarketers to phone numbers used for paging produce false pages and enormous confusion. Most paging subscribers' receivers, are not capable of receiving the aural message transmitted by the automatic dialer. So the paging customer is left concerned and befuddled about who is trying to reach him and whether there is some family or business emergency. The net effect is that the call does not serve its telemarketing objective; the paging subscriber is seriously inconvenienced; and, the paging carrier receives complaints about false pages. This serves no one's interests while producing wholly unnecessary costs and disruption.

Second, these unsolicited calls could undermine important emergency, safety and public health services. For example, under the LifePage Program sponsored by Telocator, paging carriers throughout the country donate free pagers and paging services to potential organ transplant candidates. We are seriously concerned about the possibility of pages generated by automatic telephone dialers causing needless emotional distress to such persons and their families as well as jeopardizing the continued success of this socially beneficial program. Similarly, emergency services provided by hospitals, police, fire department and, even national defense organizations depend upon reliable paging services to alert them to real emergencies rather than false signals caused by unrequested telemarketing solicitations.

Third, cellular subscribers are billed for air time whether they are originating or receiving calls. Most paging subscribers' rates include a call limit. Paging subscribers are billed for each call over the limit. As a result,

-4-

telemarketing messages generated by automatic dialers to phone numbers used for cellular and paging services are billed to the cellular or paging subscriber. This effectively forces the cellular subscriber to underwrite the costs of unwanted calls.

Fourth, and most importantly, automatic telephone dialer systems are programmed to dial a sequential range of telephone numbers.  In effect, calls are generated through a series of consecutive numbers — one after the other.  Because mobile carriers obtain large blocks of consecutive phone numbers for their subscribers, automatic dialer transmitted calls can run through whole groups of paging and cellular numbers at one time.  This can result in a seizure of a paging carrier's facilities that effectively blocks service to its customers.  As you know, this problem is further aggravated by the fact that many automatic dialers do not immediately release the phone line once their message has been transmitted.

In light of these very serious concerns, Telocator convinced the Federal Communications Commission to issue a Public Notice in 1987, warning telemarketing firms that numbers assigned to paging and cellular subscribers should be avoided. Moreover, as we requested, the FCC's Public Notice pointed out that the simple solution to this problem would be for telemarketing firms to contact local radio common carriers to get lists of numbers that could be excluded from computer programmed solicitations.  The FCC warned that further action might be taken if problems continued.

Notwithstanding the FCC's warnings, the automatic telephone dialer system problem persists even today.  For instance, since the first of the year our Morgantown, West Virginia paging system has literally been "brought to its knees" on three

79

-5-

separate occasions by an auto dialer system.  In all three instances our custom-
ers were unable to access our paging system for approximately two hours while the
auto dialer kept our system "tied up."

Requests to the serving telephone company to trace the source of these unwanted
calls met on deaf ears until the third interruption at which time C&P did insti-
tute a procedure for us to follow should the problem occur again.  Fortunately,
at least for now, the problem seems to have subsided.

In the interim, however, customers who count on their pagers to stay in touch
were unable to gain access to our paging system.  Lives literally "hung in the
balance" while hospitals were unable to page doctors, to reach code blue teams,
rescue squads, etc.  Imagine being unable to reach a pager because a carrier's
terminal is rendered useless by an automatic dialer.  Imagine being unable to
respond to medical emergencies until the dialer quits, or reaches the last of the
numbers!  Yet as a carrier all that we can do is stand by, watching the dialer
call each and every pager number, one by one, until the dialer has done its job
and all the calls are completed.  Worse yet, we are forced to watch this happen
while trying to explain to our customers, and their callers, why they are unable
to reach the pagers they are calling.

In light of these continuing difficulties, our companies and Telocator believe
that legislation patterned along the lines of H.R. 628 represents a reasonable,
responsible solution to the dilemma.  In essence, this bill sets in place a
procedure whereby telemarketing companies must respect requests by telecommunica-
tions users that they not receive unsolicited calls.  There is no reason why
telemarketing companies, as provided in H.R. 628, cannot first consult with

-6-

common carriers to identify the phone numbers of such subscribers so that they are not included within their computerized message programs.

In such respects, we would suggest one small improvement in the bill.  Specifi-cally, we believe that common carriers should be authorized to automatically include on the lists of prohibited numbers all of their phone numbers used for paging and cellular services.  These numbers ought to be so protected from telemessaging calls, because messages to paging numbers cannot be completed in any event and cellular customers should not be burdened with the costs of receiv-ing such unwanted calls.

In closing, I once again would express my appreciation for the opportunity to appear before you today.  I hope that my participation provides you with a fuller understanding and appreciation of the extremely acute problems automatic tele-phone dialer systems cause mobile communications users.  Moreover, as I noted, legislation based upon the approach contained in H.R. 628, with slight modifica-tions, could provide a simple and effective approach to protecting the public and vital telecommunications services.

Thank you for your kind attention.

81

Mr. COOPER. Thank you very much. The next witness will be Mr. John M. Glynn, Office of People's Counsel, Baltimore, Maryland, representing the National Association of State Utility Consumer Advocates.

### STATEMENT OF JOHN M. GLYNN

Mr. GLYNN. Thank you very much, Mr. Cooper. I appreciate the opportunity to be here today. The Office of People's Counsel in the State of Maryland is an independent agency of the State which represents consumers of utility services. As you're probably aware, NASUCA is a national organization consisting of similar offices in other States, and I'm a member of the Telecommunications Committee of that particular organization.

I have with me here today a letter from Mr. Richard M. Kessel, who's executive director of the State Consumer Protection Board of the State of New York. He was unable to appear here today. I understand that the committee counsel has a copy of this letter, and on behalf of Mr. Kessel I'd respectfully request that it be included within the record of this hearing.

Mr. COOPER. Without objection, it will be inserted in the record following your prepared statement.

Mr. GLYNN. All right. Now within the State of Maryland there has already been a law passed with respect to automatic dialing, which I will discuss in a minute. Recently, a law was passed and is now before the Governor of the State with respect to junk fax, which has been discussed here today also.

First, with respect to automatic dialing. Automatic dialing, computerized dialing of the kind discussed by Mr. Seltzer amounts to residential consumers to the involuntary seizure of their phone, a phone which they rely upon frequently for the—to save the lives of their own children, their own family members, to contact law enforcement agencies, fire departments, organizations of that sort.

Mr. Kessel in his own letter noted the incident already noted here today, in which a mother was prevented for 5 minutes from calling an emergency service for her son because of a computerized call. These computerized calls, which I would anticipate because of their cheapness and efficiency, will only increase in their usage, are a far more serious inconvenience, invasion of privacy and threat to safety than is the case of similar things, such as junk mail.

You can open your junk mail and throw it away at your leisure. When you answer your phone call from one of these services, you are stuck on the line, voluntarily or involuntarily, for as long as it takes the caller, ordinarily a computer voice, to terminate the call. This amounts, as I said, not only to an invasion of privacy but a seizure of your phone.

I've had the experience myself in receiving phone calls, oddly enough during the last election from political candidates whose computerized voice urged me to vote for them, and whose computerized voice I was unable to terminate on my phone for approximately 1 or 2 minutes. I shudder to think what will happen if one of these automated dialers should reach the White House hotline

page 113
Exhibit 10

during a critical event in international relations. Hopefully, they're not able to do that.

The effect of these also is critical for institutions. I had the occasion to be participating in an effort to solicit funds for a university and one of these automatic dialers came through, reach the block of lines which the university was using, and of course immediately tied up all of these lines for several minutes as it dialed them in sequence. I see little real public interest in having these types of services protected.

Maryland, as I indicated, has passed a law. One of the unfortunate aspects of this law is it has been delegated to the Maryland Public Service commission, which does not have enforcement powers. Efforts to delegate that authority to the Attorney General have been thwarted over the past several years. So far in Maryland, cases of extreme fraud have been prosecuted in the State of Maryland. But the simple use of these abuses, these automatic dialers, have not thus far been prosecuted on the general basis.

With respect to junk fax, a bill was recently introduced in the General Assembly of Maryland and passed, prohibiting the use of junk fax for solicitation on an unsolicited basis. That bill is now before the Governor. As other witnesses have also indicated, this is likewise an intrusion upon your privacy and a seizure of legitimate business equipment.

The Attorney General of Maryland has indicated to the Governor in a letter dated April 24 that this bill is Constitutional, does not violate the first amendment because the State has a legitimate interest in preventing the abuse and the interference with a legitimate business use of your fax machine. As has also been noted, junk fax not only interferes with the use of your fax machine but makes you pay for it, which adds actually insult to injury.

I'd urge the committee to consider the very reasoned and limited approaches taken to legislation, to inhibit the use both of automatic dialing and junk fax, which I suspect is going to become an increasingly difficult problem. I thank you.

[The prepared statement of Mr. Glynn and the letter referred to follow:]

#### TESTIMONY OF JOHN M. GLYNN, MARYLAND PEOPLE'S COUNSEL

The Maryland Office of People's Counsel is an independent agency of the State of Maryland authorized by Maryland law to represent the interests of residential consumers of regulated utility service including consumers of telephone services. The office appears regularly before the Maryland Public Service Commission as well as before the Federal Communications Commission and the Federal Regulatory Commission. The office has previously testified before this committee regarding AT&T's price cap proposal.

The purpose of my testimony today is to comment regarding proposed legislation affecting the commercial use of telephone facsimile machines (generally known as fax machines) and the use of automatic dialing equipment for commercial purposes.

The State of Maryland recently enacted legislation prohibiting the use of fax machines for unsolicited commercial solicitation to encourage a person to purchase goods, realty, or services. The use of "fax" machines for commercial solicitation is a recent development but one which will be used in an increasingly aggressive fashion in the future.

The fax machine, used properly can be a boon to business efficiency. It provides professional and business people with the opportunity to transmit written materials instantly from one local location to the other. Unfortunately, the same equipment can also be used to inundate the owners of fax machines with voluminous and unso-

licited material. This material not only causes the same annoyance as junk mail, but it introduces added expense and inefficiency into normal office operations. Junk fax increases costs of operating a commercial fax machine and ties up fax machines when they could be used for constructive purposes.

I suspect that we are only now seeing the tip of the iceberg. As this inexpensive form of solicitation becomes more popular, the problem will grow in scale. The Maryland Statute is a constructive attempt to eliminate this nuisance. However, Maryland can only deal with intra-state communications. Because of Maryland's proximity to the District of Columbia, the law can easily be evaded. A bill dealing with the inter-state implications of junk fax would be useful in preventing the abuse of Maryland citizens. The bill proposed is a reasoned and limited effort to discourage this unconstructive and inefficient practice.

The use of automatic dialing devices involves the employment of a computer system to dial telephone subscribers. When the subscriber answers the call, the computer plays a prerecorded message. It is possible for a person employing these devices to contact numerous residential telephones within a short period of time.

My office has received numerous complaints from individuals who find irritating and inconvenient the reception of automated dialing solicitations. The Maryland Public Service Commission has been advised that many hospitals, nursing homes, fire stations, and law enforcement agencies have reported receiving calls from automatic dialing which have interfered with their emergency-type operations. Telephone subscribers have contended that automatic dialing systems tie up a customers line along enough after the called party hangs up to create a hazard by blocking the caller from the use of his or her phone. Maryland law has already rendered illegal the use of automatic dialers and certain forms of solicitation by telephone in Maryland. However, this law generally has not been enforced because the Public Service Commission lacks enforcement mechanisms. Efforts to have this jurisdiction transferred to the Attorney General have been frustrated by opponents of the measure.

The legislative effort presented here to provide customers with the ability to avoid annoying and irresponsible telephone calls deserves serious consideration.



STATE OF NEW YORK
EXECUTIVE DEPARTMENT
**STATE CONSUMER PROTECTION BOARD**

**RICHARD M. KESSEL**
CHAIR AND EXECUTIVE DIRECTOR

REPLY TO:
99 WASHINGTON AVENUE
ALBANY, NEW YORK 12210
(518) 474-3514

REPLY TO:
250 BROADWAY, 17th FLOOR
NEW YORK, NEW YORK 10007
(212) 587-4482

May 23, 1989

Hon. Edward J. Markey
Chairman
Subcommittee on Telecommunications
   and Finance
Committee on Energy and Commerce
Room H2-316
House Office Building Annex No. 2
Washington, DC 20515

        Re: Telephone and Telefacsimile Advertising Legislation

Dear Chairman Markey:

        Thank you for inviting me to speak at the Subcommittee's May
24, 1989 hearing on legislation to restrict automatic-dialing
telephone advertising devices and unsolicited telefacsimile
advertising. Although I am unable to attend, I would appreciate
your including the following comments in the hearing record.

1.    Automatic Dialing Devices

        The Consumer Protection Board (CPB) began investigating
automatic telephone dialing devices in the wake of several
consumer complaints about the "seizure" of their lines until
recorded messages had finished playing. In one well-publicized
incident, a mother was prevented for five minutes from calling
emergency services for her son because an incoming computerized
call would not release her telephone line after she hung up.

        Indeed, customers could potentially lose service for much
longer periods. A Federal Communications Commission (FCC) report
noted that automatic dialing devices could seize customer lines
for as long as 40 minutes. "Commission Ends Inquiry On
Unsolicited Calls, Cites Jurisdictional Limits, Little Need For
Regulation, Limited Effect (CC DOCKET No. 78-100)," Report No.
15694, issued April 24, 1980.



        Although the threat posed by automatic dialing devices to

public safety was not confined to the State of New York, the FCC deemed the problem best suited to state regulation because only three percent of all unsolicited telephone calls are interstate and only a fraction of those calls are automatically dialed. (Unsolicited Telephone Calls, CC Docket No. 78-100, 77 FCC 2d 1023, 1024, 1033 (1980))

As a result, the CPB proposed a bill enacted by New York Legislature in 1988, and signed by Governor Cuomo (Chapter 231 of the Laws of 1988), which requires an automatic device to disconnect after a call is terminated by either the person calling or the person called. This solution, narrowly tailored to address the "seizure" problem, protects a consumer's access to his or her line without imposing any significant burden upon the advertisers who employ automatic dialing devices.

It is our understanding that at least nineteen other states have now also imposed legal restrictions on the use of automatic dialing/announcing devices. Nevertheless, we urge that Congress adopt legislation similar to New York's to protect all American consumers from the dangers of automatic dialing-announcing devices.

## 2.   Unsolicited Telefacsimile Advertising

As the price of telefacsimile machines has fallen, the number of business and residential customers owning such machines has rapidly increased.     With this increased ownership, advertisers have used facsimile transmissions of print commercial messages to sell goods and services. This practice has led to consumer complaints.

Unsolicited facsimile advertising "seizes" customers' receiving machines until the transmission is completed or a person at the receiving machine breaks off the connection. The latter action, however, requires the customer to continuously monitor all received transmissions, which is not economically feasible or practical from a business standpoint.

When a customer's machine is so engaged, it cannot receive any other transmissions.     This can prove very costly, particularly to business consumers.

As more consumers acquire facsimile machines, this problem will likely become aggravated as advertisers find that this form of solicitation is cheaper than the mails and other means of distributing their messages. For example, firms like "Mr. Fax" are developing databases of facsimile telephone numbers by offering bounties to persons who report such numbers.

In view of these concerns, the Consumer Protection Board has proposed state legislation to ban the unsolicited

2

transmission of facsimile advertising offering the sale of goods or services. (A.8005/S.3170)  This bill, too, is narrowly drawn. It would not restrict the transmission of customer-requested commercial advertising;  nor would it preclude commercial advertisers from broadcasting their messages in any of the other available media.

I am pleased to report that the bill is making good progress in both houses of the New York Legislature and I expect it to be enacted.    Nevertheless,  our bill would only protect New York consumers.   I urge Congress to adopt similar legislation to protect all American consumers.

Both automatic dialing devices and unsolicited facsimile transmission constitute forms of mechanical intrusions upon personal privacy.   While society benefits from the productivity realized by technological advances, we must not lose sight that the purpose of technology is to improve the quality of life. Suitable legislation must be adopted to ensure that privacy of the user is respected.

I appreciate your considering these comments.    If the Subcommittee desires any additional information, please ask.

Thank you.

Richard M. Kessel
Executive Director

Enclosures

RMK/sk

3

## NEW YORK CITY—EMINENT DOMAIN PROCEDURE—CAPITAL PROJECT PROCEEDINGS—COUNSEL FEES

### CHAPTER 230

S.7208, A.9199

Approved July 8, 1988, effective as provided in section 2

AN ACT to amend the administrative code of the city of New York, in relation to allowance of counsel fees in capital project proceedings

*The People of the State of New York, represented in Senate and Assembly, do enact as follows:*

§ 1.   Subdivision c of section 5–326 of the administrative code of the city of New York is amended to read as follows:

c.  Property owners appearing in the proceedings shall not be entitled to recover counsel fees, costs, disbursements or allowances, except as provided in ~~section~~ sections seven hundred one and seven hundred two of the eminent domain procedure law.

§ 2.   This act shall take effect immediately and shall be deemed to have been in full force and effect on and after August seventh, nineteen hundred eighty-seven.

———

## TELEPHONES—AUTOMATIC DIALING–ANNOUNCING DEVICES

### CHAPTER 231

S.7224–B

*Memorandum relating to this chapter, see Legislative Memoranda, post*

Approved July 8, 1988, effective as provided in section 2

AN ACT to amend the general business law, in relation to regulating the use of automatic dialing-announcing devices

*The People of the State of New York, represented in Senate and Assembly, do enact as follows:*

§ 1.   The general business law is amended by adding a new section three hundred ninety-nine-p to read as follows:

### § 399-p.   Use of automatic dialing-announcing devices

1.   As used in this section, the term "automatic dialing-announcing device" means any automatic equipment which incorporates a storage capability of telephone numbers to be called or a random or sequential number generator capable of producing numbers to be called and is used, working alone or in conjunction with other equipment, to disseminate a prerecorded message to the telephone number called without the use of an operator.

2.   As used in this section, the term "person" means any natural person, firm, organization, partnership, association or corporation, or other entity, whether for-profit or not-for-profit.

3.   No person shall operate an automatic dialing-announcing device except in accordance with the provision of this section.  The use of such device by any person, either individually or acting as an officer, agent, or employee of a person operating automatic dialing-announcing devices, is subject to the provisions of this section.

Ch. 231 LAWS OF NEW YORK

4. Whenever telephone calls are placed through the use of an automatic dialing-announcing device, such device shall do all of the following:

(a) state at the beginning of the call the nature of the call and the name of the person or on whose behalf the message is being transmitted and at the end of such message the address, and telephone number of the person on whose behalf the message is transmitted, provided such disclosures are not otherwise prohibited or restricted by any federal, state or local law; and

(b) disconnect the automatic dialing-announcing device from the telephone line upon the termination of the call by either the person calling or the person called.

5. Federal, state or local municipalities, or any subdivision thereof, using an automatic dialing-announcing device for emergency purposes shall be exempted from the provisions of this section.

6. Whenever there shall be a violation of this section, an application may be made by the attorney general in the name of the people of the state of New York to a court or justice having jurisdiction to issue an injunction, and upon notice to the defendant of not less than five days, to enjoin and restrain the continuance of such violations; and if it shall appear to the satisfaction of the court or justice, that the defendant has, in fact, violated this section an injunction may be issued by such court or justice enjoining and restraining any further violation, without requiring proof that any person has, in fact, been injured or damaged thereby. In any such proceeding, the court may make allowances to the attorney general as provided in paragraph six of subdivision (a) of section eighty-three hundred three of the civil practice law and rules, and direct restitution. Whenever the court shall determine that a violation of this section has occurred, the court may impose a civil penalty of not more than two thousand dollars per call, up to a total of not more than twenty thousand dollars, for calls placed in violation of this section within a continuous seventy-two hour period. In connection with any such proposed application, the attorney general is authorized to take proof and make a determination of the relevant facts and to issue subpoenas in accordance with the civil practice law and rules.

7. In addition to the right of action granted to the attorney general pursuant to this section, any person who has received a telephone call in violation of this section may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both such actions. The court may, in its discretion, increase the award of damages to an amount not to exceed three times the actual damages up to one thousand dollars, if the court finds the defendant willfully or knowingly violated this section. The court may award reasonable attorney's fees to a prevailing plaintiff.

§ 2. This act shall take effect on the ninetieth day after it shall have become a law.

---

## GUARDIANSHIP OF THE PERSON OF A MINOR

### CHAPTER 232

S.7249

Approved and effective July 8, 1988

AN ACT to amend the family court act and the surrogate's court procedure act, in relation to guardianship of the person of a minor

*The People of the State of New York, represented in Senate and Assembly, do enact as follows:*

§ 1. Section six hundred sixty-one of the family court act, as amended by chapter one hundred eighty of the laws of nineteen hundred eighty-seven, is amended to read as follows:

Additions in text are indicated by <u>underline</u>; deletions by <s>strikeouts</s>

89

# STATE OF NEW YORK

8005

1989-1990 Regular Sessions

# IN ASSEMBLY

April 18, 1989

Introduced by COMMITTEE ON RULES -- (at request of M. of A. Nadler, Schimminger) -- (at request of the Consumer Protection Board) -- read once and referred to the Committee on Consumer Affairs and Protection

AN ACT to amend the general business law, in relation to unsolicited telefacsimile advertising

The People of the State of New York, represented in Senate and Assembly, do enact as follows:

1  Section 1. The general business law is amended by adding a new section
2  396-aa to read as follows:
3  S 396-aa. Unsolicited telefacsimile advertising. 1. The unsolicited
4  transmission of telefacsimile messages promoting goods or services for
5  purchase by the recipient of such messages is prohibited. For purposes
6  of this section, "telefacsimile" shall mean every process in which elec-
7  tronic signals are transmitted by telephone lines for conversion into
8  written text.
9  2. Any person, partnership, corporation, or any other entity which in-
10 tentionally transmits the messages proscribed by section one hereof or
11 which directs others to transmit such messages shall be liable to the
12 recipient of such messages for damages of five hundred dollars for each
13 minute of transmission plus reasonable attorney's fees and costs. Upon
14 finding that a defendant willfully or knowingly violated this section, a
15 court may also enjoin the defendant from such unlawful act or practice.
16 3. Any action brought pursuant to this section shall be commenced
17 within three years of the date of such transmission.
18 S 2. This act shall take effect on the sixtieth day after it shall
19 have become a law.

EXPLANATION--Matter in italics (underscored) is new; matter in brackets
[ ] is old law to be omitted.

LBD07137-03-9

Mr. COOPER. Thank you for that testimony. Mr. Barton, I would like to ask you to comment on the example given by Mr. Seltzer, a very specific three situations. I'd like to ask you how such things happen and how they can be prevented now through self-regulation.

Mr. BARTON. Well, we agree that they shouldn't happen. Prevent it through self-regulation is really just a process which is a very—I don't mean just a process, but is a process of having companies who use the machines become completely aware of what the ethical guidelines of the Direct Marketing Association and what telemarketers are and it is not to use automatic, sequential dialing machines in marketing.

I'm not sure frankly that you can do it through self-regulation. I think that this probably is an area which is susceptible to good regulation and we do not necessarily automatically oppose regulation along those lines. You just need to be careful in crafting regulation, so that it doesn't reach out more broadly and touch areas that you may have more difficulty with.

That's about the best I can do on that, in terms of self-regulation, Mr. Chairman.

Mr. COOPER. Mr. Barton, according to your testimony, your association is the largest trade association in the direct marketing arena?

Mr. BARTON. Yes sir.

Mr. COOPER. Can you tell us generally what percentage of telemarketing activity is confined within the boundaries of a single State and what percentage is interstate in nature?

Mr. BARTON. I will—I do not think I can get that, but I don't have it at my fingertips. I don't know. I will say, however, that I think probably the vast majority of certainly of the problem areas that we're talking about, are intra-state and not interstate.

My general knowledge of our members, who tend to be the biggest national telemarketers who do not use these practices—I don't think they use them at all. I don't know of anybody who does in our association. There might be some—are national marketers and we find that the sequential dialing, the "junk fax" is essentially in most cases a local phenomenon. It's local restaurants sending out menus and things of that nature.

Mr. COOPER. So your answer would apply both to automatic dialers and to fax machines?

Mr. BARTON. I think so, yes sir.

Mr. COOPER. Well, wouldn't it be relatively easy to find out the local calling areas in the United States in which one happened to jump State lines? For example, here in the District of Columbia area, it's a local call from Maryland to D.C. to Virginia and any combination of the above. Therefore, it would seem to me that you could receive fax attacks from any one of three jurisdictions, interstate, and yet it would be a local telephone call.

Mr. BARTON. That would be interstate, yes.

Mr. COOPER. So isn't it a relatively easy thing to look at a map of the United States and look at which areas, for example, the Washington, D.C. area, the New York area, that straddle two or more States, and then measure the markets in those areas. At least for

91

Washington and New York, they happen to be two of the largest markets in the United States, and to extrapolate from there.

With all due respect to West Virginia and Morgantown and places like that, my guess would be that that wouldn't be the number one fax attack target in the United States. It's more likely that——

Mr. BARTON. You mean the D.C. area or West Virginia?

Mr. COOPER. West Virginia would not be, because there's so many more people——

Mr. BARTON. Oh, would not be. I'm sorry.

Mr. COOPER. —here in the Washington, D.C. area. So you haven't undertaken even that sort of preliminary analysis, to look at local calling areas and which ones straddle State lines?

Mr. BARTON. No, not in the area of fax definitely. As far as I know, though I will check into our research records, I don't think it's been done in the area of telephone either.

Mr. COOPER. I would suggest that just off the top of my head, as a relatively quick and painless way to look at the potential markets there, and I would think the average businessman would look at those potential markets as the prime areas to approach. It would seem to me——

Mr. BARTON. I'm not quite sure what you're getting to. I agree with you in that sense, but the question I think was, was how many calls are interstate and how many are intra-state, and my answer, which is completely off the top of my head, was that most of the problem calls that we're talking about are probably intra-state. But I don't know that for a fact.

Mr. COOPER. You see, before you can make a statement like that, it seems to me you should have taken—undertaken preliminary analysis, just to look at jurisdictions in the United States which are so close to a State line that the local calling area crosses the State line. So you do not have to make a long distance call to call across the State line in the major metropolitan areas. Look at a few. St. Louis, Missouri, Kansas City.

Mr. BARTON. Sure.

Mr. COOPER. Baltimore is very close to a State line. Cincinnati, Ohio; Louisville, Kentucky; Memphis, Tennessee. It's almost hard to think of a major metropolitan area that isn't fairly close to a State line and in many of these cases, I would assume it's a local call, to cross the State line.

Therefore, you could be located say in Mississippi or Arkansas and make a local call to Memphis. Therefore, you could use an automatic dialing machine to make a local call across a State line.

Mr. BARTON. Yes.

Mr. COOPER. Since these are major metropolitan areas, to me you may be premature in asserting that most of these calls take place intra-state.

Mr. BARTON. I may be.

Mr. COOPER. For example, in the Washington, D.C. area it's almost hard to make a local call here, because the District of Columbia is so confined in its boundaries. Most people call routinely as a matter of course a local call could cross two or three States here, and yet it's viewed as a local call.

92

Mr. BARTON. Yes, yes. I'll find out whatever research the industry has on it and we'll send it to the committee.

Mr. COOPER. Mr. Glynn, do you have specific information on this point?

Mr. GLYNN. Well, I should point out to you that when these bills have been debated in the legislature of Maryland, one of the arguments against them has been they're a waste of time because all that will happen is if you illegalize it in Maryland, they'll just go to the District of Columbia and do it from there.

Also, in the case of a recent fax attack on the Governor of Maryland with respect to the bill he now has before him, that material came from the State of California. It came into Maryland and then was refaxed to the Governor in Maryland and—in what was described as a counterproductive lobbying effort—and approximately 20 percent of the people who got it and sent it back to the Governor changed the endorsement from veto the bill to sign the bill, suggesting that at least 20 percent of the people who got this material from California across interstate lines didn't really agree with the position of the person sending it to them.

But as you suggest, Maryland has a particular problem with its proximity to the District and its general smallness. I suspect quite a few other States have this same problem, and that argument has been made in the legislature.

Mr. BARTON. I would like to point out one thing about the fax attack. Number one, I would never ever use that as a lobbying technique, so I do not approve of it, but number two, it would not be affected by this bill, because it is not a solicitation for products, goods, or services.

Mr. COOPER. But, presumably, a fax owner could put his phone number on a list of excluded numbers, so that would limit the circulation of his fax number, would it not? Therefore, it would make it a little bit harder for the random telephone caller or for the would-be telephone caller to have his fax number. It would help alleviate the problem if not eliminate the problem.

Mr. BARTON. Yes. I just wanted to point out that this was not a solicitation. It was a request for an action.

Mr. COOPER. So, often—I hope you understand this—we as legislators are called on not to regulate the best members of an industry but to regulate to the lowest common denominator. All it takes are a few rotten apples to spoil a whole lot of the barrel if not the whole barrel, so I would encourage you and your association to get rid of as many bad apples as possible. I would like to ask you how many members have you ever kicked out of the Direct Marketing Association?

Mr. BARTON. In my 10 years there, I think it has only been one or two.

Mr. COOPER. Are there that few bad apples?

Mr. BARTON. It is a very difficult thing to do under our interpretation of the antitrust laws. We have found—we have an ethics committee, which, I believe, is in the testimony which holds—literally holds hearings behind closed doors against people who break our ethical guidelines, and then, we will either turn them over to the Federal Trade Commission, Postal Service, or first try to draw upon them to change them. Most of the complaints we get are not

about members of our Association. Our power is more likely to be exercised in keeping those people out of the Association. It is easier for us, from a legal viewpoint, to not grant them membership, or when their membership comes up for renewal, just not to renew their membership, and we have quite a few companies in which that has happened.

Mr. COOPER. Do you a periodic review of your members' practices so that you are able to monitor how they behave or misbehave?

Mr. BARTON. I think I can say we have a permanent, ongoing review through our ethics committee. Our Committee on Ethical Business Practices meets monthly and has a caseload at any one time of 20 or so cases which it is looking at for violations of ethical business practices.

Mr. COOPER. Those people to whom you deny membership, do they have an association of their own, the Bad Apple Association, perhaps?

Mr. BARTON. Not that I know of, but it might be a very popular one.

Mr. COOPER. They would have to get a new name for it, I suppose.

Mr. Ellis, do you have any way of predicting how many fax machines there are going to be in this country in the next few years, considering how the price is going down and the quality is going up?

Mr. ELLIS. The breaking point was in 1986 when what I call the fax revolution began. The statistic that I have seen, and it is not my own, is that by 1992, there will probably be in the area of 7 million fax machines in this country. Right now, there are 4.2 million in use worldwide, but the statistics are somewhat inconsistent, depending on who you listen to. In any case, there is no question that the sales of fax machines have been doubling every year for the past 2 or 3 years, and they will probably continue to double under the market is saturated.

Mr. COOPER. So, you would expect that doubling rate to continue——

Mr. ELLIS. For the next couple of years, at least.

Mr. COOPER. An almost exponential rate of growth.

Mr. ELLIS. Unquestionably.

Mr. COOPER. Mr. Glynn, since Maryland has banned the use of automatic dialers, what has been the response from consumer? Have consumer complaints gone down?

Mr. GLYNN. Not that I have been aware of. I mean the Public Service Commission continues to receive complaints regarding this issue and has continued to push in the legislature to get some enforcement techniques attached to the bill that already has passed the legislature. The problem has been sufficient that they have continued to push that particular effort. What has happened and what I think would always tend to happen with enforcement techniques, and I think this can be very effective, the IRS cannot arrest everyone who violates tax laws, but if you use enforcement techniques to prosecute the most severe violators of the law, that often has the effect of deterring others who do so, and that is generally what I suspect would probably happen.

page 125
Exhibit 10

Mr. COOPER. I guess if the level of consumer complaints have continued, that would indicate that, perhaps, the source of a lot of the phone calls is out of State?

Mr. GLYNN. That has been suggested, as I indicated, by a number of people that a lot of this actually originates either in northern Virginia or the District of Columbia, and as you suggested, that is the same local calling area, and that calling area calls greatly in excess of a million people.

Mr. COOPER. I cannot help but know that my Congressional district is bigger—in fact, double or triple the size of several States in New England, and it is hard for me to understand how State lines would be considered much of a barrier to these calls.

Mr. Seltzer, I believe you noted in your testimony that everyone—the consumer, the telemarketer, and the service provider—loses when telemessaging calls are placed to numbers assigned to pagers and to cellular phones. Well, given this situation, why do such calls continue to placed? Are specific sanctions needed in order to stop this particular problem, or as Mr. Barton suggests, will the market forces eventually be adequate?

Mr. SELTZER. Mr. Cooper, I feel that the primary reason that the problem persists is because the people using the autodialers—the telemarketers, if you will—are not really aware of exactly what they are doing.

Typically, I believe, these machines are preprogrammed. You enter a starting range and an ending range of numbers. The business person using that machine has no idea whose phone numbers they are within that range, but they program it to dial from A to Z, and hopefully, if they are paying attention to the results, they get to Z and they realize, "Gee, we did not get very many leads from this. We had better not use this block again."

Unfortunately, I think a practice that has become somewhat common in the telemarketing industry is when somebody buys one of these machines, he shares it with his friend and his friend's friend, and that is how you recoup some of your investment, whether you rent it, lease it, borrow it, however you get it, and unfortunately, five people may take the same machine and learn from the school of hard knocks that M through Q is a bad range of numbers, but unfortunately, they know what the beginning number is in a particular market and ending number and, given enough time, will get through all of those numbers.

Over time, will it police itself? I think it depends on whether these machines are allowed to continue to be easily gotten by businesses. Our firm had considered using such a machine to generate leads for paging service, but we quickly realized that if we were going to do that, that we would be subjecting other people to some of the same abuses that we are and we ought not to do that. I am strongly in favor of some way, if people want to use machines—I am not saying I am against them. What I am against is the machines accessing these critical numbers, such as paging, cellular, hospitals, etc., that we have reported to you today.

Mr. COOPER. Mr. Barton, can you remember any examples of market forces controlling industry abuses along these lines already? Has there been any industry response that is already indicative of how market forces are going to be successful in the future?

Mr. BARTON. I think in the area of direct mail—we do not use the "J" word as far as mail is concerned. We use it for other things, maybe, but not for direct mail.

Mr. COOPER. So, no direct mail is junk, according to your view?

Mr. BARTON. No, I said we do not use the "J" word.

Mr. COOPER. Let me elaborate on this. Is it against the ethics of your Association to use the word "junk" to describe some of the product that your members might produce?

Mr. BARTON. No. It is against my employment contract.

Mr. COOPER. You are an honest man, revealing a key detail like that.

Mr. BARTON. I think that the past several years show that even though there is a continuing problem with fraudulent and misleading mail—fraudulent mail is the junk mail, so I will do that way—that, in fact, complaints have been declining. The Better Business Bureau, in fact, for the first time, has shown that complaints against misleading advertising in direct mail are now number three in overall complaints, rather than number one.

I think we have been reasonably successful in the area of mail of keeping a lot of bad practices out of it, both through ethical guidelines and through the improvement of direct mail over the last 20 or 25 years. I think that is a successful example. It has not gotten rid of everybody, and to the extent that you can get rid of it through regulation of the really bad guys, I think we approve of regulations along those lines.

The market is going to take care of a situation in which you have "legitimate"—we are not talking about fraudulent people here—direct marketers when they cannot sell their product, and we do not know whether sending unsolicited fax now, in fact, is a very good way to sell a product. I suspect it is not, to tell you the truth.

Mr. COOPER. It is a specific problem that the direct marketer might respond to his ability or inability to sell product, but that in now way takes into account emergency messages that may have been interrupted as he was trying to sell his product. There are a whole host of risks and extranalities and problems that the direct marketer is probably completely unaware of.

Mr. BARTON. That is true.

Mr. COOPER. And that unless these disadvantages are taken into account, the direct marketer will never know how much his efforts are costing society, if not him personally.

Mr. BARTON. Now, we are talking about fax. I realize that that question can cover both, but if we are talking about fax, in general, that is true.

Mr. COOPER. I think it is automatic dialers, in general. I like Mr. Ellis' narrowing of the issue, because any interrupt of an dependable communications service could have a significant cost.

Mr. BARTON. Well, as I mentioned before, our good business practices guidelines for the Association say you should not even use them.

Mr. COOPER. How can this committee get a hold of the bad apples, if all your guys are good, what trade association represents those folks who do not believe in your ethical guidelines?

Mr. BARTON. I do not know.

Mr. COOPER. Are they just anonymous out there? They are not represented by anyone?

Mr. BARTON. In general, they are not represented by anyone.

Mr. COOPER. So, we cannot even find witnesses for this committee who will represent their viewpoint and interests?

Mr. BARTON. I am sure you could. I can give you some names, yes.

Mr. COOPER. Are you willing to do so publicly?

Mr. BARTON. I would do it in a letter to you, yes.

Mr. COOPER. I think that would be very helpful to the committee. I would be happy to yield back the microphone to the chairman of the committee.

Mr. MARKEY. Thank you, Mr. Cooper.

Mr. Barton, in your prepared statement, you briefly mentioned your Associations' telephone preference service.

Mr. BARTON. Yes.

Mr. MARKEY. Can you tell us more about how that service works and, specifically, how you go about notifying consumers that they can participate in the service, how many consumers are currently listed by the service, and how many individual telemarketing firms request and use the list?

Mr. BARTON. The way we educate the public as to the service is several ways, and we are now in the process of analyzing how we do it with the intention of going out for even a bigger public education campaign. About eight phone companies, I believe it is, carry the service in their white pages—in the information section of their white pages. We have an extensive network of mailing the information to consumers organizations, like the National Consumers League, so they can distribute among their members. Actionline editors of all newspapers, consumer editors of newspapers, magazines, and television and radio stations—we send it to them. Ann Landers, for example, who has advertised it several times in her column—we cover people like, and general trade press releases.

We have, now, slightly over, I believe it is, 100,000 names, and that is growing substantially every month. We just started the program. Well, we started in a fledgling way around 2 or 3 years ago, but it really has just been fairly—becoming commonly known just in the past few months or so.

I do not know how many companies we have. It is not as large a number as we would like. I believe there are around 40 companies that use the service, but that is a little misleading, and we need to check into that, because those companies are essentially service bureaus, who then rent telephone—the numbers that they have out to other companies. Therefore, we think we are probably covering 50 to 80 percent of the national telemarketing lists through those 40-some-odd companies, but we do not have very clear statistics on that.

Mr. MARKEY. OK. When Massachusetts consumers were given the chance to have their telephone numbers placed on an exclusion list, 200,000 Massachusetts consumers availed themselves of that opportunity. That was 7 percent of all the subscribers of telephones in Massachusetts, and that was in a first-time offering to get themselves off of this telemarketing connection. So, with 123 million telephone subscribers in the country, it would not be unreasonable

to expect, perhaps, tens of millions of Americans to want to just say that they do not want any part of this telemarketing world, and what I am wondering is whether or not you agree that that would be the natural result of making this a nationwide program?

Mr. BARTON. I really do not know.

Mr. MARKEY. You do not know. Do you think the Massachusetts example of 200,000 people——

Mr. BARTON. I personally was not aware of that example. I am sure somebody in our office was. That is a substantial example. I mean that it is a substantial number, and frankly, we do not want to call them. We do want to call people who do want to receive——

Mr. MARKEY. And they do not want to be called and it is a perfect marriage here that I think they want to be consummated immediately. They do not want to have to wait for some long-term solution to be put in place that incrementally gets towards the point where it is solved. They want something that it is in place now. It is a nuisance today. It is not something that is in the long-distant future. I mean the beneficiaries of this service are the advertisers. They are the ones who are deriving the primary benefit from it.

What is the rationale for shifting the cost of that advertising to the recipients?

Mr. BARTON. We are talking about fax?

Mr. MARKEY. Yes. Now we are moving over to fax—I am sorry—which is the case in the examples cited by Mr. Seltzer and Mr. Glynn in their testimony. Is there any real case that can be made for shifting the burden over to the recipient of this mail?

Mr. BARTON. I might defer to a legal expert on this. From a purely marketing-lobbying expert, that is one of the most difficult things that Direct Marketing Association has with the whole question of solicitation by fax—is, in fact, the fact that the customer or the prospective customer has to pay something, and I cannot answer your question at this point. We, frankly, off the cuff, do not like it either, and I think we would look with some favor in trying to resolve that problem by regulation or some sort of—I do not—right now, I do not how to do it.

Mr. MARKEY. Who can help me on this? Professor, maybe you could help me to sort this thing out. You have got the problem of cellular phones and the problem of fax, where the recipient is billed for——

Mr. ELLIS. That is not the issue, though. People who buy fax machines have shelled out a lot of money and 3 cents or 10 cents a page is not the issue. The issue is the intrusiveness, and I think what you need to do is differentiate between the telephone preference list—which, incidentally, I am a member of and it has really helped—for consumers—for private individual in their homes, on the one hand, and on the other, business telephone numbers, including fax telephone numbers. I think that there is a big difference between——

Mr. MARKEY. Can I just say—I beg to differ with you on saying that the cost is not an issue. If you were a Congressman, you would realize how upset people can be, no matter how wealthy they are, when someone tries to stick them with 6 or 8 or 10 bucks worth of cost.


98

Mr. ELLIS. I think we agree. It is not the cost. It is the fact that, even if it is 3 cents, somebody else has forced me to spend it. I can afford the 3 cents.

Mr. MARKEY. I understand that, OK, but you would be surprised at how many people object to the money as well, OK? The principle is not exclusive.

Mr. ELLIS. Quite true.

Mr. MARKEY. OK.

Mr. ELLIS. I think a more fundamental issue is the differentiation between intrusiveness of the homes of private consumers, private individuals, via telemarketing, which is something that the telephone preference list addresses quite well, from my understanding. At least, it is a good attempt to do that, but on the other hand, fax and business-type telephone numbers—what business does not want to be solicited for a better deal at a better price? That is why businesses have telephones. That is one of the reasons why they have fax machines.

So, I think that a list to be maintained by a local operating company that would enable a business to say, "We do not want to receive unsolicited messages", I think it would be missing the mark, because businesses want to receive messages. They just do not want to receive the junk messages, the cold calls.

Mr. COOPER. Can I intervene briefly here?

To me, that does not directly address the issue. Sure, a business likes to be able to receive things, but it does not want its ability to transmit at the same time interrupted. It does not want its ability to receive other more important messages interrupted. That is the trouble. You have got a bottleneck here, and the junk is clogging up the bottleneck.

Mr. ELLIS. That is right. You have a scarce resource, and to the extent that you are successful in using your fax machine in your business, let us say, to take purchase orders, the more people that use your fax machine to send you purchase orders, the more your fax machine is going to be tied up, and it is a difficult thing to prioritize what has a right to come and what does not. It could very well be that some sort of emergency situation where somebody is trying to send you something via fax is blocked by a purchase order or a lesser priority type of commercial mail.

If we are going to be prohibiting something, it has got to be something that doesn't chill normal business correspondence. That is why my suggestion is that to minimize the regulatory burden and to not put a chilling effect on normal business correspondence, that we focus on the dialers, these people like Mr. Seltzer has mentioned that just can dial every single number until they get a Fax response.

I don't know if that answers that you were trying to address.

Mr. COOPER. It seems to me that most people view Fax messages as having some priority and some urgency, and normal business correspondence, as you refer to it, at least in 1989, means letters and maybe phone calls, things like that. It is the blurring of these two categories that creates confusion.

Mr. ELLIS. That is correct.

Mr. COOPER. My view of someone who put his business on an exclusionary list would be to say my Fax machine is reserved for

99

high priority messages, and if anyone wants to contact me, they will have to do it in the normal letter or other means but not through my Fax machine. That to me has a de facto prioritization that makes a lot of sense. It doesn't prohibit communications with the business. He just says: Look, put a stamp on a letter if you want to talk to me, or use the telephone.

Mr. ELLIS. I think that is a legitimate concern. My concern would be that allowing or instituting that sort of a practice, the asterisked phone directory of Fax numbers, would perhaps be misinterpreted by some businesses. In reaction to the Mr. Fax ads or whatever, they put their name on the list and then realize at some point that they are not getting messages they wish they would get.

If I am a restaurant supply house—or instead of a restaurant supply house, let's say that I am a chain of restaurants and somebody out there has a deal that they can offer me very quickly. Maybe they can get to me on the phone, but they want to Fax me the list and the notice I am on that asterisked number. It is a chilling effect. It doesn't prohibit the business. Obviously, they can mail it.

Mr. MARKEY. A chilling effect in what way? I'm sorry. I don't understand.

Mr. ELLIS. It is a chilling effect in that if we institute a system whereby this——

Mr. MARKEY. I don't understand. It seems to me that if I want to send you something and I see that you are in need of some new product, that I can call you on your phone and say I have got this important message that I want to Fax you, you get to talk to the businessman's secretary, the businessman's secretary says let me get right back to you, she walks in, she sees the business executive, he walks back out and he says thanks very much, why don't you send me a letter.

Now, if he wants to give you his confidential Fax number, he has got a choice at that moment in time. It doesn't seem to me that is a chilling effect. That is a proper balance between his right of privacy and your right to solicit his business. If he wants to then construct what the nature of your communication with him would be, which would be not even through phone but through a letter rather than getting his private, confidential Fax number, why would that have a chilling effect?

Mr. ELLIS. It would have a chilling effect only in that business people—and in my law practice I represent a lot of business people that don't like lawyers and they just want to get on with making the deal and not worrying about the legalistic aspects of it. If in the course of a normal business day, as a businessman I have to think about am I allowed to send him a Fax or not, that is a slight chilling effect. Maybe it is not a significant one. That is perhaps not for me to judge. It is just a concern that it would be a deliberate under-utilization of a resource.

Mr. MARKEY. But it would seem to me that if the other party wanted to construct a barrier to your ability to get to them as a negotiating technique and that they wanted you to go through a very convoluted process to reach them, and you were able to say: Oh, no, I sent a Fax right in to you, you can't say that I didn't talk to you or I didn't meet you. OK? You would be invading his right

to be able to restrict your access to him, and I think that on balance, Professor, it just seems to me that you would want to allow someone to be able to construct his own private world.

Mr. ELLIS. If somebody really wants to do that, the technology is available today through call blocking.

Mr. MARKEY. Why should he have to pay to protect himself from somebody that is trying to invade his privacy? Why shouldn't we slant the burden the other way? That is what I don't understand. Here you have got a system that you belong to which how many people belong to?

Mr. ELLIS. I have no idea.

Mr. MARKEY. I mean the system that excludes people, something like 100,000 people. In Massachusetts they put it out for a week and 200,000 people want to join up. You have only got 100,000 people. At this rate, around 2095 we will have everyone in America joining up to that system. Over here we see a mass demand that has to be met, it seems to me, on a mass response basis in order to provide the level of privacy people are looking for.

Mr. ELLIS. You are correct there, and it is a judgment call for businesses whether we allow the market to self regulate and allow call blockers to do their thing for businesses that really don't want to receive unsolicited messages, or whether you do it via regulation. That I will defer to the committee on because it is a judgment call.

Mr. COOPER. If the gentleman would yield for a second, it seems to me that under your definition, Professor Ellis, of chilling of communication, any businessman in American who has a good secretary who is screening calls is guilty of chilling communication. Any businessman with a good, strong front door with a lock on it or a "No Solicitation" sign in his front window or a building that has got proper soundproofing would be guilty of chilling communication.

Mr. ELLIS. Exactly the point.

Mr. COOPER. I think most businessmen would view that as their right.

Mr. MARKEY. Or I might add—I have found this—as you walk door to door it is unbelievable the chilling effect that a Doberman Pinscher can have on your right to ring that doorbell at 8:00 in the morning to ask them for your vote or at 9:00 at night. It is unbelievable. You just don't feel like you ought to be doing it when you hear that Doberman coming over the fence.

Mr. ELLIS. And that is where the chilling effect should come in, from the person who does not want to receive the messages saying I don't want to do it rather than the person who wishes to send something.

Mr. MARKEY. That is why they want a list and why they want to have it expedited and why they want to have it centralized and why they want to have you notified that if you want to do it, you are going to be running a list of violating their legally protected right to privacy.

Mr. ELLIS. I have often thought of maybe telling Ed McMahon anything he sends me is obscene and therefore under the Rowland test——

Mr. MARKEY. By definition.

101

Mr. ELLIS. We used to do that by saying, I think, anything from the Draft Board, they viewed that as obscene and didn't want to receive any further mail from that source.

Mr. COOPER. If I could just have one more question, Mr. Chairman.

Mr. MARKEY. Surely.

Mr. COOPER. I have wondered why, when we are talking about free market response, the telephone companies haven't responded with promotions of exclusionary lists or other ways of blocking these calls. Telephone companies seem to offer a great many value-added services now, call forwarding, all sorts of things like that. This seems to be a type of service for which there is great demand if 200,000 people will sign up for that.

As I understand it, we had difficulty locating a telephone company witness for this hearing today because they didn't want to be associated with the issue. Why are they not clamoring to be able to provide this service to consumers?

Mr. ELLIS. The answer to that is fairly simple. There is not a regulatory mechanism in effect that would enable them to do that and have teeth in it.

Mr. COOPER. The phone companies approach us all the time asking for regulatory mechanisms that enable them to offer all sorts of new services, some of which would be illegal for them to provide today. Why aren't they asking for the regulatory power to do that with this type of service?

Mr. ELLIS. That is beyond me. I don't know unless they view—no, that would be speculative. I don't know.

Mr. SELTZER. May I attempt to respond? Keep in mind the phone company is in the business of processing phone calls. If somebody wants to Fax Professor Ellis something, in most jurisdictions they are going to pay a message unit to make that call. In fact, the phone company is in the business of selling phone service. If a company is paying on an auto-dialer situation for every call that goes out, what incentive is there for the phone company to want to stop that?

I am not suggesting that that is their motive for not being here today or not responding, but you are asking them to stop what they are in the business to do.

Mr. COOPER. But that assumes there would be no charge for being on the exclusionary list. I am not advocating that there be such a charge, but it seems to me that the consumer of appeal of a broad advertisement that said "Freedom from Junk Fax, $1," that would be one of the best spent dollars the consumer could get.

Mr. SELTZER. It is almost like you pay extra to have an unlisted number. You pay extra to have something that you don't get, i.e., a listing in the phone book, yet there is a rationale for doing that. But again, now you are asking the consumers to pay money so that they don't have to get these Fax messages, et cetera, and I think that is part of it.

Mr. COOPER. Most or a great number of women all over America for years have been asked to pay for an unlisted number so that they would not be subjected to obscene phone calls or other unwanted calls, and that has been a promotional device that has been used for years.

page 133
Exhibit 10

Mr. ELLIS. Of course, the unlisted number isn't that much good any more with the auto-dialers.

Mr. COOPER. Right. Are you suggesting they should lower the charge for the unlisted the phone number?

Mr. ELLIS. Probably.

Mr. SELTZER. Professor Ellis made a comment of the cost of a Fax being anywhere from three to ten cents, and in the case of a cellular customer or a paging customer——

Mr. ELLIS. It's the paper.

Mr. SELTZER. I understand. The paper and use of machine, et cetera. But in the case of a cellular customer and a paging customer, depending on the rate plan they are on, they could be paying anywhere from about 27 cents to 47 cents for that call that they would receive that they didn't want in their car, or in the case of paging, about 15 cents for the call. So the cost increases dramatically when you are looking at a mobile telephone subscriber or a paging subscriber as opposed to a Fax customer.

Mr. COOPER. I have no further questions.

Mr. MARKEY. I just have one final question, which goes to Mr. Barton's point. I want to just read Mr. Barton's statement and the I can get some comment from the other members. He says that Facsimile advertising "is simply a technology used in connection with commercial speech," and he urges any legislation or regulation we consider "to take account of and properly reflect the protections accorded by the first amendment to speech in all of its richness and forms."

Could you tell me what you believe is the proper balance, Mr. Seltzer, between the first amendment rights of Facsimile advertisers and——

Mr. SELTZER. I am sure there are people in business today that do not object to receiving types of junk Fax that we are talking about today. However, I feel that those are likely the minority and I think that we are here to address the majority, and I would have to go on record as saying that the majority of business people do not want that type of intrusion. I think they are already unhappy.

I know he is not allowed to talk about junk mail, but it is not in my employment contract so I can do that. We are not happy about that but we accept that because I don't feel we have any control over it, but I certainly feel I should have control over my Fax machine.

Mr. MARKEY. Mr. Glynn?

Mr. GLYNN. I think there is very little legal and moral justification for permitting one group of people to abuse another group of people's rights just because Fax is a very cheap method of turning a buck. There are plenty of other ways legitimate business people can exercise their first amendment rights, get their message delivered and get a legitimate response from those who are interested in hearing about it. I would tend to put the balance heavily on the side of the right of the public to be protected from these types of intrusions, and recognizing that there is plenty of other first amendment methods whereby this type of message can be delivered legitimately.

Mr. MARKEY. Professor Ellis?

Mr. ELLIS. It is clear that commercial speech does not enjoy the same protections under the first amendment that other types of speech enjoy. In fact, prior to 1976 commercial speech was considered to be outside the scope of the first amendment entirely. Since 1980 there has been a pretty well-established test to determine whether government can regulate certain types of speech.

Without going into it orally, my written testimony contains a pretty extensive outline of that test. It is the *Central Hudson Gas and Electric Corporation* v. *Public Service Commission* test. Under that test, this committee could certainly regulate or the Congress certainly could regulate the type of speech in question here. So constitutionally, speaking bout the first amendment, there is no problem in regulation.

Mr. MARKEY. We will give you the final word, Mr. Barton.

Mr. BARTON. I have no final word. I commend you for what you are trying to do and we would like to work with you to get some good regulations to prevent the problems which you describe from coming into existence in a good, legitimate way.

Mr. MARKEY. Great. Well, I am encouraged by your willingness to cooperate, and we will take this hearing, use it as our foundation, continue to solicit, consistent with constitutional protections for those we solicit from, views of various other parties across the country.

We intend on moving forward with this area of legislation, and what we would like to be able to do is to stay in close contact with all of you because I think we are going to have a number of questions which will be raising their heads as we move forward and we will need your participation for us to help to iron it out and do so in a way that satisfies constitutional protections while at the same time protecting the public.

So we thank you all very much. I think it has been a very useful hearing, and I can promise you that it will most likely lead to some legislative product being produced. You, Mr. Barton, especially, I would encourage you to stay close to us to give us your input.

Thank you. This hearing is adjourned.

[Whereupon, at 12:15 p.m. the hearing was adjourned.]

[The following letters and statement were received:]

104

**Bell Atlantic**

Aubrey Sarvis

Vice President
Federal Legislative Relations

1710 Rhode Island Avenue, N.W.
Washington, D.C. 20036
(202) 392-1382

June 26, 1989

The Honorable Ed Markey
Chairman, House Telecommunications and
Finance Subcommittee
2125 Rayburn House Office Building
Washington, D.C. 20515

Dear Mr. Chairman:

Bell Atlantic appreciates the opportunity to comment on
legislation recently introduced in the House pertaining to the use
of automatic telephone dialing systems and facsimile machines
(H.R. 628 - Restrictions on the Use of Telephone Autodialing
Systems, H.R. 2131 - Automated Telephone Solicitation Protection
Act of 1989, and H.R. 2184 - Facsimile Advertising Regulation
Act). While we recognize the concerns that led to the
introduction of these bills, we believe that certain provisions in
two of the bills (H.R. 628 and H.R. 2131) may be overly
restrictive in that they may prevent legitimate uses of automatic
telephone dialing equipment. Bell Atlantic is also concerned with
provisions requiring common carriers to maintain listings of
customers who object to unsolicited calls or fax messages and with
provisions that may place the responsibility for 5 second
disconnect on telephone companies.

H.R. 628 does not recognize the legitimate uses of this
automatic dialing equipment. Organizations use automatic
telephone dialers for legitimate purposes such as group alerting,
emergency reporting, providing customer notification when orders
are ready for pick-up, and providing message delivery services to
customers. Bell Atlantic uses automatic dialing devices in its
normal business operations (e.g., to follow up on customer
satisfaction of repair and installation services). The bill
focuses on the equipment and not on the problem -- organizations
that abuse automatic telephone dialers.

**105**

-2-

Both H.R. 628 and H.R. 2184 require common carriers to keep lists of subscribers who do not wish to receive unsolicited messages. Bell Atlantic is concerned that these requirements would place excessive costs as well as an administrative burden on the telephone companies when these carriers are not the cause of the abuse. Although H.R. 628 prohibits common carriers from charging any customer who wants to be added or removed from the lists, the legislation is unclear as to whether we can charge telemarketing firms who use the lists.

Also, contrary to statements made at the May 24 hearing on these bills, we do not agree that requiring telephone companies to absorb the cost of list maintenance is parallel to efforts to block '979' numbers. Bell Atlantic has the technical capability to block calls to 976 services. However, we do not have the capability to prevent calls made by users of automatic telephone dialing systems. A requirement for the telephone companies to maintain lists of customers who do not want to receive calls made by automatic dialing devices does not prevent these types of calls from being made. The telephone companies cannot enforce or require telemarketers to purchase or use lists. Common carriers should not be responsible for the actions of telemarketers.

Two of the bills (H.R. 628 and H.R. 2131) contain a provision requiring the automatic telephone dialing system to disconnect within 5 seconds after the called party hangs up. Although upgraded switching technology may allow carriers to offer a service in the near future which provides disconnect on such a shortened interval, most telephone company switches currently provide disconnect within 11-12 seconds. Older switching equipment may take up to 30 seconds to disconnect. To require telephone companies to provide disconnect within 5 seconds would mean that these companies would have to change existing switches before the switching equipment naturally evolves with more sophisticated software applications. This would be inefficient and would result in tremendous additional capital expenses that would ultimately be borne by our ratepayers.

A more appropriate solution would be to place the responsibility for disconnect on the user of automatic dialing equipment; they should use suitable technology that can sense disconnect. For example, technology currently exists which enables the automatic dialing equipment to provide an opening message to the called party indicating that they can push a key on their touchtone phone to disconnect (much the same way some answering machines work). Although this solution will not work with all phones, it is one option available to users of automatic dialing systems.

106

-3-

Bell Atlantic is concerned that other suitable alternatives have not been considered.  We believe some of the public's concerns can be alleviated by increased customer awareness and by the involvement of organizations like the Direct Marketing Association (DMA).  DMA offers free to consumers a service called "Telephone Preference Service" through which telemarketers remove an individual's name from their telephone lists upon the consumer's request.  DMA also publishes Guidelines for Ethical Business Practices which recommends that telephone marketers should not solicit sales using automatic electronic dialing equipment unless the equipment can disconnect immediately after the called person hangs up.

If these bills move forward, Bell Atlantic recommends the following:

Include language recognizing the legitimate use of automatic telephone dialing equipment (e.g., emergency notification, school system & church uses, business and residence messages services, or situations where a business relationship exists).

H.R. 626 and H.R. 2184 -- although a more appropriate solution would be to establish a national clearinghouse for consumers who do not want their numbers given to telemarketing firms, if common carriers are required to maintain lists several issues should be addressed:

-    firms who select customers to receive calls made by automatic dialing equipment should pay the costs of creating and maintaining the lists.
-    common carriers should not enforce use of the lists and should not be liable for any misuse or failure by a firm to maintain current listings.

H.R. 628 and H.R. 2131 -- place the responsibility for disconnect on the automatic dialing equipment or extend the disconnect time requirements from 5 seconds to 11-12 seconds.

Thank you for your consideration of this matter.  Please feel free to contact me on 392-1382 if Bell Atlantic can provide you with additional information.

*Ruby Davis*

(PA) (800) 512-0944
FAX (814) 944-3916

## *Modern Communications Corporation*

1215 Sixteenth Street   •   Altoona, PA 16601   • (814) 944-2028

June 12, 1989

The Honorable Edward J. Markey, Chairman
Telecommunications & Finance Sub-Committee
H2-316 HOB Annex II
Washington, D.C.   20515

Dear Chairman Markey:

As a follow up to my testimony before your Sub-Committee Hearing last month, and to assure you that the cases of disruption from auto-dialers continues, I enclose a copy of a log from our Uniontown paging terminal from Friday, June 2, 1989.  This log shows that an automatic dialer began calling our paging numbers at approximately 1:36pm.  Fortunately in this case, we were able to determine who the firm was doing the calling.  We notified them, so the problem only continued for a short period of time.  In this case we were lucky, but in other cases we have not been so lucky!

These problems are serious and continue to plague our industry.  I urge you to do anything you can to provide a solution to this long-standing problem.

Sincerely,

Steven S. Seltzer
President

SSS/jak
Enclosure
cc:   Mary Ann Kilduff/Telocator
       Margaret Burwell

*Your Total Communications Company Since 1954*

- Telephone Answering Service
- Electronic Telephone Systems
- Two Way Radio Sales
- Radio Paging Service
- Agent-Cellular One®
- ADAM Voice Messaging
- Mobile Telephone Service
- 3M Sound Products
- Alarm Monitoring

```
BRS-UNIONTOWN  Friday  June 2, 1989

Trunk   2    Pager 3702    Chan. 1   S Tx.  1 2 3 4 . . . .    Type  2   13:15:05
Trunk   1    Pager 1443    Chan. 1   S Tx.  1 2 3 4 . . . .    Type  5   13:15:06
Trunk   7    Pager 1038    Chan. 1   S Tx.  . 2.3 . . . .      Type  2   13:15:09
Trunk   4    Pager 3584    Chan. 1     Tx.  1 . . . . . . .    Type  2   13:16:41
Trunk   3    Pager 4378    Chan. 1   S Tx.  1 2 3 4 . . . .    Type  5   13:17:13
Trunk   7    Pager 1175    Chan. 1   S Tx.  1 2 3 4 . . . .    Type  6   13:17:14
Trunk   1    Pager 1244    Chan. 1   S Tx.  1 2 3 4 . . . .    Type  5   13:17:52
Trunk   5    Pager 3954    Chan. 1   S Tx.  . 2 . 4 . . . .    Type  2   13:17:53
Trunk   6    Pager 3820    Chan. 1   S Tx.  1 2 3 4 . . . .    Type  5   13:18:26
Trunk   6    Pager 3833    Chan. 1   S Tx.  1 2 3 4 . . . .    Type  5   13:19:43
Trunk   2    Pager 4388    Chan. 1     Tx.  1 . . . . . . .    Type  2   13:19:52
Trunk   5    Pager 3929    Chan. 1   S Tx.  1 2 3 4 . . . .    Type  5   13:20:09
Trunk   7    Pager 1105    Chan. 1   S Tx.  1 2 3 4 . . . .    Type  6   13:20:41
Trunk   4    Pager 4379    Chan. 1   S Tx.  1 2 3 4 . . . .    Type  5   13:20:48
Trunk   3    Pager 2707    Chan. 1   S Tx.  1 2 3 4 . . . .    Type  5   13:21:18
Trunk   2    Pager 2752    Chan. 1     Tx.  1 . . . . . . .    Type  2   13:21:36
Trunk   8    Pager 3964    Chan. 1   S Tx.  1 . 3 4 . . . .    Type  2   13:22:07
Trunk   4    Pager 3659    Chan. 1   S Tx.  1 2 3 4 . . . .    Type  2   13:23:15
Trunk   5    Pager 2063    Chan. 1   S Tx.  . . 3 4 . . . .    Type  2   13:23:15
Trunk   3    Pager 6882    Chan. 1   S Tx.  1 2 3 4 . . . .    Type  5   13:24:29
Trunk   2    Pager 6882    Chan. 1   S Tx.  1 2 3 4 . . . .    Type  5   13:25:04
Trunk   4    Pager 6882    Chan. 1   S Tx.  1 2 3 4 . . . .    Type  5   13:26:01
Trunk   6    Pager 1827    Chan. 1   S Tx.  1 2 3 4 . . . .    Type  3   13:26:20
Trunk   2    Pager 4736    Chan. 1   S Tx.  1 2 3 4 . . . .    Type  5   13:26:32
Trunk   4    Pager 3572    Chan. 1   S Tx.  1 2 3 4 . . . .    Type  6   13:26:33
Trunk   1    Pager 1239    Chan. 1   S Tx.  1 2 3 4 . . . .    Type  5   13:27:02
Trunk   3    Pager 3542    Chan. 1   S Tx.  1 2 3 4 . . . .    Type  6   13:27:55
Trunk   6    Pager 3800    Chan. 1   S Tx.  1 2 3 4 . . . .    Type  5   13:28:24
Trunk   2    Pager 4738    Chan. 1   S Tx.  1 2 3 4 . . . .    Type  5   13:28:39
Trunk   7    Pager 1219    Chan. 1   S Tx.  1 2 3 4 . . . .    Type  5   13:30:16
Trunk   1    Pager 1443    Chan. 1   S Tx.  1 2 3 4 . . . .    Type  5   13:30:31
Trunk   4    Pager 2728    Chan. 1     Tx.  1 . . . . . . .    Type  2   13:31:08
Trunk   8    Pager 2034    Chan. 1   S Tx.  1 2 3 4 . . . .    Type  2   13:31:25
Trunk   8    Pager 3955    Chan. 1   S Tx.  1 2 3 4 . . . .    Type  3   13:32:17
Trunk   1    Pager 1339    Chan. 1   S Tx.  1 2 3 4 . . . .    Type  6   13:32:17
Trunk   5    Pager 2020    Chan. 1     Tx.  . . . 4 . . . .    Type  2   13:32:54
Trunk   6    Pager 3833    Chan. 1   S Tx.  1 2 3 4 . . . .    Type  5   13:33:03
Trunk   8    Pager 2944    Chan. 1   S Tx.  1 2 3 4 . . . .    Type  2   13:33:51
Trunk   5    Pager 7057    Chan. 1   S Tx.  1 2 3 4 . . . .    Type  5   13:34:08
Trunk   6    Pager 1827    Chan. 1   S Tx.  1 2 3 4 . . . .    Type  3   13:34:20
Trunk   1    Pager 1439    Chan. 1   S Tx.  1 2 3 4 . . . .    Type  5   13:35:20
Trunk   6    Pager 8059    Chan. 1     Tx.  . 2 . . . . . .    Type  2   13:35:28
Trunk   3    Pager 6804    Chan. 1     Tx.  1 . . . . . . .    Type  2   13:36:08
Trunk   2    Pager 6814    Chan. 1   S Tx.  1 2 3 4 . . . .    Type  3   13:36:36
Trunk   6    Pager 3833    Chan. 1   S Tx.  1 2 3 4 . . . .    Type  5   13:36:39
Trunk   4    Pager 6824    Chan. 1     Tx.  1 . . . . . . .    Type  2   13:36:53
Trunk   3    Pager 6953    Chan. 1   S Tx.  1 2 3 4 . . . .    Type  6   13:37:12
Trunk   2    Pager 6834    Chan. 1   S Tx.  1 2 3 . . . . .    Type  2   13:37:21
Trunk   7    Pager 1244    Chan. 1   S Tx.  1 2 3 4 . . . .    Type  5   13:37:38
Trunk   4    Pager 6844    Chan. 1     Tx.  1 . . . . . . .    Type  2   13:37:51
Trunk   6    Pager 8049    Chan. 1   S Tx.  1 2 3 4 . . . .    Type  2   13:38:05
Trunk   8    Pager 3985    Chan. 1   S Tx.  1 2 3 4 . . . .    Type  5   13:38:15
Trunk   3    Pager 6854              Invalid subscriber number.            13:38:17
Trunk   1    Pager 1434    Chan. 1   S Tx.  1 2 3 4 . . . .    Type  5   13:38:25
Trunk   2    Pager 6864    Chan. 1     Tx.  1 . . . . . . .    Type  2   13:38:40
Trunk   3    Pager 6874    Chan. 1   S Tx.  1 2 3 . . . . .    Type  3   13:39:10
```

109

```
Trunk  4    Pager 3598    Chan. 1   S Tx. 1 2 3 4 . . . .    Type  6   13:39:11
Trunk  2    Pager 6818    Chan. 1     Tx. 1 . . . . . . .    Type  2   13:39:18
Trunk  7    Pager 1135    Chan. 1   S Tx. 1 2 3 4 . . . .    Type  6   13:39:29
Trunk  4    Pager 6884        Invalid subscriber number.               13:39:36
Trunk  3    Pager 6894    Chan. 1   S Tx. 1 . 3 4 . . . .    Type  2   13:39:56
Trunk  2    Pager 3641    Chan. 1   S Tx. 1 . 3 . . . . .    Type  2   13:40:16
Trunk  4    Pager 3552    Chan. 1   S Tx. 1 2 3 4 . . . .    Type  5   13:40:23
Trunk  3    Pager 6904    Chan. 1   S Tx. 1 2 3 4 . . . .    Type  3   13:40:25
Trunk  1    Pager 1239    Chan. 1   S Tx. 1 2 3 4 . . . .    Type  5   13:40:25
Trunk  2    Pager 6914        Invalid subscriber number.               13:40:40
Trunk  3    Pager 6924    Chan. 1   S Tx. 1 2 3 4 . . . .    Type  3   13:41:01
Trunk  7    Pager 1412    Chan. 1   S Tx. 1 2 3 4 . . . .    Type  6   13:41:14
Trunk  5    Pager 3905    Chan. 1   S Tx. 1 2 3 4 . . . .    Type  5   13:41:17
Trunk  4    Pager 6934        Invalid subscriber number.               13:41:24
Trunk  2    Pager 6944    Chan. 1   S Tx. 1 2 3 4 . .. . .   Type  2   13:41:44
Trunk  3    Pager 6954    Chan. 1   S Tx. 1 2 3 4 . .. . .   Type  3   13:42:02
Trunk  4    Pager 6964    Chan. 1   S Tx. 1 2 3 4 . . . .    Type  2   13:42:20
Trunk  7    Pager 1412    Chan. 1   S Tx. 1 2 3 4 . . . .    Type  6   13:42:41
Trunk  2    Pager 6974    Chan. 1   S Tx. 1 2 3 4 . . . .    Type  5   13:42:46
Trunk  1    Pager 1439    Chan. 1   S Tx. 1 2 3 4 . . . .    Type  5   13:42:51
Trunk  3    Pager 6984    Chan. 1   S Tx. 1 2 3 4 . . . .    Type  6   13:43:11
Trunk  4    Pager 4384    Chan. 1     Tx. 1 . . . . . . .    Type  2   13:43:23
Trunk  2    Pager 6994    Chan. 1   S Tx. 1 2 3 4 . . . .    Type  2   13:43:29
Trunk  3    Pager 3586    Chan. 1     Tx. 1 . . . . . . .    Type  2   13:43:44
Trunk  7    Pager 1336    Chan. 1   S Tx. 1 2 3 4 . . . .    Type  5   13:43:45
Trunk  1    Pager 1262    Chan. 1   S Tx. 1 2 3 4 . . . .    Type  3   13:44:29
Trunk  4    Pager 3657    Chan. 1   S Tx. 1 2 3 4 . . . .    Type  6   13:44:38
Trunk  6    Pager 8055    Chan. 1   S Tx. 1 2 3 4 . . . .    Type  6   13:44:52
Trunk  3    Pager 2753    Chan. 1     Tx. 1 . . . . . . .    Type  2   13:45:33
Trunk  6    Pager 3838    Chan. 1   S Tx. 1 2 3 4 . . . .    Type  5   13:46:00
Trunk  4    Pager 6925    Chan. 1   S Tx. 1 2 3 4 . . . .    Type  6   13:46:45
Trunk  6    Pager 3833    Chan. 1   S Tx. 1 2 3 4 . . . .    Type  5   13:46:57
Trunk  2    Pager 6991    Chan. 1   S Tx. 1 . 3 . . . . .    Type  2   13:47:06
Trunk  7    Pager 1364    Chan. 1   S Tx. 1 2 3 4 . . . .    Type  5   13:47:07
Trunk  8    Pager 3924    Chan. 1   S Tx. 1 2 3 4 . . . .    Type  5   13:47:29
Trunk  1    Pager 1221    Chan. 1   S Tx. 1 2 3 4 . . . .    Type  6   13:47:31
Trunk  5    Pager 6580    Chan. 1   S Tx. 1 2 3 4 . . . .    Type  6   13:47:32
Trunk  3    Pager 6996    Chan. 1     Tx. 1 . . . . . . .    Type  2   13:47:35


Trunk  4    Pager 4310    Chan. 1   S Tx. 1 2 3 4 . . . .    Type  3   13:48:00
```

National Retail Merchants Association                                    **NRMa**

TELEX—INT'L. 220 · 883 · TAUR
TWS—DOMESTIC 710 · 581 · 5380 TPNYK
        ATTN: NRMA

1000 Connecticut Avenue, N.W.
Washington, D.C. 20036
202/223-8250

June 26, 1989

The Honorable Edward J. Markey
Chairman
Telecommunications and Finance Subcommittee
Committee on Energy and Commerce
U.S. House of Representatives
Washington, D.C. 20515

Dear Mr. Chairman:

The National Retail Merchants Association hereby submits comments on legislation designed to impose certain restrictions on the use of automatic telephone dialing equipment, H.R. 2131 and H.R. 628, which have been the subject of hearings in your Subcommittee on Telecommunications and Finance. (These comments do not address H.R. 2184, legislation related to practices involving commercial uses of telephone facsimile machines, which was also the subject of those hearings.) NRMA requests that this letter be made a part of the Subcommittee's hearing record on that legislation.

By way of background, NRMA is the nation's largest trade association representing the general merchandise retail industry. Our members operate approximately 45,000 department, chain, specialty and independent stores across the country. Their annual aggregate sales exceed $175 billion and they employ more than three million workers. Because the telephone is an important link between retailer and consumer and is widely used to benefit both parties, the retail industry is naturally interested in any legislation which imposes restrictions or prohibitions on its ability to use this vital equipment.

At the outset, it is important to note that NRMA is sympathetic to the goals of the pending legislation to eliminate abuses of the existing technology. However, we believe the broad sweep of the legislation will unnecessarily restrict and impede normal, natural and necessary business transactions between retailer and consumer. Our specific concerns are noted below.

**EXECUTIVE OFFICERS**

Chairman of the Board
**HARWELL W. PROFFITT**
Chairman of the
  Executive Committee
Proffitt's, Inc.

First Vice Chairman of the Board
**WILLIAM R. HOWELL**
Chairman and CEO
J.C. Penney Company, Inc.

Second Vice Chairman of the Board
**JOSEPH E. ANTONINI**
Chairman, President and CEO
K mart Corporation

Chairman of the Finance Committee
**FRANCIS R. STRAWBRIDGE, III**
Chairman of the Board
Strawbridge & Clothier

President & Treasurer
**JAMES R. WILLIAMS**
NRMA

Corporate Secretary
**MARY ELLEN McGROARTY**
NRMA

Home Office: 100 West 31st Street, New York, N.Y. 10001

111

2

LEGISLATIVE SCOPE:  As a threshold issue, we question the scope of H.R. 2131 in that it applies only to business solicitation (sales) telephone calls which use automatic dialing equipment, but would exclude those calls if they were made by charities or political groups.  It appears obvious that if the automatic dialing equipment is subject to abuse, those abuses can as easily be committed by charities or political groups as they can by business organizations. Therefore, we oppose this provision in the legislation, and argue that it violates the Equal Protection Clause and the First Amendment.

DEFINITION OF "AUTOMATIC DIALING DEVICE":  Because the definition of "automatic dialing device" contained in both H.R. 2131 and H.R. 628 includes any equipment which has the capacity to dial and play recorded messages, the bill would cover equipment which may not, in fact, be used for that purpose.  As an example, any device that is programmable, or is adjunct to a computer, can have the "capacity" to do the things proscribed by both H.R. 2131 and H.R. 628.  At a minimum, NRMA recommends that the definitions in both bills be changed to cover equipment which is "used" for that purpose. Moreover, the term "sequential number generator" should be more clearly defined to indicate that it applies to equipment which is used to dial all the numbers in a particular calling area (e.g., 432-1000 through 432-9000).  Without this additional language, the legislation could be interpreted to cover machines that are programmed to dial, on a sequential basis, designated groups of customers (e.g., all numbers on a "prescreened" list).

MAINTENANCE OF CONSUMER LISTS:  H.R. 628 contains an additional problem in that it flatly prohibits autodial calls to listed consumers (those objecting to receiving autodial calls), without regard to the purpose of the call.  For example, a message advising customers that merchandise they ordered is ready for pickup, confirming a delivery date or maintenance appointment, advising of a contract expiration date, communicating a product recall, or made for the purpose of collecting a debt would be treated the same as sales solicitation calls.

In addition, H.R. 628 will generate consumer confusion and pressure to restrict all unsolicited calls, not just those made with autodial equipment.  Consumers who notify the common carrier that they want to be listed will probably expect "instant" relief from all telephone solicitations and probably will not understand that the protection covers only autodial calls and may not take effect until the carrier updates its "no autodial calls" list.  Many retailers and

112

3

other businesses buy mailing and other kinds of lists from entities other than common carriers.  Therefore, it will be impossible for retailers to be certain the lists they obtain will be free of names of consumers who do not wish to receive solicitation calls.

NRMA has no objection to the concept proposed in H.R. 628 that common carriers be required to maintain a list of customers who do not wish to receive messages from automatic dialing systems.  We believe the mechanics of administering such lists by the telephone industry and communicating the information to business will create an unwarranted financial burden on the business community.

RECORDED MESSAGE:  As drafted, H.R. 2131 requires that the message identify the "name" of the "person" initiating the call.  For purposes of clarity, we recommend that the legislation be reworded so that the entity or business initiating the call is the party identified.  In reality, few customers would have any interest in learning the name of the individual whose voice is heard in a prerecorded message as opposed to the name of the firm on whose behalf the call was placed.

AUTOMATIC CUT-OFF FEATURE:  NRMA does not object to the concept expressed in H.R. 2131 and H.R. 628 that the telephone connection be terminated within a given time of "hang up".  However, there are conflicting views of the state of technology which even allow the telephone network to properly signal the "hang up" condition back to the automatic dialer.  While the latest technology allows the signal to be sent, full deployment of this technology throughout the telephone network will not take place for several years.

Moreover, H.R. 2131 would require the call to be terminated within five seconds of a failure to "give consent".  NRMA is concerned that existing technology and automatic dialing equipment may not permit compliance with these requirements.  We prefer language similar to H.R. 628 whereby the Federal Communications Commission would establish standards requiring these dialing systems, within five seconds of receiving the proper technical signal that the called party has hung up, to automatically create a disconnect signal or on-hook condition which allows the called party's line to be released.

HOURS OF USE:  H.R. 2131 restricts the use of automatic dialing equipment to the 9 a.m. to 5 p.m. weekday period, apparently under the assumption that this time period represents the normal business day.  However, for much of America the "normal business day" is likely to extend from 8

113 .

4

a.m. until 8 or 9 p.m. and from Monday through Saturday. Therefore we recommend that this out-dated concept be revised in the legislation to more appropriately reflect the realities of the modern business day.   To do otherwise will deprive businesses of access to potential customers who may not be available during the 9 a.m. to 5 p.m. period.

Moreover, this antiquated definition would deny entire classes of consumers (because of occupation or work hours) the opportunity to benefit from information they would receive from these telephone calls.   This restriction raises First Amendment concerns.   Moreover, it establishes a precedent which, if extended to other proposals involving the telephone, would establish onerous barriers for many businesses, including retailing.

JOINT STUDY: The study provision contained in H.R. 2131, by directing the Federal Trade Commission and the Federal Communications Commission to study only the issue of a complete ban of automatic dialing devices, is unlikely to generate impartial data regarding the costs of benefits which may be derived from the use of such devices.   As an alternative, NRMA recommends that any study be conducted in an impartial and objective manner and include a comprehensive review of abuses, as well as uses, of automatic telephone dialing equipment.   Such study could, of course, include recommendations for legislative restrictions if deemed advisable and appropriate.

CONCLUSION

In conclusion, NRMA has grave concerns about the scope and breadth of the pending legislation, H.R. 2131 and H.R. 628.   We believe a more narrowly drafted bill which more carefully targets abuses without creating unnecessary burdens for legitimate businesses would be a far wiser course of action for the Subcommittee to pursue.   We would be happy to work with you and your staff toward that objective.

Sincerely,

Tracy Mullin
Senior Vice President
Government Affairs

TM/pmb

114

**NYNEX Government Affairs**
1828 L Street NW Suite 1000 Washington DC 20036
202 955 1153

**Morrison DeS. Webb**
Vice President
Government Affairs

# NYNEX

June 23, 1989

The Honorable Edward J. Markey
Chairman
Subcommittee on Telecommunications and Finance
Committee on Energy and Commerce
2125 Rayburn House Office Building
Washington, DC   20515

Dear Mr. Chairman:

On May 24, 1989, your Subcommittee held a hearing on two bills which would restrict automatic telephone dialing systems, HR 628 and HR 2131, and one bill which would prohibit unsolicited advertising by telephone facsimile machine, HR 2184. Based upon our experiences in Massachusetts, NYNEX would like to offer for your consideration some comments and suggestions with respect to these bills.

First, as way of background, Massachusetts has a law very similar to HR 628 which provides telephone customers the opportunity to be placed on an exclusion list for calls from Automatic Telephone Dialing Systems. A copy of the applicable Massachusetts law along with a brief history of the regulations and the issues and costs associated with its implementation is attached.

The requirement that technical standards be established which would require automatic dialing systems to release or free up the called party's line within 5 seconds after the called party hangs up is appropriate. This makes sense not only from the customer's perspective by not having his line hung up with an unwanted call, but also from the marketer's perspective of not continuing a call for which there will be no sale.

The requirement for each common carrier to maintain a list of those telephone customers who object to receiving messages from automatic telephone dialing systems or fax advertisements is burdensome and difficult to administer both from a carrier perspective and an advertiser's perspective. Especially difficult is seeing that associated costs are recovered from the users of automatic telephone dialing systems. When such a requirement is established on a carrier by carrier basis, it is impossible to recover the costs without knowing in advance the number and frequency of requests from users of automatic dialing systems. Some carriers (of which there are approximately 1,500 in the

Mr. Markey
June 23, 1989
Page two

United States) could develop and maintain a list while never receiving a
request to use the data.  What we would suggest is that it would be more
efficient and effective to have such a list maintained on a centralized
basis at a national clearing house.  An example is the type of system
described by Mr. Richard Barton, Senior Vice President of the Direct
Marketing Association (DMA), in his testimony before the Subcommittee.
His testimony described both a Mail Preference Service and the Telephone
Preference Service which are national lists offering consumers the
opportunity to have their names excluded from many mail and telephone
marketing campaigns.  Once consumers are made aware of the opportunity to
have their names on these lists, they need only contact DMA.  This offers
a central point for advertisers to go to as well as a single point of
contact for consumers without any requirement for a third party in the
middle of the process.

Another issue which needs to be considered in discussion of the proposed
legislation (HR 628) is that automatic dialing systems are not used only
for telemarketing applications.  For example, these systems are currently
being used by some school districts to notify parents when children are
absent.  Some retailers use them to notify customers of order status and
some health services use them to remind patients of appointments.  These
and other applications would be hindered by the proposed legislation in
its current form.

NYNEX hopes that these comments are helpful in your consideration of the
proposed legislation.  Please feel free to contact me if NYNEX can provide
you with any additional information.

Sincerely,

Morrison BeS. Webb

MDW/pcc
Attachment

cc:   The Honorable Barney Frank
      The Honorable Marge Roukema

BRIEF HISTORY OF MASSACHUSETTS REGULATIONS DEALING

WITH THE USE OF AUTOMATIC TELEPHONE DIALING SYSTEMS

- December-29, 1986 - Chapter 159 of the Massachusetts General Laws was amended to include sections 19B, 19C, 19D, and 19E relating to Automatic Telephone Dialing Systems. The bill provides telephone customers the opportunity to be placed on an exclusion list for calls from Automatic Telephone Dialing Systems; the local telephone company will compile such a list and make it available to persons using automatic dialing systems; automatic dialing system users are required to eliminate the telephone numbers on the list from their program; automatic dialing systems are to disconnect within 5 seconds after the called party hangs up; and the costs to implement the program will be borne by the automatic dialing system users who purchase the list.

- January 30, 1987 - Mass-DPU proposed regulations designed to implement the provisions of the law.

- April 30, 1987 - Mass DPU issued an order on final regulations which included a requirement that lists provided to the automatic dialing system users not contain customer names.

- October/November 1987 - Bill insert was sent out to all residence and business customers notifying them of their right -not to receive calls from automatic dialing systems.  Notice also informed subscribers of the obligation of system suppliers/operators to obtain the Exclusion List.

- Approximately 200,000 requests to be included on the list (7% of the universe)

- Information about the automatic dialing systems regulations have been added to the "Consumer Rights and Responsibilities" section of the White Pages Directory.

- Cost for obtaining copy of the exclusion list is $300 initial time with quarterly updates for $100.

- Three lists have been purchased.  No updates have been purchased.

- The one-time or start-up cost for the implementation program was approximately $308,000.  This cost includes the bill insert; processing of customer requests; and the programming design for maintaining the list.

- Ongoing annual expenses are estimated to be approximately $290,000. This includes expenses for notification of new customers and handling customer complaints/inquiries.

MASSACHUSETTS

**159:19B.   Definitions for Secs. 19C and 19D.**

*[Added by 1986, 663 effective March 29, 1987.]*

Section 19B.   As used in sections nineteen C and nineteen D, the fol-   1
lowing words shall, unless the context requires otherwise, have the fol-   2
lowing meanings:   3

"Automatic telephone dialing system", any automatic terminal equip-   4
ment which is capable of storing numbers to be called or producing num-   5
bers to be called, using a random or sequential number generator, and   6
with the ability to call such numbers, and which is capable of delivering   7
a prerecorded message to the number called with or without manual   8
assistance.   9

**159:19C.   Customers Not Wishing to Receive Calls from Automatic Tele-
phone Dialing System May Notify Common Carrier; Regulations; Costs.**

*[Added by 1986, 663 effective March 29, 1987.]*

Section 19C.   Any person who is a customer of a common carrier and   1
who wishes not to receive telephone calls from an automatic telephone   2
dialing system may notify such common carrier which provides telephone   3
exchange service that he does not wish to receive such calls.   4

The department shall prescribe regulations specifying the manner in   5
which such notification shall be given, specifying the manner in which   6
common carriers shall make available to persons using an automatic   7
dialing system the names and telephone numbers of persons who do not   8
wish to receive such calls, and specifying the time at which and manner   9
in which a subscriber may give or revoke such notification. The regula-   10
tions shall require that a customer be given the opportunity to give such   11
notification whenever a telephone is installed, and not less frequently   12
than annually thereafter.   13

A common carrier shall not make any charge to a customer for the   14
service of listing him as not wishing to receive such calls. The costs   15
incurred by any common carrier to administer the provisions of this sec-   16
tion shall be borne by those persons or institutions obtaining the names   17
and telephone numbers of those subscribers who do not wish to receive   18
calls under a schedule to be approved by the department.   19

Nothing in this section or regulation promulgated thereunder shall be   20
deemed to impose any liability on a common carrier providing local   21
exchange service arising or resulting from the use of an automatic dialing   22
system except in producing or using such a system.   23

**159:19D.  Automatic Dialing Systems Sold in Commonwealth to Be Designed to Prevent Dialing of Numbers Listed Pursuant to Section 19C.**

*[Added by 1986, 663 effective March 29, 1987.]*

Section 19D.  Any automatic telephone dialing system sold in the commonwealth shall be designed to prevent the selection or dialing of any telephone numbers listed pursuant to section nineteen C.

Any person using an automatic telephone dialing system shall prevent such system from selecting or dialing any telephone numbers listed pursuant to said section nineteen C.

Any automatic telephone dialing system used in the commonwealth shall be operated so that the system will, within five seconds after the called party hangs up, automatically create a disconnect signal or on-hook condition which allows the called party's line to be released.

**159:19E.  Solicitation of Certain Sales, etc., by Telephone Regulated; Statements Required; Misrepresentation of Status, etc., of Solicitor Prohibited.**

*[Added by 1986, 663 effective March 29, 1987.]*

Section 19E.  No person shall solicit a sale or order for sale of goods or services at the residence of a prospective buyer by means of a telephone without expressly revealing at the time the person initially contacts the prospective buyer, and before making any other statement, except a greeting, or asking the prospective buyer any other questions, that the purpose of the contact is to effect a sale, by doing all of the following:

(1) stating the identity of the person making the solicitations;

(2) stating the trade name of the person represented by the person making the solicitation; and

(3) stating the kind of goods or services being offered for sale.

No person shall, in soliciting a sale or order for the same of goods or services at the residence of a prospective buyer by the telephone, use any plan, scheme, or ruse which misrepresents his true status or mission for the purpose of making such sale or order for the sale of goods or services.

COMMENTS OF SOUTHWESTERN BELL CORPORATION ON H.R.2184


H.R.2184, AS WRITTEN, REQUIRES COMMON CARRIERS SUCH AS
SOUTHWESTERN BELL TELEPHONE COMPANY, A WHOLLY-OWNED
SUBSIDIARY OF SOUTHWESTERN BELL CORPORATION, TO MAINTAIN A
LIST OF SUBSCRIBERS WHO OBJECT TO RECEIVING UNSOLICITED
ADVERTISING BY TELEPHONE FACSIMILE MACHINE.  IT CHARGES THE
FEDERAL COMMUNICATIONS COMMISSION (FCC) WITH PRESCRIBING THE
METHODS BY WHICH SUBSCRIBERS WOULD GIVE AND REVOKE
NOTIFICATION TO THE COMMON CARRIER THAT THEY DO NOT WISH TO
RECEIVE UNSOLICITED ADVERTISING BY FACSIMILE MACHINE, AS
WELL AS HOW SUCH A LIST IS TO BE MADE AVAILABLE TO
ADVERTISERS AND AT WHAT COST.  THE LEGISLATION ALSO
STIPULATES THAT SUBSCRIBERS MAY NOT BE CHARGED FOR ADDING OR
REMOVING THEMSELVES FROM THE LIST.

SOUTHWESTERN BELL CORPORATION STRONGLY OBJECTS TO THE
PROVISIONS OF THIS LEGISLATION WHICH PLACE OUR TELEPHONE
COMPANY SUBSIDIARY AND OTHER COMMON CARRIERS IN THE
POSITION OF HAVING TO POLICE THE TRANSMISSION OF UNSOLICITED
ADVERTISING BY FACSIMILE.  THE FOLLOWING POINTS ARE OFFERED
IN SUPPORT OF OUR POSITION AND APPLY TO THE SAME PROVISION
AS OUTLINED IN H.R.628, "RESTRICTIONS ON THE USE OF
TELEPHONE AUTODIALING SYSTEMS," INTRODUCED JANUARY 24, 1989
BY REPRESENTATIVE BARNEY FRANK:

    (1)  WHILE THE BILL PROVIDES FOR THE FCC TO SPECIFY
    METHODS AND COSTS ASSOCIATED WITH FURNISHING RESULTANT
    LISTS TO FACSIMILE ADVERTISERS, IT DOES NOT OFFER ANY
    DEFINITIVE LANGUAGE NOR ANY ASSURANCE THAT THE FCC CAN
    ESTABLISH A MECHANISM WHICH IS ADEQUATE TO RECOVER THE
    COSTS ASSOCIATED WITH THE ESTABLISHMENT AND MAINTENANCE
    OF THESE LISTS.  SOUTHWESTERN BELL ANTICIPATES THAT THE
    COST OF MAINTAINING THESE LISTS WILL BE SIGNIFICANT FOR
    SEVERAL REASONS:

    A.  TELEPHONE FACSIMILE MACHINES MAY BE USED IN
    CONJUNCTION WITH VIRTUALLY ANY BUSINESS OR RESIDENCE
    LINE.  AS A RESULT, ADMINISTRATION OF THIS
    RESPONSIBILITY WOULD BE DIRECTED TO THE ENTIRE CUSTOMER
    SERVICES ORGANIZATION OF SOUTHWESTERN BELL.
    B.  EXTENSIVE CHANGES TO THE CUSTOMER RECORDS DATABASE,
    WOULD NEED TO BE MADE IN ORDER TO ACCOMMODATE THE ENTRY
    AND RETENTION OF THE CUSTOMER NOTIFICATION INFORMATION.
    C.  SERVICE ORDER METHODS AND PROCEDURES WOULD HAVE TO
    BE DEVELOPED TO ACCOMMODATE SUBSCRIBER REQUESTS TO BE
    ADDED OR DELETED FROM THE LIST.

(2)  METHODS AND PROCEDURES FOR PREPARING AND
DISTRIBUTING THE LIST OF CUSTOMERS WHO DO NOT WISH TO
RECEIVE UNSOLICITED ADVERTISING WOULD HAVE TO BE DEVELOPED
AND A SINGLE POINT OF CONTACT ESTABLISHED FOR THOSE WHO WISH
TO OBTAIN THE LIST.  A CRITICAL ISSUE IN THIS REGARD WOULD
BE THE FREQUENCY WITH WHICH THE REPORT WOULD BE
UPDATED.  OBVIOUSLY, THE MORE FREQUENTLY THE REPORT IS
UPDATED, THE GREATER THE COST TO THE COMMON CARRIER OF
PROVIDING THE REPORT.  HOWEVER, INFREQUENT UPDATES
COULD RESULT IN A CUSTOMER WHO HAS NOTIFIED THE COMMON
CARRIER THAT THEY DO NOT WISH TO RECEIVE UNSOLICITED
FACSIMILE ADVERTISING RECEIVING SUCH ADVERTISING ANYWAY
BECAUSE THE LIST HAS NOT YET BEEN UPDATED TO INCLUDE
THE CUSTOMER'S NAME AND FACSIMILE NUMBER.

(3)  IF SOUTHWESTERN BELL, AND OTHER COMMON CARRIERS,
ARE REQUIRED TO SERVE AS THE CLEARINGHOUSE/POLICING
AGENTS, OUR CUSTOMERS WILL LIKELY EXPECT THAT WE DO
MORE ON THEIR BEHALF THAN MAINTAIN THE LIST.  IN THE
EVENT A FACSIMILE ADVERTISER FAILS TO COMPLY WITH THE
BILL'S PROVISIONS, SOUTHWESTERN BELL COULD BE PLACED IN
THE UNTENABLE POSITION OF THE "MIDDLEMAN" IN THE
CONTROVERSY.  THE BILL PROVIDES NO AUTHORITY OR
ENFORCEMENT POWERS FOR THE COMMON CARRIER, OR ANY
REMEDIES FOR CUSTOMERS WHO RECEIVE UNSOLICITED
ADVERTISING DESPITE THEIR BEING PLACED ON THE LIST.  IT
IS ANTICIPATED THAT, PARTICULARLY DUE TO THE EXISTENT
DIFFICULTY IN IDENTIFYING THE OFFENDING ADVERTISERS,
THE CUSTOMER WILL SEEK REDRESS FROM THE COMMON
CARRIER, WHICH HAD NO PART IN THE CREATION OR
TRANSMISSION OF THE ADVERTISING OTHER THAN THE PROVISION
OF NETWORK FACILITIES.

(4)  PURSUANT TO THE DEFINITION OF A COMMON CARRIER
IN THE COMMUNICATIONS ACT OF 1934, SOUTHWESTERN BELL
TELEPHONE COMPANY HAS ABSOLUTELY NO CONTROL OVER THE
USE OF ITS NETWORK FOR THE TRANSMISSION OF FACSIMILE
COMMUNICATIONS, AND YET PLACING US IN THE ROLE OF
POLICEMAN CAN BE EXPECTED TO TRANSFER NEGATIVE PUBLIC
OPINION FROM THE UNSCRUPULOUS FACSIMILE ADVERTISER TO
SOUTHWESTERN BELL.

(5)  THE BILL HAS, IN EFFECT, TRANSFERRED
RESPONSIBILITY FOR UNPOPULAR ADVERTISING PRACTICES BY
USERS OF FACSIMILE MACHINES FROM SUCH USERS TO THE
PUBLIC NETWORK PROVIDER, IN THIS CASE SOUTHWESTERN BELL
TELEPHONE COMPANY.  IT WOULD BE MUCH MORE EQUITABLE TO
REQUIRE SENDER IDENTIFICATION AND LET THE ISSUE REMAIN
BETWEEN THE SENDER AND THE RECEIVER.  THIS COULD BE
DONE BY PROVIDING LEGAL REMEDIES FOR INDIVIDUALS WHO
RECEIVE UNSOLICITED FACSIMILE ADVERTISING.

IN SUMMARY, SOUTHWESTERN BELL CORPORATION BELIEVES THAT THE
REQUIREMENTS PLACED ON COMMON CARRIERS BY H.R.2184 ARE
ONEROUS AND UNWORKABLE.  THE FUNCTION OF A COMMON CARRIER
SHOULD BE TO PROVIDE FACILITIES FOR THE TRANSMISSION OF A
WIDE VARIETY OF COMMUNICATIONS, NOT TO ACT AS AN
INTERMEDIARY OR POLICING AUTHORITY BETWEEN THE SENDER AND
THE RECEIVER AS TO WHAT COMMUNICATIONS THE SENDER MAY SEND
AND THE RECEIVER WILL ACCEPT.

O

# EXHIBIT 11

DECLARATION OF SEAN P. FLYNN IN SUPPORT OF DEFENDANT IC SYSTEM, INC.'S
MOTION TO DISMISS PLAINTIFF'S COMPLAINT

I

<div align="right">

101ST CONGRESS
1ST SESSION
</div>

# H. R. 2921

To amend the Communications Act of 1934 to prohibit certain practices involving the use of telephone equipment for advertising and solicitation purposes.

---

## IN THE HOUSE OF REPRESENTATIVES

JULY 18, 1989

Mr. MARKEY (for himself, Mr. RINALDO, Mr. FRANK, Mrs. ROUKEMA, Mr. SHAYS, and Mr. STARK) introduced the following bill; which was referred to the Committee on Energy and Commerce

---

# A BILL

To amend the Communications Act of 1934 to prohibit certain practices involving the use of telephone equipment for advertising and solicitation purposes.

1    *Be it enacted by the Senate and House of Representa-*

2 *tives of the United States of America in Congress assembled,*

3 **SECTION 1. SHORT TITLE.**

4    This Act may be cited as the "Telephone Advertising

5 Regulation Act".

6 **SEC. 2. AMENDMENTS TO THE COMMUNICATIONS ACT OF 1934.**

7    (a) AMENDMENT.—Title II of the Communications Act

8 of 1934 is amended by inserting after section 224 (47 U.S.C.

9 224) the following new section:

<div align="right">

page 153
Exhibit 11
</div>

2

1    "RESTRICTIONS ON THE USE OF TELEPHONE EQUIPMENT

2             FOR ADVERTISING

3    "SEC. 225. (a) DEFINITIONS.—As used in this sec-

4    tion—

5        "(1) The term 'automatic telephone dialing

6    system' means equipment which has the capacity—

7           "(A) to store or produce numbers to be

8           called, using a random or sequential number gen-

9           erator;

10           "(B) to dial such numbers; and

11           "(C) to deliver a prerecorded voice message

12           to the number dialed, with or without manual as-

13           sistance.

14        "(2) The term 'telephone facsimile machine'

15    means equipment which has the capacity—

16           "(A) to transcribe text or images, or both,

17           from paper into an electronic signal and to trans-

18           mit that signal over a regular telephone line; and

19           "(B) to receive such signals over such a line

20           and to produce a copy of the transmitted text and

21           images.

22        "(3) The term 'telephone solicitation' means the

23    unsolicited initiation of a telephone conversation for the

24    purpose of encouraging a person to purchase, rent, or

25    invest in property, goods, or services.

3

1      "(4) The term 'unsolicited advertisement' means

2      any material advertising the commercial availability or

3      quality of any property, goods, or services which is

4      transmitted to any person without that person's prior

5      express invitation or permission.

6      "(b) RESTRICTIONS.—It shall be unlawful for any

7  person within the United States by means of telephone—

8          (1) to use any telephone facsimile machine or

9      other electronic device to send any unsolicited adver-

10     tisement to the telephone facsimile machine of any

11     person whose number is listed pursuant to subsection

12     (c) as the telephone number of a person who objects to

13     receiving unsolicited advertisements by telephone fac-

14     simile machine;

15         "(2) to use any automatic telephone dialing

16     system to transmit any prerecorded telephone solicita-

17     tion to any person whose number is listed pursuant to

18     subsection (c) as the telephone number of a person who

19     objects to receiving telephone solicitations from auto-

20     matic telephone dialing systems;

21         "(3) to use any automatic telephone dialing

22     system to make unsolicited calls—

23             "(A) to any emergency telephone line of any

24         hospital, medical physician or service office,

4

1     health care facility, fire protection, or law enforce-

2     ment agency; or

3          "(B) to any number assigned to paging or

4     cellular telephone service; or

5          "(4) to use any telephone facsimile machine or

6     any automatic telephone dialing system that does not

7     comply with the technical standards prescribed under

8     subsection (d).

9     "(c) COMPILATION OF LISTS OF OBJECTING PER-

10    SONS.—

11         "(1) SELECTION AND OPERATION OF LISTING

12    MECHANISM.—The Commission shall compare and

13    evaluate alternative mechanisms for establishing a na-

14    tional clearinghouse to compile a list of telephone sub-

15    scribers who have submitted objections under subpara-

16    graph (A) or (B) of paragraph (2) (or both) and to make

17    that compiled list available. Such evaluation shall in-

18    clude the evaluation of the establishment of the clear-

19    inghouse by the Commission itself, or by an agent or

20    contractor of the Commission. The Commission shall,

21    within 120 days after the date of enactment of this

22    section, select the mechanism which it determines will

23    be the most cost effective in carrying out the purposes

24    of this section. Such mechanism shall provide for the

25    recovery, from persons obtaining lists for purposes of

5

1     complying with this section or comparable State law,

2     of all costs under this paragraph.

3         "(2) NOTIFICATION TO SUBSCRIBERS.—Each

4     common carrier providing telephone exchange service

5     shall, in accordance with regulations prescribed by the

6     Commission, afford its subscribers for telephone ex-

7     change service the opportunity to provide notification

8     in accordance with regulations established under para-

9     graph (3) that such subscriber objects to either or both

10     of the following:

11         "(A) to receiving unsolicited advertisements

12         by telephone facsimile machine; or

13         "(B) to receiving prerecorded telephone so-

14         licitations from automatic telephone dialing sys-

15         tems.

16     "(3) REGULATIONS.—The regulations prescribed

17     under this subsection shall—

18         "(A) specify the methods by which a sub-

19         scriber shall be informed by a common carrier of

20         the right to give or revoke a notification of an ob-

21         jection under subparagraph (A) or (B) (or both) of

22         paragraph (2) and specify the methods by which

23         such right may be exercised by the subscriber;

24         "(B) specify the methods by which such ob-

25         jections shall be collected and transmitted to the

6

1  national clearinghouse established by the Commis-

2  sion under paragraph (1);

3   "(C) prohibit any subscriber from being

4  charged for giving or revoking such notification or

5  for being carried on a list compiled under this sec-

6  tion;

7   "(D) specify the methods by which such list

8  shall be made available to any person desiring to

9  transmit unsolicited advertisements by telephone

10  facsimile machine or to use an automatic dialing

11  system to transmit telephone solicitations, and the

12  costs to be recovered from such persons;

13   "(E) specify the frequency with which such

14  lists will be updated and specify the method by

15  which such updated list will take effect for pur-

16  poses of compliance with subsection (b);

17   "(F) be designed to permit and encourage

18  States to use the listing mechanism selected by

19  the Commission under paragraph (3) for purposes

20  of administering or enforcing State law; and

21   "(G) prohibit the use of such list for any pur-

22  pose other than compliance with the requirements

23  of this section and any such State law and specify

24  methods for protection of the privacy rights of

25  persons whose numbers are included in such list.

7

1    "(d) TECHNICAL AND PROCEDURAL STANDARDS.—

2         "(1) TELEPHONE FACSIMILE MACHINES.—The

3    Commission shall revise the regulations setting techni-

4    cal and procedural standards for telephone facsimile

5    machines to require that any such machine which—

6              "(A) is manufactured after 6 months after

7         the date of enactment of this section, and

8              "(B) is used for the distribution of unsolicited

9         advertising,

10   be equipped to identify, in a margin at the top or

11   bottom of each transmitted page, the date and time

12   sent, an identification of the business sending the ad-

13   vertising, and the telephone number of the sending ma-

14   chine.

15        "(2) AUTOMATIC TELEPHONE DIALING SYS-

16   TEMS.—The Commission shall prescribe technical and

17   procedural standards for automatic telephone dialing

18   systems that are used to transmit any prerecorded tele-

19   phone solicitation. Such standards shall require that—

20             "(A) all recorded messages shall, at the be-

21        ginning of the message, state clearly the business

22        identity and originating telephone number of the

23        business initiating the call; and

24             "(B) such systems will, within 5 seconds

25        after the called party hangs up, automatically

8

1       create a disconnect signal or on-hook condition

2       which allows the called party's line to be re-

3       leased.

4     "(e) STATE LAW NOT PREEMPTED.—Nothing in this

5 section or in the regulations prescribed pursuant to this sec-

6 tion shall preempt any State law that imposes more restric-

7 tive requirements or regulations on, or which prohibits, either

8 or both of the following:

9       "(1) the use of telephone facsimile machines or

10       other electronic devices to send unsolicited advertise-

11       ments; and

12       "(2) the use of automatic telephone dialing sys-

13       tems to transmit prerecorded telephone solicitations.

14     "(f) SCHEDULE FOR PROMULGATIONS OF REGULA-

15 TIONS.—The regulations required by this section shall be

16 prescribed within 6 months after the date of enactment of this

17 section.

18     "(g) EFFECTIVE DATE OF REQUIREMENTS.—The re-

19 quirements of this section shall take effect 30 days after the

20 date that such regulations are prescribed.".

21     (b) CONFORMING AMENDMENT.—Section 2(b) of the

22 Communications Act of 1934 (47 U.S.C. 152(b)) is amended

23 by striking "section 224" and inserting "sections 224 and

24 225".

O

# EXHIBIT 12

DECLARATION OF SEAN P. FLYNN IN SUPPORT OF  DEFENDANT IC SYSTEM, INC.'S
MOTION TO DISMISS PLAINTIFF'S COMPLAINT

United States General Accounting Office

# GAO

# Congressional Record, 101st Congress, Extension of Remarks

| Bill H.R.2921 | Date July 18, 1989 (96) | Page(s) E2549-2550 |
|---|---|---|

**Remarks:** Introduced by Mr. Markey

### INTRODUCTION OF THE TELEPHONE ADVERTISING REGULATION ACT

### HON. EDWARD J. MARKEY
#### OF MASSACHUSETTS
#### IN THE HOUSE OF REPRESENTATIVES
#### *Tuesday, July 18, 1989*

Mr. MARKEY. Mr. Speaker, I rise today to introduce the Telephone Advertising Regulation Act, a bill to make it possible for businesses and individuals, who rely on the telephone as a necessary ingredient of their daily activities, to free themselves from the cost and intrusion of the unwanted advertising that is increasingly finding its way into their offices and homes.

The telephone resides in virtually every American home and business and has become an integral part of our daily lives. Its promises and problems affect us all. Telephone solicitation also offers us both promises and, unfortunately, problems.

Telemarketing, the use of the telephone to purchase or sell products and services, or obtain and give information, has been with us since the 1920's. It offers businesses an opportunity to reach out cost-effectively to broader markets and to provide fast, efficient customer service information to those who need it. However, unsolicited telemarketing to consumers and businesses that are not familiar with either the company or its product or service increasingly crosses the line between helpful and unacceptably intrusive.

The telephone is an insistent master—when it rings we answer it—and many consumers complain bitterly that, when it rings to deliver unsolicited advertising, it is invading their privacy. Likewise, businesses, dependent on their telephone lines to carry the words, data and images that are so essential to the success of their enterprise, have come to decry the cost and interference with business activities of some forms of unsolicited advertising.

In recent years a growing number of telephone solicitors have started to use automatic dialing systems. Each of these machines can automatically dial up to 1,000 phones per day to deliver a prerecorded message. According to industry officials, each day they are used by more than 180,000 solicitors to call more than 7 million Americans. Unfortunately, these machines are often programmed to dial sequentially whole blocks of numbers, including hospitals, fire stations, pagers, and unlisted numbers. This not only makes the machine an equal opportunity nuisance, but an equal opportunity hazard, particularly in instances where the machine is not capable of releasing the called party's line once they hang up.

The newest technology to gain popularity for delivering unsolicited advertising is the facsimile machine. An office oddity 2 years ago, the fax machine has rapidly become an office necessity in my office and more than 2 million others, delivering more than 30 billion pages of material each year. But, with the growth in fax machine numbers has come junk fax, the electronic equivalent of junk mail. To quote a recent article from the Washington Post, receiving a junk fax is like getting junk mail with the postage due. Succinctly put, using a facsimile machine to send unsolicited advertising not only shifts costs from the advertiser to the recipient, but keeps an important business machine from being used for its intended purpose.

The bill I am introducing today, together with the ranking minority member of the subcommittee, Mr. RINALDO, and Mr. FRANK, Mrs. ROUKEMA, Mr. SHAYS, and Mr. STARK, is a bipartisan effort to return a measure of control to consumers over what they hear and read.

This is a bill that combines the best aspects of three separate pieces of legislation on which the Subcommittee on Telecommunications and Finance held hearings earlier this year. It has received broad acceptance within both the telecommunications and direct marketing industries as a fair and reasonable compromise between more stringent calls for restrictions of telemarketing and a continuation of today's growing consumer complaints.

This bill will not eliminate unsolicited telephone advertising, for certainly we must acknowledge that telephone solicitation, when conducted properly, is an established, lawful marketing practice. But this bill will give consumers a mechanism to specify that they do not want to receive unsolicited advertising and require advertisers to honor that choice.

I urge my colleagues to examine and support this legislation, not as a restriction on commercial practices, but as an affirmation of an individual's right to choose to be free from

# EXHIBIT 13

DECLARATION OF SEAN P. FLYNN IN SUPPORT OF  DEFENDANT IC SYSTEM, INC.'S
MOTION TO DISMISS PLAINTIFF'S COMPLAINT

IB

# Union Calendar No. 392

101st CONGRESS
2d SESSION

# H. R. 2921

**[Report No. 101–633]**

To amend the Communications Act of 1934 to prohibit certain practices involving the use of telephone equipment for advertising and solicitation purposes.

---

## IN THE HOUSE OF REPRESENTATIVES

JULY 18, 1989

Mr. MARKEY (for himself, Mr. RINALDO, Mr. FRANK, Mrs. ROUKEMA, Mr. SHAYS, and Mr. STARK) introduced the following bill; which was referred to the Committee on Energy and Commerce

JULY 27, 1990

Reported with an amendment, committed to the Committee of the Whole House on the State of the Union, and ordered to be printed

[Strike out all after the enacting clause and insert the part printed in italic]

[For text of introduced bill, see copy of bill as introduced on July 18, 1989]

---

# A BILL

To amend the Communications Act of 1934 to prohibit certain practices involving the use of telephone equipment for advertising and solicitation purposes.

1    *Be it enacted by the Senate and House of Representa-*

2    *tives of the United States of America in Congress assembled,*

2

1  **SECTION 1. SHORT TITLE.**

2  *This Act may be cited as the "Telephone Advertising*

3  *Regulation Act".*

4  **SEC. 2. AMENDMENTS TO THE COMMUNICATIONS ACT OF 1934.**

5  *(a) AMENDMENT.—Title II of the Communications Act*

6  *of 1934 is amended by inserting after section 224 (47*

7  *U.S.C. 224) the following new section:*

8  *"RESTRICTIONS ON THE USE OF TELEPHONE EQUIPMENT*

9  *FOR ADVERTISING*

10  *"SEC. 225. (a) DEFINITIONS.—As used in this sec-*

11  *tion—*

12  *"(1) the term 'automatic telephone dialing system'*

13  *means equipment which has the capacity—*

14  *"(A) to store or produce numbers to be*

15  *called, using a random or sequential number gen-*

16  *erator;*

17  *"(B) to dial such numbers; and*

18  *"(C) to deliver, without initial live operator*

19  *intervention, a prerecorded voice message to the*

20  *number dialed, with or without manual assist-*

21  *ance.*

22  *"(2) The term 'telephone facsimile machine'*

23  *means equipment which has the capacity—*

24  *"(A) to transcribe text or images, or both,*

25  *from paper into an electronic signal and to trans-*

26  *mit that signal over a regular telephone line; and*

1          *"(B) to receive such signals over such a line
2      and to produce a copy of the transmitted text and
3      images.

4          *"(3) The term 'telephone solicitation' means the
5      unsolicited initiation of a telephone message, without
6      initial live operator intervention, for the purpose of en-
7      couraging a person to purchase, rent, or invest in prop-
8      erty, goods, or services.

9          *"(4) The term 'unsolicited advertisement' means
10      any material advertising the commercial availability or
11      quality of any property, goods, or services which is
12      transmitted to any person without that person's prior
13      express invitation or permission.

14      *"(b) RESTRICTIONS.—It shall be unlawful for any
15  person within the United States by means of telephone—

16          *(1) to use any telephone facsimile machine or
17      computer or other electronic device to send any unsolic-
18      ited advertisement to the telephone facsimile machine of
19      any person whose number is listed pursuant to subsec-
20      tion (c) as the telephone number of a person who ob-
21      jects to receiving unsolicited advertisements by tele-
22      phone facsimile machine;

23          *(2) to use any automatic telephone dialing system
24      to transmit, without initial live operator intervention,
25      any prerecorded telephone solicitation to any person

4

1    *whose number is listed pursuant to subsection (c) as*

2    *the telephone number of a person who objects to receiv-*

3    *ing telephone solicitations from automatic telephone*

4    *dialing systems;*

5    *"(3) to use any automatic telephone dialing*

6    *system to make unsolicited calls—*

7    *"(A) to any emergency telephone line of any*

8    *hospital, medical physician or service office,*

9    *health care facility, fire protection, or law enforce-*

10   *ment agency; or*

11   *"(B) to any number assigned to paging or*

12   *cellular telephone service;*

13   *"(4) to use any telephone facsimile machine or*

14   *any automatic telephone dialing system that does not*

15   *comply with the technical standards prescribed under*

16   *subsection (d); or*

17   *"(5) to use a computer or other electronic device to*

18   *send an unsolicited advertisement via a facsimile ma-*

19   *chine unless such person sending the advertisement*

20   *clearly notes the date and time it is sent and the iden-*

21   *tity and telephone number of the business initiating the*

22   *message.*

23   *"(c) COMPILATION OF LISTS OF OBJECTING PER-*

24   *SONS.—*

1       *"(1) SELECTION AND OPERATION OF LISTING*

2   *MECHANISM.—The Commission shall compare and*

3   *evaluate alternative mechanisms for establishing a na-*

4   *tional clearinghouse to compile a list of telephone sub-*

5   *scribers who have submitted objections under subpara-*

6   *graph (A) or (B) of paragraph (2) (or both) and to*

7   *make that compiled list available. Such comparison*

8   *and evaluation shall include the solicitation of public*

9   *comment on such alternative mechanisms and shall in-*

10   *clude the evaluation of the establishment of the clear-*

11   *inghouse by the Commission or its designee. Within*

12   *180 days after the date of enactment of this section, the*

13   *Commission shall by regulation select the mechanism*

14   *which it determines will be the most cost effective in*

15   *carrying out the purposes of this section. Such mecha-*

16   *nism shall provide for the recovery, from persons ob-*

17   *taining lists for purposes of complying with this section*

18   *or comparable State law, of costs incurred under this*

19   *paragraph.*

20       *"(2) NOTIFICATION TO SUBSCRIBERS.—Each*

21   *common carrier providing telephone exchange service*

22   *shall, in accordance with regulations prescribed by the*

23   *Commission, afford its subscribers for telephone ex-*

24   *change service the opportunity to provide notification*

25   *in accordance with regulations established under para-*

1  *graph (3) that such subscriber objects to either or both*

2  *of the following:*

3      *"(A) to receiving unsolicited advertisements*

4      *by telephone facsimile machine; or*

5      *"(B) to receiving prerecorded, commercial*

6      *telephone solicitations from automatic telephone*

7      *dialing systems.*

8  *"(3) REGULATIONS.—The regulations prescribed*

9  *under this subsection shall—*

10     *"(A) specify the methods by which a sub-*

11     *scriber shall be informed by a common carrier of*

12     *the right to give or revoke a notification of an ob-*

13     *jection under subparagraph (A) or (B) (or both) of*

14     *paragraph (2) and specify the methods by which*

15     *such right may be exercised by the subscriber;*

16     *"(B) specify the methods by which such ob-*

17     *jections shall be collected and transmitted to the*

18     *national clearinghouse established by the Com-*

19     *mission under paragraph (1);*

20     *"(C) prohibit any residential subscriber from*

21     *being charged for giving or revoking such notifica-*

22     *tion or for being carried on a list compiled under*

23     *this section;*

24     *"(D) specify the methods by which such list*

25     *shall be available to any person desiring to trans-*

7

1    *mit unsolicited advertisements by telephone fac-*

2    *simile machine or to use an automatic dialing*

3    *system to transmit telephone solicitations, and the*

4    *costs to be recovered from such persons;*

5    *"(E) specify the frequency with which such*

6    *lists will be updated and specify the method by*

7    *which such updated list will take effect for pur-*

8    *poses of compliance with subsection (b);*

9    *"(F) be designed to permit and encourage*

10   *States to use the listing mechanism selected by*

11   *the Commission under paragraph (1) for purposes*

12   *of administering or enforcing State law; and*

13   *"(G) prohibit the use of such list for any*

14   *purpose other than compliance with the require-*

15   *ments of this section or any similar State law*

16   *and specify methods for protection of the privacy*

17   *rights of persons whose numbers are included in*

18   *such list.*

19   *"(4) ALTERNATIVE MECHANISM PERMITTED.—*

20   *If the Commission, on the basis of its investigation*

21   *during the rulemaking proceedings required for pur-*

22   *poses of this subsection, determines that the listing*

23   *mechanism required by this subsection is not the most*

24   *efficient, effective, and economic means of accomplish-*

25   *ing the purposes of this subsection, the Commission*

8

1    *shall consider alternative mechanisms to accomplish*
2    *such purposes. If the Commission determines that an*
3    *alternative mechanism will provide equivalent protec-*
4    *tion of telephone subscriber privacy rights in a more*
5    *efficient, effective, and economic manner and without*
6    *the imposition of any additional charge to telephone*
7    *subscribers, the Commission shall, after notice and op-*
8    *portunity for comment thereon and after 90 days notice*
9    *to the Congress, prescribe such regulations as are nec-*
10   *essary to implement such alternative mechanism.*
11   *"(d) TECHNICAL AND PROCEDURAL STANDARDS.—*
12   *"(1) TELEPHONE FACSIMILE MACHINES.—The*
13   *Commission shall revise the regulations setting techni-*
14   *cal and procedural standards for telephone facsimile*
15   *machines to require that any such machine which—*
16   *"(A) is manufactured after 6 months after*
17   *the date of enactment of this section, and*
18   *"(B) is used for the distribution of unsolic-*
19   *ited advertising,*
20   *be equipped to identify, in a margin at the top or*
21   *bottom of each transmitted page, the date and time*
22   *sent, an identification of the business sending the ad-*
23   *vertising, and the telephone number of the sending ma-*
24   *chine or of such business. The Commission shall*
25   *exempt from such standards, for 18 months after such*

1    *date of enactment, telephone facsimile machines that do*
2    *not have the capacity for automatic dialing and trans-*
3    *mission and that are not capable of operation through*
4    *an interface with a computer.*

5    *"(2) AUTOMATIC TELEPHONE DIALING SYS-*
6    *TEMS.—The Commission shall prescribe technical and*
7    *procedual standards for automatic telephone dialing*
8    *systems that are used to transmit any prerecorded tele-*
9    *phone solicitation. Such standards shall require that—*

10    *"(A) all recorded messages (i) shall, at the*
11    *beginning of the message, state clearly the identity*
12    *of the business initiating the call, and (ii) shall,*
13    *during or after the message, state clearly the tele-*
14    *phone number or address of such business; and*

15    *"(B) such systems will, as soon as is techni-*
16    *cally practicable (given the limitations of the tele-*
17    *phone exchange service facilities) after the called*
18    *party hands up, automatically create a disconnect*
19    *signal or on-hook condition which allows the*
20    *called party's line to be released.*

21    *"(e) STATE LAW NOT PREEMPTED.—Nothing in this*
22    *section or in the regulations prescribed pursuant to this sec-*
23    *tion shall preempt any State law that imposes more restric-*
24    *tive intrastate requirements or regulations on, or which pro-*
25    *hibits, either or both of the following:*

10

1    *"(1) the use of telephone facsimile machines or*

2    *other electronic devices to send unsolicited advertise-*

3    *ments; and*

4    *"(2) the use of automatic telephone dialing sys-*

5    *tems to transmit prerecorded telephone solicitations.*

6    *"(f) SCHEDULE FOR PROMULGATIONS OF REGULA-*

7    *TIONS.—The regulations required by this section shall be*

8    *prescribed within 6 months after the date of enactment of this*

9    *section.*

10   *"(g) EFFECTIVE DATE OF REQUIREMENTS.—The re-*

11   *quirements of this section shall take effect 30 days after the*

12   *date that such regulations are prescribed.".*

13       *(b) CONFORMING AMENDMENT.—Section 2(b) of the*

14   *Communications Act of 1934 (47 U.S.C. 152(b)) is amend-*

15   *ed by striking "section 223 or 224" and inserting "sections*

16   *223, 224, and 225".*

Union Calendar No. 392

101st CONGRESS
2d Session

# H. R. 2921

[Report No. 101–631]

# A BILL

To amend the Communications Act of 1934 to prohibit certain practices involving the use of telephone equipment for advertising and solicitation purposes.

July 27, 1990

Reported with an amendment, committed to the Committee of the Whole House on the State of the Union, and ordered to be printed

# EXHIBIT 14

DECLARATION OF SEAN P. FLYNN IN SUPPORT OF  DEFENDANT IC SYSTEM, INC.'S
MOTION TO DISMISS PLAINTIFF'S COMPLAINT

| 101ST CONGRESS<br>*2d Session* | HOUSE OF REPRESENTATIVES | REPORT<br>101–633 |
| --- | --- | --- |

### TELEPHONE ADVERTISING REGULATION ACT

JULY 27, 1990.—Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

. Mr. DINGELL, from the Committee on Energy and Commerce, · submitted the following

# REPORT·

[To accompany H.R. 2921]

[Including cost estimate of the Congressional Budget Office]

The Committee on Energy and Commerce, to whom was referred the bill (H.R. 2921) to amend the Communications Act of 1934 to prohibit certain practices involving the use of telephone equipment for advertising and solicitation purposes, having considered the same, report favorably thereon with an amendment and recommend that the bill as amended do pass.

#### CONTENTS

|  | Page |
| --- | --- |
| Purpose and summary | 2 |
| Background and need | 2 |
| Issues specific to ADRMPs | 3 |
| Issues specific to facsimile advertising | 3 |
| Hearings | 4 |
| Committee consideration | 4 |
| Committee oversight findings | 5 |
| Committee on Government Operations | 5 |
| Committee cost estimate | 5 |
| Congressional Budget Office estimate | 5 |
| Inflationary impact statement | 6 |
| Section-by-section analysis | 6 |
| Section 1. Short title | 6 |
| Section 2. Amendments to the Communications Act of 1934 | 6 |
| Changes in existing law made by the bill, as reported | 10 |

· The amendment strikes out all after the enacting clause of the · bill and inserts a new text which appears in italic type in the reported bill.

39–006

2

## Purpose and Summary

The purpose of the bill (H.R. 2921) is to protect consumers by restricting the use of telecommunications equipment for specific, unsolicited advertising purposes. The bill makes it unlawful, within the United States, to use automatic dialing systems for the transmission of prerecorded solicitations via the telephone to individuals objecting to such calls. The legislation also applies to the sending of unsolicited advertisements via facsimile machines. While prohibiting these specific activities, the Committee does not attempt to make all unsolicited telemarketing or facsimile advertising illegal because telephone solicitation, when conducted properly, is an established lawful marketing practice.

H.R. 2921 is designed to retain a measure of control for both individual telephone customers and owners of facsimile machines. The legislation calls for a Federal Communications Commission (Commission) rulemaking to establish a national clearinghouse that collects and manages lists of individuals and businesses who object to receiving unsolicited advertising in the form of prerecorded solicitations or unsolicited advertising via facsimile machines. These lists would be made available to telemarketers who would be prohibited from sending unsolicited advertising by means of prerecorded messages or facsimile to people on the lists.

In developing the listing mechanism, the Commission is required to issue regulations outlining how consumers are to be notified of their privacy rights. In addition, H.R. 2921 also allows the Commission to consider more efficient, effective, or economical alternatives to the listing mechanism, provided the alternative results in equivalent consumer protection. Finally, the bill directs the Commission to establish technical standards governing the use of automatic telephone dialing systems and facsimile machines.

## Background and Need

In the United States, use of the telephone and other telecommunications technologies in the conduct of business has been common since the 1920's. Telemarketing offers businesses a cost-effective opportunity to broaden their markets as well as provide fast, efficient customer service information. However, with the rapid decrease in the cost of telecommunications and the adoption of sophisticated telemarketing tools by businesses around the country, the number of unsolicited telemarketing practices has increased overwhelmingly.

Recently, advertisers have seized on facsimile machines as a potent tool for direct marketing of a number of products and services. Coupled with a computer or automatic dialer, an advertiser's facsimile machine can deliver tens of thousands of unsolicited messages per week to other facsimile machines across the country. Unsolicited telemarketing most often is targeted toward consumers who are not familiar with the telemarketer's product or service and frequently represents more of a nuisance than an aid to commerce. Congressional action has been prompted by the increase in the number and sophistication of telemarketing methods which have become unacceptably intrusive.

## AUTOMATIC DIALER RECORDED MESSAGE PLAYERS (ADRMP'S)

In recent years a growing number of telemarketers have begun using automatic dialing systems to increase their number of customer contacts. The Committee record indicates that ADRMP's are used by more than 180,000 solicitors to call more than 7 million Americans every day. Each ADRMP has the capacity to automatically dial as many as 1,000 phones per day. ADRMP's often are programmed to dial sequential blocks of telephone numbers, including those of emergency public organizations and unlisted subscribers. Since ADRMP's can "seize" a recipients's telephone line once a phone connection is made and may not release the line when the recipient hangs up, they can result in intrusive and potentially dangerous use of telecommunications equipment. The Committee record includes examples of ADRMP's calling and seizing the telephone lines of public emergency services, dangerously preventing those lines from being utilized to receive calls from those needing emergency services. In addition, customers who pay additional fees for cellular phones, pagers, or unlisted numbers are inconvenienced and even charged for receiving unsolicited ADRMP calls. This legislation prohibits telephone and facsimile advertisers from using machines to call these numbers.

Due to ADRMPs' technical flaws, consumer complaints about their use have prompted more than 27 state legislatures to enact or introduce legislation that restricts or totally bans the use of ADRMP's. However, because regulatory jurisdiction is shared between federal and state agnecies, telemarketers have been able to circumvent more restrictive regulation. By altering the routing of their calls among intrastate and interstate telephone lines, telemarketers have sought the least restrictive regulatory requirements. H.R. 2921 is an attempt to resolve the patchwork of intrastate and interstate regulation. The bill accomplishes this by establishing a single set of rules to guide telemarketers. In addition, the bill provides the Commission an enforcement mechanism that can be used to control the ever increasing telemarketing industry without overburdening the Commission's limited resources. The National Association of Regulatory Utility Commissioners (NARUC) has endorsed this legislation since it would eliminate the opportunity for telemarketers to easily evade individual state telemarketing regulations.

### FACSIMILE ADVERTISING

An office rarity a few years ago, the facsimile machine has become a primary tool for business to relay written communications and transactions quickly. In an effort to speed communications and cut overnight delivery costs, 2 million offices in the United States currently send more than 30 billion pages of information via facsimile each year. However, the proliferation of facsimile machines has been accompanied by explosive growth in unsolicited facsimile advertising, or "junk fax."

Facsimile machines are designed to accept, process, and print all messages which arrive over their dedicated lines. The fax advertisers takes advantage of this basic design by sending advertisements to known fax numbers, knowing that his or her advertisements will

4

be printed out on the recipient's machine. This type of telemarketing is problematic for two reasons. First, it shifts some of the costs of advertising from the sender to the recipient. Second, it occupies the recipient's facsimile machine so that it is unavailable for other messages while processing and printing the fax advertisements.

When an advertiser sends marketing material to a potential customer through regular mail, the recipient pays nothing to receive the letter. In the case of fax advertisements, however, the recipient assumes both the cost associated with the use of the facsimile machine and the cost of the expensive paper used to print out facsimile messages. It is important to note that these costs are borne by the recipient of the fax advertisement regardless of their interest in the product or service being advertised.

In addition to the costs associated with fax advertisements, when a facsimile machine is receiving a fax, it may require several minutes or more to process and print the advertisement. The fax machine is then unable to process actual business communications. Only the most sophisticated and expensive facsimile machines can process and print more than one message at a time. Since businesses have begun to express their concerns on the interference and interruptions and expenses that junk fax have placed upon them, states are taking action to eliminate these telemarketing practices. Connecticut and Maryland have recently enacted laws banning the use of facsimile machines for unsolicited advertising. Similar bills are currently pending in the legislatures of 21 other states.

### HEARINGS

Three bills, H.R. 628, H.R. 2131, and H.R. 2184 were the focus of a hearing on telemarketing practices held by the Subcommittee on May 24, 1989.

The Committee received testimony from the following witnesses: The Honorable Barney Frank (D-Mass.), The Honorable Marge Roukema (R-N.J.), and The Honorable Christopher Shays (D-Conn.), U.S. House of Representatives; Mr. Richard A. Barton, Senior Vice President, Government Affairs, Direct Marketing Association, Inc.; Mr. Steven S. Seltzer, President, Modern Communications Corporation (representing Telocator); Professor Robert L. Ellis, Indiana University School of Law; and Mr. John M. Glynn, Office of People's Counsel, State of Maryland (representing National Association of State Utility Consumer Advocates).

### COMMITTEE CONSIDERATION

H.R. 2921 reflects a combination of provisions of three separate bills affecting telemarketing practices. The bill specifically restricts certain uses of automatic telephone dialing systems and telephone facsimile machines which they are conveying unsolicited advertising. The regulations adopted in H.R. 2921 were originally proposed in H.R. 628, H.R. 2131, and H.R. 2184.

H.R. 2921, the "Telephone Advertising Regulation Act," was introduced on July 20, 1989, and considered in an open markup session on the same day. The Subcommittee on Telecommunications and Finance reported the legislation by voice vote to the full Committee on Energy and Commerce without amendment.

page 176
Exhibit 14

On January 23, 1989, the full Committee on Energy and Commerce is an open markup session considered H.R. 2921. An amendment in the nature of a substitute was approved by the Committee by voice vote. The amendment incorporated technical changes and clarifying language stemming from comments received after the Subcommittee markup. The changes clarified definitions of terms and restrictions incorporated in the bill; allowed the Federal Communications Commission more time and latitude in fulfilling its responsibilities imposed by the bill; modified the bill's technical and procedural identification standards; temporarily exempted from technical identification standards fax machines unsuitable for advertising; required a more technically reasonable disconnect standard for auto-dialed calls, and clarified the states' authority to impose more restrictive intrastate requirements.

### COMMITTEE OVERSIGHT FINDINGS

Pursuant to clause 2(l)(3)(A) of rule XI of the Rules of the House of Representatives, the Subcommittee held hearings and made oversight findings that are reflected in this report.

### COMMITTEE ON GOVERNMENT OPERATIONS

Pursuant to clause 2(l)(3)(D) of rule XI of the Rules of the House of Representatives, no oversight findings have been submitted to the Committee by the Committee on Government Operations.

### COMMITTEE COST ESTIMATE

In compliance with clause 7(a) of rule XIII of the Rules of the House of Representatives, the Committee believes that the cost incurred in carrying out H.R. 2921 will be approximately $350,000 in FY 1991 and $250,000 each year thereafter.

However, the Committee believes that these costs will be offset in their entirety from fees paid by users, and will result in no significant additional costs to the Federal Government.

### CONGRESSIONAL BUDGET OFFICE ESTIMATE

U.S. CONGRESS,
CONGRESSIONAL BUDGET OFFICE,
*Washington, DC, June 21, 1990.*

Hon. JOHN D. DINGELL,
*Chairman, Committee on Energy and Commerce,*
*House of Representatives, Washington, DC.*

DEAR MR. CHAIRMAN: The Congressional Budget Office has reviewed H.R. 2921, the Telephone Advertising Regulation Act, as ordered reported by the House Committee on Energy and Commerce, May 15, 1990. We expect that implementation of the bill would result in no significant additional cost to the federal government and in no cost to state or local governments.

H.R. 2921 would prohibit sales organizations from directing unsolicited telephone facsimile transmissions and computerized telephone calls to persons who do not want to receive such calls. The Federal Communications Commission (FCC) would be required to initiate an inquiry to establish and maintain a list of persons who

object to being solicited over the telephone. Companies that do not use the list to purge their files would be subject to fines by the FCC. The bill would also require the FCC to revise certain technical and procedural standards for facsimile machines and automatic telephone dialing systems.

Based on information from the FCC, CBO estimates that conducting the inquiry, initiating a rulemaking, and establishing and operating the listing mechanism required by the bill would cost about $350,000 in 1991 and $250,000 each year thereafter. The estimate assumes that telephone companies would establish lists at the local level, which would be complied into a master list by the FCC. H.R. 2921 would require the FCC to recover—from persons obtaining the list—all costs incurred in compiling and maintaining the list. As a result, we expect that implementation of the bill would not result in significant additional net cost to the federal government.

If you wish further details on this estimate, we will be pleased to provide them. The CBO staff contact is Laura Carter, who can be reached at 226–2860.

Sincerely,

ROBERT F. HALE
(For Robert D. Reischauer, Director).

## INFLATIONARY IMPACT STATEMENT

Pursuant to clause 2(l)(4) of rule XI of the Rules of the House of Representatives, the Committee makes the following statement with regard to the inflationary impact of the reported bill.

The Committee does not believe that an inflationary impact on the economy will result from the passage of H.R. 2921.

## SECTION-BY-SECTION ANALYSIS

### SECTION 1. SHORT TITLE

This section states that the Act may be cited as the "Telephone Advertising Regulation Act."

### SECTION 2. AMENDMENTS TO THE COMMUNICATIONS ACT OF 1934

*Subsection A. Definitions*

"Automatic telephone dialing system" means any equipment which has the capacity to store or produce numbers to be called, using a random or sequential number generator; to dial such numbers; and to deliver, without initial live operator intervention, a prerecorded voice message to the number dialed, with or without manual assistance.

It should be noted that the bill's definition of an "automatic telephone dialing system" is broad, not only including equipment which is designed or intended to be used to deliver automatically-dialed prerecorded messages, but also including equipment which has the "capability" to be used in such manner. The Committee is aware of concerns that this broad definition could cover the mere ownership of office computers which are capable, perhaps when used in conjunction with other equipment, of delivering automated messages. Section 225(b)(2), does not impose restrictions on the ownership of such equipment, but only its active "use" to deliver auto-

matically dialed prerecorded telephone solicitations without live operator intervention. A live operator would be able to disconnect a call to a customer, eliminating the problem of "seizing" a customer's line. The bill does not apply to ADRMP solicitations that include live operator intervention.

"Telephone facsimile machine" means equipment which has the capacity to transcribe text, images, or both, from paper into an electronic signal and to transmit that signal over a regular telephone line and to receive such signals over such a line and to produce a copy of the transmitted text and images.

"Telephone solicitation," means the unsolicited initiation of a telephone message, without initial live operator intervention, for the purpose of encouraging a person to purchase, rent, or invest in property, goods, or services. The definition of "telephone solicitation" contained in the legislation does not include soliciting by political groups and charities. Research into potential constitutional issues by the American Law Division of the Congressional Research Service revealed that there is considerable precedent for establishing exclusionary lists for consumers and for placing reasonable time, place, and manner restrictions on commercial speech, such as telephone solicitation. However, the report concludes that extending such restrictions to political speech might well violate First Amendment rights. Accordingly, the Committee clearly and intentionally does not extend the restrictions beyond commercial speech.

"Unsolicited advertisement" means any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission. The Committee is not attempting to eliminate every phone call consumers may find intrusive. However, the legislation does establish limited and reasonable place and manner restrictions on the most intrusive of these calls, primarily those originating from automatic dialed recorded message players. The equipment needed to place this particular type of call is complex, expensive, and requires continued high-volume use to reap a reasonable return on investment to its owner. The Committee record indicates that most charitable organizations, which are either local or depend largely on locally based companies, do not use this technology.

By incorporating language into the bill that focuses on specific types of solicitation calls, the Committee recognizes that legitimate business uses of autodialers will not be restricted under this bill. For example, a business which utilized autodial calls to alert its employees about delayed work hours due to a snow storm would not be covered, since the purpose of such a call is not to "encourage a purchase" or other covered transaction. The Committee recognizes that situations involving prior existing relationships benefit when technology we serve a useful purpose and eliminate costly labor.

The Committee also notes that automated dialing technology is used by retail stores to alert customers who have previously ordered or purchased merchandise, or customers who have left items for repair, that such items are available for pick-up. This use would not be prohibited under the legislation, even if a secondary, solicitous message is included. The Committee believes that, because the

principal purpose of the call was not to generate a purchase, prohibition is not necessary. However, the Committee intends to include those calls that, while claiming no purchase is necessary, nevertheless introduces new products. In determining the purpose for which a call is made, it is the Committee's intention that the principal purpose of the call should be determinative. A call made principally for a purpose other than to encourage a purchase would not be covered merely because the message contained an incidental reference to a potential sale, rental or investment opportunity.

*Subsection B. Restrictions on the use of telephone equipment for advertising*

It shall be unlawful for any person in the United States—

(1) to conduct unsolicited advertising via facsimile machine, computer, or other electronic device to any telephone number listed pursuant to (c).

(2) to use automatic telephone dialing systems to deliver, without initial live operator contact, any prerecorded advertisement to a number listed pursuant to (c).

(3) to use an automatic dialing system to make unsolicited calls to any emergency, public safety, medical, cellular or law enforcement line.

(4) to use any automatic dialing or facsimile machine that does not comply with subsection (d).

(5) to send any advertisement via autodialer or facsimile without including clearly the time, date, telephone number, and identity of the business initiating the call.

The Committee intends that the requirements of the section be imposed on the advertiser and not the carriers who transmit the advertisements on behalf of the telemarketers.

*Subsection C. Compilation of lists of objecting persons*

Subsection C(1) directs the Commission to determine the best mechanism to establish a national clearinghouse that will compile and maintain a list of individuals who object either to receiving unsolicited advertising on a facsimile machine or being contacted by an ADRMP with unsolicited advertising telephone calls. The Commission has 180 days following the enactment of H.R. 2921 into law, within which to establish the clearinghouse. In establishing such a mechanism, either through the clearinghouse, or using any alternative as discussed in Section 2(c)(4), the Commission shall provide for the recovery of all costs under this paragraph and, those costs under Section 2(c)(2), from persons obtaining lists for purposes of complying with this section or comparable state law.

Organizations that either notify customers, compile lists of objecting customers, or provide lists to those making unsolicited advertisements via the facsimile machine or telephone while employing automatic dialers, will not be required to absorb costs in conjunction with implementation of this legislation, unless they were using such technology for purposes of unsolicited advertisement as defined herein. The Committee specifically intends that these costs are not to be borne by telephone company ratepayers.

*Subsection C(2). Notification of subscribers*

This section states that common carriers shall give subscribers the opportunity to notify the carrier, in writing, of their objection to receiving unsolicited facsimile advertisements and prerecorded phone solicitations from ADRMPs.

*Subsection C(3). Regulations*

The Commission shall—

(A) specify the methods by which a customer may give or revoke a notification regarding unsolicited advertising and specify the methods a subscriber may exercise such rights,

(B) specify the methods by which notifications are collected and transmitted to the national clearinghouse,

(C) prohibit customers from being charged for such notification,

(D) specify the methods by which such lists will be made available to persons desiring to transmit unsolicited advertising,

(E) specify the frequency by which such lists will be updated and take effect,

(F) permit States to use the lists to enforce State laws,

(G) prohibit the use of such lists for any purpose other than compliance with this or similar state laws.

*Subsection C(4). Alternative mechanism permitted*

If the Commission determines that the listing procedure described is not the most efficient or effective method of accomplishing the purpose of the Act, the Commission may, after opportunity for public comment through the Administrative Procedures Act, and after notice to Congress, prescribe such regulations as necessary to implement such alternative mechanism.

*Subsection D. Technical and procedural standards*

Subsection D sets technical standards for facsimile machines manufactured six months after enactment and used for distribution of unsolicited advertising. Facsimile machines must be equipped to identify in the top or bottom margin the time and date sent, an identification of the business sending the advertisement[s] and the telephone number of the sending machine or business. The Commission shall exempt from these standards facsimile machines which do not have the capacity for automatic dialing or interface through a computer.

*Subsection D(2). Automatic telephone dialing systems*

The Commission shall prescribe standards for automatic dialers and facsimile machines, and these standards will require that—

(A) all recorded messages shall, at the beginning of the message, state clearly the identity of the business initiating the call and shall state during the call the telephone number or address of such business;

(B) such systems shall, as soon as the called party hangs up, given the technical limitations of the telephone service facilities, disconnect with the called party's line. The Committee

record indicates that existing technology permits most lines to disconnect, or release a line, within twelve seconds. As technology progresses, the disconnect requirements should reflect such advances.

*Subsection E. State law not preempted*

The legislation provides that no state law which is more restrictive may be preempted.

*Subsection F. Schedule of regulations*

The legislation requires that the regulations shall be prescribed within 6 months after date of enactment.

*Subsection G. Effective date*

The legislation states that the requirements shall take effect 30 days after the regulations are prescribed.

CHANGES IN EXISTING LAW MADE BY THE BILL, AS REPORTED

In compliance with clause 3 of rule XIII of the Rules of the House of Representatives, changes in existing law made by the bill, as reported, are shown as follows (existing law proposed to be omitted is enclosed in black brackets, new matter is printed in italic, existing law in which no changes is proposed is shown in roman):

COMMUNICATIONS ACT OF 1934

TITLE I—GENERAL PROVISIONS

\*        \*        \*        \*        \*        \*        \*

APPLICATION OF ACT

SEC. 2. (a) \* \* \*
(b) Except as provided in [section 223 or 224] *sections 223, 224, and 225* and subject to the provisions of section 301 and title VI, nothing in this Act shall be construed to apply or to give the Commission jurisdiction with respect to (1) charges, classifications, practices, services, facilities, or regulations for or in connection with intrastate communication service by wire or radio of any carrier, or (2) any carrier engaged in interstate or foreign communication solely through physical connection with the facilities of another carrier not directly or indirectly controlling or controlled by, or under direct or indirect common control with such carrier, or (3) any carrier engaged in interstate or foreign communication solely through connection by radio, or by wire and radio, with facilities, located in an adjoining State or in Canada or Mexico (where they adjoin the State in which the carrier is doing business), of another carrier not directly or indirectly controlling or controlled by, or under direct or indirect common control with such carrier, or (4) any carrier to which clause (2) or clause (3) would be applicable except for furnishing interstate mobile radio communication service or radio communicatin service to mobile stations on land vehicles in Canada or Mexico; except that sections 201 through 205 of

this Act, both inclusive, shall, except as otherwise provided therein, apply to carriers described in clauses (2), (3), and (4).

\*       \*       \*       \*       \*       \*       \*

## TITLE II—COMMON CARRIERS

\*       \*       \*       \*       \*       \*       \*

*RESTRICTIONS ON THE USE OF TELEPHONE EQUIPMENT FOR ADVERTISING*

SEC. 225. (a) DEFINITIONS.—*As used in this section—*

*(1) The term "automatic telephone dialing system" means equipment which has the capacity—*

*(A) to store or produce numbers to be called, using a random or sequential number generator;*

*(B) to dial such numbers; and*

*(C) to deliver, without initial live operator intervention, a prerecorded voice message to the number dialed, with or without manual assistance.*

*(2) The term "telephone fasimile machine" means equipment which has the capacity—*

*(A) to transcribe text or images, or both, from paper into an electronic signal and to transmit that signal over a regular telephone line; and*

*(B) to receive such signals over such a line and to produce a copy of the transmitted text and images.*

*(3) The term "telephone solicitation" means the unsolicited initiation of a telephone message, without initial live operator intervention, for the purpose of encouraging a person to purchase, rent, or invest in property, goods, or services.*

*(4) The term "unsolicited advertisement" means any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission.*

(b) RESTRICTIONS.—*It shall be unlawful for any person within the United States by means of telephone—*

*(1) to use any telephone facsimile machine or computer or other electronic device to send any unsolicited advertisement to the telephone facsimile machine of any person whose number is listed pursuant to subsection (c) as the telephone number of a person who objects to receiving unsolicited advertisements by telephone facsimile machine;*

*(2) to use any automatic telephone dialing system to transmit, without initial live operator intervention, any prerecorded telephone solicitation to any person whose number is listed pursuant to subsection (c) as the telephone number of a person who objects to receiving telephone solicitations from automatic telephone dialing systems;*

*(3) to use any automatic telephone dialing system to make unsolicited calls—*

*(A) to any emergency telephone line of any hosptial, medical physician or service office, health care facility, fire protection, or law enforcement agency; or*

(B) to any number assigned to paging or cellular tele-
phone service;

(4) to use any telephone facsimile machine or any automatic
telephone dialing system that does not comply with the techni-
cal standards prescribed under subsection (d); or

(5) to use a computer or other electronic device to send an un-
solicited advertisement via a facsimile machine unless such
person sending the advertisement clearly notes the date and
time it is sent and the identity and telephone number of the
business initiating the message.

(c) COMPILATION OF LISTS OF OBJECTING PERSONS.—

(1) SELECTION AND OPERATION OF LISTING MECHANISM.—The
Commission shall compare and evaluate alternative mecha-
nisms for establishing a national clearinghouse to compile a
list of telephone subscribers who have submitted objections
under subparagraph (A) or (B) of paragraph (2) (or both) and to
make that compiled list available. Such comparison and eval-
uation shall include the solicitation of public comment on such
alternative mechanisms and shall include the evaluation of the
establishment of the clearinghouse by the Commission or its
designee. Within 180 days after the date of enactment of this
section, the Commission shall by regulation select the mecha-
nism which it determines will be the most cost effective in car-
rying out the purposes of this section. Such mechanism shall
provide for the recovery, from persons obtaining lists for pur-
poses of complying with this section or comparable State law, of
costs incurred under this paragraph.

(2) NOTIFICATION TO SUBSCRIBERS.—Each common carrier pro-
viding telephone exchange service shall, in accordance with reg-
ulations prescribed by the Commission, afford its subscribers for
telephone exchange service the opportunity to provide notifica-
tion in accordance with regulations established under para-
graph (3) that such subscriber objects to either or both of the
following:

(A) to receiving unsolicited advertisements by telephone
facsimile machine; or

(B) to receiving prerecorded, commercial telephone solici-
tations from automatic telephone dialing systems.

(3) REGULATIONS.—The regulations prescribed under this sub-
section shall—

(A) specify the methods by which a subscriber shall be in-
formed by a common carrier of the right to give or revoke a
notification of an objection under subparagraph (A) or (B)
(or both) of paragraph (2) and specify the methods by which
such right may be exercised by the subscriber;

(B) specify the methods by which such objections shall be
collected and transmitted to the national clearinghouse es-
tablished by the Commission under paragraph (1);

(C) prohibit any residential subscriber from being charged
for giving or revoking such notification or for being carried
on a list compiled under this section;

(D) specify the methods by which such list shall be made
available to any person desiring to transmit unsolicited ad-
vertisements by telephone facsimile machine or to use an

automatic dialing system to transmit telephone solicitations, and the costs to be recovered from such persons;

(E) specify the frequency with which such lists will be updated and specify the method by which such updated list will take effect for purposes of compliance with subsection (b);

(F) be designed to permit and encourage States to use the listing mechanism selected by the Commission under paragraph (1) for purposes of administering or enforcing State law; and

(G) prohibit the use of such list for any purpose other than compliance with the requirements of this section or any similar State law and specify methods for protection of the privacy rights of persons whose numbers are included in such list.

(4) ALTERNATIVE MECHANISM PERMITTED.—If the Commission, on the basis of its investigation during the rulemaking proceedings required for purposes of this subsection, determines that the listing mechanism required by this subsection is not the most efficient, effective, and economic means of accomplishing the purposes of this subsection, the Commission shall consider alternative mechanisms to accomplish such purposes. If the Commission determines that an alternative mechanism will provide equivalent protection of telephone subscriber privacy rights in a more efficient, effective, and economic manner and without the imposition of any additional charge to telephone subscribers, the Commission shall, after notice and opportunity for comment thereon and after 90 days notice to the Congress, prescribe such regulations as are necessary to implement such alternative mechanism.

(d) TECHNICAL AND PROCEDURAL STANDARDS.—

(1) TELEPHONE FACSIMILE MACHINES.—The Commission shall revise the regulations setting technical and procedural standards for telephone facsimile machines to require that any such machine which—

(A) is manufactured after 6 months after the date of enactment of this section; and

(B) is used for the distribution of unsolicited advertising, be equipped to identify, in a margin at the top or bottom of each transmitted page, the date and time sent, an identification of the business sending the advertising, and the telephone number of the sending machine or of such business. The Commission shall exempt from such standards, for 18 months after such date of enactment, telephone facsimile machines that do not have the capacity for automatic dialing and transmission and that are not capable of operation through an interface with a computer.

(2) AUTOMATIC TELEPHONE DIALING SYSTEMS.—The Commission shall prescribe technical and procedural standards for automatic telephone dialing systems that are used to transmit any prerecorded telephone solicitations. Such standards shall require that—

(A) all recorded messages (i) shall, at the beginning of the message, state clearly the identity of the business initiating

14

the call, and (ii) shall, during or after the message, state clearly the telephone number or address of such business; and

(B) such systems will, as soon as is technically practicable (given the limitations of the telephone exchange service facilities) after the called party hangs up, automatically create a disconnect signal or on-hook condition which allows the called party's line to be released.

(e) STATE LAW NOT PREEMPTED.—Nothing in this section or in the regulations prescribed pursuant to this section shall preempt any State law that imposes more restrictive intrastate requirements or regulations on, or which prohibits, either or both of the following:

(1) the use of telephone facsimile machines or other electronic devices to send unsolicited advertisements; and

(2) the use of automatic telephone dialing systems to transmit prerecorded telephone solicitations.

(f) SCHEDULE FOR PROMULGATIONS OF REGULATIONS.—The regulations required by this section shall be prescribed within 6 months after the date of enactment of this section.

(g) EFFECTIVE DATE OF REQUIREMENTS.—The requirements of this section shall take effect 30 days after the date that such regulations are prescribed.

\*    \*    \*    \*    \*    \*    \*

O

# EXHIBIT 15

DECLARATION OF SEAN P. FLYNN IN SUPPORT OF  DEFENDANT IC SYSTEM, INC.'S
MOTION TO DISMISS PLAINTIFF'S COMPLAINT

United States General Accounting Office

# GAO

# Congressional Record, 101st Congress, House

| Bill | H.R.2921 | Date | Jul 30, 1990 (100) | Page(s) | H5818-22 |
|---|---|---|---|---|---|
| | | | | | H5879 |

**Action:** AMENDED AND PASSED UNDER SUSPENSION OF THE RULES

*Telephone advertising:* H.R. 2921, amended, to amend the Communications Act of 1934 to prohibit certain practices involving the use of telephone equipment for advertising and solicitation purposes;

**Page H5818**

## TELEPHONE ADVERTISING REGULATION ACT

Mr. MARKEY. Mr. Speaker, I move to suspend the rules and pass the bill (H.R. 2921) to amend the Communications Act of 1934 to prohibit certain practices involving the use of telephone equipment for advertising and solicitation purposes, as amended.

The Clerk read as follows:

### H.R. 2921

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

SECTION 1. SHORT TITLE.

This Act may be cited as the "Telephone Advertising Regulation Act".

SEC. 2. AMENDMENTS TO THE COMMUNICATIONS ACT OF 1934.

(a) AMENDMENT.—Title II of the Communications Act of 1934 is amended by inserting after section 224 (47 U.S.C. 224) the following new section:

"RESTRICTIONS ON THE USE OF TELEPHONE EQUIPMENT FOR ADVERTISING

"SEC. 225. (a) DEFINITIONS.—As used in this section—

"(1) the term 'automatic telephone dialing system' means equipment which has the capacity—

"(A) to store or produce numbers to be called, using a random or sequential number generator;

"(B) to dial such numbers; and

"(C) to deliver, without initial live operator intervention, a prerecorded voice message to the number dialed, with or without manual assistance.

"(2) The term 'telephone facsimile machine' means equipment which has the capacity—

"(A) to transcribe text or images, or both, from paper into an electronic signal and to transmit that signal over a regular telephone line; and

"(B) to receive such signals over such a line and to produce a copy of the transmitted text and images.

"(3) The term 'telephone solicitation' means the unsolicited initiation of a telephone message, without initial live operator intervention, for the purpose of encouraging

a person to purchase, rent, or invest in property, goods, or services.

"(4) The term 'unsolicited advertisement' means any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission.

"(b) RESTRICTIONS.—It shall be unlawful for any person within the United States by means of telephone—

"(1) to use any telephone facsimile machine or computer or other electronic device to send any unsolicited advertisement to the telephone facsimile machine of any person whose number is listed pursuant to subsection (c) as the telephone number of a person who objects to receiving unsolicited advertisements by telephone facsimile machine;

"(2) to use any automatic telephone dialing system to transmit, without initial live operator intervention, any prerecorded telephone solicitation to any person whose number is listed pursuant to subsection (c) as the telephone number of a person who objects to receiving telephone solicitations from automatic telephone dialing systems;

"(3) to use any automatic telephone dialing system to make unsolicited calls—

"(A) to any emergency telephone line of any hospital, medical physician or service office, health care facility, fire protection, or law enforcement agency; or

"(B) to any number assigned to paging or cellular telephone service;

"(4) to use any telephone facsimile machine or any automatic telephone dialing system that does not comply with the technical standards prescribed under subsection (d); or

"(5) to use a computer or other electronic device to send an unsolicited advertisement via a facsimile machine unless such person sending the advertisement clearly notes the date and time it is sent and the identity and telephone number of the business initiating the message.

"(c) COMPILATION OF LISTS OF OBJECTING PERSONS.—

"(1) SELECTION AND OPERATION OF LISTING MECHANISM.—The Commission shall compare and evaluate alternative mechanisms for establishing a national clearinghouse to compile a list of telephone subscribers who have submitted objections under subparagraph (A) or (B) of paragraph (2) (or both) and to make that compiled list available. Such comparison and evaluation shall include the solicitation of public comment on such alternative mechanisms and shall include the evaluation of the establishment of the clearinghouse by the Commission or its designee. Within 180 days after the date of enactment of this section, the Commission shall by regulation select the mechanism which it determines will be the most cost effective in carrying out the purposes of this section. Such mechanism shall provide for the recovery, from persons obtaining lists for purposes of complying with this section or comparable State law, of costs incurred under this paragraph.

"(2) NOTIFICATION TO SUBSCRIBERS.—Each common carrier providing telephone exchange service shall, in accordance with regulations prescribed by the Commission, afford its subscribers for telephone exchange service the opportunity to provide notification in accordance with regulations established under paragraph (3) that such subscriber objects to either or both of the following:

"(A) to receiving unsolicited advertisements by telephone facsimile machine; or

"(B) to receiving prerecorded, commercial telephone solicitations from automatic telephone dialing systems.

"(3) REGULATIONS.—The regulations prescribed under this subsection shall—

"(A) specify the methods by which a subscriber shall be informed by a common carrier of the right to give or revoke a notification of an objection under subparagraph (A) or (B) (or both) of paragraph (2) and specify the methods by which such right may be exercised by the subscriber;

"(B) specify the methods by which such objections shall be collected and transmitted to the national clearinghouse established by the Commission under paragraph (1);

"(C) prohibit any residential subscriber from being charged for giving or revoking such notification or for being carried on a list compiled under this section;

"(D) specify the methods by which such list shall be available to any person desiring to transmit unsolicited advertisements by telephone facsimile machine or to use an automatic dialing system to transmit telephone solicitations, and the costs to be recovered from such persons;

"(E) specify the frequency with which such lists will be updated and specify the method by which such updated list will take effect for purposes of compliance with subsection (b);

"(F) be designed to permit and encourage States to use the listing mechanism selected by the Commission under paragraph (1) for purposes of administering or enforcing State law; and

"(G) prohibit the use of such list for any purpose other than compliance with the requirements of this section or any similar State law and specify methods for protection of the privacy rights of persons whose numbers are included in such list.

"(4) ALTERNATIVE MECHANISM PERMITTED.—If the Commission, on the basis of its investigation during the rulemaking proceedings required for purposes of this subsection, determines that an alternative mechanism required by this subsection is not the most efficient, effective, and economic means of accomplishing the purposes of this subsection, the Commission shall consider alternative mechanisms to accomplish such purposes. If the Commission determines that an alternative mechanism will provide equivalent protection of telephone subscriber privacy rights in a more efficient, effective, and economic manner and without the imposition of any additional charge to telephone subscribers, the Commission shall, after notice and opportunity for comment thereon and after 90 days notice to the Congress, prescribe such regulations as are necessary to implement such alternative mechanism.

"(d) TECHNICAL AND PROCEDURAL STANDARDS.—

"(1) TELEPHONE FACSIMILE MACHINES.—The Commission shall revise the regulations setting technical and procedural standards for telephone facsimile machines to require that any such machine which—

"(A) is manufactured after 6 months after the date of enactment of this section, and

"(B) is used for the distribution of unsolicited advertising,

be equipped to identify, in a margin at the top or bottom of each transmitted page, the date and time sent, an identification of the business sending the advertistng, and the telephone number of the sending machine or of such business. The Commission shall exempt from such standards, for 18 months after such date of enactment, telephone facsimile machines that do not have the capacity for automatic dialing and transmission and that are not capable of operation through an interface with a computer.

"(2) AUTOMATIC TELEPHONE DIALING SYSTEMS.—The Commission shall prescribe

technical and procedural standards for automatic telephone dialing systems that are used to transmit any prerecorded telephone solicitation. Such standards shall require that—

"(A) all recorded messages (i) shall, at the beginning of the message, state clearly the identity of the business initiating the call, and (ii) shall, during or after the message, state clearly the telephone number or address of such business; and

"(B) such systems will, as soon as is technically practicable (given the limitations of the telephone exchange service facilities) after the called party hands up, automatically create a disconnect signal or on-hook condition which allows the called party's line to be released.

"(e) STATE LAW NOT PREEMPTED.—Nothing in this section or in the regulations prescribed pursuant to this section shall preempt any State law that imposes more restrictive intrastate requirements or regulations on, or which prohibits, either or both of the following:

"(1) the use of telephone facsimile machines or other electronic devices to send unsolicited advertisements; and

"(2) the use of automatic telephone dialing systems to transmit prerecorded telephone solicitations.

"(f) SCHEDULE FOR PROMULGATIONS OF REGULATIONS.—The regulations required by this section shall be prescribed within 6 months after the date of enactment of this section.

"(g) EFFECTIVE DATE OF REQUIREMENTS.—The requirements of this section shall take effect 30 days after the date that such regulations are prescribed.".

(b) CONFORMING AMENDMENT.—Section 2(b) of the Communications Act of 1934 (47 U.S.C. 152(b)) is amended by striking "section 223 or 224" and inserting "sections 223, 224, and 225".

The SPEAKER pro tempore. Is a second demanded?

Mr. RITTER. Mr. Speaker, I demand a second.

The SPEAKER pro tempore. Without objection, a second will be considered as ordered.

There was no objection.

The SPEAKER pro tempore. The gentleman from Massachusetts [Mr. MARKEY] will be recognized for 20 minutes, and the gentleman from Pennsylvania [Mr. RITTER] will be recognized for 20 minutes.

The Chair recognizes the gentleman from Massachusetts [Mr. MARKEY].

Mr. MARKEY. Mr. Speaker, I yield myself such time as I may consume.

Mr. Speaker, I rise in support of H.R. 2921, the Telephone Advertising Regulation Act of 1990. This legislation will protect businesses and consumers who rely on the telephone as a necessary ingredient of their daily activities, from the cost and intrusion of the unsolicited telephone advertising which is increasingly finding its way into individual's homes and offices.

The telephone resides in virtually every American home and business and has become an integral part of our daily lives. Today telecommunications technologies are improving the services brought into our homes. However, the use of the telephone and fax machine to advertise and solicit products not only offers us new services but unfortunately, new problems.

The telephone is an insistent master—when it rings we answer it. Many consumers complain bitterly that when it rings to deliver unsolicited advertising, it is invading their privacy. Likewise, businesses dependent on the fax machine to carry vital information have come to decry unsolicited advertising that results in cost to, and interference with business activity.

In recent years a growing number of telephone solicitors have started to use automatic dialing systems. Each of these machines can automatically dial up to 1,000 phones per day to deliver a prerecorded message. According to industry officials, each day they are used by more than 180,000 solicitors to call more than 7 million Americans. Unfortunately, these machines are often programmed to dial whole blocks of numbers in sequence, including hospitals, fire stations, pagers, and unlisted numbers. Such random programming not only makes the machine an equal opportunity nuisance, but an equal opportunity hazard. This threat is particularly serious in instances where the machine is not capable of releasing the called party's line once the party hangs up.

The newest technology to gain popularity for delivering unsolicited advertising is the facsimile machine. An office oddity 2 years ago, the fax machine has rapidly become a necessity in my office and in more than 2 million others, delivering more than 30 billion pages of material each year. However, with the growth in use of the fax machines has come "junk fax," the electronic equivalent of junk mail. To quote an article from the Washington Post, "receiving junk fax is like getting junk mail with the postage due." Succinctly put, using a facsimile machine to send unsolicited advertising not only shifts costs from the advertiser to the recipient, but keeps an important business machine from being used for its intended purpose.

H.R. 2921, which I introduced together with the ranking minority member of the subcommittee, Mr. RINALDO, and Mr. FRANK, Mrs. ROUKEMA, Mr. SHAYS, and Mr. STARK, is a bipartisan effort to return a measure of control to consumers over what they hear and read.

This bill is supported by the National Association of Regulatory Utility Commissioners [NARUC], the American Telemarketers Association, and consumer groups, including the National Association of State Utilities Consumer Advocates [NASUCA]. The bill, as amended, is now acceptable to most in the telecommunications industry. It is a fair and reasonable compromise that addresses today's growing consumer complaints while protecting the interests of legitimate telemarketers.

This bill will not eliminate unsolicited telephone advertising, for certainly we must acknowledge that telephone solicitation, when conducted properly, is an established, lawful marketing practice. However, this bill will give consumers an alternative, to specify that they do not want to receive unsolicited advertising and require advertisers to honor that choice.

In addition, this bill eliminates unsolicited calls to emergency and public safety telephone numbers as well as paging and cellular equipment. The random calling of emergency and certain business equipment can be dangerous and special protections for the use of this equipment is included. Finally, the legislation, which covers both intrastate and interstate unsolicited calls, establishes Federal guidelines to fill the regulatory gap arising from differences in Federal and State telemarketing regulations. These guideline will give advertisers a single set of ground rules, and prevent them from falling through the cracks between Federal and State statutes.

Mr. FRANK, Mrs. ROUKEMA, Mr. SHAYS and I would like to thank my colleagues for their cooperation in drafting this bill, which incorporated many of the concepts that were included in legislation the originally introduced. I would especially like to commend Representative RINALDO and the minority staff for the cooperative spirit with which this bill was crafted.

I urge my colleagues to support this legislation, not as a restriction on commercial practices, but as an affirmation of an individual's right to choose to be free from unwanted intrusions.

Mr. Speaker, I reserve the balance of my time.

Mr. RITTER. Mr. Speaker, I yield myself such time as I may consume.

Mr. Speaker, the telephone is much more than a means of keeping in touch with our far-flung families. The telephone is a highway of commerce through which billions of dollars of products and services are made available.

A wise man once said that every innovation breeds a new problem. This is certainly true of both auto-dialers and "junk fax". Telecommunications is exploding with innovations. So it shouldn't surprise us that the use of these new technologies has bred new problems and headaches that we have never encountered, and that present law does not address.

Automatic dialing devices, or auto-dialers, are widely used in telemarketing because they enable a business to complete many more calls automatically than people dialing manually. Unfortunately, these auto-dialers can clog up phone lines, making it impossible to complete calls. This can be a life-and-death situation, when someone cannot complete an emergency call because an auto-dialer has not disconnected yet.

There are legitimate purposes for auto-dialers. But they should not be permitted to tie up the phone lines. The telephone is the lifeline link for many of our citizens, especially senior citizens.

The so-called junk fax problem has arisen from the fact that fax machines are becoming indispensable tools, as many Members of Congress will tell you. There already are over 2¼ million fax machines in the United States. Soon, fax machines will even be available in your car.

No sooner did fax machines begin to be used generally than fax advertising, or junk fax, began to appear. Junk fax is more than just irritating: It is also costly, because the receiver has to pay for the junk fax. Also, like auto-dialers, unsolicited and unwanted faxes can tie up a machine for hours and thwart the receipt of legitimate and important messages.

Examples of the problems with junk fax are multiplying. The Houston Oilers' office was "fax attacked" by Cleveland Browns' fans the week before a game between the two teams. Last year, Connecticut enacted a law against junk fax after Governor O'Neill was himself subjected to a fax attack: Junk fax messages urging him to vote against the bill. Unfortunately for the bill's opponents, this fax attack happened at the same time that an emergency flood report was expected.

In Maryland, a similar thing happened to Governor Schaefer, and he immediately signed legislation to ban junk fax. Recently, Virginia permitted the receiver of a junk fax to sue the sender for $200 plus attorney's fees. A dozen other States are considering similar legislation.

To address the problem of interstate junk fax calls, Federal legislation is necessary. That is why Republicans have worked with the subcommittee chairman, Mr. MARKEY, to craft bipartisan legislation to cure the junk fax problem: H.R. 2921—the Telephone Advertising Regulation Act.

Our legislation prohibits the use of auto-dialers or unsolicited faxes to reach any number which is on record with the local telephone company as objecting to their receipt. It is a narrowly tailored response to a problem which we cannot permit to grow out of control.

The bill balances the first amendment rights of those who wish to send with those who do not wish to receive. Some say that legislation of this type violates the first amendment rights of junk faxers. I strongly disagree. We must remember that the first amendment also guarantees to our citizens the choice not to listen. It is absurd to suggest that citizens who own fax machines must receive junk fax, but that they also must pay for the privilege.

□ 1420

Mr. Speaker, I would like to commend some individual Members for their leadership in bringing this legislation to the attention of Congress: The gentlewoman from New Jersey

*July 30, 1990*      CONGRESSIONAL RECORD — HOUSE      H 5821

[Mrs. ROUKEMA] and the gentleman from Connecticut [Mr. SHAYS] from our side of the aisle, and the gentleman from Massachusetts [Mr. FRANK] and the gentleman from California [Mr. STARK] on the other side of the aisle.

Mr. Speaker, there was unanimous agreement in the Energy and Commerce Committee that these abusive practices must stop. I believe this legislation will make sure that they do.

I urge the House to support the Telephone Advertising Regulations Act.

Mr. Speaker, I reserve the balance of my time.

Mr. MARKEY. Mr. Speaker, I yield such time as he may consume to the gentleman from Massachusetts [Mr. FRANK]. The gentleman introduced the original piece of legislation dealing with the autodialing problem, and we have incorporated the basic precepts of that legislation in this bill.

Mr. FRANK. Mr. Speaker, I wish to offer my congratulations to the gentleman from New Jersey, the ranking member from New Jersey, and others for a very well done piece of legislation. This is the legislative process at its best, a problem that is bothering citizens being brought to the attention of members of the committee, and they have brought over a bill that balances legitimate competing interests quite well. It gives protection to those entitled to protection, without interfering with any legitimate commercial activity.

There are people who wonder sometimes about the degree of responsiveness in our system. I think those criticisms are greatly overstated. In my case and I believe in the case of the gentleman from New Jersey, we had constituent complaints that came to our attention. What we did was to work on them, to come up with legislative approaches. We respectively brought them to members on the Committee on Energy and Commerce, and as a result of this bipartisan corroboration, we have a very good piece of legislation generated in part by citizen complaints.

Mr. Speaker, people ought to understand why our Constitution is supposed to work and often does, and often does not get recognized.

Second, Mr. Speaker, I must say a good word for regulation. Regulation can be overdone because of inefficiencies, but is also essential. In a complex economic world, citizens need some protections. Virtually every Member in this Chamber knows that the private sector is the primary engine in this country for the creation of wealth. It is the basis of our economy. We also understand that sensible Government regulation is needed and desirable to protect people from aspects of that private system that may have negative consequences.

What members on the Committee of Energy and Commerce have done, the gentleman from Massachusetts, the

gentleman from New Jersey, and others, the gentleman from Pennsylvania who participated in this, is to come forward with a bill that allows the private sector to do well what it is supposed to do, while through sensible regulation protects the interests of consumers.

Mr. Speaker, this is not an earth-shaking issue. It is one that is important to people who might find they wanted to make an emergency phone call, and there is an autophone that will not disconnect, as we have seen, or people who do not like being the recipient of material over which they have no control for whatever reason.

Mr. Speaker, the committee has responded to give protection to those people, and it has done it in a very thoughtful and balanced way. This is an important bill, not just for the particular goals it serves, which are valuable in themselves, but as an example of the legislative process at its very best. I thank the members of the committee and the others that are cosponsors of the bill.

Mr. RITTER. Mr. Speaker, I yield 4 minutes to the gentlewoman from New Jersey [Mrs. ROUKEMA], one of the original drafters of legislation of this type.

(Mrs. ROUKEMA asked and was given permission to revise and extend her remarks.)

Mrs. ROUKEMA. Mr. Speaker, I rise today in strong support of H.R. 2921, the Telephone Advertising Regulation Act. I would like to commend the distinguished chairman of the subcommittee, Mr. MARKEY, and ranking Republican Mr. RINALDO, for so finely crafting this legislation, which includes the language and intent of my own "Computer Calls" bill, H.R. 2131. This legislation is much-needed and overdue. It ends unsolicited computer-generated telemarketing, and Mr. Speaker, I say none too soon.

In an age where advanced computers and telecommunications become more and more an everyday fact of our lives, these junk calls are absolutely a nuisance and an invasion of privacy, and in the worst cases, dangerous and life threatening! Ma Bell may be turning over in her grave, but with the proliferation of computer calls, and random dialing machines, our own telephones are becoming health hazards!

I know my colleagues would agree that this legislation has strong grassroot support. I came to this issue because I've been contacted by a number of doctors in my district who have rightly complained that their office emergency lines, usually reserved for especially serious cases, have instead been clogged with unsolicited computer calls.

One of those doctors just happens to be my husband, Dr. Richard W. Roukema, who has threatened not to vote for me next time if I don't see to it that this legislation is passed.

Mr. MARKEY. Mr. Speaker, will the gentlewoman yield?

Mrs. ROUKEMA. I yield to the gentleman from Massachusetts.

Mr. MARKEY. Mr. Speaker, at a point very early in the consideration of this legislation the gentlewoman from New Jersey [Mrs. ROUKEMA] came to me and told me the story of her husband's protest to the inability of disconnecting junk phone calls coming into the house, especially into a physician's home.

□ 1430

I knew that her husband was a physician, a psychiatrist.

Similarly, when I went home and I repeated to my wife, who is a doctor and a psychiatrist, the complaint of the gentlewoman from New Jersey and her husband, there was an automatic power nexus that had been constructed which I felt was going to absolutely guarantee the passage of this legislation. I believe the gentlewoman's husband deserves a lot of credit for identifying and bringing to your attention and creating momentum for the passage of this legislation, because there was a real live story that epitomized the problems that exist in human relationships when technology no longer serving us, but in fact making it more difficult for humans to serve others. I want to congratulate the gentlewoman and her husband especially for the work she was doing.

Mrs. ROUKEMA. I thank the gentleman. We have had here a little bit of levity, but it is a very serious problem and it was a serious issue in Dr. Roukema's office when the line that is to be reserved only for emergency calls from hospitals or in cases of suicidal patients, when those lines were being held up, and that is the precise nature of the kinds of health hazards that we are talking about here.

I have also been contacted by police and fire officials who have expressed dismay about random phone calls which will not disconnect.

And, if I may share with my colleagues a letter from a constituent which stresses her frustration:

Dear Mrs. Roukema: I've had these calls early in the morning and as late as 9:30 at night. I have had surgery, and while home recuperating these calls were coming in. I volunteer at the hospital on Sunday at the information desk, and when I am there these computer calls are coming in through two phones; one would come and after hanging up it would ring again and again.

That's an excerpt from her letter, and I think my constituent gets to the heart of this problem.

Without question, Mr. Speaker, the most important provision in this bill is the prohibition on computer-generated calls to the emergency phone lines of any hospital, medical physician or service office, health care facility, or fire protection or law enforcement facility. When phone lines to police stations, fire stations, doctors' offices, and hospitals are blocked with tape-recorded plugs for time shares, this matter moves from beyond annoyance

**H 5822**      CONGRESSIONAL RECORD — HOUSE      *July 30, 1990*

to a potentially life-threatening situation. And that must stop.

But it is not only when these calls come to doctors' offices or fire stations that the public faces a dangerous health hazard. If you recall, when I introduced my legislation a year ago, I spoke of a New York mother who tried to call an ambulance for her child who had collapsed, and the sheer terror she went through when she picked up her phone to find it tied up by a computer call that would not disconnect. Thankfully, the child survived—but think of what might have happened. Mr. Speaker, another key component of this bill is the requirement that these computer calls disconnect and free up the telephone line as soon as possible. Anyone who, under this bill, would choose to block their phones to telemarketing computer calls need not worry. But this vital provision protects those people who, even though they may choose to receive computer calls, may still need a free and clear phone line in cases of emergency.

In short, Mr. Speaker, if computers, cellular phones, and global FAX machines are ideas whose time has come, the ban on the nuisance and hazard of random, intrusive, and potentially life-threatening computer-generated sales calls is even more necessary. Let me say that I believe a compelling case can be made to ban all computer-generated telemarketing. But lacking that, this bill is a major step forward in protecting the public. I urge my colleagues to vote for this bill, stand up for privacy, the end of harassment, and most important, health and safety, and put the phone lines back where they belong: in the hands of the people who pay for them!

Mr. MARKEY. Mr. Speaker, I yield such time as he may consume to the gentleman from Maryland [Mr. McMILLEN]. He has been working on this legislation this year with us and been a very valuable Member in constructing this piece of legislation we bring to the House floor today.

Mr. McMILLEN of Maryland. Mr. Speaker, I too rise in strong support of H.R. 2921. I want to thank the gentleman from Massachusetts [Mr. MARKEY] for his leadership in moving this bill so expeditiously through the Subcommittee on Telecommunications and Finance, and through our full committee and onto the floor. I also want to commend the gentleman from Pennsylvania, [Mr. RITTER] for his leadership as well.

Mr. Speaker, today I rise in strong support of H.R. 2921, the Telephone Advertising Regulation Act. This legislation would prevent abusive and dangerous use of automatic dialer recorded message players [ADRMP's]—which automatically dial telephone numbers and play a prerecorded message. H.R. 2921 would prohibit the use of ADRMP's to tie up communications services, and would make illegal the use of ADRMP's in sending "junk fax" to emergency services and to persons

and organizations who do not wish to receive these forms of unsolicited advertising.

Mr. Speaker. I believe that this legislation is desperately needed. We have seen an explosion in the last few years in the use of ADRMP's. What originated as an innovative idea, has become an abused practice which hinders the ability of emergency agencies to receive critical information and serves as a nuisance to individuals at home and in the workplace. I believe the chairman of the Telecommunications and Finance Subcommittee has acted expeditiously in moving H.R. 2921 through the Energy and Commerce Committee. And I believe the final legislative product is an excellent one.

I hope to work with Chairman MARKEY in the next few months in ensuring that the FCC promulgate regulations of certain uses of ADRMP's that are not specifically covered in the bill. Abuses of ADRMP's are not limited to just emergency telephones, paging, and cellular, but to other types of answering services such as voice mail. If ADRMP's are to become a legitimate advertising mechanism, we need regulations that will protect the consumer. H.R. 2921 is an important first step in moving us closer to that goal. Therefore, I ask my colleagues to support H.R. 2921.

Mr. RITTER. Mr. Speaker, I have no more requests for time, and I yield back the balance of my time.

Mr. MARKEY. Mr. Speaker, I yield myself such time as I may consume only for the purpose of concluding our discussions on this piece of legislation by thanking the gentleman from Pennsylvania [Mr. RITTER] for his leadership on this issue and on every other issue that comes before the Telecommunications and Finance Subcommittee dealing with these issues of technology and their relationship with humanity. As usual, he has done a splendid job in handling this bill out on the floor. It is just a continuation of the fine job that he does in the committee as well.

I would like to thank the gentleman from New Jersey [Mr. RINALDO] for his work and thank his staff and my staff for their leadership, as well as the gentleman from Michigan [Mr. DINGELL] at the full committee level and his staff in ensuring that we do push forward the toughest possible bill at this time.

We recommend it to the full House at this time as a good piece of legislation that will really help our country.

Mr. Speaker, I yield back the balance of my time.

The SPEAKER pro tempore (Mr. MAZZOLI). The question is on the motion offered by the gentleman from Massachusetts [Mr. MARKEY] that the House suspend the rules and pass the bill, H.R. 2921, as amended.

The question was taken.

Mr. RITTER. Mr. Speaker, on that I demand the yeas and nays.

The yeas and nays were ordered.

The SPEAKER pro tempore. Pursuant to the provisions of clause 5, rule I, and the Chair's prior announcement, further proceedings on this motion will be postponed.

EMERGING [...]TIONS T[...] 1990      [...]UNICA-[...]ACT OF

Mr. MAR[...] [...]r, I move to suspend t[...] [...]s the bill (H.R. 2965) t[...] [...]retary of Commerce [...] [...]onal frequencies ava[...] [...]ercial assignment in [...] [...]e the development [...] [...] telecommunications [...] [...]and for other purpos[...]

The Clerk [...]

*Be it enacte[...]*      *[...]d House of* *Representative[...]*      *States of America in Co[...]*

SECTION 1. SHOR[...]
This Act m[...] Telecommunic[...]      "Emerging 1990".      [...]s Act of

SEC. 2. FINDINGS
The Congre[...]
(1) the Gove[...] its own use, o[...]      [...]eserves for proximately [...]      [...]cess to, ap-netic spectrun[...]      [...]lectromag-suant to the C[...]      [...]or use pur-[...] of 1934;
(2) many of [...]      [...]e underuti-lized by Gover[...]
(3) the publ[...]      [...]that many of such frequ[...]      [...]more effi-ciently by gov[...]      [...]rcial opera-tors;
(4) addition[...]      [...]ssigned for services that [...]      [...]more effi-ciently from [...]      [...]s or other vendors;
(5) scarcity [...]      [...]uencies for commercial u[...]
(A) impede [...]      [...]d commer-cialization of [...]      [...]tions prod-ucts and servi[...]
(B) reduce [...]      [...]fficiency of the United S[...]      [...]ations sys-tems; and
(C) thereby [...]      [...]he produc-tive capacity [...]      [...]ompetitive-ness of the U[...]      [...]y;
(6) a reass[...]      [...]frequencies can produce [...]      [...]ic returns; and
(7) the Sec[...]      [...] the Presi-dent, and t[...]      [...]unications Commission [...]      [...]to take ap-propriate ste[...]      [...]leficiencies.
[...]G.

SEC. 3. NATIONA[...]
(a) PLANNI[...]      [...] Assistant Secretary for [...]      [...]d Informa-tion and the [...]      [...]Commission shall meet, a [...]      [...]to conduct joint spectrun[...]      [...]pect to the following issu[...]
(1) the futu[...]      [...]ements for public and pr[...]
(2) the spe[...]      [...]tions neces-sary to accom[...]      [...]and
(3) actions [...]      [...]te the effi-cient use of [...]      [...]uding spec-trum manage[...]      [...]to promote increased sh[...]      [...]ctrum as a means of inc[...]      [...]ccess.
(b) REPORT[...] Communicati[...]      [...]ecretary for Chairman of [...]      [...]on and the all submit a

## TELEPHONE ADVERTISING REGULATION ACT

The SPEAKER pro tempore. The pending business is the question of suspending the rules and passing the bill, H.R. 2921, as amended.

The Clerk read the title of the bill.

The SPEAKER pro tempore. The question is on the motion offered by the gentleman from Massachusetts [Mr. MARKEY] that the House suspend the rules and pass the bill, H.R. 2921, as amended.

The question was taken; and (two-thirds having voted in favor thereof) the rules were suspended and the bill, as amended, was passed.

A motion to reconsider was laid on the table.

# EXHIBIT 16

DECLARATION OF SEAN P. FLYNN IN SUPPORT OF  DEFENDANT IC SYSTEM, INC.'S
MOTION TO DISMISS PLAINTIFF'S COMPLAINT

II

**Calendar No. 1026**

101ST CONGRESS
2D SESSION

# H. R. 2921

———————————

## IN THE SENATE OF THE UNITED STATES

AUGUST 1 (legislative day, JULY 10), 1990

Received; read twice and referred to the Committee on Commerce, Science, and Transportation

OCTOBER 26 (legislative day, OCTOBER 2), 1990

Committee discharged; ordered to be placed on the calendar

———————————

# AN ACT

To amend the Communications Act of 1934 to prohibit certain practices involving the use of telephone equipment for advertising and solicitation purposes.

1   *Be it enacted by the Senate and House of Representa-*

2   *tives of the United States of America in Congress assembled,*

3   **SECTION 1. SHORT TITLE.**

4   This Act may be cited as the "Telephone Advertising

5   Regulation Act".

6   **SEC. 2. AMENDMENTS TO THE COMMUNICATIONS ACT OF 1934.**

7   (a) AMENDMENT.—Title II of the Communications Act

8   of 1934 is amended by inserting after section 224 (47 U.S.C.

9   224) the following new section:

page 194
Exhibit 16

2

1 "RESTRICTIONS ON THE USE OF TELEPHONE EQUIPMENT

2               FOR ADVERTISING

3     "SEC. 225. (a) DEFINITIONS.—As used in this

4 section—

5         "(1) the term 'automatic telephone dialing system'

6     means equipment which has the capacity—

7             "(A) to store or produce numbers to be

8         called, using a random or sequential number gen-

9         erator;

10             "(B) to dial such numbers; and

11             "(C) to deliver, without initial live operator

12         intervention, a prerecorded voice message to the

13         number dialed, with or without manual assistance.

14         "(2) The term 'telephone facsimile machine'

15     means equipment which has the capacity—

16             "(A) to transcribe text or images, or both,

17         from paper into an electronic signal and to trans-

18         mit that signal over a regular telephone line; and

19             "(B) to receive such signals over such a line

20         and to produce a copy of the transmitted text and

21         images.

22         "(3) The term 'telephone solicitation' means the

23     unsolicited initiation of a telephone message, without

24     initial live operator intervention, for the purpose of en-

3

1    couraging a person to purchase, rent, or invest in prop-

2    erty, goods, or services.

3        "(4) The term 'unsolicited advertisement' means

4    any material advertising the commercial availability or

5    quality of any property, goods, or services which is

6    transmitted to any person without that person's prior

7    express invitation or permission.

8    "(b) RESTRICTIONS.—It shall be unlawful for any

9 person within the United States by means of telephone—

10        (1) to use any telephone facsimile machine or

11    computer or other electronic device to send any unso-

12    licited advertisement to the telephone facsimile ma-

13    chine of any person whose number is listed pursuant to

14    subsection (c) as the telephone number of a person who

15    objects to receiving unsolicited advertisements by tele-

16    phone facsimile machine;

17        (2) to use any automatic telephone dialing system

18    to transmit, without initial live operator intervention,

19    any prerecorded telephone solicitation to any person

20    whose number is listed pursuant to subsection (c) as

21    the telephone number of a person who objects to re-

22    ceiving telephone solicitations from automatic tele-

23    phone dialing systems;

24        "(3) to use any automatic telephone dialing

25    system to make unsolicited calls—

4

1     "(A) to any emergency telephone line of any

2     hospital, medical physician or service office,

3     health care facility, fire protection, or law enforce-

4     ment agency; or

5     "(B) to any number assigned to paging or

6     cellular telephone service;

7     "(4) to use any telephone facsimile machine or

8     any automatic telephone dialing system that does not

9     comply with the technical standards prescribed under

10    subsection (d); or

11    "(5) to use a computer or other electronic device

12    to send an unsolicited advertisement via a facsimile

13    machine unless such person sending the advertisement

14    clearly notes the date and time it is sent and the iden-

15    tity and telephone number of the business initiating the

16    message.

17    "(c) COMPILATION OF LISTS OF OBJECTING

18    PERSONS.—

19    "(1) SELECTION AND OPERATION OF LISTING

20    MECHANISM.—The Commission shall compare and

21    evaluate alternative mechanisms for establishing a na-

22    tional clearinghouse to compile a list of telephone sub-

23    scribers who have submitted objections under subpara-

24    graph (A) or (B) of paragraph (2) (or both) and to make

25    that compiled list available. Such comparison and eval-

5

1　uation shall include the solicitation of public comment

2　on such alternative mechanisms and shall include the

3　evaluation of the establishment of the clearinghouse by

4　the Commission or its designee. Within 180 days after

5　the date of enactment of this section, the Commission

6　shall by regulation select the mechanism which it de-

7　termines will be the most cost effective in carrying out

8　the purposes of this section. Such mechanism shall pro-

9　vide for the recovery, from persons obtaining lists for

10　purposes of complying with this section or comparable

11　State law, of costs incurred under this paragraph.

12　　"(2) NOTIFICATION TO SUBSCRIBERS.—Each

13　common carrier providing telephone exchange service

14　shall, in accordance with regulations prescribed by the

15　Commission, afford its subscribers for telephone ex-

16　change service the opportunity to provide notification

17　in accordance with regulations established under para-

18　graph (3) that such subscriber objects to either or both

19　of the following:

20　　　　"(A) to receiving unsolicited advertisements

21　　　　by telephone facsimile machine; or

22　　　　"(B) to receiving prerecorded, commercial

23　　　　telephone solicitations from automatic telephone

24　　　　dialing systems.

6

1   "(3) REGULATIONS.—The regulations prescribed

2 under this subsection shall—

3     "(A) specify the methods by which a sub-

4    scriber shall be informed by a common carrier of

5    the right to give or revoke a notification of an ob-

6    jection under subparagraph (A) or (B) (or both) of

7    paragraph (2) and specify the methods by which

8    such right may be exercised by the subscriber;

9     "(B) specify the methods by which such ob-

10    jections shall be collected and transmitted to the

11    national clearinghouse established by the Commis-

12    sion under paragraph (1);

13     "(C) prohibit any residential subscriber from

14    being charged for giving or revoking such notifica-

15    tion or for being carried on a list compiled under

16    this section;

17     "(D) specify the methods by which such list

18    shall be available to any person desiring to trans-

19    mit unsolicited advertisements by telephone fac-

20    simile machine or to use an automatic dialing

21    system to transmit telephone solicitations, and the

22    costs to be recovered from such persons;

23     "(E) specify the frequency with which such

24    lists will be updated and specify the method by

7

1      which such updated list will take effect for pur-

2      poses of compliance with subsection (b);

3           "(F) be designed to permit and encourage

4      States to use the listing mechanism selected by

5      the Commission under paragraph (1) for purposes

6      of administering or enforcing State law; and

7           "(G) prohibit the use of such list for any pur-

8      pose other than compliance with the requirements

9      of this section or any similar State law and speci-

10     fy methods for protection of the privacy rights of

11     persons whose numbers are included in such list.

12       "(4) ALTERNATIVE MECHANISM PERMITTED.—If

13   the Commission, on the basis of its investigation during

14   the rulemaking proceedings required for purposes of

15   this subsection, determines that the listing mechanism

16   required by this subsection is not the most efficient, ef-

17   fective, and economic means of accomplishing the pur-

18   poses of this subsection, the Commission shall consider

19   alternative mechanisms to accomplish such purposes. If

20   the Commission determines that an alternative mecha-

21   nism will provide equivalent protection of telephone

22   subscriber privacy rights in a more efficient, effective,

23   and economic manner and without the imposition of

24   any additional charge to telephone subscribers, the

25   Commission shall, after notice and opportunity for

8

1    comment thereon and after 90 days notice to the Con-

2    gress, prescribe such regulations as are necessary to

3    implement such alternative mechanism.

4    "(d) TECHNICAL AND PROCEDURAL STANDARDS.—

5        "(1) TELEPHONE FACSIMILE MACHINES.—The

6    Commission shall revise the regulations setting techni-

7    cal and procedural standards for telephone facsimile

8    machines to require that any such machine which—

9            "(A) is manufactured after 6 months after

10           the date of enactment of this section, and

11           "(B) is used for the distribution of unsolicited

12           advertising,

13   be equipped to identify, in a margin at the top or

14   bottom of each transmitted page, the date and time

15   sent, an identification of the business sending the ad-

16   vertising, and the telephone number of the sending ma-

17   chine or of such business. The Commission shall

18   exempt from such standards, for 18 months after such

19   date of enactment, telephone facsimile machines that

20   do not have the capacity for automatic dialing and

21   transmission and that are not capable of operation

22   through an interface with a computer.

23       "(2) AUTOMATIC TELEPHONE DIALING SYS-

24   TEMS.—The Commission shall prescribe technical and

25   procedual standards for automatic telephone dialing

9

1    systems that are used to transmit any prerecorded tele-
2    phone solicitation. Such standards shall require that—
3            "(A) all recorded messages (i) shall, at the
4        beginning of the message, state clearly the identi-
5        ty of the business initiating the call, and (ii) shall,
6        during or after the message, state clearly the tele-
7        phone number or address of such business; and
8            "(B) such systems will, as soon as is techni-
9        cally practicable (given the limitations of the tele-
10       phone exchange service facilities) after the called
11       party hands up, automatically create a disconnect
12       signal or on-hook condition which allows the
13       called party's line to be released.
14   "(e) STATE LAW NOT PREEMPTED.—Nothing in this
15   section or in the regulations prescribed pursuant to this sec-
16   tion shall preempt any State law that imposes more restric-
17   tive intrastate requirements or regulations on, or which pro-
18   hibits, either or both of the following:
19           "(1) the use of telephone facsimile machines or
20       other electronic devices to send unsolicited advertise-
21       ments; and
22           "(2) the use of automatic telephone dialing sys-
23       tems to transmit prerecorded telephone solicitations.
24   "(f) SCHEDULE FOR PROMULGATIONS OF REGULA-
25   TIONS.—The regulations required by this section shall be

10

1 prescribed within 6 months after the date of enactment of this

2 section.

3     "(g) EFFECTIVE DATE OF REQUIREMENTS.—The re-

4 quirements of this section shall take effect 30 days after the

5 date that such regulations are prescribed.".

6     (b) CONFORMING AMENDMENT.—Section 2(b) of the

7 Communications Act of 1934 (47 U.S.C. 152(b)) is amended

8 by striking "section 223 or 224" and inserting "sections 223,

9 224, and 225".

      Passed the House of Representatives July 30, 1990.

      Attest:          DONNALD K. ANDERSON,

                                              *Clerk.*

Calendar No. 1026

101st CONGRESS
2d SESSION

# H. R. 2921

# AN ACT

To amend the Communications Act of 1934 to prohibit certain practices involving the use of telephone equipment for advertising and solicitation purposes.

OCTOBER 26 (legislative day, OCTOBER 2), 1990

Ordered to be placed on the calendar

# EXHIBIT 17

DECLARATION OF SEAN P. FLYNN IN SUPPORT OF DEFENDANT IC SYSTEM, INC.'S
MOTION TO DISMISS PLAINTIFF'S COMPLAINT

II

101st CONGRESS
2d SESSION

# H. R. 2921

---

## IN THE SENATE OF THE UNITED STATES

AUGUST 1 (legislative day, JULY 10), 1990

Received; read twice and referred to the Committee on Commerce, Science, and Transportation

---

# AN ACT

To amend the Communications Act of 1934 to prohibit certain practices involving the use of telephone equipment for advertising and solicitation purposes.

1    *Be it enacted by the Senate and House of Representa-*

2 *tives of the United States of America in Congress assembled,*

3 **SECTION 1. SHORT TITLE.**

4    This Act may be cited as the "Telephone Advertising

5 Regulation Act".

6 **SEC. 2. AMENDMENTS TO THE COMMUNICATIONS ACT OF 1934.**

7    (a) AMENDMENT.—Title II of the Communications Act

8 of 1934 is amended by inserting after section 224 (47 U.S.C.

9 224) the following new section:

2

1 "RESTRICTIONS ON THE USE OF TELEPHONE EQUIPMENT

2                 FOR ADVERTISING

3    "SEC.  225.  (a)  DEFINITIONS.—As  used  in  this

4 section—

5        "(1) the term 'automatic telephone dialing system'

6       means equipment which has the capacity—

7             "(A)  to  store  or  produce  numbers  to  be

8            called, using a random or sequential number gen-

9            erator;

10             "(B) to dial such numbers; and

11             "(C) to deliver, without initial live operator

12            intervention, a prerecorded voice message to the

13            number dialed, with or without manual assistance.

14        "(2)  The  term  'telephone  facsimile  machine'

15       means equipment which has the capacity—

16             "(A)  to  transcribe  text  or  images,  or  both,

17            from paper into an electronic signal and to trans-

18            mit that signal over a regular telephone line; and

19             "(B) to receive such signals over such a line

20            and to produce a copy of the transmitted text and

21            images.

22        "(3) The term 'telephone solicitation' means the

23       unsolicited initiation of a telephone message, without

24       initial live operator intervention, for the purpose of en-

3

1    couraging a person to purchase, rent, or invest in prop-
2    erty, goods, or services.

3    "(4) The term 'unsolicited advertisement' means
4    any material advertising the commercial availability or
5    quality of any property, goods, or services which is
6    transmitted to any person without that person's prior
7    express invitation or permission.

8    "(b) RESTRICTIONS.—It shall be unlawful for any
9    person within the United States by means of telephone—

10   (1) to use any telephone facsimile machine or
11   computer or other electronic device to send any unso-
12   licited advertisement to the telephone facsimile ma-
13   chine of any person whose number is listed pursuant to
14   subsection (c) as the telephone number of a person who
15   objects to receiving unsolicited advertisements by tele-
16   phone facsimile machine;

17   (2) to use any automatic telephone dialing system
18   to transmit, without initial live operator intervention,
19   any prerecorded telephone solicitation to any person
20   whose number is listed pursuant to subsection (c) as
21   the telephone number of a person who objects to re-
22   ceiving telephone solicitations from automatic tele-
23   phone dialing systems;

24   "(3) to use any automatic telephone dialing
25   system to make unsolicited calls—

4

1          "(A) to any emergency telephone line of any

2     hospital,   medical   physician   or   service   office,

3     health care facility, fire protection, or law enforce-

4     ment agency; or

5          "(B) to any number assigned to paging or

6     cellular telephone service;

7          "(4) to use any telephone facsimile machine or

8     any automatic telephone dialing system that does not

9     comply with the technical standards prescribed under

10    subsection (d); or

11         "(5) to use a computer or other electronic device

12    to send an unsolicited advertisement via a facsimile

13    machine unless such person sending the advertisement

14    clearly notes the date and time it is sent and the iden-

15    tity and telephone number of the business initiating the

16    message.

17    "(c)   COMPILATION   OF   LISTS   OF   OBJECTING

18 PERSONS.—

19         "(1) SELECTION AND OPERATION OF LISTING

20    MECHANISM.—The   Commission   shall   compare   and

21    evaluate alternative mechanisms for establishing a na-

22    tional clearinghouse to compile a list of telephone sub-

23    scribers who have submitted objections under subpara-

24    graph (A) or (B) of paragraph (2) (or both) and to make

25    that compiled list available. Such comparison and eval-

5

1    uation shall include the solicitation of public comment

2    on such alternative mechanisms and shall include the

3    evaluation of the establishment of the clearinghouse by

4    the Commission or its designee. Within 180 days after

5    the date of enactment of this section, the Commission

6    shall by regulation select the mechanism which it de-

7    termines will be the most cost effective in carrying out

8    the purposes of this section. Such mechanism shall pro-

9    vide for the recovery, from persons obtaining lists for

10   purposes of complying with this section or comparable

11   State law, of costs incurred under this paragraph.

12       "(2)  NOTIFICATION   TO   SUBSCRIBERS.—Each

13   common carrier providing telephone exchange service

14   shall, in accordance with regulations prescribed by the

15   Commission, afford its subscribers for telephone ex-

16   change service the opportunity to provide notification

17   in accordance with regulations established under para-

18   graph (3) that such subscriber objects to either or both

19   of the following:

20           "(A) to receiving unsolicited advertisements

21       by telephone facsimile machine; or

22           "(B) to receiving prerecorded, commercial

23       telephone solicitations from automatic telephone

24       dialing systems.

6

1               "(3) REGULATIONS.—The regulations prescribed

2 under this subsection shall—

3               "(A) specify the methods by which a sub-

4 scriber shall be informed by a common carrier of

5 the right to give or revoke a notification of an ob-

6 jection under subparagraph (A) or (B) (or both) of

7 paragraph (2) and specify the methods by which

8 such right may be exercised by the subscriber;

9               "(B) specify the methods by which such ob-

10 jections shall be collected and transmitted to the

11 national clearinghouse established by the Commis-

12 sion under paragraph (1);

13               "(C) prohibit any residential subscriber from

14 being charged for giving or revoking such notifica-

15 tion or for being carried on a list compiled under

16 this section;

17               "(D) specify the methods by which such list

18 shall be available to any person desiring to trans-

19 mit unsolicited advertisements by telephone fac-

20 simile machine or to use an automatic dialing

21 system to transmit telephone solicitations, and the

22 costs to be recovered from such persons;

23               "(E) specify the frequency with which such

24 lists will be updated and specify the method by

7

1 which such updated list will take effect for pur-

2 poses of compliance with subsection (b);

3   "(F) be designed to permit and encourage

4 States to use the listing mechanism selected by

5 the Commission under paragraph (1) for purposes

6 of administering or enforcing State law; and

7   "(G) prohibit the use of such list for any pur-

8 pose other than compliance with the requirements

9 of this section or any similar State law and speci-

10 fy methods for protection of the privacy rights of

11 persons whose numbers are included in such list.

12  "(4) ALTERNATIVE MECHANISM PERMITTED.—If

13 the Commission, on the basis of its investigation during

14 the rulemaking proceedings required for purposes of

15 this subsection, determines that the listing mechanism

16 required by this subsection is not the most efficient, ef-

17 fective, and economic means of accomplishing the pur-

18 poses of this subsection, the Commission shall consider

19 alternative mechanisms to accomplish such purposes. If

20 the Commission determines that an alternative mecha-

21 nism will provide equivalent protection of telephone

22 subscriber privacy rights in a more efficient, effective,

23 and economic manner and without the imposition of

24 any additional charge to telephone subscribers, the

25 Commission shall, after notice and opportunity for

8

1   comment thereon and after 90 days notice to the Con-

2   gress, prescribe such regulations as are necessary to

3   implement such alternative mechanism.

4   ''(d) TECHNICAL AND PROCEDURAL STANDARDS.—

5       ''(1) TELEPHONE FACSIMILE MACHINES.—The

6   Commission shall revise the regulations setting techni-

7   cal and procedural standards for telephone facsimile

8   machines to require that any such machine which—

9           ''(A) is manufactured after 6 months after

10          the date of enactment of this section, and

11          ''(B) is used for the distribution of unsolicited

12          advertising,

13  be equipped to identify, in a margin at the top or

14  bottom of each transmitted page, the date and time

15  sent, an identification of the business sending the ad-

16  vertising, and the telephone number of the sending ma-

17  chine or of such business. The Commission shall

18  exempt from such standards, for 18 months after such

19  date of enactment, telephone facsimile machines that

20  do not have the capacity for automatic dialing and

21  transmission and that are not capable of operation

22  through an interface with a computer.

23      ''(2) AUTOMATIC TELEPHONE DIALING SYS-

24  TEMS.—The Commission shall prescribe technical and

25  procedual standards for automatic telephone dialing

9

1 systems that are used to transmit any prerecorded tele-

2 phone solicitation. Such standards shall require that—

3   "(A) all recorded messages (i) shall, at the

4   beginning of the message, state clearly the identi-

5   ty of the business initiating the call, and (ii) shall,

6   during or after the message, state clearly the tele-

7   phone number or address of such business; and

8   "(B) such systems will, as soon as is techni-

9   cally practicable (given the limitations of the tele-

10   phone exchange service facilities) after the called

11   party hands up, automatically create a disconnect

12   signal or on-hook condition which allows the

13   called party's line to be released.

14 "(e) STATE LAW NOT PREEMPTED.—Nothing in this

15 section or in the regulations prescribed pursuant to this sec-

16 tion shall preempt any State law that imposes more restric-

17 tive intrastate requirements or regulations on, or which pro-

18 hibits, either or both of the following:

19   "(1) the use of telephone facsimile machines or

20   other electronic devices to send unsolicited advertise-

21   ments; and

22   "(2) the use of automatic telephone dialing sys-

23   tems to transmit prerecorded telephone solicitations.

24 "(f) SCHEDULE FOR PROMULGATIONS OF REGULA-

25 TIONS.—The regulations required by this section shall be

10

1 prescribed within 6 months after the date of enactment of this

2 section.

3 "(g) EFFECTIVE DATE OF REQUIREMENTS.—The re-

4 quirements of this section shall take effect 30 days after the

5 date that such regulations are prescribed.".

6 (b) CONFORMING AMENDMENT.—Section 2(b) of the

7 Communications Act of 1934 (47 U.S.C. 152(b)) is amended

8 by striking "section 223 or 224" and inserting "sections 223,

9 224, and 225".

Passed the House of Representatives July 30, 1990.

Attest:          DONNALD K. ANDERSON,

*Clerk.*

# EXHIBIT 18

DECLARATION OF SEAN P. FLYNN IN SUPPORT OF  DEFENDANT IC SYSTEM, INC.'S
MOTION TO DISMISS PLAINTIFF'S COMPLAINT

II

101st CONGRESS
2d Session

# H. R. 2921

---

## IN THE SENATE OF THE UNITED STATES

August 1 (legislative day, July 10), 1990

Received; read twice and referred to the Committee on Commerce, Science, and Transportation

October 26 (legislative day, October 2), 1990

Committee discharged

---

# AN ACT

To amend the Communications Act of 1934 to prohibit certain practices involving the use of telephone equipment for advertising and solicitation purposes.

1    *Be it enacted by the Senate and House of Representa-*

2  *tives of the United States of America in Congress assembled,*

3  **SECTION 1. SHORT TITLE.**

4    This Act may be cited as the "Telephone Advertising

5  Regulation Act".

6  **SEC. 2. AMENDMENTS TO THE COMMUNICATIONS ACT OF 1934.**

7    (a) Amendment.—Title II of the Communications Act

8  of 1934 is amended by inserting after section 224 (47 U.S.C.

9  224) the following new section:

page 215
Exhibit 18

2

1    "RESTRICTIONS ON THE USE OF TELEPHONE EQUIPMENT

2                        FOR ADVERTISING

3    "SEC. 225. (a) DEFINITIONS.—As used in this

4 section—

5          "(1) the term 'automatic telephone dialing system'

6    means equipment which has the capacity—

7              "(A) to store or produce numbers to be

8          called, using a random or sequential number gen-

9          erator;

10             "(B) to dial such numbers; and

11             "(C) to deliver, without initial live operator

12         intervention, a prerecorded voice message to the

13         number dialed, with or without manual assistance.

14         "(2) The term 'telephone facsimile machine'

15   means equipment which has the capacity—

16             "(A) to transcribe text or images, or both,

17         from paper into an electronic signal and to trans-

18         mit that signal over a regular telephone line; and

19             "(B) to receive such signals over such a line

20         and to produce a copy of the transmitted text and

21         images.

22         "(3) The term 'telephone solicitation' means the

23   unsolicited initiation of a telephone message, without

24   initial live operator intervention, for the purpose of en-

3

1    couraging a person to purchase, rent, or invest in prop-
2    erty, goods, or services.

3        "(4) The term 'unsolicited advertisement' means
4    any material advertising the commercial availability or
5    quality of any property, goods, or services which is
6    transmitted to any person without that person's prior
7    express invitation or permission.

8    "(b) RESTRICTIONS.—It shall be unlawful for any
9    person within the United States by means of telephone—

10       "(1) to use any telephone facsimile machine or
11   computer or other electronic device to send any unso-
12   licited advertisement to the telephone facsimile ma-
13   chine of any person whose number is listed pursuant to
14   subsection (c) as the telephone number of a person who
15   objects to receiving unsolicited advertisements by tele-
16   phone facsimile machine;

17       "(2) to use any automatic telephone dialing
18   system to transmit, without initial live operator inter-
19   vention, any prerecorded telephone solicitation to any
20   person whose number is listed pursuant to subsection
21   (c) as the telephone number of a person who objects to
22   receiving telephone solicitations from automatic tele-
23   phone dialing systems;

24       "(3) to use any automatic telephone dialing
25   system to make unsolicited calls—

4

1          "(A) to any emergency telephone line of any

2     hospital, medical physician or service office,

3     health care facility, fire protection, or law enforce-

4     ment agency; or

5          "(B) to any number assigned to paging or

6     cellular telephone service;

7     "(4) to use any telephone facsimile machine or

8     any automatic telephone dialing system that does not

9     comply with the technical standards prescribed under

10    subsection (d); or

11    "(5) to use a computer or other electronic device

12    to send an unsolicited advertisement via a facsimile

13    machine unless such person sending the advertisement

14    clearly notes the date and time it is sent and the iden-

15    tity and telephone number of the business initiating the

16    message.

17    "(c) COMPILATION OF LISTS OF OBJECTING

18 PERSONS.—

19         "(1) SELECTION AND OPERATION OF LISTING

20    MECHANISM.—The Commission shall compare and

21    evaluate alternative mechanisms for establishing a na-

22    tional clearinghouse to compile a list of telephone sub-

23    scribers who have submitted objections under subpara-

24    graph (A) or (B) of paragraph (2) (or both) and to make

25    that compiled list available. Such comparison and eval-

5

1    uation shall include the solicitation of public comment

2    on such alternative mechanisms and shall include the

3    evaluation of the establishment of the clearinghouse by

4    the Commission or its designee. Within 180 days after

5    the date of enactment of this section, the Commission

6    shall by regulation select the mechanism which it de-

7    termines will be the most cost effective in carrying out

8    the purposes of this section. Such mechanism shall pro-

9    vide for the recovery, from persons obtaining lists for

10    purposes of complying with this section or comparable

11    State law, of costs incurred under this paragraph.

12        "(2) NOTIFICATION TO SUBSCRIBERS.—Each

13    common carrier providing telephone exchange service

14    shall, in accordance with regulations prescribed by the

15    Commission, afford its subscribers for telephone ex-

16    change service the opportunity to provide notification

17    in accordance with regulations established under para-

18    graph (3) that such subscriber objects to either or both

19    of the following:

20            "(A) to receiving unsolicited advertisements

21          by telephone facsimile machine; or

22            "(B) to receiving prerecorded, commercial

23          telephone solicitations from automatic telephone

24          dialing systems.

6

1    "(3) REGULATIONS.—The regulations prescribed

2    under this subsection shall—

3        "(A) specify the methods by which a sub-

4        scriber shall be informed by a common carrier of

5        the right to give or revoke a notification of an ob-

6        jection under subparagraph (A) or (B) (or both) of

7        paragraph (2) and specify the methods by which

8        such right may be exercised by the subscriber;

9        "(B) specify the methods by which such ob-

10       jections shall be collected and transmitted to the

11       national clearinghouse established by the Commis-

12       sion under paragraph (1);

13       "(C) prohibit any residential subscriber from

14       being charged for giving or revoking such notifica-

15       tion or for being carried on a list compiled under

16       this section;

17       "(D) specify the methods by which such list

18       shall be available to any person desiring to trans-

19       mit unsolicited advertisements by telephone fac-

20       simile machine or to use an automatic dialing

21       system to transmit telephone solicitations, and the

22       costs to be recovered from such persons;

23       "(E) specify the frequency with which such

24       lists will be updated and specify the method by

7

1     which such updated list will take effect for pur-
2     poses of compliance with subsection (b);

3         "(F) be designed to permit and encourage
4     States to use the listing mechanism selected by
5     the Commission under paragraph (1) for purposes
6     of administering or enforcing State law; and

7         "(G) prohibit the use of such list for any pur-
8     pose other than compliance with the requirements
9     of this section or any similar State law and speci-
10    fy methods for protection of the privacy rights of
11    persons whose numbers are included in such list.

12        "(4) ALTERNATIVE MECHANISM PERMITTED.—If
13    the Commission, on the basis of its investigation during
14    the rulemaking proceedings required for purposes of
15    this subsection, determines that the listing mechanism
16    required by this subsection is not the most efficient, ef-
17    fective, and economic means of accomplishing the pur-
18    poses of this subsection, the Commission shall consider
19    alternative mechanisms to accomplish such purposes. If
20    the Commission determines that an alternative mecha-
21    nism will provide equivalent protection of telephone
22    subscriber privacy rights in a more efficient, effective,
23    and economic manner and without the imposition of
24    any additional charge to telephone subscribers, the
25    Commission shall, after notice and opportunity for

8

1    comment thereon and after 90 days notice to the Con-
2    gress, prescribe such regulations as are necessary to
3    implement such alternative mechanism.

4    "(d) TECHNICAL AND PROCEDURAL STANDARDS.—

5        "(1) TELEPHONE FACSIMILE MACHINES.—The
6    Commission shall revise the regulations setting techni-
7    cal and procedural standards for telephone facsimile
8    machines to require that any such machine which—

9            "(A) is manufactured after 6 months after
10           the date of enactment of this section, and

11           "(B) is used for the distribution of unsolicited
12           advertising,

13   be equipped to identify, in a margin at the top or
14   bottom of each transmitted page, the date and time
15   sent, an identification of the business sending the ad-
16   vertising, and the telephone number of the sending ma-
17   chine or of such business. The Commission shall
18   exempt from such standards, for 18 months after such
19   date of enactment, telephone facsimile machines that
20   do not have the capacity for automatic dialing and
21   transmission and that are not capable of operation
22   through an interface with a computer.

23       "(2) AUTOMATIC TELEPHONE DIALING SYS-
24   TEMS.—The Commission shall prescribe technical and
25   procedural standards for automatic telephone dialing

9

1    systems that are used to transmit any prerecorded tele-

2    phone solicitation. Such standards shall require that—

3            "(A) all recorded messages (i) shall, at the

4        beginning of the message, state clearly the identi-

5        ty of the business initiating the call, and (ii) shall,

6        during or after the message, state clearly the tele-

7        phone number or address of such business; and

8            "(B) such systems will, as soon as is techni-

9        cally practicable (given the limitations of the tele-

10       phone exchange service facilities) after the called

11       party hands up, automatically create a disconnect

12       signal or on-hook condition which allows the

13       called party's line to be released.

14   "(e) STATE LAW NOT PREEMPTED.—Nothing in this

15   section or in the regulations prescribed pursuant to this sec-

16   tion shall preempt any State law that imposes more restric-

17   tive intrastate requirements or regulations on, or which pro-

18   hibits, either or both of the following:

19           "(1) the use of telephone facsimile machines or

20       other electronic devices to send unsolicited advertise-

21       ments; and

22           "(2) the use of automatic telephone dialing sys-

23       tems to transmit prerecorded telephone solicitations.

24   "(f) SCHEDULE FOR PROMULGATIONS OF REGULA-

25   TIONS.—The regulations required by this section shall be

10

1   prescribed within 6 months after the date of enactment of this

2   section.

3       "(g) EFFECTIVE DATE OF REQUIREMENTS.—The re-

4   quirements of this section shall take effect 30 days after the

5   date that such regulations are prescribed.".

6       (b) CONFORMING AMENDMENT.—Section 2(b) of the

7   Communications Act of 1934 (47 U.S.C. 152(b)) is amended

8   by striking "section 223 or 224" and inserting "sections 223,

9   224, and 225".

Passed the House of Representatives July 30, 1990.

Attest:            DONNALD K. ANDERSON,

*Clerk.*

# EXHIBIT 19

DECLARATION OF SEAN P. FLYNN IN SUPPORT OF  DEFENDANT IC SYSTEM, INC.'S
MOTION TO DISMISS PLAINTIFF'S COMPLAINT

I

102D CONGRESS
1ST SESSION

# H. R. 1304

To amend the Communications Act of 1934 to regulate the use of telephones in making commercial solicitations.

───────────────

## IN THE HOUSE OF REPRESENTATIVES

MARCH 6, 1991

Mr. MARKEY (for himself, Mr. RINALDO, Mr. RICHARDSON, Mr. SLATTERY, Mr. BOUCHER, Mr. COOPER, Mr. HARRIS, Mr. FRANK of Massachusetts, Mrs. ROUKEMA, Mr. SHAYS, and Mr. STARK) introduced the following bill; which was referred to the Committee on Enery and Commerce

───────────────

# A BILL

To amend the Communications Act of 1934 to regulate the use of telephones in making commercial solicitations.

1    *Be it enacted by the Senate and House of Representa-*

2   *tives of the United States of America in Congress assembled,*

3   **SECTION 1. SHORT TITLE.**

4        This Act may be cited as the "Telephone Advertising

5   Consumer Rights Act".

2

1   **SEC. 2. RESTRICTIONS ON THE USE OF TELEPHONE EQUIP-**

2            **MENT FOR ADVERTISING.**

3      Title II of the Communications Act of 1934 is

4 amended by inserting immediately after section 226 (47

5 U.S.C. 226) the following new section:

6   **"SEC. 227. RESTRICTIONS ON THE USE OF TELEPHONE**

7           **EQUIPMENT FOR ADVERTISING.**

8      "(a) DEFINITIONS.—As used in this section:

9         "(1) The term 'automatic telephone dialing sys-

10        tem' means equipment which has the capacity—

11             "(A) to store or produce telephone num-

12            bers to be called, using a random or sequential

13            number generator;

14             "(B) to dial such numbers; and

15             "(C) to deliver, without initial live operator

16            assistance, a prerecorded voice message to the

17            number dialed, with or without manual assist-

18            ance.

19         "(2) The term 'telephone facsimile machine'

20        means equipment which has the capacity to do either

21        or both of the following: (A) to transcribe text or im-

22        ages (or both) from paper into an electronic signal

23        and to transmit that signal over a regular telephone

24        line, or (B) to transcribe text or images (or both)

25        from an electronic signal received over a regular

26        telephone line onto paper.

3

1      "(3) The term 'telephone solicitation' means the

2      initiation of a telephone message for the purpose of

3      encouraging a person to purchase, rent, or invest in

4      property, goods, or services without that person's

5      prior express invitation or permission.

6      "(4) The term 'unsolicited advertisement'

7      means any material advertising the commercial

8      availability or quality of any property, goods, or

9      services which is transmitted to any person without

10      that person's prior express invitation or permission.

11      "(b) RESTRICTIONS.—It shall be unlawful for any

12 person within the United States by means of telephone—

13      "(1) to make any telephone solicitation in vio-

14      lation of the regulations prescribed by the Commis-

15      sion pursuant to subsection (c);

16      "(2) to use, to make any telephone solicitation,

17      any telephone facsimile machine or any automatic

18      telephone dialing system that does not comply with

19      the technical and procedural standards prescribed

20      under subsection (d), or to use, to make any tele-

21      phone solicitation, any telephone facsimile machine

22      or automatic telephone dialing system in a manner

23      that does not comply with such standards;

24      "(3) to use any telephone facsimile machine,

25      computer, or other device to send an unsolicited ad-

4

1     vertisement in violation of any regulations prescribed

2     by the Commission pursuant to subsection (e);

3          "(4) to use any automatic telephone dialing sys-

4     tem to make unsolicited calls—

5               "(A) to any emergency telephone line or

6               pager of any hospital, medical physician or

7               service office, health care facility, or fire protec-

8               tion or law enforcement agency; or

9               "(B) to any telephone number assigned to

10              paging or cellular telephone service; or

11         "(5) to use a computer or other electronic de-

12     vice to send an unsolicited advertisement via a tele-

13     phone facsimile machine unless such person clearly

14     marks, in a margin at the top or bottom of each

15     transmitted page of the advertisement, the date and

16     time it is sent and an identification of the business

17     sending the advertisement and the telephone number

18     of the sending machine or of such business.

19     "(c) ELECTRONIC DATA BASE OF OBJECTING PER-

20  SONS.—

21          "(1) ESTABLISHMENT AND OPERATION OF

22     DATA BASE.—Within 60 days after the date of en-

23     actment of this section, the Commission shall initiate

24     a rulemaking proceeding concerning the need to pro-

25     tect telephone subscribers' privacy rights to avoid re-

5

1  ceiving telephone solicitations and the need to estab-

2  lish a single national data base to compile a list of

3  telephone numbers of subscribers who have submit-

4  ted objections under paragraph (2)(A) and to make

5  that compiled list available for purchase. The pro-

6  ceeding shall—

7      "(A) evaluate whether such a data base

8      should be established and administered by the

9      Commission or its designee;

10      "(B) compare and evaluate alternative

11      mechanisms for establishing and administering

12      the data base, in terms of their cost effective-

13      ness and their other advantages and dis-

14      advantages; and

15      "(C) consider what means other than a na-

16      tional data base could be used to accomplish

17      the purposes of this section.

18      "(2) REGULATIONS.—Not later than 210 days

19  after the date of enactment of this section, the Com-

20  mission shall conclude the rulemaking proceeding

21  initiated under paragraph (1) and shall prescribe

22  regulations to implement the most cost effective

23  mechanism for establishing and operating the data

24  base described in paragraph (1), or shall determine

25  under paragraph (3) that another means is pref-

6

1    erable. Unless the Commission determines that an-

2    other means is preferable, the Commission shall pre-

3    scribe regulations to—

4         "(A) require each common carrier provid-

5         ing telephone exchange service, in accordance

6         with regulations prescribed by the Commission,

7         to afford subscribers for telephone exchange

8         service the opportunity to provide notification,

9         in accordance with regulations established

10        under this paragraph, that such subscriber ob-

11        jects to receiving telephone solicitations;

12         "(B) specify the methods by which each

13        telephone subscriber shall be informed, by the

14        common carrier that provides local exchange

15        service to that subscriber, of (i) the subscriber's

16        right to give or revoke a notification of an ob-

17        jection under subparagraph (A), and (ii) the

18        methods by which such right may be exercised

19        by the subscriber;

20         "(C) specify the methods by which such

21        objections shall be collected and added to the

22        data base;

23         "(D) prohibit any residential subscriber

24        from being charged for giving or revoking such

•HR 1304 IH

7

1      notification or for being carried on a list com-

2      piled under this section;

3           "(E) prohibit any person from transmit-

4      ting a telephone solicitation to the telephone

5      number of any subscriber contained on such

6      list;

7           "(F) specify (i) the methods by which any

8      person desiring to transmit telephone solicita-

9      tions will be required to obtain copies of such

10     list; and (ii) the costs to be recovered from such

11     persons;

12          "(G) specify the methods for recovering,

13     from persons obtaining such list, the costs in-

14     volved in notifying, collecting, updating, dis-

15     seminating, and selling, and other activities re-

16     lating to, the list that are incurred by the enti-

17     ties carrying out those activities;

18          "(H) specify the frequency with which such

19     data base will be updated and specify the meth-

20     od by which such updating will take effect for

21     purposes of compliance with subsection (b);

22          "(I) be designed to permit and encourage

23     States to use the data base mechanism selected

24     by the Commission under paragraph (1) for

8

1    purposes of administering or enforcing State

2    law;

3    "(J) prohibit the use of such database for

4    any purpose other than compliance with the re-

5    quirements of this section and any such State

6    law and specify methods for protection of the

7    privacy rights of persons whose numbers are in-

8    cluded in such list; and

9    "(K) require each common carrier provid-

10   ing services to any person for the purpose of

11   making telephone solicitations to notify such

12 -   person of the requirements of this section and

13   the regulations thereunder.

14   "(3) OTHER MEANS.—If the Commission, dur-

15   ing the rulemaking proceeding initiated under para-

16   graph (1), required by this subsection, determines

17   that another means to accomplish the purposes of

18   this section will provide equivalent protection of tele-

19   phone subscriber privacy rights in a more efficient,

20   effective, and economic manner and without the im-

21   position of any additional charge to telephone sub-

22   scribers, the Commission shall prescribe such regula-

23   tions as are necessary to implement such other

24   means. Such regulation shall be prescribed, after no-

25   tice and opportunity for comment thereon, not later

•HR 1304 IH

9

1    than 270 days after the date of enactment of this

2    section.

3    "(d) TECHNICAL AND PROCEDURAL STANDARDS.—

4        "(1) TELEPHONE FACSIMILE MACHINES.—The

5    Commission shall revise the regulations setting tech-

6    nical and procedural standards for telephone fac-

7    simile machines to require that any such machine

8    which—

9           "(A) is manufactured after 6 months after

10        the date of enactment of this section, and

11          "(B) is used for the distribution of unsolic-

12        ited advertising,

13    clearly marks, in a margin at the top or bottom of

14    each transmitted page or on the first page of each

15    transmission, the date and time sent, an identifica-

16    tion of the business or other entity sending the ad-

17    vertisement, and the telephone number of the send-

18    ing machine or of such business. The Commission

19    shall exempt from such standards, for 12 months

20    after such date of enactment, telephone facsimile

21    machines that do not have the capacity for auto-

22    matic dialing and transmission and that are not ca-

23    pable of operation through an interface with a com-

24    puter.

10

1    "(2) AUTOMATIC TELEPHONE DIALING SYS-
2    TEMS.—The Commission shall prescribe technical
3    and procedural standards for automatic telephone
4    dialing systems that are used to transmit any
5    prerecorded telephone solicitation. Such standards
6    shall require that—

7         "(A) all prerecorded telephone messages (i)
8         shall, at the beginning of the message, state
9         clearly the identity of the business or other en-
10        tity initiating the call, and (ii) shall, during or
11        after the message, state clearly the telephone
12        number or address of such business or other en-
13        tity; and

14        "(B) such systems will, as soon as is tech-
15        nically practicable (given the limitations of the
16        telephone exchange service facilities) after the
17        called party hangs up, automatically create a
18        disconnect signal or on-hook condition which al-
19        lows the called party's line to be released.

20   "(e) CONSIDERATION OF FACSIMILE MACHINE RE-
21   STRICTIONS.—Within 90 days after the date of enactment
22   of this section, the Commission shall initiate a rulemaking
23   proceeding to prescribe rules to restrict the use of any tele-
24   phone facsimile machine or computer or other electronic
25   device to send any unsolicited advertisement to the tele-

11

1  phone facsimile machine of any person. In establishing

2  such restrictions, the Commission shall consider—

3      "(1) the extent to which unsolicited advertise-

4  ments are transmitted through telephone facsimile

5  machines;

6      "(2) the extent to which recipients of such ad-

7  vertisements incur costs for such receipt; and

8      "(3) the most cost effective methods of prevent-

9  ing advertising abuses with telephone facsimile ma-

10  chines.

11  "(f) STATE LAW NOT PREEMPTED.—Nothing in this

12  section or in the regulations prescribed under this section

13  shall preempt any State law that imposes more restrictive

14  intrastate requirements or regulations on, or which pro-

15  hibits, either or both of the following:

16      "(1) The use of telephone facsimile machines or

17  other electronic devices to send unsolicited advertise-

18  ments.

19      "(2) The use of automatic telephone dialing

20  systems to transmit prerecorded telephone solicita-

21  tions.

22  "(g) EFFECTIVE DATE OF REQUIREMENTS.—The re-

23  quirements of this section shall take effect 30 days after

24  the date that regulations are prescribed under subsection

25  (c).".

12

1 **SEC. 3. CONFORMING AMENDMENT.**

2     Section 2(b) of the Communications Act of 1934 is

3 amended by striking "Except as provided" and all that

4 follows through "and subject to the provisions" and insert-

5 ing "Except as provided in sections 223 through 227, in-

6 clusive, and subject to the provisions".

O

# EXHIBIT 20

DECLARATION OF SEAN P. FLYNN IN SUPPORT OF DEFENDANT IC SYSTEM, INC.'S
MOTION TO DISMISS PLAINTIFF'S COMPLAINT

United States General Accounting Office

# GAO

# Congressional Record, 102nd Congress, Extension of Remarks

| 1. Bill H.R.1304 | 2. Date Mar 6, 1991 (38) | 3. Pages E793 |
|---|---|---|

**4. Action:**

INTRODUCED BY MR. MARKEY

## INTRODUCTION OF THE TELEPHONE ADVERTISING CONSUMER RIGHTS ACT

## HON. EDWARD J. MARKEY
### OF MASSACHUSETTS
### IN THE HOUSE OF REPRESENTATIVES
#### *Wednesday, March 6, 1991*

Mr. MARKEY. Mr. Speaker, today I am pleased to be introducing the Telephone Advertising Consumer Rights Act, a bill created to free individuals and businesses from the often intrusive, costly, even dangerous consequences of unsolicited telephone advertising.

Today's advances in telecommunications technology have spawned an exciting array of new products and services that have improved our quality of life—via the telephone. Individuals and businesses are equally empowered by an ever increasing number of highly efficient communications pathways and once unimaginable access to information.

However, these new technologies equally empower both ethical and irresponsible users. Consequently, the tremendous benefits stemming from ethical applications of modern telecommunications may—unless prohibited—offset by the intrusive, sometimes dangerous, costly detriments of irresponsible applications. From this dichotomy, emerges the need to protect the consumer from the undesirable intrusions and potentially adverse consequences of unethical applications of modern telecommunications technology.

The Telephone Advertising Consumer Rights Act provides an electronic database mechanism through which objecting individuals and business subscribers can free themselves from unwanted telephone solicitations, including solicitations using facsimile machines and automatic telephone dialing systems.

The telephone is an insistent master—when it rings, we answer it—and many consumers complain bitterly that, when it rings to deliver unsolicited advertising, it is invading their privacy. Likewise, businesses, dependent on their telephone lines to carry the words, data, and images that are so essential to the success of their enterprise, have come to decry the cost and interference with business activities of some forms of unsolicited advertising.

In recent years, a growing number of telephone solicitors have started to use automatic dialing systems. Each of these machines can automatically dial up to 1,000 phones per day to deliver a prerecorded message. According to industry officials each day they are used by more than 180,000 solicitors to call more than 7 million Americans. Unfortunately, these machines are often programmed to dial sequentially whole blocks of numbers, including hospitals, fire stations, pagers, and unlisted numbers.

This not only makes the machine an equal opportunity nuisance, but an equal opportunity hazard, particularly in instances where the machine is not capable of releasing the called party's line once they hang up.

Facsimile technology has also gained popularity for delivering unsolicited advertising. An office oddity a few years ago, the fax machine has rapidly become an office necessity in my office and more than 2 million others, delivering more than 30 billion pages of material each year. But, with the growth in fax machine numbers has come junk fax, the electronic equivalent of junk mail. When this nuisance first emerged, the Washington Post reported, "receiving a junk fax is like getting junk mail with the postage due." Succinctly put, using a facsimile machine to send unsolicited advertising not only shifts costs from the advertiser to the recipient, but keeps an important business machine from being used for its intended purpose.

This bill, which I have introduced with the ranking minority member of the subcommittee, Mr. RINALDO, is a bipartisan effort to return a measure of control to consumers over what they hear and read. I would especially like to commend Representative RINALDO and the minority staff for the cooperative spirit with which this bill has been crafted.

This bill will not eliminate unsolicited telephone advertising, for certainly we must acknowledge that telephone solicitation, when conducted properly, is an established, lawful marketing practice. But this bill will give consumers a mechanism to specify that they do not want to receive unsolicited advertising and require advertisers to honor that choice.

In addition, the bill will eliminate unsolicited calls to emergency and public safety telephone numbers and to paging and cellular equipment. The legislation, which covers both intrastate and interstate unsolicited calls, will establish Federal guidelines that will fill the regulatory gap due to differences in Federal and State telemarketing regulations. This will give advertisers a single set of ground rules and prevent them from falling through the cracks between Federal and State statutes. It will also guide responsible development of fledgling industries unable to police themselves and provide assistance to States in regulating intrastate telemarketing abuses.

I urge my colleagues to support this legislation, not as a burden on legitimate businesses, but as an affirmation that unwanted intrusions into the American home and workplace are objectionable and should be restricted.

---

# EXHIBIT 21

DECLARATION OF SEAN P. FLYNN IN SUPPORT OF DEFENDANT IC SYSTEM, INC.'S
MOTION TO DISMISS PLAINTIFF'S COMPLAINT

I

102D CONGRESS
1ST SESSION

# H. R. 1589

To amend the Communications Act of 1934 to regulate the use of telephones in making commercial solicitations with the use of automatic dialing and announcing devices and to protect the privacy of telephone subscribers.

———————

## IN THE HOUSE OF REPRESENTATIVES

MARCH 21, 1991

Mrs. UNSOELD introduced the following bill; which was referred to the Committee on Energy and Commerce

———————

# A BILL

To amend the Communications Act of 1934 to regulate the use of telephones in making commercial solicitations with the use of automatic dialing and announcing devices and to protect the privacy of telephone subscribers.

1    *Be it enacted by the Senate and House of Representa-*

2    *tives of the United States of America in Congress assembled,*

3    **SECTION 1. SHORT TITLE.**

4        This Act may be cited as the "Telephone Privacy

5    Act".

6    **SEC. 2. FINDINGS.**

7        The Congress finds that—

2

1    (1) the use of automatic dialing and announc-

2    ing devices for purposes of commercial solicitation—

3        (A) deprives consumers of the opportunity

4        to immediately question a seller about the ve-

5        racity of his or her claims;

6        (B) subjects consumers to unwarranted

7        and unwanted invasions of their privacy; and

8        (C) encourages inefficient and potentially

9        harmful use of the telephone network; and

10    (2) it is in the public interest to prohibit the

11    use of automatic dialing and announcing devices for

12    purposes of commercial solicitation.

13  **SEC. 3. AMENDMENT.**

14    Title II of the Communications Act of 1934 is

15  amended by adding at the end thereof the following new

16  section:

17  **"SEC. 228. AUTOMATIC DIALING AND SOLICITATION DE-**

18        **VICES.**

19    "(a) DEFINITIONS.—As used in this section—

20    "(1) The term 'automatic dialing and announc-

21    ing device' means a device which automatically dials

22    telephone numbers and plays a recorded message

23    once the connection is made.

24    "(2) The term 'commercial solicitation' means

25    the unsolicited initiation of a telephone conversation

3

1    for the purpose of encouraging a person to purchase

2    property, goods, or services.

3    "(b) RESTRICTIONS.—No person may use an auto-

4    matic dialing and announcing device for the purpose of

5    making any commercial solicitation.

6    "(c) PENALTIES.—For the purposes of assessing for-

7    feiture penalties under section 503 for willful or repeated

8    violations of this section or the regulations thereunder—

9        "(1) each solicitation made in violation of sub-

10       section (b) shall be a separate offense; and

11       "(2) the limitation contained in section

12       503(b)(2)(B) shall not apply.

13   "(d) REGULATIONS.—The Commission shall pre-

14   scribe regulations to implement and enforce this section

15   within 1 year after the date of its enactment.".

O

# EXHIBIT 22

DECLARATION OF SEAN P. FLYNN IN SUPPORT OF  DEFENDANT IC SYSTEM, INC.'S
MOTION TO DISMISS PLAINTIFF'S COMPLAINT

United States General Accounting Office

# GAO

# Congressional Record, 102nd Congress, House

| 1. Bill H.R.1589 | 2. Date Mar 21, 1991 (49) | 3. Pages H1918 |
|---|---|---|

**4. Action:**

INTRODUCED BY MR. UNSOELD

## INTRODUCTION OF THE TELEPHONE PRIVACY ACT

(Mrs. UNSOELD asked and was given permission to address the House for 1 minute and to revise and extend her remarks and include extraneous matter.)

Mrs. UNSOELD. Mr. Speaker, today I'm introducing a piece of legislation of interest to every American with a telephone and a desire for peace and quiet once they reach the sanctity of their own home.

The Telephone Privacy Act would outlaw commercial solicitation by computers. No more would you be torn away from the family dinner, only to find yourself listening to a computer offering you some sweetheart deal of the century. No more would you hit the rewind button on your phone-message machine, only to be subjected to a computer-generated spiel urging you to call some number "right now" because you, too, can be a millionaire.

Mr. Speaker, in 1986 my State of Washington passed a law banning the use of automatic dialing-announcing devices for commercial solicitation. But many of these unwanted solicitations cross State borders.

My bill is straightforward: If you are going to be subjected to a sales pitch over the telephone, it can't be by computer.

Mr. Speaker, I urge my colleagues to support their constituents' rights to peace and privacy at home by endorsing the Telephone Privacy Act of 1991.

# EXHIBIT 23

DECLARATION OF SEAN P. FLYNN IN SUPPORT OF  DEFENDANT IC SYSTEM, INC.'S
MOTION TO DISMISS PLAINTIFF'S COMPLAINT

# TELEMARKETING/PRIVACY ISSUES

## HEARING

**BEFORE THE**

### SUBCOMMITTEE ON TELECOMMUNICATIONS AND FINANCE

**OF THE**

## COMMITTEE ON ENERGY AND COMMERCE HOUSE OF REPRESENTATIVES

### ONE HUNDRED SECOND CONGRESS

FIRST SESSION

ON

**H.R. 1304 and H.R. 1305**

BILLS TO AMEND THE COMMUNICATIONS ACT OF 1934 TO REGULATE THE USE OF TELEPHONES IN MAKING COMMERCIAL SOLICITATIONS AND TO PROTECT THE PRIVACY RIGHTS OF SUBSCRIBERS

APRIL 24, 1991

## Serial No. 102–9

Printed for the use of the Committee on Energy and Commerce



U.S. GOVERNMENT PRINTING OFFICE

WASHINGTON : 1991

44-026

## COMMITTEE ON ENERGY AND COMMERCE

JOHN D. DINGELL, Michigan, *Chairman*

JAMES H. SCHEUER, New York
HENRY A. WAXMAN, California
PHILIP R. SHARP, Indiana
EDWARD J. MARKEY, Massachusetts
AL SWIFT, Washington
CARDISS COLLINS, Illinois
MIKE SYNAR, Oklahoma
W.J. "BILLY" TAUZIN, Louisiana
RON WYDEN, Oregon
RALPH M. HALL, Texas
DENNIS E. ECKART, Ohio
BILL RICHARDSON, New Mexico
JIM SLATTERY, Kansas
GERRY SIKORSKI, Minnesota
JOHN BRYANT, Texas
RICK BOUCHER, Virginia
JIM COOPER, Tennessee
TERRY L. BRUCE, Illinois
J. ROY ROWLAND, Georgia
THOMAS J. MANTON, New York
EDOLPHUS TOWNS, New York
C. THOMAS McMILLEN, Maryland
GERRY E. STUDDS, Massachusetts
PETER H. KOSTMAYER, Pennsylvania
RICHARD H. LEHMAN, California
CLAUDE HARRIS, Alabama

NORMAN F. LENT, New York
CARLOS J. MOORHEAD, California
MATTHEW J. RINALDO, New Jersey
WILLIAM E. DANNEMEYER, California
DON RITTER, Pennsylvania
THOMAS J. BLILEY, JR., Virginia
JACK FIELDS, Texas
MICHAEL G. OXLEY, Ohio
MICHAEL BILIRAKIS, Florida
DAN SCHAEFER, Colorado
JOE BARTON, Texas
SONNY CALLAHAN, Alabama
ALEX McMILLAN, North Carolina
J. DENNIS HASTERT, Illinois
CLYDE C. HOLLOWAY, Louisiana
FRED UPTON, Michigan

JOHN S. ORLANDO, *Chief of Staff*
JOHN M. CLOUGH, JR., *Staff Director*
MARGARET A. DURBIN, *Minority Chief Counsel/Staff Director*

---

### SUBCOMMITTEE ON TELECOMMUNICATIONS AND FINANCE

EDWARD J. MARKEY, Massachusetts, *Chairman*

JAMES H. SCHEUER, New York
MIKE SYNAR, Oklahoma
W.J. "BILLY" TAUZIN, Louisiana
RALPH M. HALL, Texas
DENNIS E. ECKART, Ohio
BILL RICHARDSON, New Mexico
JIM SLATTERY, Kansas
JOHN BRYANT, Texas
RICK BOUCHER, Virginia
JIM COOPER, Tennessee
THOMAS J. MANTON, New York
C. THOMAS McMILLEN, Maryland
RON WYDEN, Oregon
RICHARD H. LEHMAN, California
CLAUDE HARRIS, Alabama
JOHN D. DINGELL, Michigan
(Ex Officio)

MATTHEW J. RINALDO, New Jersey
CARLOS J. MOORHEAD, California
DON RITTER, Pennsylvania
THOMAS J. BLILEY, JR., Virginia
JACK FIELDS, Texas
MICHAEL G. OXLEY, Ohio
MICHAEL BILIRAKIS, Florida
DAN SCHAEFER, Colorado
JOE BARTON, Texas
NORMAN F. LENT, New York
(Ex Officio)

HERBERT H. BROWN, *Chief Counsel/Staff Director*
R. GERARD SALEMME, *Policy Analyst*
COLIN CROWELL, *Policy Analyst*
JOHN KINNEY, *Legislative Assistant*
MICHAEL REGAN, *Minority Counsel*

(II)

# CONTENTS

|  | Page |
|---|---|
| Text of: | |
|   H.R. 1304 | 8 |
|   H.R. 1305 | 20 |
| Testimony of: | |
|   Barton, Richard A., vice president, Direct Marketing Association | 102 |
|   Beard, Thomas, chairman, Florida Public Service Commission, on behalf of the National Association of Regulatory Utility Commissioners | 30 |
|   Brown, Richard H., president, Illinois Bell | 94 |
|   Cooper, Mark N., director of research, Consumer Federation of America | 38 |
|   Frawley, Michael J., president, Gold Coast Paging, on behalf of Telocator | 110 |
|   Goldman, Janlori, legislative counsel, American Civil Liberties Union | 45 |
|   MacKenzie, Donald, president, NYNEX Information Resources Co., on behalf of Yellow Pages Publishers Association | 115 |
|   Rotenberg, Marc, director, Computer Professionals for Social Responsibility | 43 |
|   Shreve, Jack, public counsel, State of Florida, on behalf of the National Association of State Utility Consumer Advocates | 52 |
|   Unsoeld, Hon. Jolene, a Representative in Congress from the State of Washington | 28 |
| Material submitted for the record by: | |
|   American Telephone and Telegraph: Statement of Carol Knauff | 134 |
|   Commonwealth of Virginia, State Corporation Commission: Letter dated April 24, 1991 to Chairman Markey from Preston Shannon re H.R. 1305 | 151 |
|   Direct Marketing Association: Responses to subcommittee questions by Richard Barton | 126 |
|   GTE Corporation: Letter dated May 1, 1991 to Chairman Markey from Samuel Shawhan re H.R. 1305 | 153 |
|   GTE Telephone Operating Companies: Statements and FCC attachments | 155 |
|   Holland, Edward M., Virginia State Senator: Statement | 188 |
|   Kolker Systems Inc.: Letter dated April 22, 1991 to Chairman Markey from Ray Kolker re H.R. 1304 | 148 |
|   West Virginia Public Service Commission: Letter dated April 22, 1991 to Chairman Markey from Boyce Griffith re H.R. 1305 | 186 |

(III)

# TELEMARKETING/PRIVACY ISSUES

### WEDNESDAY, APRIL 24, 1991

House of Representatives,
Committee on Energy and Commerce,
Subcommittee on Telecommunications and Finance,
*Washington, DC.*

The subcommittee met, pursuant to notice, at 9:08 a.m., in room 345, Cannon House Office Building, Hon. Edward J. Markey (chairman) presiding.

Mr. MARKEY. Good morning.

First of all, I apologize to all of you for the change of venue, all of this due to circumstances beyond our control. But we very much appreciate your cooperation this morning.

Today the subcommittee will hold a legislative hearing on H.R. 1304, the "Telephone Advertising and Consumer Rights Act", and H.R. 1305, the "Telephone Consumer Privacy Rights Act".

These two complementary pieces of legislation have been introduced to curb unsolicited electronic advertising and telemarketing, as well as to restore the important balance in personal privacy that has been skewed by some offerings of Caller ID and some uses of Automatic Number Identification.

Unsolicited electronic advertising is one of the unforeseen consequences of the modern telecommunications revolution. The information age equivalents of the door-to-door salesman of yesteryear are plying their wares through the wires these days. These new telemarketing techniques are not only more pervasive, but also more intrusive than ever before. Unsolicited calls have become a nightly ritual for many consumers, and many complain bitterly that these junk calls from strangers and robots are an invasion of their privacy.

Some telemarketing technologies, such as automatic dialing machines, can dial up to 1,000 homes per day to deliver a prerecorded or live message. These machines place calls randomly, meaning they sometimes call unlisted numbers or the numbers of hospitals and police and fire stations, causing public safety problems. In addition, more than 3 million fax machines in this country will transmit and receive more than 40 billion pages of information this year. According to industry officials, each day these machines are used by more than 180,000 solicitors to call more than 7 million Americans.

H.R. 1304, introduced by Congressman Rinaldo and myself, and which presently has 35 cosponsors, is legislation that will finally give the public an opportunity to "just say no" to unsolicited phone or facsimile advertisements. Individuals and business subscribers

(1)

2

who object to unwanted telephone solicitations would be able to make their telephone numbers "off limits" to telephone telemarketers by placing these numbers in a restricted electronic database. Our bill also would prohibit advertising calls to public safety numbers as well as to paging and cellular equipment. The aim of this legislation is not to eliminate telemarketing or attack new technologies, but rather to secure an individual's right to privacy that might be unintentionally intruded upon by these new technologies or marketing techniques.

The reason for the proliferation of such unsolicited advertising over our Nation's telecommunications network is that companies can now target their marketing to individual home phone numbers or business fax machines. The reason why these unsolicited telemarketers can target individual homes is simple; corporate America has your number.

You may not have been aware of it, but whenever you call an 800 or a 900 number, or even a local business, new telephone technologies may be collecting your name, your address, and your telephone number. And you are powerless to stop it. New technologies, from Caller ID to the Automatic Number Identification used by 800 and 900 number services, mean that your home phone number can be easily accessed over phone lines. These numbers can then be matched to your name and address through the use of reverse directories, opening the door to even greater information—transactions, buying habits, movements, even information about hobbies.

These personal information tidbits are subsequently manipulated by computers to produce highly-sophisticated and possibly intrusive personal socioeconomic data. These data are then compiled into lists which are then bought or sold without restriction. According to a recent Wall Street Journal article, the business of buying and selling these lists is, indeed, big business, with each of the three largest purveyors raking in between $150–$250 million yearly.

The American public has expressed widespread concern with threats to personal privacy. Last year, a survey conducted by Lou Harris and Associates showed an overwhelming 79 to 19 percent margin of Americans agreed that if we rewrote the Declaration of Independence today, we would probably add privacy to the list of life, liberty, and the pursuit of happiness as a fundamental right. And by a 71 to 27 percent margin in that same Harris survey, Americans subscribed to the view that consumers have lost control over how personal information is circulated and used by companies.

I feel strongly that each and every American, whether using the telephone for a personal or business transaction, should have complete control over the personal or private information that may be derived from telephone services such as Caller ID and Automatic Number Identification. Whether a new technology or service is popular among some subscribers or useful to American business is irrelevant when the debate centers around the technological infringement of personal privacy. As a bottom line, consumers should be no worse off after the introduction of a new technology than they were before the introduction of that technology.

H.R. 1305, the "Telephone Consumer Privacy Rights Act", was introduced to address the fundamental ways in which personal pri-

page 247
Exhibit 23

vacy may be threatened by new telecommunications technology. The legislation would require phone companies to allow callers to continue to protect their personal telephone numbers by withholding, on a per-call basis, the disclosure of their telephone number to those they are calling. This is of special concern to those telephone subscribers who have paid their telephone company for an unlisted telephone number, only to realize that this same telephone company is now selling their unlisted number to all comers, anyone willing to pay for Caller ID.

The bill also would prohibit corporate America's reuse or resale of personal information gathered over the telephone network without the affirmative consent of the consumer. This legislation is not meant to outlaw Caller ID or ANI, but it will help to ensure that enhanced service offerings don't become the equivalent of a joint venture between "Ma Bell," the "Baby Bells", and "Big Brother". Enhanced telecommunications technologies like these can be exciting new additions to our telecommunications offerings. I feel that we should actively encourage their development and deployment, while also seeking to ensure that they truly serve the interests of the public.

Today we will listen to testimony from consumer representatives and industry spokespersons, and we will start by hearing testimony from the Honorable Jolene Unsoeld, who has been a leader in highlighting the often intrusive nature of telemarketing techniques such as auto-dialers and has introduced legislation in this area.

Before we do that, we will first hear from the ranking minority member on the subcommittee, the gentleman from New Jersey, Congressman Matt Rinaldo.

Mr. RINALDO. Thank you very much, Mr. Chairman. I want to commend you for calling this important hearing, and I want to welcome our colleague, Jolene Unsoeld, and commend the interest and role she has taken in addressing the important issues we will face today.

The telephone and telecommunications are an essential part of American life. In many ways, the telephone is a lifeline for both business and the average citizen. But the telephone is increasingly a means of commerce, and as we will hear today, potential abuses and invasions of privacy are increasingly real threats for all of us.

Today the subcommittee will look at problems that have received attention from the public and from Congress—the use of automatic dialing machines, or "autodialers", the unauthorized sending of advertisements through fax machines, and the deployment and use of Automatic Number Identification and a related service known as Caller ID.

Autodialers typically call homes and play recorded advertising messages to as many as 1,000 telephone numbers per day. That is not only a nuisance, but it's a potential danger if an autodialer does not disconnect, as some apparently do not, while calling a hospital or other emergency health and safety related service.

Another festering problem has arisen from the so-called "junk fax". Junk fax is more than merely irritating. It represents an unfair shifting of the cost of advertising from the advertiser to the unwitting customer. Also, like autodialers, unsolicited and unwant-

4

ed faxes can tie up a machine for hours and thwart the receipt of legitimate and important messages.

The legislation that Chairman Markey and I have introduced would bar unsolicited, prerecorded telephone messages and fax transmissions to any number which is on record as objecting to their receipt. It also prohibits unsolicited calls to emergency telephone lines at health care facilities and safety-related agencies.

The bill, which is substantially similar to legislation passed by the House last year, is a narrowly-tailored response to a problem which we cannot permit to grow out of control. It balances the first amendment rights of those who wish to receive advertising through those mediums with those who do not wish to receive such advertising.

Today we will also address the privacy issues related to caller number identification. In my home State of New Jersey, the first State to offer Caller ID, the number of abusive telephone calls reported to the telephone company since the advent of Caller ID has dropped precipitously, by as much as 50 percent, according to some statistics offered to this committee.

While I applaud the tremendous impact that Caller ID has had on reducing abusive calls, the service does raise some very serious privacy concerns. We all recognize that there is a compelling basis for protecting by not revealing the telephone numbers of certain special groups of people, including those calling from domestic violence and rape crisis centers, and those involved in law enforcement, and particularly undercover activities.

But there are other groups with privacy expectations as well. Customers who request and pay for unlisted telephone numbers through a monthly fee have as compelling an expectation of privacy as those who request and pay for Caller ID services. In New Jersey, roughly one-third of residential telephone subscribers have unlisted telephone numbers. They desire, they pay for, and they have a right to expect some anonymity as to their home telephone numbers.

I believe that telephone subscribers who have an unlisted number have a right and reasonable expectation to seek to prevent the transmission of their telephone numbers to those subscribing to Caller ID. In fact, it should be taken for granted. It should be automatic. They are paying to have their number protected.

I do not believe any harm occurs to the privacy rights or expectations of persons being called by an individual exercising the option of blocking the telephone number. Anyone with Caller ID who observes that the incoming call is from a blocked number may simply choose to not take the call. Thereby, that person preserves the right to have that other person's privacy invaded.

To those who are concerned that allowing callers to block the called party's receipt of their numbers will lead to an increase in abusive calls, I would simply point out that there are other services, notably Call Trace, which act as a deterrent to such abuses. Call Trace is a service that provides the telephone number of an abusive caller through the telephone company to a law enforcement agency for appropriate legal action. Call Trace is a reasonably priced service that prudently involves law enforcement officials in handling cases that likely involve criminal activity.

Thus, where Caller ID is offered, I believe that in balancing the privacy expectations of the calling and called parties, Caller ID should be offered in conjunction with free-per-call blocking. Additionally, I believe very strongly that those with unlisted numbers should have the option to request per-line blocking which automatically blocks the receipt of the caller's number.

Finally, we will also address this morning abusive commercial practices that are growing fairly unabated through the use of Automatic Number Identification. I do not believe that customers who call 800 or 900 numbers to inquire about or purchase a particular product or service expect or desire that their telephone number and other customer information will be divulged or even sold to other merchants. Unrestricted access by telemarketers to such customer information clearly could lead to the type of intrusive, unsolicited advertising practices that people are tired of and are asking Congress to address.

Once again I want to take this opportunity to commend Chairman Markey for his leadership in raising these issues and seeking fair, appropriate solutions. I look forward to receiving all of the witnesses' testimony and working with them and with the majority and other interested parties to craft meaningful and responsive legislation to address these problems.

I yield back the balance of my time.

Mr. MARKEY. The gentleman's time has expired.

I will next recognize the gentleman from the State of Texas, Mr. Barton.

Mr. JOE BARTON. Thank you, Mr. Chairman. I want to commend you and the vice chairman, Congressman Rinaldo, for holding this hearing.

Very briefly, the first bill we're going to consider, H.R. 1304, appears to me to be noteworthy legislation. I would reserve the right to review some of the sections for possible amendments, but in general I support that.

The "Telephone Consumer Privacy Rights Act", H.R. 1305, I have to say that, on the surface, I am strongly opposed to the intent of that act. I have a publicly listed phone number at my home. I think, as a public representative, the people need to be able to get in touch with me, or have the right to get in touch with me. So I don't have an unlisted telephone number. As a consequence, I get an average of 3 to 4 anonymous/obscene phone calls a day.

My wife feels very strongly that if the State of Texas were to allow Caller ID, that that would be something that would be very useful. I can certainly understand the concerns of law enforcement and some of the rape crisis centers, and I think there might be a way to prevent those types of calls from being traced. But I have to say that if somebody walks up to my door and knocks on the door, I have a right to know who that person is before I let them into my home. By the same token, if somebody calls my home, I think I have the right, or any American citizen has the right, to know who is making that phone call.

So I will work in a very cooperative fashion on H.R. 1304, and I reserve the right to try to retain the rights of the individuals that are being harassed in H.R. 1305.

I yield back the balance of my time.

Mr. MARKEY. The gentleman's time has expired.

I recognize the gentleman from the State of Oklahoma, Mr. Synar.

Mr. SYNAR. Thank you, Mr. Chairman.

Let me first of all commend you for these hearings. This is an issue which is growing in importance and also in interest throughout the country. In my own State of Oklahoma we are beginning to get a tremendous amount of mail from citizens who are concerned about their privacy.

As a member of this subcommittee who also serves on the Judiciary Subcommittee on Intellectual Property and Copyrights, I have taken the advantage of being on both subcommittees to introduce my own legislation with regards to privacy. Our Caller ID legislation that we have introduced would allow Caller ID to be done within the jurisdictions of the various phone companies, but it also would allow the blocking decision to be made on a State-by-State basis.

I look forward to working with this subcommittee—because this will be jointly referred, whatever the two subcommittees do—to coming up with a solution that will be satisfactory not only to the privacy of citizens but also to protect the people who do want to have that kind of information not disbanded throughout the public.

This is an important issue. In many ways, as we go past 1984, it seems now that we're really where many people anticipated we would be there. It is important that the legislative body that we serve in take the opportunity to review this, to take the input that is necessary, so that we can make good decisions.

Mr. MARKEY. The gentleman's time has expired. I look forward to working with the gentleman from Oklahoma. We clearly have to craft something that deals with all of these complex issues.

[Testimony resumes on p. 28.]

[The prepared statement of Hon. Don Ritter and the text of H.R. 1304 and H.R. 1305 follow:]

### OPENING STATEMENT OF HON. DON RITTER

Mr. Chairman: As technology advances, Congress must be careful not to regulate it to the point where the technology is smothered by the regulation. That is why I have some serious concerns about Federal regulation of Caller ID.

Caller ID is available because of the advancement of digital technology. Digital technology is the key to moving from a copper cable-based information system to a fiber optic based system. We are moving into the digital era of telecommunications technology. Hopefully, soon, we will even be viewing television in this country via digital HDTV.

It is imperative that these technologies be allowed to grow. Caller ID is an important service. Many consumers have spent the $50 for the display terminal and another $5 to $8 per month for the service. There is a definite market for this technology. Those who want to prevent prank and threatening phone calls, as well as those who want to avoid pesky insurance salesman have signed up for Caller ID. This technology could lead to further technological enhancements and developments.

Of course, I recognize that there are situations where it is necessary to protect the identity of the calling party. In these instances, the telephone companies have been more than willing to work with individuals to protect special needs.

We are considering regulating this service on a Federal level. Currently, because Caller ID only works on intrastate calls, there is no reason for Federal preemption. Additionally, the technology itself will provide the answers to the small number of individual problems cases.

Mr. Chairman, I think we would be wise to wait before enacting legislation. This is especially true since the State public utility commissions around the country are taking the lead in addressing Caller ID issues. there is no urgent need for the Congress to act in this area, especially when Congress may be unnecessarily inhibiting technological advancements.

8

I

102D CONGRESS
1ST SESSION

# H. R. 1304

To amend the Communications Act of 1934 to regulate the use of telephones
in making commercial solicitations.

IN THE HOUSE OF REPRESENTATIVES

MARCH 6, 1991

Mr. MARKEY (for himself, Mr. RINALDO, Mr. RICHARDSON, Mr. SLATTERY,
Mr. BOUCHER, Mr. COOPER, Mr. HARRIS, Mr. FRANK of Massachusetts,
Mrs. ROUKEMA, Mr. SHAYS, and Mr. STARK) introduced the following
bill; which was referred to the Committee on Enery and Commerce

# A BILL

To amend the Communications Act of 1934 to regulate the
use of telephones in making commercial solicitations.

1    *Be it enacted by the Senate and House of Representa-*

2    *tives of the United States of America in Congress assembled,*

3    **SECTION 1. SHORT TITLE.**

4        This Act may be cited as the "Telephone Advertising

5    Consumer Rights Act".

2

1  SEC. 2. RESTRICTIONS ON THE USE OF TELEPHONE EQUIP-

2          MENT FOR ADVERTISING.

3      Title II of the Communications Act of 1934 is

4  amended by inserting immediately after section 226 (47

5  U.S.C. 226) the following new section:

6  "SEC. 227. RESTRICTIONS ON THE USE OF TELEPHONE

7          EQUIPMENT FOR ADVERTISING.

8      "(a) DEFINITIONS.—As used in this section:

9          "(1) The term 'automatic telephone dialing sys-

10      tem' means equipment which has the capacity—

11          "(A) to store or produce telephone num-

12      bers to be called, using a random or sequential

13      number generator;

14          "(B) to dial such numbers; and

15          "(C) to deliver, without initial live operator

16      assistance, a prerecorded voice message to the

17      number dialed, with or without manual assist-

18      ance.

19          "(2) The term 'telephone facsimile machine'

20      means equipment which has the capacity to do either

21      or both of the following: (A) to transcribe text or im-

22      ages (or both) from paper into an electronic signal

23      and to transmit that signal over a regular telephone

24      line, or (B) to transcribe text or images (or both)

25      from an electronic signal received over a regular

26      telephone line onto paper.

•HR 1304 IH

10

3

1        "(3) The term 'telephone solicitation' means the

2   initiation of a telephone message for the purpose of

3   encouraging a person to purchase, rent, or invest in

4   property, goods, or services without that person's

5   prior express invitation or permission.

6        "(4) The term 'unsolicited advertisement'

7   means any material advertising the commercial

8   availability or quality of any property, goods, or

9   services which is transmitted to any person without

10   that person's prior express invitation or permission.

11   "(b) RESTRICTIONS.—It shall be unlawful for any

12 person within the United States by means of telephone—

13        "(1) to make any telephone solicitation in vio-

14   lation of the regulations prescribed by the Commis-

15   sion pursuant to subsection (c);

16        "(2) to use, to make any telephone solicitation,

17   any telephone facsimile machine or any automatic

18   telephone dialing system that does not comply with

19   the technical and procedural standards prescribed

20   under subsection (d), or to use, to make any tele-

21   phone solicitation, any telephone facsimile machine

22   or automatic telephone dialing system in a manner

23   that does not comply with such standards;

24        "(3) to use any telephone facsimile machine,

25   computer, or other device to send an unsolicited ad-

4

1    vertisement in violation of any regulations prescribed

2    by the Commission pursuant to subsection (e);

3    "(4) to use any automatic telephone dialing sys-

4    tem to make unsolicited calls—

5    "(A) to any emergency telephone line or

6    pager of any hospital, medical physician or

7    service office, health care facility, or fire protec-

8    tion or law enforcement agency; or

9    "(B) to any telephone number assigned to

10    paging or cellular telephone service; or

11    "(5) to use a computer or other electronic de-

12    vice to send an unsolicited advertisement via a tele-

13    phone facsimile machine unless such person clearly

14    marks, in a margin at the top or bottom of each

15    transmitted page of the advertisement, the date and

16    time it is sent and an identification of the business

17    sending the advertisement and the telephone number

18    of the sending machine or of such business.

19    "(c) ELECTRONIC DATA BASE OF OBJECTING PER-

20    SONS.—

21    "(1) ESTABLISHMENT AND OPERATION OF

22    DATA BASE.—Within 60 days after the date of en-

23    actment of this section, the Commission shall initiate

24    a rulemaking proceeding concerning the need to pro-

25    tect telephone subscribers' privacy rights to avoid re-

•HR 1304 IH

5

1     ceiving telephone solicitations and the need to estab-

2     lish a single national data base to compile a list of

3     telephone numbers of subscribers who have submit-

4     ted objections under paragraph (2)(A) and to make

5     that compiled list available for purchase. The pro-

6     ceeding shall—

7          "(A) evaluate whether such a data base

8         should be established and administered by the

9         Commission or its designee;

10        "(B) compare and evaluate alternative

11       mechanisms for establishing and administering

12       the data base, in terms of their cost effective-

13       ness and their other advantages and dis-

14       advantages; and

15        "(C) consider what means other than a na-

16       tional data base could be used to accomplish

17       the purposes of this section.

18     "(2) REGULATIONS.—Not later than 210 days

19     after the date of enactment of this section, the Com-

20     mission shall conclude the rulemaking proceeding

21     initiated under paragraph (1) and shall prescribe

22     regulations to implement the most cost effective

23     mechanism for establishing and operating the data

24     base described in paragraph (1), or shall determine

25     under paragraph (3) that another means is pref-

6

1    erable. Unless the Commission determines that an-
2    other means is preferable, the Commission shall pre-
3    scribe regulations to—

4           "(A) require each common carrier provid-
5        ing telephone exchange service, in accordance
6        with regulations prescribed by the Commission,
7        to afford subscribers for telephone exchange
8        service the opportunity to provide notification,
9        in   accordance   with   regulations   established
10       under this paragraph, that such subscriber ob-
11       jects to receiving telephone solicitations;

12          "(B) specify the methods by which each
13       telephone subscriber shall be informed, by the
14       common carrier that provides local exchange
15       service to that subscriber, of (i) the subscriber's
16       right to give or revoke a notification of an ob-
17       jection under subparagraph (A), and (ii) the
18       methods by which such right may be exercised
19       by the subscriber;

20          "(C) specify the methods by which such
21       objections shall be collected and added to the
22       data base;

23          "(D) prohibit any residential subscriber
24       from being charged for giving or revoking such

7

1 notification or for being carried on a list com-
2 piled under this section;

3     "(E) prohibit any person from transmit-
4 ting a telephone solicitation to the telephone
5 number of any subscriber contained on such
6 list;

7     "(F) specify (i) the methods by which any
8 person desiring to transmit telephone solicita-
9 tions will be required to obtain copies of such
10 list; and (ii) the costs to be recovered from such
11 persons;

12     "(G) specify the methods for recovering,
13 from persons obtaining such list, the costs in-
14 volved in notifying, collecting, updating, dis-
15 seminating, and selling, and other activities re-
16 lating to, the list that are incurred by the enti-
17 ties carrying out those activities;

18     "(H) specify the frequency with which such
19 data base will be updated and specify the meth-
20 od by which such updating will take effect for
21 purposes of compliance with subsection (b);

22     "(I) be designed to permit and encourage
23 States to use the data base mechanism selected
24 by the Commission under paragraph (1) for

15

8

1   purposes of administering or enforcing State

2   law;

3        "(J) prohibit the use of such database for

4   any purpose other than compliance with the re-

5   quirements of this section and any such State

6   law and specify methods for protection of the

7   privacy rights of persons whose numbers are in-

8   cluded in such list; and

9        "(K) require each common carrier provid-

10  ing services to any person for the purpose of

11  making telephone solicitations to notify such

12  person of the requirements of this section and

13  the regulations thereunder.

14       "(3) OTHER MEANS.—If the Commission, dur-

15  ing the rulemaking proceeding initiated under para-

16  graph (1), required by this subsection, determines

17  that another means to accomplish the purposes of

18  this section will provide equivalent protection of tele-

19  phone subscriber privacy rights in a more efficient,

20  effective, and economic manner and without the im-

21  position of any additional charge to telephone sub-

22  scribers, the Commission shall prescribe such regula-

23  tions as are necessary to implement such other

24  means. Such regulation shall be prescribed, after no-

25  tice and opportunity for comment thereon, not later

9

1    than 270 days after the date of enactment of this

2    section.

3    "(d) TECHNICAL AND PROCEDURAL STANDARDS.—

4        "(1) TELEPHONE FACSIMILE MACHINES.—The

5    Commission shall revise the regulations setting tech-

6    nical and procedural standards for telephone fac-

7    simile machines to require that any such machine

8    which—

9            "(A) is manufactured after 6 months after

10        the date of enactment of this section, and

11            "(B) is used for the distribution of unsolic-

12        ited advertising,

13    clearly marks, in a margin at the top or bottom of

14    each transmitted page or on the first page of each

15    transmission, the date and time sent, an identifica-

16    tion of the business or other entity sending the ad-

17    vertisement, and the telephone number of the send-

18    ing machine or of such business. The Commission

19    shall exempt from such standards, for 12 months

20    after such date of enactment, telephone facsimile

21    machines that do not have the capacity for auto-

22    matic dialing and transmission and that are not ca-

23    pable of operation through an interface with a com-

24    puter.

17

10

1        "(2) AUTOMATIC TELEPHONE DIALING SYS-
2     TEMS.—The Commission shall prescribe technical
3     and procedural standards for automatic telephone
4     dialing systems that are used to transmit any
5     prerecorded telephone solicitation. Such standards
6     shall require that—

7            "(A) all prerecorded telephone messages (i)
8         shall, at the beginning of the message, state
9         clearly the identity of the business or other en-
10        tity initiating the call, and (ii) shall, during or
11        after the message, state clearly the telephone
12        number or address of such business or other en-
13        tity; and

14            "(B) such systems will, as soon as is tech-
15        nically practicable (given the limitations of the
16        telephone exchange service facilities) after the
17        called party hangs up, automatically create a
18        disconnect signal or on-hook condition which al-
19        lows the called party's line to be released.

20      "(e) CONSIDERATION OF FACSIMILE MACHINE RE-
21    STRICTIONS.—Within 90 days after the date of enactment
22    of this section, the Commission shall initiate a rulemaking
23    proceeding to prescribe rules to restrict the use of any tele-
24    phone facsimile machine or computer or other electronic
25    device to send any unsolicited advertisement to the tele-

page 262
Exhibit 23

18

11

1 phone facsimile machine of any person. In establishing

2 such restrictions, the Commission shall consider—

3     "(1) the extent to which unsolicited advertise-

4     ments are transmitted through telephone facsimile

5     machines;

6     "(2) the extent to which recipients of such ad-

7     vertisements incur costs for such receipt; and

8     "(3) the most cost effective methods of prevent-

9     ing advertising abuses with telephone facsimile ma-

10     chines.

11     "(f) STATE LAW NOT PREEMPTED.—Nothing in this

12 section or in the regulations prescribed under this section

13 shall preempt any State law that imposes more restrictive

14 intrastate requirements or regulations on, or which pro-

15 hibits, either or both of the following:

16     "(1) The use of telephone facsimile machines or

17     other electronic devices to send unsolicited advertise-

18     ments.

19     "(2) The use of automatic telephone dialing

20     systems to transmit prerecorded telephone solicita-

21     tions.

22     "(g) EFFECTIVE DATE OF REQUIREMENTS.—The re-

23 quirements of this section shall take effect 30 days after

24 the date that regulations are prescribed under subsection

25 (c).".

12

1 **SEC. 3. CONFORMING AMENDMENT.**

2    Section 2(b) of the Communications Act of 1934 is

3 amended by striking "Except as provided" and all that

4 follows through "and subject to the provisions" and insert-

5 ing "Except as provided in sections 223 through 227, in-

6 clusive, and subject to the provisions".

20

I

102D CONGRESS
1ST SESSION
# H. R. 1305

To amend the Communications Act of 1934 to protect the privacy rights
of telephone subscribers.

_____

## IN THE HOUSE OF REPRESENTATIVES

MARCH 6, 1991

Mr. MARKEY (for himself, Mr. RICHARDSON, Mr. SLATTERY, Mr. COOPER,
and Mr. FRANK of Massachusetts) introduced the following bill; which
was referred to the Committee on Energy and Commerce

_____

# A BILL

To amend the Communications Act of 1934 to protect the
privacy rights of telephone subscribers.

1    *Be it enacted by the Senate and House of Representa-*

2  *tives of the United States of America in Congress assembled,*

3  **SECTION 1. SHORT TITLE.**

4      This Act may be cited as the "Telephone Consumer

5  Privacy Rights Act".

6  **SEC. 2. CUSTOMER PRIVACY REQUIREMENTS.**

7      (a) AMENDMENT.—Title II of the Communications

8  Act of 1934 is further amended by adding at the end

9  thereof the following new section:

2

1  **"SEC. 227. CUSTOMER PRIVACY REQUIREMENTS.**

2      "(a) DEFINITIONS.—As used in this section—

3          "(1) The term 'caller identification service'

4      means a service which makes use of a display device

5      at the customer's telephone to automatically indicate

6      the area code and local telephone number of any

7      party calling from within the local area or from an-

8      other area, except that such term does not include

9      an automatic number identification service.

10          "(2) The term 'automatic number identifica-

11      tion' means a system in common use by common

12      carriers that uses an identifying signal associated

13      with the use of subscriber's telephone to provide bill-

14      ing information or other information to the local ex-

15      change carrier and to any other interconnecting car-

16      riers.

17          "(3) The term 'aggregate information' mean

18      collective data that relates to a group or category of

19      services or customers, from which individual cus-

20      tomer identities or characteristics have been re-

21      moved.

22      "(b) CALLING PARTY IDENTIFICATION.—

23          "(1) RULEMAKING REQUIRED.—The Commis-

24      sion shall, within 180 days after the date of enact-

25      ment of this section, prescribe regulations requiring

26      any caller identification service offered by a common

3

1  carrier, or by any other person that makes use of
2  the facilities of a common carrier, to allow the caller
3  to withhold, on a per-call basis, the display of the
4  caller's telephone number from the telephone or
5  other instrument of the individual receiving the call.

6  "(2) CHARGES FOR WITHHOLDING NUMBERS
7  PROHIBITED.—Such regulations shall prohibit any
8  charges from being imposed on the caller who re-
9  quests that his or her telephone number be withheld
10  from the recipient of a call placed by the caller.

11  "(3) NOTIFICATION TO CUSTOMERS.—Such reg-
12  ulations shall require every common carrier to notify
13  its subscribers that their calls may be identified to
14  a called party not later than—

15      "(A) 30 days before the common carrier
16      commences to participate in the offering of a
17      call identification service; and

18      "(B) 60 days after the date such regula-
19      tions are prescribed, if the private or common
20      carrier is participating in the offering of a call
21      identification service prior to such date.

22  "(4) EXEMPTIONS.—This subsection does not
23  apply to any of the following:

24      "(A) A caller identification service which is
25      used solely in connection with calls within the

4

1    same limited system, including (but not limited

2    to) a Centrex or private branch exchange sys-

3    tem, as the recipient telephone.

4        "(B) A caller identification service which is

5    used on a public agency's emergency telephone

6    line or on the line which receives the primary

7    emergency telephone number (911).

8        "(C) A caller identification service provided

9    in connection with legally authorized call trac-

10   ing or trapping procedures specifically re-

11   quested by a law enforcement agency.

12   "(5) WAIVER.—The regulations prescribed by

13   the Commission under paragraph (1) may waive the

14   requirements of this subsection where compliance

15   with such requirements is not technologically fea-

16   sible.

17   "(c) AUTOMATIC NUMBER IDENTIFICATION SERV-

18   ICES.—

19       "(1) CONTRACT REQUIREMENTS.—Any common

20   carrier or affiliate of a common carrier providing

21   automatic number identification services to any per-

22   son shall provide such services under a contract or

23   tariff containing customer information requirements

24   that comply with this subsection. Such requirements

25   shall—

5

1      "(A) permit such person to use the tele-

2      phone number and billing information provided

3      pursuant to the automatic number identifica-

4      tion service for billing and collection, completion

5      of the customer's call or transaction, or for

6      services directly related to the customer's call or

7      transaction;

8      "(B) prohibit such person from reusing or

9      selling the telephone number or billing informa-

10     tion provided pursuant to the automatic num-

11     ber identification service without the customer's

12     affirmative consent;

13     "(C) prohibit such person from disclosing,

14     without the affirmative consent of the customer,

15     any information derived from the automatic

16     number identification service, or any informa-

17     tion derived from the analysis of the character-

18     istics of a telecommunications transmission

19     (such as calling patterns and locations, trans-

20     mission speeds, and transaction profiles), for

21     any purpose other than—

22          "(i) performing the services or trans-

23          actions that are the subject of the cus-

24          tomer's call,

6

1             "(ii) ensuring network performance,
2        security, and the effectiveness of call deliv-
3        ery,
4             "(iii) compiling, using, and disclosing
5        aggregate information, and
6             "(iv) complying with applicable law or
7        legal process.
8      "(2) EXCEPTION FOR ESTABLISHED CUS-
9    TOMERS.—The customer information requirements
10    imposed under paragraph (1) shall not prevent a
11    person to which automatic number identification
12    services are provided from using—
13        "(A) the telephone number and billing in-
14        formation provided pursuant to such service,
15        and
16        "(B) any information derived from the
17        automatic number identification service, or
18        from the analysis of the characteristics of a
19        telecommunications transmission,
20    to offer, to any customer with which such person has
21    established a customer relationship, a product or
22    service that is directly related to the products or
23    services previously acquired by that customer from
24    such person.

page 270
Exhibit 23

26

7

1       "(3) ENFORCEMENT.—(A) Each common car-

2    rier shall receive and transmit to the Commission

3    customer complaints concerning violations of the

4    customer information requirements imposed under

5    paragraph (1). Each common carrier shall submit to

6    the Commission, in such form as the Commission

7    may require by regulation, periodic reports on ac-

8    tions taken by the carrier to obtain compliance with

9    such requirements.

10       "(B) The Commission may, by rule or order, di-

11    rect the termination of automatic number identifica-

12    tion services to any person who has violated the cus-

13    tomer information requirements imposed under

14    paragraph (1). For purposes of section

15    503(b)(1)(B), violations of such requirements shall

16    be considered to be a violation of a provision of this

17    Act.

18       "(4) EFFECTIVE DATE.—(A) Except as pro-

19    vided in subparagraph (B), the requirements of this

20    subsection shall apply to any automatic number

21    identification service provided on or after one year

22    after the date of enactment of this subsection.

23       "(B) In the case of any automatic number iden-

24    tification service provided under a contract entered

25    into, or tariff taking effect, more than 90 days after

page 271

Exhibit 23

8

1     the date of enactment of this subsection, the require-

2     ments of this subsection shall apply to any auto-

3     matic number identification service provided pursu-

4     ant to such contract or tariff.".

**5 SEC. 3. CONFORMING AMENDMENT.**

6     Section 2(b) of the Communications Act of 1934 is

7 amended by striking "Except as provided" and all that

8 follows through "and subject to the provisions" and insert-

9 ing "Except as provided in sections 223 through 227, in-

10 clusive, and subject to the provisions".

Mr. MARKEY. Are there any other members seeking recognition for the purpose of making an opening statement at this time? The Chair does not see any other members seeking recognition, so we will begin then with our first witness, Representative Jolene Unsoeld from the 3rd District of Washington, who has been an aggressive leader in this area in trying to find some accommodation between the intrusive technological problems which we have found and the rights of privacy that individuals in our country are assumed to have.

Welcome, Jolene. Whenever you're ready, please begin your testimony.

### STATEMENT OF HON. JOLENE UNSOELD, A REPRESENTATIVE IN CONGRESS FROM THE STATE OF WASHINGTON

Mrs. UNSOELD. Thank you very much, Mr. Chairman. Thank you for letting me follow the lead of you and this committee, because I think this is an area that the public is asking for more and more of the protections that you're considering. I certainly support your well-crafted and carefully-considered bill, and appreciate the lead that all of you are taking on this.

Now, as you and I have discussed, I introduced the Telephone Privacy Act to combat one of the issues that you address in your comprehensive legislation: computer-generated calls. My bill bans outright the use of Automatic Dialing and Announcing Devices, ADAD's, for commercial solicitations.

When I was in the State legislature in Washington State, we instituted this several years ago. The only flaw in it is that it cannot prevent calls coming from another State into Washington, which is why national legislation would be necessary. Of course, it couldn't give the Federal Communications Commission the power to find and fine violators in order to control the situation.

I have heard from dozens of people who support this concept, Mr. Chairman. People dislike telemarketing in general and are particularly infuriated when a machine invades the precious little time and privacy they enjoy at home. In addition, home-bound elderly or disabled people are too often the primary targets of these intrusive machines and their "too good to be true" scams.

I am sure you've heard the horror stories also, Mr. Chairman. A doctor is called on his beeper and returns the call, only to be offered a deal on diet pills, and then charged $3 for the call. In the aftermath of the devastating San Francisco earthquake, a man hears his phone ringing beneath the rubble of his home, answers it, and finds himself listening to a computer sales pitch. Or the man in the hospital bed in the intensive care ward; a computer dialed him, too, offering him a trip to Hawaii. And maybe most disturbing of all are the stories from people who have tried to hang up on these contraptions because they needed to make an emergency call, but the line was blocked.

You probably have received a letter from someone who is in this business who claims that, contrary to my claim, today's products do disconnect upon the called party hanging up. The letter also asks when the last time your answering machine was filled up with "Call this number now, call this number now." Mine has this year.

The latest horror story about it refusing to hang up was a woman who received such a call on her car phone, and not only would it not hang up but, of course, she was paying by the minute for this unsolicited intrusion.

I will work with you, Mr. Chairman, to develop a way to protect Americans from these intrusions. I prefer my bill because it makes the telemarketers do the work. They must dispose of their machines that intrude upon 7 million Americans each day, and they must employ human beings who will make fewer privacy-invading calls.

In your bill, the burden is on phone owners to protect themselves. They must know they can become "off limits" to telemarketers, they must find the address, and they must trust the Government to protect them. However, I feel we must do something, and your bill provides a good compromise.

Mr. Chairman, thank you for your excellent work. Let's get as comprehensive a bill as we can as soon as we can, and I will help however I can. Thank you.

Mr. MARKEY. Thank you very much.

Do you think that the enforcement provisions in your bill are strong enough to accomplish the goals you have?

Mrs. UNSOELD. We increase the currently allowable fine levels, so I believe it is. But it could always be raised in the future.

Mr. MARKEY. And the reason you have decided to introduce this legislation at the national level, even though it has already been in place in Washington State for the last several years, is that it still cannot control the interstate calls?

Mrs. UNSOELD. Correct. I believe that those who are engaged in this kind of telemarketing probably have a single location and can reach across the United States anywhere, so it requires national legislation to address this.

The issue has also been raised about freedom of speech and whether a total ban is appropriate, but my reading of the Constitution does not bestow that right upon computers. They may be pretty smart, but they haven't received that right.

Mr. MARKEY. I don't have any other questions at this time.

Do any of the members have questions of Congresswoman Unsoeld? Thank you, Jolene, very much.

Mrs. UNSOELD. Thank you, Mr. Chairman.

Mr. MARKEY. Let's move then to our second panel, which consists of Mr. Mark Cooper, research director for the Consumer Federation of America; Mr. Jack Shreve, public counsel, State of Florida; Mr. Tom Beard, chairman of the Public Service Commission of the State of Florida; Miss Janlori Goldman, director of the Privacy and Technology Project for the American Civil Liberties Union; and Mr. Marc Rotenberg, director of the Computer Professionals for Social Responsibility.

We have a logistical problem this morning, in that we are only able to use this room for another hour and 25 minutes, and we have yet another panel to hear from as well, in addition to questions from members of the subcommittee. We have historically had a 5-minute rule in terms of statements from witnesses, and because of the time constraints we have, we are going to enforce that very strictly and would ask for your cooperation from the outset.

Let's begin with you, Mr. Beard, if we could. Please try to abide by the 5-minute restriction.

**STATEMENTS OF THOMAS BEARD, CHAIRMAN, FLORIDA PUBLIC SERVICE COMMISSION, ON BEHALF OF THE NATIONAL ASSOCIATION OF REGULATORY UTILITY COMMISSIONERS; MARK N. COOPER, DIRECTOR OF RESEARCH, CONSUMER FEDERATION OF AMERICA; MARC ROTENBERG, DIRECTOR, COMPUTER PROFESSIONALS FOR SOCIAL RESPONSIBILITY; JANLORI GOLDMAN, LEGISLATIVE COUNSEL, AMERICAN CIVIL LIBERTIES UNION; AND JACK SHREVE, PUBLIC COUNSEL, STATE OF FLORIDA, ON BEHALF OF THE NATIONAL ASSOCIATION OF STATE UTILITY CONSUMER ADVOCATES**

Mr. BEARD. Thank you. If I take 5 minutes, I will be excessively wordy.

On my behalf, and on behalf of NARUC, we have filed our complete comments with supporting documentation. I want to thank you, Mr. Chairman, and the members of the committee for the opportunity to be here, and especially thank you for taking up these topics, primarily the issue of privacy. I will be brief.

One of the primary concerns that I think we have with ADAD's and junk fax is as expressed earlier. It ties up our telephone lines and it forces me to print the advertising of someone else in the case of junk fax. Basically it is an expense that I, as an individual, would incur and would otherwise chose not to.

On a personal level, I am the telemarketing bottleneck at my home. When someone calls they hand me the phone and the conversation is fairly brief and it's over with. I can't do that with a recording. I can't shut it off and I can't make it stop. I think that is a primary concern. The same thing with junk fax as it comes across and it creates a bottleneck in and of itself.

With respect to Caller ID and the privacy issues, Florida has taken a position—and NARUC has not; I cannot speak for NARUC in that sense. Florida just recently had hearings and had a ruling on that. We did approve Caller ID with free per-call blocking; we allowed per-line blocking for law enforcement and certain social abuse type agencies, where that was of paramount concern.

It was a fairly drastic move. I was originally in the same position as Congressman Barton, in that I felt strongly about Caller ID with no blocking. After extensive hearings, traveling throughout Florida and getting an opportunity to hear the people, I can tell you that 100 percent of the people of Florida at least, and probably this Nation, want to be able to, in every instance, receive the number of who's calling them, but in every instance not allow their number to be transmitted. Unfortunately, I don't think that technology can ever be invented. Therefore, you have to try and balance those privacy rights. In Florida we found that the free per-call blocking seemed to be the logical balance.

In going through those hearings, I kept an actual score pad of each person who came forward. There was just about a 50-50 balance in each instance of those who favored Caller ID versus those that opposed it, and in most cases a reasonable compromise appeared to be per-call blocking.

page 275
Exhibit 23

I can tell you, from having faced the people right out on the streets, in those hearings, it is extremely controversial and it is an extremely personal issue. I commend you for taking this on because it's not an easy subject to deal with.

Thank you.

[The prepared statement and attachments of Mr. Beard follow:]

STATEMENT OF THOMAS BEARD, CHAIRMAN, FLORIDA PUBLIC SERVICE COMMISSION, ON BEHALF OF NATIONAL ASSOCIATION OF REGULATORY UTILITY COMMISSIONERS

Mr. Chairman and members of the subcommittee: My name is Tom Beard and I serve as the Chairman of the Florida Public Service Commission and a member of the Committee on Communications National Association of Regulatory Utility Commissioners (NARUC), on whose behalf I submit this statement today.

As you may know, the NARUC is a quasi-governmental, non-profit organization founded in 1889. Within our membership are the governmental agencies of the 50 States, the District of Columbia, Puerto Rico and the Virgin Islands which are engaged in the regulation of utilities and carriers. Our chief objective is to serve the consumer interest by seeking to improve the quality and effectiveness of government regulation in America. More specifically, the NARUC is composed of, *inter alia*, State and territorial officials charged with the duty of regulating the telecommunications common carriers within their respective borders. As such, they have the obligation to assure the establishment of such services and facilities as may be required by the public convenience and necessity, and the furnishing of service at rates that are just and reasonable.

It is a pleasure to be here today to present the position of the NARUC on automatic dialers and junk fax machines as stated in H.R. 1304, "the Telephone Advertising Consumer Rights Act." While the NARUC has not taken a position on the bill being considered today, the Association strongly supports Federal legislation to restrict the use of automatic dialing and announcing devices for unsolicited calls.

I would also like to add my personal commendation to the committee for addressing this and other areas which involve privacy concerns of the telephone customers.

Many consumers find ADAD's to be a nuisance or an invasion of privacy. In some cases, ADAD's have jeopardized public safety by tying up emergency telephone lines and by not disconnecting after the called party has hung up the telephone. They seize and hold the line until the recorded message is completed, whether the customer hangs up or not. Many States have imposed restrictions on the intrastate use of ADAD's (See Attachment) but they lack jurisdiction over interstate calling.

The customer is denied use of their own phone until the machine lets go. And the capacity of the system is potentially threatened as more and more of these machines pump out call after unwanted call.

The junk fax problem is a more recent situation and I do not believe many States have passed legislation on this issue.

The junk fax advertiser is a nuisance who wants to print their add on your paper. That call also seizes your fax machine so that it is not available for calls you want or need. The NARUC recently ran into this problem and I have attached the ad to this statement.

As fax machines have become faster and easier to use, use of this form of communication has shown tremendous growth. Although I have seen no figures on national usage, I am judging by my own increasing reliance on the fax.

Meeting in Washington last year, the NARUC reviewed the situation and passed a resolution (See Attachment) urging Congress to enact legislation on the subject. The NARUC said the legislation should restrict the use of ADAD's and facsimile machines for unsolicited advertising and prescribe specific penalties for violations.

Although Florida and a number of other States have addressed what we call Caller ID, the NARUC has not yet established its position so I cannot comment for the NARUC on H.R. 1305, "the Telephone Consumer Privacy Rights Act".

In Florida, we approved Caller ID with per-call blocking earlier this month. We allowed per-line blocking for police agencies and social agencies where it was considered necessary. However, we did require Southern Bell to also offer a service commonly known as: "Block the Blocker". If I had that service, persons who blocked their number when they called my house would get a recording which advises them that I do not wish to receive their call, and why.

Florida specifically defined Caller ID to delineate that it does not include Automatic Number Identification (ANI). It was our feeling that this was a different service, although having some similarities. We intend to deal with this issue in our In-

formation Services tariffs. It is unclear whether or not blocking of ANI, because of its technological configuration, can currently be done on either a per-call or per-line basis.

I would be glad to answer any questions you may have.

RESOLUTION SUPPORTING LEGISLATION TO REGULATE THE USE OF AUTOMATIC DIALING AND ANNOUNCING DEVICES AND JUNK FAX

WHEREAS, Telemarketers are increasingly using automatic dialing and announcing devices (ADAD's) and facsimile machines to deliver unsolicited advertising; and

WHEREAS, Many people find such advertising to be a nuisance or an invasion of privacy; and

WHEREAS, ADAD's have jeopardized public safety by tying up emergency telephone lines and by not disconnecting after the called party has hung up the telephone; and

WHEREAS, Many States have imposed restrictions on the intrastate use of ADAD's and unsolicited advertising delivered by facsimile; and

WHEREAS, H.R. 2921, currently pending before the U.S. Congress, proposes the "Telephone Advertising Regulations Act" and would prohibit both unsolicited calls made by ADAD's and unsolicited advertisements delivered by facsimile to any person whose telephone number is listed with a national clearinghouse to be designated by the Federal Communications Commission and would require all local exchange carriers to give their customers the opportunity to be placed on this list according to FCC guidelines; now, therefore, be it

RESOLVED, That the Executive Committee of the National Association of Regulatory Utility Commissioners (NARUC), assembled at its 1990 Winter Meeting in Washington, D.C., urges the Congress to enact legislation to restrict the unsolicited advertising use of ADAD's or facsimile machines and that specific penalties be prescribed for violations.

Sponsored by the Committee on Communications
Adopted February 28, 1990

33

612

## STATE REGULATION OF TELEMARKETING, AUTODIALERS AND ADADs

The following tables were compiled from state agency responses to the questions contained in the surveys reproduced below. The surveys were distributed during October 1989 and the responses compiled and distributed at the 101st NARUC Annual Convention in November 1989. Throughout this section, telemarketing should be taken to mean specifically those companies (or individuals) which attempt to sell a product or service by telephone. The same regulations or restrictions do not necessarily apply to contact between parties with a pre-existing business relationship; nor to charitable or political fund-raising or non-commercial poll-taking or other non-commercial uses.

TELEMARKETING  Please indicate all actions in force or under consideration in pending rules or legislation.
1.   What agency in your state has jurisdiction over telemarketing activities?
2.   Must a telemarketer register with your agency or another state agency or office (please specify) to operate within the state.
     2a. Must telemarketer post a bond? (please indicate the amount)
3.   Hours of operation are restricted. (To what hours?)
4.   Must a telemarketer furnish the purchaser with written confirmation of purchase agreement made over the telephone (If a minimum period of time has been established for furnishing written confirmation, please indicate the time period.)
5.   Must a customer be allowed to cancel an order agreed to by telephone within a certain period of time after placing the order (please indicate the period of time - "cooling off period".)
6.   Telephone subscribers may request that their telephone directory listings be marked as unwilling to receive telemarketing sales calls; telemarketers must respect their wishes.
7.   Has your state imposed restrictions on telemarketing by facsimile (FAX) machines?  Please describe briefly.

STATE IMPOSED RESTRICTIONS ON TELEMARKETING USING AUTODIALERS  Autodialer is defined as a device that automatically dials telephone numbers until it detects that someone has answered, bypassing "ring-no-answer" and "ring-busy" conditions.  After the device detects that connection has been made, one of several events may occur depending on the telemarketing operation set-up:  the device could hand the call to an available station (Automatic Call Distribution) which may have a live operator; or it could be connected to a device which plays a prerecorded message. The combination of an autodialer and a recorded message is sometimes referred to as an ADAD (Automatic Dialing and Announcing Device). Autodialers are not in all cases connected to a device which delivers a recorded message.

     Please indicate all actions in force or under consideration in pending rules or legislation.  To reiterate, all these questions should be understood to apply specifically to commercial uses of such equipment, not necessarily to charitable or political fund-raising or for contact between parties with a pre-existing business relationship (one such use notifies purchasers of the availability of items they have ordered).

1.   May telemarketers use autodialers?
2.   Using an autodialer is permitted, but only with any of the following restrictions:
     a) A live operator must deliver the sales pitch; no recorded sales pitch allowed.
     b) Recorded sales pitch allowed only with a live operator delivering an introduction?  Or is a recorded introduction allowed as well?
     c) The introduction, whether live c_____ t state the purpose of the call _____ and/or identify the source of the call. _____
     d) Autodialer must automatically terminate call when the recipient of the call hangs up (or within a very short time of hang-up).
     e) Sequential (or random dialing) autodialers, which dial every possible combination of telephone number within an exchange, including emergency and unpublished numbers, are prohibited _____, or permitted only if autodialer is programmed to avoid dialing specified numbers _____
     f) Autodialers must avoid calling telephone subscribers who have indicated that they do not wish to receive unsolicited sales calls _____  How can subscribers indicate this?
     g) Length of recorded sales pitch is restricted. _____  To what length of time? _____
3.   Are there other restrictions on telemarketing using autodialers? Please describe briefly.
4.   Non-compliance with any or all of the above restrictions carries a penalty of:
     a) Fines; b) Disconnection of telemarketer's telephone service; c) Loss of registration or other required license; d) Other (Please specify)
5.   Does your agency (or other state agency) use any type of "Consumer Alert" to advise consumers of potential telemarketing problems?  Please describe briefly.

NARUC Annual Report on Utility and Carrier Regulation 12/31/1989

**34**

613

**TABLE 92 - STATE REGULATION OF TELEMARKETERS**

| ** UC=UNDER CONSIDERATION STATE | 1 AGENCY W/ JURISDICTION | 2 REGISTRA- TION RE- QUIRED? | 2a BOND REQUIRED $ | 3 OPERATING HOURS RESTRICTED | 4 WRITTEN CONFIRMATION REQ'D W/IN: | 5 COOLING OFF PERIOD REQ'D (DAYS) | 6 DIRECTORY MARKING AVAILABLE |
|---|---|---|---|---|---|---|---|
| ALABAMA | ATTORNEY GENERAL-UC | | | | | | UC |
| ALASKA | | | | | | | |
| ARIZONA | SECT OF STATE | YES | $25,000 | | | 3 DAYS | |
| ARKANSAS | ATTORNEY GENERAL-UC | | | | | | |
| CALIFORNIA | PUC | YES | | | | | YES 1/ |
| COLORADO | | | | | | | |
| CONNECTICUT | | | | | | | |
| DELAWARE | | | | | 10 DAYS | 3 DAYS | NO 2/ |
| DC | | | | | | | |
| FLORIDA | PSC, DIV OF CONS. SVCS | | | | | | YES |
| GEORGIA | | | | | | | |
| HAWAII | | | | | | | |
| IDAHO | | | | | | | |
| ILLINOIS | | | | | | | |
| INDIANA | | | | 8 AM-9 PM | | | |
| IOWA | | | | | | | |
| KANSAS | | | | | | | |
| KENTUCKY | | | | | | | |
| LOUISIANA | | | | | | | |
| MAINE | | | | | | | |
| MARYLAND | | | | | YES | N/A 3/ | |
| MASSACHUSETTS | | | | 9 AM-9 PM | | | YES |
| MICHIGAN | | | | 9 AM-9 PM | | | |
| MINNESOTA | ATTORNEY GENERAL | | | | | UC | |
| MISSISSIPPI | | | | | | | |
| MISSOURI | | | | | YES OVER $25 | N/A 3/ | |
| MONTANA | | | | | | | |
| NEBRASKA | | | | | | | |
| NEVADA | DEPT OF COMMERCE-CONS AFF | YES | $50,000 | | IF REQUESTED | 30 DAYS | |
| NEW HAMPSHIRE | ATTY GENL-CONS, PROTECT | YES | | | | | |
| NEW JERSEY | | | | | | | |
| NEW MEXICO | | | | 9 AM-9 PM | | | |
| NEW YORK | | | | YES | | | |
| NORTH CAROLINA | | | | | | | |
| NORTH DAKOTA | | | | | | | |
| OHIO | ATTORNEY GENERAL-UC | UC HB 305 | | UC-HB 305 | YES OVER $25 | 3 DAYS | UC-HB 305 |
| OKLAHOMA | | | | | | | |
| OREGON | DEPT OF JUSTICE | YES | | | YES | 3 DAYS | YES |
| PENNSYLVANIA | | | | | | | UC |
| RHODE ISLAND | | | | | | | |
| SOUTH CAROLINA | DEPT OF CONSUMER AFFAIRS | | | 8 AM-9 PM | | | |
| SOUTH DAKOTA | | | | | | | |
| TENNESSEE | | | | | | | |
| TEXAS | | | | | | POSSIBLE | |
| UTAH | DIV OF CONSUMER PROTECTION | YES | | 9 AM-9 PM | | | UC |
| VERMONT | | | | | | | |
| VIRGINIA | | | | | YES-3 DAYS | 3 DAYS | |
| WASHINGTON | ATTY GENERAL-1/1/90 | YES | | 8 AM-9 PM | YES | 3 DAYS | |
| WEST VIRGINIA | | | | | | 3 D-CREDIT | UC |
| WISCONSIN | | | | | | | |
| WYOMING | SECT OF STATE | | | UC | YES 7-10 DAYS | | |
| CRTC | | | | | | | |
| ALBERTA | | | | | | | |
| NOVA SCOTIA | DEPT OF CONSUMER AFFAIRS | YES | 5,000-20,000 | | YES-IMMEDIATE | 10 DAYS | |
| QUEBEC | | | | | | | |

** For clarification of column headers, please refer to the questionnaire reproduced above.  Numbers coincide with numbered questions.

1/   Telco must remove all unpublished and emergency numbers from the lists they sell to telemarketers.
2/   Except for unlisted or public safety numbers.
3/   No telephone orders; customer signs and returns the written purchase contract.

NARUC Annual Report on Utility and Carrier Regulation 12/31/1989

614

**TABLE 93 - RESTRICTIONS ON TELEMARKETING BY FACSIMILE (FAX)**

| STATE | Question #7<br>Briefly describe any state restrictions imposed on telemarketing by FAX machine |
|---|---|
| ALABAMA | NONE |
| ALASKA | NONE |
| ARIZONA | NONE |
| ARKANSAS | NONE |
| CALIFORNIA | NONE |
| COLORADO | NONE |
| CONNECTICUT | P.A. 89-103, Eff. 10/1/89 prohibits unsolicited advertising and harassment by FAX - Class C misdemeanor |
| DELAWARE | Diamond State Tel. prohibits telemarketing by FAX |
| DC | NONE |
| FLORIDA | CH 89-95, Eff. 10/1/89 prohibits unsolicited advertising by FAX - $500 fine |
| GEORGIA | NONE |
| HAWAII | |
| IDAHO | NONE |
| ILLINOIS | NONE |
| INDIANA | |
| IOWA | NONE |
| KANSAS | NONE |
| KENTUCKY | NONE |
| LOUISIANA | NONE |
| MAINE | |
| MARYLAND | Law code ann. 14-2201, 1989, unsolicited advertising prohibited ($1,000 fine); no restraint if pre-existing business relationship |
| MASSACHUSETTS | NONE |
| MICHIGAN | NONE |
| MINNESOTA | NONE |
| MISSISSIPPI | NONE |
| MISSOURI | NONE |
| MONTANA | NONE |
| NEBRASKA | |
| NEVADA | NONE |
| NEW HAMPSHIRE | NONE |
| NEW JERSEY | Under consideration in pending legislation |
| NEW MEXICO | |
| NEW YORK | NONE |
| NORTH CAROLINA | NONE |
| NORTH DAKOTA | NONE |
| OHIO | Under consideration in HB 457, telemarketer must seek permission in advance of sending FAX for commercial purposes |
| OKLAHOMA | NONE |
| OREGON | SB 857, eff. 10/3/89, prohibits unsolicited advertising by FAX; subject to Unlawful Trade Practices Act |
| PENNSYLVANIA | NONE |
| RHODE ISLAND | |
| SOUTH CAROLINA | NONE |
| SOUTH DAKOTA | NONE |
| TENNESSEE | NONE |
| TEXAS | No autodialed sales calls to cellular or FAX. |
| UTAH | NONE |
| VERMONT | |
| VIRGINIA | NONE |
| WASHINGTON | NONE |
| WEST VIRGINIA | NONE |
| WISCONSIN | Under consideration in pending legislation, prohibit unsolicited advertising by FAX |
| WYOMING | Under consideration |
| CRTC | NONE |
| ALBERTA | NONE |
| NOVA SCOTIA | Same as for all telemarketing:  register with Dept of Consumer Affairs, post a bond, furnish written confirmation of order, allow 10-day cooling off period |
| QUEBEC | NONE |

NARUC Annual Report on Utility and Carrier Regulation 12/31/1989

615

**TABLE 94 - STATE REGULATION OF TELEMARKETING USING AUTODIALERS OR ADADs**

| | 1 | 2a | 2b AUTO-DIALING AND ANNOUNCING DEVICE (ADAD) 1/ Introduction Req'd | | 2c Intro States: | | 2d | 2e RANDOM DIALER | | |
|---|---|---|---|---|---|---|---|---|---|---|
| STATE | AUTO-DIALER ALLOWED? | LIVE OPERATOR ONLY | Live Only | Live or Recorded | Purpose | Source | ADAD Must Auto Call Terminate | Prohib. | Avoid #s | CITATION |
| ALABAMA | YES | | YES | NO | YES | YES | N/A | YES | | H-800, 1989 |
| ALASKA 2/ | . | YES | ADADs PROHIBITED FOR SALES SOLICITATION | | | | | | | § 45.50.472 |
| ARIZONA | | YES | ADADs PROHIBITED FOR SALES SOLICITATION | | | | | | | T44, C#9, 9/15/89 |
| ARKANSAS | | | ADADs PROHIBITED FOR SALES SOLICITATION | | | | | | | § 41-4162 |
| CALIFORNIA | YES | NO | YES | NO | YES | YES | N/A | | YES | §42872, 2876 1/1/90 |
| COLORADO | NO | | | | | | | | | CRS 18-9-311, 1979 |
| CONNECTICUT | YES | NO | | | | | YES | | YES | PA 89-103 10/1/89 |
| DELAWARE | | YES | ADADs PROHIBITED FOR SALES SOLICITATION | | | | | | | BILL 8-248 |
| DC | UC-NO | | | | | | | | | |
| FLORIDA | YES | NO | YES | NO | YES | YES | N/A | | YES | 365.165; 501.059 |
| GEORGIA | | | | | | | | | | HB 1284 4/88 |
| HAWAII | | | | | | | | | | N 2339 5/88 |
| IDAHO | YES | | | | YES | YES | YES | YES | | U-1500-158 7/9/85 |
| ILLINOIS | | | ADADs PROHIBITED FOR SALES SOLICITATION | | | | | | | 78-0087 2/15/78 |
| INDIANA | YES | | YES | NO | | | N/A | | | SB 183 7/1/88 |
| IOWA | YES | | | | | | | | | |
| KANSAS | YES | | | | | YES | YES | | | |
| KENTUCKY | | | | | | | | | | |
| LOUISIANA | | | | | | | | | | |
| MAINE | | | | | | | | | | |
| MARYLAND | YES | NO | YES | NO | YES | YES | N/A | NOT ADDRESSED | | §§14-2201, §55C '88 |
| MASSACHUSETTS | YES | NO | NO | YES | YES | YES | YES | NO | YES | GL c.159 §§ 198-190 |
| MICHIGAN | YES | YES | | | | | YES | YES | | MCL 484.125 |
| MINNESOTA | YES | NO | YES | NO | YES | YES | N/A | | | 325 E.25-31 8/1/87 |
| MISSISSIPPI | | | | | | | | YES | | HB 368 CH436 7/1/89 |
| MISSOURI | YES | NO | NO | YES | YES | YES | YES | | | |
| MONTANA | YES | NO | NO | YES | YES | YES | YES | NO | YES | 30-14-501 1973 |
| NEBRASKA | YES | | | | | | YES | NO | YES | HB 180 7/9/88 |
| NEVADA | NO | | | | | | | | | AB 142 7/89, 10/89 |
| NEW HAMPSHIRE | YES | NO | NO | YES | YES | YES | 30 SECS | NO | YES 3/ | HB 373-FN 1/1/90 |
| NEW JERSEY | UC-NO | | | | UC-YES | UC-YES | UC-YES | UC-YES | | A-1926 |
| NEW MEXICO | YES | | YES 2/ | NO | | | N/A | | | CH 309 6/16/89 |
| NEW YORK | YES | NO | NO | YES | YES | YES | | | | S-72248 10/88 |
| NORTH CAROLINA | | | | | | | | | | |
| NORTH DAKOTA | | | | | | | | | | |
| OHIO | YES | | UC-YES | | UC-YES | UC-YES | UC-YES | | | HB 305, 324, 457 |
| OKLAHOMA | | | | | | | | | | |
| OREGON | YES | YES | ADADs PROHIBITED FOR SALES SOLICITATION | | | | | | | SB 857 10/3/89 |
| PENNSYLVANIA | YES | NO | NO | YES | YES | YES | YES | NO | YES | §63.60 7/30/88 |
| RHODE ISLAND | | | | | | | 5 SECS | | | |
| SOUTH CAROLINA | YES | NO | NO | YES | YES | YES | YES | YES | | HB 3453 6/88 |
| SOUTH DAKOTA | YES | NO | NO | YES | YES | YES | YES | | | TARIFF |
| TENNESSEE | YES | NO | | | | YES | YES | NO | YES | $23.32 |
| TEXAS | YES | NO | NO | YES | YES | YES | 10 SECS | YES | NO | |
| UTAH | UC-NO | UC-YES | | UC-YES | | UC-YES | UC-YES | | | |
| VERMONT | | | | | | | | | | |
| VIRGINIA | YES | YES | ADADs PROHIBITED FOR SALES SOLICITATION | | | | | | | §18.2-425.1 4/7/86 |
| WASHINGTON | | | ADADs PROHIBITED FOR SALES SOLICITATION | | | | | | | RCW 80.36.390 1/90 |
| WEST VIRGINIA | | | | | | | | | | |
| WISCONSIN | YES | YES | | | | | | | | |
| WYOMING | | | ADADs PROHIBITED FOR SALES SOLICITATION | | | | | | | HB 0245 3/13/87 |
| CRTC | YES | NO | NO | YES | YES | YES | 10 SECS | YES | NO | DEC. 85-2 2/4/85 |
| ALBERTA | YES | NO | NO | YES | YES | YES | YES | YES | NO | |
| NOVA SCOTIA | YES | NO | NO | NO | NO | NO | YES | NO | | |
| QUEBEC | YES | | | | | | | | | |

** For clarification of column headers, please refer to the questionnaire reproduced above. Numbers coincide with numbered questions.

1/  For the purposes of this section, "solicitation" means initial contact with a telephone subscriber for the purposes of attempting to sell goods or services; it does not necessarily apply to contact between parties with an existing business relationship; nor does it necessarily apply to charitable or political fund-raising.

2/  Telemarketer must have subscriber's permission to play a recorded advertising message.

3/  Autodialer must avoid public safety (emergency) numbers.

NARUC Annual Report on Utility and Carrier Regulation 12/31/1989

FROM: MICHAEL GABBAY     TO: DATA PROCESSING - NATIONAL ASSN OF REGULATORY UTILI

MAR 30 '91 12:53                                                    P.1

# The PRICE-RITE Times

*We're Compatible*

Call 1-800-328-2539                          FAX 1-800-350-7742

PRINTER RIBBONS   •   LASER SUPPLIES   •   MAGNETIC MEDIA   •   FAX PAPER

# Price-Rite Makes It Easy to Say Yes!

## Computer Products at Big Savings

### Call Price-Rite

One of the many goals at Price-Rite is to help all of our customers save time and money. We do this by offering:

- Great prices
- 100% quality guaranteed
- All orders shipped within 24 hours
- Pre-approved credit
- Friendly knowledgeable service staff that is ready when you are.

Price-Rite will match or beat any price on products of similar quality. Call for price quotes and save!

## Old-Fashioned Business Is Alive And Well

Price-Rite puts the customer first. At our company, the customer is always right. All of our service reps work together as a team to bring you the best values to fit your specific computer needs. Call us and let us help you save time and money. Call 1-800-328-2539 for free price quotes.

## Step Into The '90s
## FAX Marketing—A Real Time Saver

The Price-Rite FAX line is toll free, 1-800-350-7742. Each month look for Monthly Buyer Incentives that offer cash savings for FAXing your order to us. Once we give you a price, we will freeze that price for one year and you can order any time you like, in any quantity, and get the same low price all year. See this month's $10 discount offer.

### $10⁰⁰ Introductory Offer
#### (Minimum $50 Order)

### ORDER FORM/PRICE QUOTE

Machine Type _____ Item _____ Quantity ____

Company Name _____ P.O. # _____

Your Name _____

Shipping Address _____

City _____ State ____ ZIP ____

If you would prefer to not receive Price-Rite information, please FAX back your company name and number.

## Dear Gabby,

The ribbons we've been using on our printer have been jamming up and not advancing properly. We are throwing out more than we are using. What do you recommend?
        Signed,
        All Jammed Up In Idaho

Dear All Jammed Up . . .
   Don't get all unwound. Most ribbons have an adjusting knob — one good turn and that should solve your problem. If not you can always call Price-Rite at 1-800-328-2539.

If you have any questions, you can write to Dear Gabby:
        c/o PRICE-RITE
        8595 Crescent Drive
        Los Angeles, CA 90046

Mr. MARKEY. Thank you, Mr. Beard. You're good for your word, only 2 minutes and 15 seconds worth of them. We appreciate your conciseness.

Our next witness is Mr. Mark Cooper, research director of the Consumer Federation of America. Welcome back, Mark.

## STATEMENT OF MARK N. COOPER

Mr. COOPER. Thank you, Mr. Chairman.

We believe there are two principles that should guide this Nation's policy with respect to the generation and use of information. The first principle can be simplified and expressed by making an analogy to environmental policy, one which I think you will appreciate.

In environmental policy we consciously choose not to pursue every economic opportunity when we feel there is damage to the environment. We will forego drilling in some places, we forego burning some fuels, we impose clean-up requirements, waste-reduction requirements, even though they're costly or difficult, because we judge the social and external cost to be too great.

I suggest that we should not pollute our psychic environment, either. We should not destroy our sense of personal privacy in pursuit of every potential economic advantage.

Now, this first principle, which is straightforward, leads to a practical implementation principle. Pass only that information which is absolutely essential to accomplishing the task, if it's an important task to society.

If a service or business does not absolutely need my personal information, it should not have it unless I explicitly and consciously want the information passed. The act of preventing the passage of information should not cost me time, money, or otherwise burden me.

For example, in order for an 800 number provider to do his business, he may need some billing information about the call. But the billing characteristics of a call are the time of day, day of week, area code and exchange, not the entire telephone number. Withholding the last four digits is the key to protecting my privacy, while allowing him to do his thing. If he wants my telephone number, the whole thing, let him ask me for it. I might or might not give it to him.

Similarly, we are repeatedly told that Caller ID will help clean up the network, and that is certainly a useful and important social function. But should we give up the control over our telephone numbers in order to achieve that? We think not. We do not accept unreasonable search and seizure to end crime. We have rights and we want to protect them.

The troublesome thing about Caller ID is that there shouldn't even be this dilemma. There is another technology out there that can do the job, as Mr. Rinaldo mentioned, and that is automatic call trace. Unfortunately, the telephone companies don't like automatic call trace because they can't make as much money on it. So what they have done is destroyed and undermined significantly the socially correct and economically efficient way to handle the prob-

lem. They don't advertise it, they misprice it in some places, and in some places they don't even offer it.

Now, that Caller ID/Call Trace example is very important to this committee, because it shows that this is not a matter of technological progress versus technological fear. Both alternatives are real progress. The issue is how to configure technology to best meet the public interest.

Whenever a "techie" says we can't do this, therefore progress demands that we should do it, decisionmakers must ask: what values does this so-called progress create and what values does it destroy? Personal privacy is not only of the values that we should give up to have the information age.

Now, Automatic Number Identification and Caller ID present problems that are complex, sufficiently complex to require careful analysis. Junk fax and autodialers are pure pollution. They are the information age equivalent of slash and burn agriculture. They create very little economic value and a great deal of environmental pollution.

ANI, Caller ID, autodialers, junk faxes, are just the tip of the iceberg. There are an infinite array of potential privacy-depriving services that are coming down the pike. I've been in ten Caller ID cases and I've seen constant references to larger files, all manner of databases, once they have my phone number. I believe it is critical that we clearly establish our commitment to protecting privacy right here on these simple issues before we get to the more complex ones.

We applaud you for introducing this legislation. I especially applaud Mr. Rinaldo for looking past the rhetoric in his own State and taking a hard look at the balance of social costs and benefits around these services. The protection of consumer privacy must be the cornerstone on which the information age is built. Saving a second or a minute on a transaction would be very small gain if it costs us control of our telephone numbers and other vital pieces of personal information.

Thank you, Mr. Chairman.

[The prepared statement of Mr. Cooper follows:]

STATEMENT OF MARK N. COOPER, DIRECTOR OF RESEARCH, CONSUMER FEDERATION OF AMERICA

Mr. Chairman and members of the committee, my name is Dr. Mark N. Cooper. I am Director of Research of the Consumer Federation of America (CFA). Founded in 1968, CFA is the Nation's largest consumer advocacy group, composed of over 250 State and local affiliates representing consumer, senior citizen, low-income, labor, farm, public power and cooperative organizations, with over 50 million members.

We appreciate the opportunity to testify on telephone consumer privacy and advertising rights (H.R. 1304 and 1305). We believe these are major consumer issues that deeply affect the public's right to privacy.

CFA and its member groups have been actively trying to secure protection of consumers' rights in a number of States. I personally have appeared as an expert witness on the Caller ID issue on behalf of the People's Counsels in 10 jurisdictions in the past 2 years.

CFA's policy on these matters makes it clear that we agree with the general thrust of the legislation before the committee.

Although CFA endorses the use of technologies to develop new services, we believe that these services should not impinge on consumer privacy or other fundamental rights, except for 911 or other emergency services. For example, companies

should not be permitted to offer Caller ID either within a State or between States without providing consumers a free per line blocking option.

CFA is concerned about the increasing frequency of telephone sales and potential for abuse inherent in this practice. CFA opposes the use of automatic or computer dialers in telemarketing without the consumer's permission or ability to disconnect the call, especially where interstate calling is used to subvert State prohibitions against this practice.

There are two basic principles that should guide this Nation's policy on the generation and use of information. The first principle can be simplified and expressed by making an analogy to environmental policy.

In environmental policy we consciously choose not to pursue every economic opportunity available when we feel that the damage to the environment is too great. We forego drilling in some areas and burning some fuels. We impose waste disposal and clean up requirements, even though they may be costly or difficult, because we judge that the social or external costs are too great.

I suggest that we should not pollute our psychic environment either. We should not destroy our sense of personal privacy in pursuit of every potential economic opportunity. Just as the inherent value of our physical environment must not be sold for a pound of gold, the personal sense of privacy that our democratic society holds so dear should not be bartered away for mere economic reward.

The strength of this first general principle leads to the second, practical principle of information flow in the information age. Pass only that information which is absolutely essential to accomplishing a task that is considered indispensable to the functioning of society.

If a service or business does not absolutely need my personal information, it should not have it, unless I explicitly and consciously want the information transferred. The act of preventing information transfer should not cost me money or time or otherwise impose a burden on me. Needless to say, I believe that my telephone number is a vital piece of personal information over which I do not wish to lose control.

Let me illustrate these principles with examples of the type of information that H.R. 1304 and H.R. 1305 seek to protect.

In order for a provider of an 800 number service to know how much it owes the telephone company, it may need some information about the billing characteristics of the call. The billing characteristics of a call are the time of day, day of the week, area code and exchange, but not the entire telephone number. For a long distance call, the first six digits are sufficient for billing purposes.

Withholding the last four digits is the key to protecting my privacy, while allowing the 800 number provider to do his thing. If providers also want my telephone number, let them ask me for it.

Telephone companies can employ a similar principle for 900 numbers, since they tend to be the billing agents. The last four digits do not have to be revealed for purposes of billing. (Indeed, it may well be that no digits have to be revealed.)

The policy result is clear. Rather than passing my number to the companies and then telling them to be good, sound policy dictates that we make available to them only the information that they need for the specific task at hand.

The two above cases deal with Automatic Number Identification (ANI) at the long distance level. A similar and even more intriguing analysis occurs with its counterpart at the local level: System Signaling Seven and the services to which it gives rise—Caller ID in particular.

We are repeatedly told that Caller ID will help to clean up the network, to catch the telephone harassers or obscene phone callers. That social function is important, but must we deny everyone the ability to control their telephone number in order to do so? To stop crime should we suspend the right of *habeas corpus* or repeal constitutional safeguards against unlawful search and seizure?

We think not. The appeals court in Pennsylvania reached this conclusion most forcefully.

The ALJ found that the private Bell customer would have less control over the distribution of his or her telephone number and that many private customers testified that Caller ID violated their privacy expectation in maintaining private telephone numbers. The ALJ also found that Caller ID potentially increases telemarketing and other sales calls; threatens an individual's ability to receive or make contact with groups and other organizations; presents a threat to battered women and those attempting to assist battered women; jeopardizes various other social, therapeutic and community groups in their contacts with clients; and threatens law enforcement officials and their informants and tipsters. Considering these findings, which

are supported by credible evidence of record, Caller ID poses a substantial invasion of the personal privacy of the citizens of this Commonwealth . . .

Hence consumers of telephone service should not suffer an invasion, erosion of deprivation of their privacy rights to protect the unascertainable number of individuals or groups who receive nuisance, obscene or annoying telephone calls which can already be traced or otherwise dealt with by existing services provided by Bell . . . this court will unhesitatingly uphold the judicial tradition of "jealous regard for individual privacy." [1]

This court and others were looking at the Caller ID issue narrowly as a matter of privacy law—constitutional privacy rights and trap and trace law. I believe that the matter could just as well be decided broadly at the level of public policy in the information age. One could well find that Caller ID is legal, as a matter of constitutional law, and still find that it is bad public policy (as a judge in South Carolina did, and as this legislation does).

Last year in the Senate I heard a telephone company representative assert that a person's telephone number is like the license plate on his or her car. Individuals should be forced to put them on public display, linked directly to them during the personal communications process—a telephone call. Putting your telephone number in the phone book does almost nothing to link you personally to the number—it is just one in a book of thousands of other numbers. giving your phone number out when you place a call is a very different matter.

In the course of a telephone call you may ask a question about a used car, want a price quote from a department store or seek advice from a rape crisis center. Revealing your telephone number in conjunction with these activities may link the number to very sensitive personal information. In my attached testimony you will find 20 situations in which this linkage creates a problem, along with quotes from real people who have suffered this problem and survey respondents who fear the occurrence of such problems.

My constituents, and survey after survey, tell me that the American people do not view their telephone numbers as license plates. They do not want to give up control over their numbers to the telephone company or anyone else. Many telephone companies insist that people give up control over their numbers because the companies will make much more money that way. Not only will a few consumers buy Caller ID, but all consumers will be forced to buy back their privacy by using credit cards, operators, phone booths, or other measures that the telephone companies will gladly sell.

The especially troubling thing about the Caller ID case is that this dilemma should not even exist. There is an alternative technology available which can give us considerable help in cleaning up the telephone network without destroying our personal private environments. The technology is called automatic call trace.

Automatic call trace allows the called party to automatically trace any incoming call and have that number stored in the telephone companies' central office switch. If it is a problem call, the call recipient can have the telephone company or the police take action, without being told the number. This technology catches the bad guys, without compromising the telephone number of all the good guys.

Whatever good Caller ID can do, call trace does better. I must caution, however, that the claims made by telephone companies for both of these services have been vastly overstated, as I show in my attached testimony.

Automatic call trace also fits in with the license plate analogy. If I do something wrong in my car and you see my license plate, you have to report it to the police and they will take care of it. That is exactly the way it should be, and exactly the capability that Automatic Call Trace gives us. Clearly, then, personal information should not be broadly available to the public.

Unfortunately, the telephone companies do not like automatic call trace because they cannot make much money from it. The average subscriber does not get an awful lot of calls which he or she would find objectionable enough to trace. Even though call trace is the socially correct and economically efficient way to handle the problem, the telephone companies have set out to undermine it. They overprice it; set policies that reduce its effectiveness; and never advertise it. In some places they won't even offer it.

The Call Trace/Caller ID example makes it clear that the issue of privacy is not one of technological progress versus technophobia. Both alternatives represent real technological progress; the question is how to configure technology to best serve the

---

[1] David M. Barasch, Consumer Advocate, et al. v. *Pennsylvania Public Utility Commission*, In the Commonwealth Court of Pennsylvania, Nos. 2270, 2268, 2324, 2371, 1989, May 30, 1990, pp. 16–18, emphasis added).

public interest. Technological determinism must be resisted in the information age in order to protect privacy and our personal psychic environment, just as we have learned to resist the urge to steam roll every inch of our physical environment in pursuit of riches.

Whenever a techie says we can do this, therefore progress demands that we should do it, decisionmakers must determine what values this so-called progress creates and what values it destroys. Personal privacy is not one of the values we should give up to achieve the information age.

ANI and Caller ID require careful analysis. We believe that the Federal Government should legislate the basic minimum standard and allow the States to go farther, if they choose to.

For example, H.R. 1305 to per call blocking, but that is not enough. There are some people who absolutely must have per line blocking. These people cannot afford to make a mistake, to forget to block a number, yet they cannot be sure without per line blocking that no mistakes will be made.

For example, battered wives are frequently separated from their husbands with custody of the children. They hide their location, to prevent the recurrence of abuse, but the court will order that the children have contact, by telephone, with the father. Passing the number inadvertently to the father can be a deadly mistake made by a small child. In Maryland, abusers themselves came to the public hearings to attest to what a useful technology Caller ID would be in hunting down their spouses.

Similarly, we urge you to stipulate in your legislation not that service providers who obtain our numbers be good, but that those seeking to know the number bear the burden of proving that it is absolutely indispensable to the provision of a socially vital function. If they just want to make money, they should be forced to ask us for our number.

ANI and Caller ID present problems that are complex enough to require some analysis. Autodialers and junk fax are pure pollution. They are the information age equivalent of slash and burn agriculture producing little of economic value at immense environmental cost.

In reaching these decisions we urge policymakers to presume in favor of protecting privacy and place the burden on those who would undermine it. The testimony I have attached, which is from Illinois, makes a general point about the evidence on Caller ID that is extremely important. Caller ID is being used to support the proposition that sensitive personal information—like a telephone number—can be passed around at will without harming the public. That is not true and we must not misread the Caller ID evidence when we consider general information age privacy matters.

In my testimony there is the outline of a thorough refutation of the propaganda published by New Jersey Bell purporting to prove that forced, unblockable Caller ID is a great success. That propaganda has been subject to full discovery and cross examination in four formal proceedings—Pennsylvania, the District of Columbia, Maryland and Delaware. In every case the Public Utility Commission and/or the courts rejected the argument that forced Caller ID is in the public interest.

I would be glad to present a detailed refutation to the committee, but the vast majority of the data has been declared private—proprietary—by the company and hidden from full public view and scrutiny. Unless the defenders of Caller ID are willing to put their data before you and the public subject to complete and thorough review and cross examination, you should reject their claims as unsubstantiated, self-interested hearsay. I am confident that if you could see the actual basis of their claims, you would reject them as all these other public bodies have when given the chance.

ANI, Caller ID, autodialers, and junk faxes are only the tip of the iceberg. There are infinitely more complex sets of information that could be linked together and passed around in the blink of an eye. It is critical that we clearly establish our commitment to protecting consumer privacy rights.

We applaud you for introducing this legislation and urge you to make it stronger. The protection of consumer privacy must be the cornerstone on which the information age is built. Saving a second or even a minute on a transaction would be a very small benefit, if it costs us control over our telephone numbers and other personal information.

Mr. MARKEY. Thank you, Mr. Cooper.

Our next witness is Mr. Marc Rotenberg, Director of the Computer Professionals for Social Responsibility. Welcome, sir.

## STATEMENT OF MARC ROTENBERG

Mr. ROTENBERG. Thank you, Mr. Chairman. I would also like to thank you, Mr. Rinaldo, and Mr. Synar, for your work and support of consumer privacy.

My name is Marc Rotenberg. I am the director of a membership organization called CPSR. We are a group of computer professionals across the country who are particularly concerned, as Mark Cooper said a moment ago, that there be a fair weighing of the costs and benefits of new technologies.

We have looked in particular at the Caller ID service because of the significant privacy issues that are raised. We believe that Caller ID is directly at odds with established legal and ethical standards of privacy protection. Caller ID would transfer the right to control the disclosure of personal information from the individual, the telephone subscriber, to the institution, the telephone company. Then only those phone subscribers who subscribe to the service would receive its benefits. Phone subscribers who did not pay the fee would not receive the incoming line number. However, all phone subscribers would effectively be required to turn over control of their telephone number to the phone company. Taken as a whole, there would be a net privacy loss.

From a consumer viewpoint, Caller ID is also a poorly conceived service. Caller ID provides residential call subscribers with only the number of the calling line. This is obviously less useful information than the identity of the caller or the reason for the call. However, telephone numbers are useful to large organizations that can link the incoming number to reverse directories and third-party information services, providing an elaborate dossier of the calling party.

Moreover, the safety features of Caller ID have been greatly overstated. It is easy to defeat the call-locating capability of Caller ID and to place a call from a pay phone, through an operator, from a stranger's phone, or even through a private service. Nor is it clear that Caller ID provides any benefit that is not currently provided by the less expensive and less intrusive telephone answering machine.

There is no reason that the privacy interests of the call originator and the call recipient cannot both be accommodated. Call originators should have the right to decide when to give out their telephone numbers. Call recipients should have the right to decide whether to accept calls from people who do not disclose their phone numbers.

The Telephone Consumer Privacy Rights Act and similar legislation before both the House and the Senate are a step in the right direction, but they do not go far enough. Consumers want strong privacy protection safeguards. They will not be satisfied with stopgap measures that require them to take additional steps to protect privacy. In fact, the recent poll by Lou Harris Associates found that more consumers believed that Caller ID should be prohibited all together than offered without call blocking.

No telephone number should be disclosed without the knowledge and consent of the phone user, except in emergency circumstances. If a person does nothing, subscribes to no new service, selects no new feature, his or her current expectation of privacy should

remain unchanged. That is the threshold test for evaluating the impact of this new service on privacy.

Therefore, CPSR recommends the following changes in the Telephone Privacy Act. First, callers should be entitled to free per-line blocking. Such blocking should remain the default setting until a consumer decides to change it. Second, notification provisions should not be read as a stop-gap measure for real privacy protection. Informing a car driver that the brakes in his or her care are less secure should result in the recall of the car, not requiring the driver to make less frequent use of the brakes. Third, the waiver provision in the bill that permits the offering of a service that would otherwise be prohibited by law should be removed. Congress should not rely on the representation of a regulated industry to decide whether the application of a law is feasible. This determination must be made by an independent agency.

I should say that CPSR takes no position on the Telephone Advertising and Consumer Rights Act. We recognize there is widespread opposition to junk faxes and autodialers and, in some cases, even public safety concerns. However, we believe that a flat prohibition on unsolicited advertising may have a chilling effect on free speech, particularly in computer network environments, where the ability to manage unsolicited messages may be much greater than most users of telephones and fax machines are aware.

Thank you, Mr. Chairman.

[The prepared statement of Mr. Rotenberg follows:]

STATEMENT OF MARC ROTENBERG, DIRECTOR, COMPUTER PROFESSIONALS FOR SOCIAL RESPONSIBILITY

Caller ID is directly at odds with well established legal and ethical standards of privacy protection. Caller ID would transfer the right to control the disclosure of personal information from the individual—the telephone subscriber—to the institution—the telephone company. Then only those phone subscribers who paid a monthly fee to the phone company would receive the benefit. Phone subscribers who did not pay the fee would not receive the number. However, all phone subscribers would be effectively required to turn over the control of their numbers, regardless of whether they subscribed to the service. Taken as a whole, there would be a net privacy loss.

Telephone subscribers are entitled to decide when, to whom, and under what circumstances they should disclose their phone numbers. Some callers may be expected to provide their numbers at the time a call is made. In other cases, such as when a subscriber calls a general information number or a hot-line, callers are not expected to disclose their numbers. In either case phone subscribers, as both call originators and call recipients, determine when to disclose phone numbers and when to ask for phone numbers based on the reason for the call and many other factors. Absent appropriate safeguards, Caller ID would destroy a caller's ability to make such choices.

From a consumer viewpoint, Caller ID is also a poorly conceived service. Caller ID provides residential call subscribers with only the number of the calling line. This is obviously less useful information than the identity of the caller or the reason for the call. However, telephone numbers are useful to large organizations that can link the incoming number to reverse directories and third-party information services, creating elaborate dossiers of the telephone caller. Moreover, the safety features of Caller ID are greatly overstated. It is easy to defeat the call locating capability of Caller ID and to place a call from a pay phone, through an operator, from a stranger's phone, or even through a private service. Nor is it clear that Caller ID provides a benefit that is not already provided by the less expensive and less intrusive answering machine.

There is no reason that the privacy interests of both the call originator and the call recipient cannot be accommodated. Call originators should have the right to decide whether to disclose their phone numbers. Call recipients should have the

right to decide whether to accept calls from callers who do not disclose their phone numbers.

The Telephone Consumer Privacy Rights Act, and similar measures in both the House and the Senate, are a step in the right direction, but they do not go far enough. Consumers want strong privacy safeguards that will ensure real privacy protection. They will not be satisfied with stop-gap measures that require them to take additional steps to protect privacy. In fact, the recent poll by Lou Harris found that more consumers believed that Caller ID should be prohibited all together than offered without blocking.

No telephone number should be disclosed without the knowledge and the consent of the phone user, except in emergency circumstances. If a person does nothing, subscribes to no new service, selects no new feature, his or her current expectation of privacy should remain unchanged. That is the threshold test for evaluating the impact on privacy of the Caller ID service.

Therefore, CPSR recommends the following changes in The Telephone Privacy Act. First, callers should be entitled to free, per-line blocking. Such blocking should remain the default setting until a customer chooses to change it. Second, notification provisions should not be used as a stop-gap measure for real privacy protection. Informing a car driver that the brakes in his or her car are less secure should result in the recall of the car—not requiring the driver to make less frequent use of the brakes. Third, the waiver provision in the bill that permits the offering of a service which would otherwise be prohibited by law should be removed. Congress should not rely on the representation of a regulated industry to decide whether the application of a law is feasible. This determination must be made by an independent agency.

CPSR takes no position on the Telephone Advertising Consumer Rights Act at this time. We recognize that there is widespread opposition to junk faxes and autodialers and, in some instances, even public safety concerns. However, we believe that a flat prohibition on automated solicitation may have a chilling effect on free speech, particularly in computer network environments where the ability to manage unsolicited messages may be much greater than most users of telephones or fax machines are aware.

In addition to the bills currently before the committee, other safeguards will be necessary to protect telecommunications privacy. In particular, both privacy protection and network utility will require that there be a clear prohibition on the disclosure of Customer Proprietary Network Information. Such disclosures should be permissible only in those instances where affirmative consent has been obtained from the customer.

Finally, we would ask that the members of the committee express their support for Congressman Wise's bill to establish a Data Protection agency. The creation of such an oversight authority is long overdue and would help to support the work of this committee and those other members who seek to improve privacy protection.

Mr. MARKEY. Thank you.

Our next witness is Miss Janlori Goldman, Director of the Privacy and Technology Project of the American Civil Liberties Union. Welcome.

## STATEMENT OF JANLORI GOLDMAN

Ms. GOLDMAN. Thank you very much. Thank you for giving us the chance to testify here today on these two bills.

The ACLU supports the bills here today, one that would restrict the use of Caller ID and ANI, and one that would create a limit, or at least a database allowing people to opt out of certain commercial telephone calls.

What we would like to talk about for just a moment is the privacy interest here. In any situation in which we're looking at the impact of new technology on individuals, we have to balance the first amendment rights and the privacy rights against societal interests. With Caller ID, what we have found is that there is a privacy interest of the person receiving the call, and in this situation, allowing blocking, what you're doing is you're saying to people "yes, you have an interest in receiving the number in your home; if

someone doesn't want to give it to you, they should be able to block."

We have even found that blocking gives more information to the person on the receiving end, not less. It can be a signal to some-body that the person calling does not want to let you know who it is and you can then decide to not even answer the phone.

I think one of the arguments that's been made, about how block-ing will encourage harassing calls and abusive calls, really is very, very misleading. As I said, it can allow people who have been re-ceiving those harassing and abusive calls to not even answer the phone. You know, the telephone company used to tell people to just hang up. Somehow that has changed.

The privacy interest here is very clear, which is that people need to be able to maintain some control over the personal information that they give to others in the course of doing business with them and in the course of using the telephone. Without that control, people have really lost the very important central privacy right that they have.

In the second bill, H.R. 1305, the ACLU is very concerned about the first amendment issues here. As you know, we have a very strong first amendment position. What we would suggest in the bill is that you create a very clear provision that would limit it only to commercial entities and exclude not-for-profit speech. We recognize there is a first amendment issue here, and what we would like to do is to balance the first amendment issue against the privacy in-terests of people receiving intrusive calls into their home. To allow them to put their name into a database, maintained at the Federal level, to opt out, that is a minimal burden on speech and it again puts the burden on the individual to make the contact, to put their name into the database.

We want to also ensure that if a commercial entity is making a call not to sell you something, not to have you rent something, but wants to make a call to you that is not commercial, even if it is a commercial entity, that that speech should be protected. So we want to make sure that is changed in the bill before we can whole-heartedly support it.

In addition, we are also concerned about the creation of a data-base at the Federal level. While we recognize this is actually a very good solution and a good way to handle the problem, as we have seen in the private sector, they have tried voluntary databases in terms of opt out. The Direct Marketing Association has such a system and it doesn't work. It is not enforceable. It's a voluntary system.

We are concerned about how the database would be used, and we would want to ensure that there are sufficient privacy and security safeguards on that database not only to protect against unauthor-ized use, but also to make sure there isn't any misuse of the infor-mation.

One of the suggestions that we would have is that before a mar-keter could make a call, before there could be a commercial phone call, they would need to again check the database and delete the phone numbers, and possibly even allow the FCC or whatever orga-nization is going to be managing the database to do the actual dele-tion.

In addition, we would suggest that instead of having the marketer purchase the database, which may not even be necessary, given how often these calls are made, but allow them to pay for the cost of allowing for the deletion to happen at the Federal level. Again, normally we're very concerned about the creation of additional databases, so we would hope that we would continue to have some input into this suggestion.

Again, any attempt to limit what information people have a right to send to others does raise very serious First Amendment questions, but we believe here that the privacy interest does outweigh the commercial interest in this area.

In addition, we do support the additional limits on fax machines, in terms of sending unsolicited advertising. We think that because of the burden that is placed on the individual who has to pay for the cost of the communication, that that then justifies the broader ban.

Thank you very much. I will be happy to answer any other questions.

[The prepared statement of Ms. Goldman follows:]

STATEMENT OF JANLORI GOLDMAN, LEGISLATIVE COUNSEL, AMERICAN CIVIL LIBERTIES UNION

Mr. Chairman and members of the subcommittee: I greatly appreciate the opportunity to testify before you today on behalf of the American Civil Liberties Union (ACLU) in support of H.R. 1304, the Telephone Advertising Consumer Rights Act, and H.R. 1305, the Telephone Privacy Consumer Rights Act. The ACLU is a private, non-profit organization of over 275,000 members dedicated to the protection of civil rights and civil liberties. Our Project on Privacy and Technology, which I direct, was established in 1984 in our Washington Office to examine the ways new technologies impact on individual privacy.

The ACLU supports the objectives of both bills before this subcommittee today. If amended as we suggest, H.R. 1304 and H.R. 1305 will strike a fair balance between the competing interests of makers and receivers of phone calls and faxes—providing both parties to a communication the ability to receive and control information, and giving people the opportunity to control the use of personal information in certain transactions. We support H.R. 1305, and if amended as we propose, we will support H.R. 1304.

The proposed legislation rests on the twin propositions which we support—there is a First Amendment right to disseminate and receive information including commercial speech and that people have the right to maintain some degree of control over personal information they disclose in the course of doing business with others. H.R. 1305 extends privacy protection to telephone users by allowing callers to "block" the display of their number on the receiving and wherever Caller ID and Automatic Number Identification (ANI) is available. In addition, H.R. 1305 would prohibit Caller ID and ANI subscribers from using the caller's number for secondary marketing purposes if the caller objects. H.R. 1304 reflects these values by allowing people to "opt-out" of unsolicited telephone calls and faxes by commercial entities.

New communication technologies are changing the ways we deal with each other. Few social and commercial relationships remain unaffected by the introduction of new technologies such as cellular and cordless phones, fax machines, automatic dialing devices, electronic mail, bulletin boards, and pagers. Traditional barriers of distance, time, and location are disappearing as our society comes to take these advanced forms of communication for granted.

As new technologies become available, a tension is often created between existing societal values and expectations, and the commercial opportunities posed by these advances. New technologies pose new risks to traditional civil liberties, as they also create new opportunities. As we recognize that technological developments can protect privacy, we also recognize that these advances can facilitate peoples' first amendment right to know, the free flow of information and, in other ways, enhance civil liberties.

One of the new telephone technologies that may enhance privacy and give individuals greater control over their lives, but also threatens to undermine these very same rights, is Caller ID, or Automatic Number Identification (ANI),[1] a small device that can be attached to a telephone that allows people on the receiving end of a call to see the number of an incoming call as the phone is ringing.

The introduction of Caller ID has sparked an emotional and divisive debate that affects everyone who uses the telephone. Federal legislation is needed to resolve ambiguities in the scope of Federal law and to establish uniform, national privacy policy in this area. In the absence of Federal legislation, phone companies around the country will continue to market Caller ID in a variety of conflicting ways·that will only create inconsistency and chaos in the development of public policy in the area of privacy and telecommunications. In addition, State courts, legislatures and public utilities commissions will persist in crafting differing laws and regulations relating to Caller ID.[2]

H.R. 1305 requires the FCC to prescribe regulations prohibiting the offering of Caller ID and ANI unless telephone subscribers are given the ability to block the display of their numbers on the receiving end. In addition the bill prohibits the secondary use of the caller's number and other telephone transaction generated information for commercial purposes without the caller's consent.[3] If passed, the ACLU believes that H.R. 1305 will strike a fair balance between the competing privacy interests of makers and receivers of phone calls, providing both parties to a phone call the ability to receive and control information.

Traditionally, without Caller ID, people have no way of learning a caller's phone number unless it is voluntarily given. As callers, people assume that the phone number from which they are calling will remain confidential unless they choose to reveal it. Unrestricted Caller ID reverses this status quo. Blocking provides callers with a mechanism to maintain confidentiality.

In addition to the policy issues raised by Caller ID, a serious question exists as to whether Caller ID, as a trap and trace device, is legal under current Federal law. As drafted, the Electronic Communications Privacy Act (ECPA) provides that "no person may install or use a pen register or trap and trace device[4] without first obtaining a court order" that certifies "that information likely to be obtained is relevant to an ongoing criminal investigation being conducted" by a particular law enforcement agency.[5] The law contemplates the use of trap and trace devices by only two parties—law enforcement, which must first obtain a court order, and telephone service providers, which must meet one of three exceptions. All other uses are prohibited. Thus, it appears that the use of a trap and trace device by a telephone subscriber is prohibited.[6]

The controversy generated over Caller ID is unusual in that the competing privacy interests are most often held by the same people—those who make and receive phone calls. In fact, when they see themselves as receivers of phone calls, most people are eager for Caller ID. But, as makers of phone calls, most people want the

---

[1] Caller ID is the term used to describe the use of the technology by local subscribers. Automatic Number Identification (ANI) is the service provided to commercial subscribers of 800 and 900 services.

[2] As of the date of this hearing, Southwestern Bell, U.S. West, NYNEX and Centel plan to offer Caller ID with blocking. Pacific Telesis also plans to offer Caller ID with blocking, as required by a State law passed last year. Bell Atlantic plans to continue offering Caller ID without blocking. Bell South and Ameritech also plan to offer Caller ID without blocking. In the current environment, what will happen when a California caller blocks his or her number to a recipient in New Jersey, where blocking is not available? Will the block be honored? Further, what are the implications when, as in Pennsylvania, Caller ID is outlawed under certain State laws.

[3] Legislation has been introduced in both the House and the Senate this Congress that would amend the Federal Electronic Communications Privacy Act to amend the Federal law to authorize Caller ID only where callers are provided the capability to block the display of their numbers on the receiving end. the sponsors of those bills are Representatives Synar (D-OK) and Edwards (D-CA), and Senator Herb Kohl (D-WI). Hearings were held on earlier versions of the legislation last Congress. The ACLU testified in support of both bills, arguing that Caller ID, if offered unrestricted, raises significant constitutional privacy issues and may be illegal under the current Federal Electronic Communications Privacy Act (ECPA).

[4] A trap device is defined as a "device which captures the originating electronic or other impulses which identify the originating number of an instrument or device from which a wire or electronic communication was transmitted." 18 U.S.C. 3127(4).

[5] 18 U.S.C. 3121(a), 3122(b).

[6] The Congressional Research Service (CRS) arrived at the same conclusion. In an opinion issued last fall, CRS interpreted the exceptions to the general prohibition to apply only to the use of trap and trace devices by providers of communication services, and not users of the services.

power to block the display of their numbers. The most recent Harris survey—Consumers in the Information Age—documented the public's views on Caller ID. Nearly half of the American people (48 percent) believe Caller ID should be permitted only if blocking is available, and over a quarter (27 percent) feel Caller ID should be prohibited by law. Significantly, only 23 percent of those polled say Caller ID should be available without any limitations.

The common thread running through the Caller ID debate is that each party, at different times and for different reasons, has an interest in receiving phone numbers and in limiting dissemination of their numbers. (Admittedly, Caller ID has a limited utility for consumers, since people will not instantly recognize most phone numbers. Most people want to know who is calling.)

What is actually at stake here?

*Interest in receiving numbers:*

1. Consumers can see the number from which a call is being placed to decide whether or not to answer the phone. The familiarity or unfamiliarity of a number will provide them with more information to make decisions about calls coming into their home.

2. Businesses want to use the technology to gather information about people who call them. Some businesses claim that the devices make it more efficient to automatically bring up files, and allows for the creation and linkage of databases for marketing purposes.

3. Law enforcement officials and emergency service providers want the technology to locate people in danger or people using the phone to make obscene or harassing calls, or to identify other illegal use.

*Interest in Limiting Disclosure:*

1. The automatic display of one's phone number can create life threatening situations, including: calls to or from battered women's shelters; calls made by a woman to a batterer; and calls by social workers, doctors, and others who protect their safety by keeping their phone numbers unlisted. In addition, law enforcement officials in a number of States, including Illinois, Pennsylvania and Florida, are concerned that Caller ID will hamper undercover operations, and may discourage informants from calling police departments.

2. Automatic number identification will be used by businesses, including phone companies, to create and enhance databases of consumer information to be used for marketing purposes.

An individual's dual interest in receiving information and in limiting disclosure are important here. The technology exists to take into account and balance both of these interests by providing blocking as part of the Caller ID service. In fact, blocking actually provides people with more information—that the person calling does not want to reveal his or her number, identity or location. A call from someone who has blocked may discourage the person on the receiving end from picking up the phone.

Some phone companies claim they want to offer Caller ID without blocking primarily to give women who receive obscene or harassing phone calls the ability to get the number of the person calling them. Clearly, obscene and harassing phone calls are a very serious problem. However, there is another service currently available in many areas, known as Call Trace, that is rarely advertised and much more effective than Caller ID for combatting harassing phone callers. With Call Trace, a person who receives such a call can instantly send a signal to the phone company and the police that records the phone number of the caller and alerts law enforcement officials that the call was just received. Most importantly, Call Trace is still effective even if the caller blocks.

It is untenable for a phone company to suggest that Caller ID without blocking will protect women from harassing phone calls, particularly in light of the advice phone company representatives have given for years to women who receive these phone calls—"just hang up and report the call." Caller ID may deter some harassing callers, thereby decreasing the number of complaints received by phone companies each year. And, those who persist in making harassing calls may block the display of their number. But, if people are reluctant to answer blocked calls, the harassing call never happens. In the event that an harassing caller does not block, what do phone company representatives suggest women do with the caller's number? Call back? Threaten the caller? Such a vigilante approach is dangerous.[7] It

---

[7] Recent industry advertisements and statements refer to Caller ID as a weapon, and suggest that women use it to fight back against obscene callers.

is irresponsible for a phone company to use Caller ID technology to wash its hands of this serious problem.[8] In a number of Caller ID trials around the country, we are beginning to see how per-call blocking actually affects the use of Caller ID. The New York Public Utility Commission mandated that the phone company in Rochester offer both per-call and per-line (permanent) blocking in its preliminary trial of Caller ID.[9] Early results from that trial confirm what many have been saying all along. A very small percentage of phone numbers are actually blocked.[10] In addition, U.S. West is also offering Caller ID with blocking in its trials of the service.

A number of reasons exist as to why few calls are blocked. One, people are reluctant to answer blocked calls. Second, blocking requires an affirmative act on the part of the caller. A caller must want to keep his or her number confidential, at least before the phone is answered, and must take steps (punching in a code) to block the display of the number. It is important to recognize that there is a burden associated with requiring people to "do something" to protect their privacy. Most likely, there will be many instances when people who want to safeguard the confidentiality of their phone numbers will forget to block.

The ACLU supports the approach in H.R. 1305 that requires the consent of the caller before the recipient can reuse or sell the number or other transaction-related information. The use of Caller ID and ANI by businesses to collect phone numbers for commercial purposes poses significant privacy concerns, in particular, that people are increasingly losing control over personal information in exchange for receiving goods and services, often without the individual's knowledge and consent. These activities violate the central principle of privacy law—information collected for one purpose should not be used for another purpose without an individual's consent. In other words, a person should not have to give up his or her phone number as a condition for using the telephone.

American Express learned that it is bad business to let consumers know it uses ANI technology. As the phone was ringing, the company would match the incoming phone number to the appropriate customer file, and answer the phone by greeting the customer by name. American Express stopped greeting customers by name after people objected to the practice, but they continue to use the technology to call up customer files.

The commercial use of Caller ID is especially troubling since most businesses can not claim to have a privacy interest in receiving phone numbers before calls are answered. In fact, many businesses welcome calls from consumers, and aren't likely to be reluctant to answer a blocked call. On the other hand, a person's phone number has become a very valuable piece of information.

A phone number is much like a social security number in that it is perceived as a unique identifier. A person's phone number may easily be used as a key to "unlock" databases containing personal information, allowing for a variety of information to be compiled, exchanged, manipulated, and sold for commercial purposes. The commercial use of Caller ID allows businesses to capture phone numbers and match them with names, addresses, buying habits, credit history and other information to build valuable consumer profile databases for marketing.

The phone number itself reveals personal information.[11] For instance, it may be significant that a person placed a call from a particular number. Or, the number may be otherwise unavailable because it is unlisted. Many businesses are becoming more anxious to receive unlisted numbers since between 30–55 percent of telephone subscribers, depending on the area, currently pay to keep their numbers unlisted.[12]

The phone number as a hot, new commodity has been well documented by the media. As the Christian Science Monitor reported last year: "Bell Atlantic, Bell South and Ameritech plan to efficiently link this transmission system [Caller ID] with every car dealer, insurance salesman and telemarketer. The Bell companies

---

[8] Again, Call Trace reports the number to police and cannot be blocked.
[9] New York Public Service Commissioner Eli Noam stated that the marketing of unrestricted Caller ID represents a "technocratic disregard for privacy."
[10] "New Caller ID Data Emerges in Trial," Telephony, May 7, 1990.
[11] As Justice Stewart stated in his dissent in *Smith* v. *Maryland:* "The numbers dialed from a private telephone—although certainly more prosaic than the conversation itself, are not without 'content.' Most private telephone subscribers . . . [would not] be happy to have broadcast to the world a list of the local or long distance numbers they have called. This is not because such a list might be incriminating, but because it easily could reveal the identifies of the persons and the places called, and thus reveal the most intimate details of a person's life."
[12] Two years ago, the Washington utilities and Transportation Commission recognized an enforceable privacy interest in unlisted phone numbers. The Commission ordered Pacific Northwest Bell not to disclose unlisted numbers to anyone, for any purpose, except in cases of a life-threatening emergency or pursuant to a court order.

will be selling a database of your home phone number, telephone records, and buying patterns for a massive, automated telephone assault." [13]

A Wall Street Journal article entitled "Making a Phone Call Might Mean Telling the World About You: Number Identification Service is a Dream for Marketers But a Threat to Privacy," posed the question: "Does a public utility—the phone company—have the right to release phone numbers, particularly unlisted ones, to individuals and institutions willing to pay a fee for the information?" [14]

Telephone companies plan to use ANI technology to profit from the collection and use of peoples' phone numbers, and other personal information generated by use of the phone. This bundle of information passing through phone company systems on its way somewhere else is known as Telephone Transaction Generated Information (TTGI). TTGI encompasses information generated by phone usage, and transactions relating to the service. One commentator notes the growing demand for TTGI by non-telephone companies that value it for marketing purposes in: characterizing, identifying, and locating their constituencies . . . TTGI may be even more telling than census and other data in defining the characteristics of individuals . . . [Citing Justice Brennan]: The transactions of an individual give a fairly accurate account of his religion, ideology, opinions and interests." [15]

In addition to the ACLU, many groups have taken the position that, if authorized, Caller ID should only be made available with a mechanism that allows callers to block the display of their numbers on the receiving end. Further, the overwhelming majority of people confronted with this issue, and the views on all sides, come to the same conclusion. Most notably, the White House Office of Consumer Affairs advocates offering Caller ID with blocking to protect consumer privacy interests. [16]

Organizations that advocate authorizing Caller ID with blocking include: the National Association of Regulatory Utility Commissioners, [17] the National Association of State utility Consumer Advocates, [18] Computer Professionals for Social Responsibility, [19] and the Direct Marketing Association. [20] In addition, many law enforcement officials, domestic violence coalitions, doctors, social workers, and others oppose unrestricted Caller ID as a threat to their physical safety.

H.R. 1304 requires the creation of a national database of the telephone numbers of people who actively seek to limit unsolicited commercial telephone calls and faxes. Under the bill, anyone making a telephone solicitation, or using an automatic telephone dialing system is required to delete from their list any telephone number appearing on the national "opt-out" list. In addition, anyone sending an unsolicited advertisement by a telephone facsimile machine must identify the name and fax number of the business sending the advertisement and the date and time the message is sent. The bill authorizes the FCC to initiate a rulemaking proceeding to consider a ban on all unsolicited advertisements sent to a fax machine. The ACLU would support H.R. 1304, if it is amended as we suggest.

Any attempt to limit what information people have a right to send to others raises very serious first amendment problems. The ACLU believes that some restrictions on the dissemination of commercial speech is permissible if there is a compelling interest and the restriction does not constitute a de facto ban. H.R. 1304 needs certain amendments to strike an appropriate balance.

The ACLU supports the principle that people have the right to opt-out of receiving commercial telephone solicitations. Similarly, we support peoples' right to have their names removed from mailing lists. Further, we believe that personal information obtained by both the government and the private sector for one purpose should not be used for another purpose without the individual's consent. These rights of

---

[13] *Chrsitian Science Monitor*, May 1, 1990.
[14] WSJ, 11/28/89. "So a company with this new technology—and some good data banks—could match a person's phone number with the story of his life. . . ."
[15] T. McManus, *TTGI: Rights and Restrictions*, Harvard, 1989.
[16] "Caller ID is just the first trickle in a floodwater of communications technologies that threaten to reduce, or at least redefine, consumer privacy in America," according to former Director Dr. Bonnie Guiton. See "Concerns Over Telecommunications Privacy Multiplying," 1/29/90, Office of Consumer Affairs, and "Should Your Phone Number Be Private?" 3/26/90, Office of Consumer Affairs)
[17] NARUC favors blocking as part of its position for "universal consumer choice" as the ethic to follow in making policy decisions regarding new technology.
[18] NASUCA believes that blocking will give consumers "total privacy" as both callers and receivers.
[19] CPSR supports a "consent alternative" to the use of Caller ID which would allow people to use the technology to affirmatively display their numbers.
[20] DMA adopted a position last month in support of legislative efforts to require that blocking be provided where Caller ID, or Automatic Number Identification is provided.

52

people to maintain some degree of control over personal information that they disclose and receive is at the heart of privacy policy.

Advances in information technology have made possible the creation of numerous, and detailed databases containing personal information and profiles on millions of people. Using the names and phones numbers of people in these databases, commercial entities are calling people at home with greater frequency. For those people who feel that these calls are an intrusion into their homes, H.R. 1304 proposes a mechanism that would allow them to opt-out of receiving unsolicited calls from commercial entities.

In this context, privacy claims must be balanced against the first amendment interest in the dissemination and receipt of information. H.R. 1304 takes into account the important value of sending and receiving commercial solicitations by placing the burden on individuals to place their telephone numbers on the "do not call" list.

In our view, the proposed legislation should be changed so as not to apply to telephone solicitations by not-for-profit groups. The first amendment interest in such communications outweighs any privacy intrusion that may be suffered by the receiver. Moreover, we are reluctant to give the FCC authority to examine the communications of not-for-profit organizations to determine what constitutes commercial speech.[21] The bill should also be amended to clarify that only commercial speech, as the Supreme Court defines that term, is covered, regardless of the sender.

Opt-out databases already exist in the private sector, but many of them are ineffective and unenforceable. The Direct Marketing Association (DMA) operates a telephone and mail preference service of computerized lists of people who have contacted the association to request that their names be removed from telephone and mailing lists. While the DMA encourages member companies to purchase and use the list to delete people who do not want to receive commercial solicitations, use of the list is voluntary. In addition, many people are unaware that the DMA compiles an opt-out list. Opt-out mechanisms do benefit the industry by removing from marketing lists those people who actively express an unwillingness to receive unsolicited calls, mailings and faxes.

Specifically, our concerns about H.R. 1304 are as follows:

(1) the terms "telephone solicitation" and "unsolicited advertisement" in Sec. 227 (a)(3)-(4) should be changed to exclude solicitations by not-for-profit entities, and to be clearly limited to commercial speech by others;

(2) the limit on sending "unsolicited advertisements" should be clarified only to apply to the use of facsimile machines, and not to telephone use, and to apply only to information relating to a product or service sold by the sender.

(3) the term "prior express invitation or permission" as used in Sec. 227 (a)(3)-(4) should be changed to include ongoing or prior business relationships if the covered solicitation or advertisement is in connection with the property, goods or services or related services received; and

(4) strict privacy and security safeguards should be built into the creation of any "electronic database of objecting persons" telephone numbers, and the use of the list should be limited to list deletion purposes only. The FCC should consider designing a system that avoids having to disclose the actual list of numbers, and permitting senders to pay for the cost of using the list without having to purchase it;

(5) In addition, the ACLU is concerned about the cost that may be imposed on those required to use the database. To maintain our support H.R. 1304, we will need assurances that the cost will not create an unreasonable burden.

New technologies can facilitate the flow of information and enhance first amendment values. These same technologies can also intrude on privacy. It is in this congressional forum that the policy implications of new communications technologies and practices can be considered and balanced to protect first amendment rights and extend fundamental privacy protections. The ACLU supports H.R. 1304, with our suggested changes, and H.R. 1305. We look forward to working with you towards their passage.

Mr. MARKEY. Four minutes and 59 seconds. Good job.

Our final witness on the first panel is Mr. Jack Shreve, who is public counsel for the State of Florida. Welcome.

## STATEMENT OF JACK SHREVE

Mr. SHREVE. Thank you, Mr. Chairman.

---

[21] See *Pittsburgh Press Co.* v. *Human Relations Commission,* 413 U.S. 376, 385.

53

Mr. Chairman and members of the subcommittee, my name is Jack Shreve. I am Public Counsel for the State of Florida, and a member of the National Association of State Utility Consumer Advocates. NASUCA consists of 43 consumer advocate offices in 38 States and the District of Columbia. NASUCA represents consumers in utility matters before the State and Federal regulatory commissions and courts. We commend the subcommittee for holding this hearing on issues concerning telephone consumer protection and privacy rights.

The Florida Office of Public Counsel and the National Association of State Utility Consumer Advocates supports the passage of H.R. 1304 and H.R. 1305. While NASUCA welcomes the new information age, we believe restrictions must be put into place to protect consumers and to maintain the level of privacy they have come to know and expect. NASUCA endorses establishing telephone subscriber's privacy rights to avoid receiving telephone solicitations and establishing a single national database list of telephone subscribers who object to telephone solicitations.

We fully support the idea of limiting the amount of unsolicited, burdensome or junk calls through the use of any automatic dialing machine, telephone facsimile machine, and computer or electronic device.

H.R. 1305 is absolutely essential for consumers to maintain their right to privacy. A national policy needs to be developed to prevent further burdensome deliberation of this matter on a State-by-State basis. NASUCA recommends that if Caller ID is to be permitted, it must be offered at the very least with universal free per-call blocking. However, we also recognize additional adequate blocking may need to be implemented in situations where per-call blocking does not provide sufficient protection or privacy for individuals.

Finally, NASUCA believes it is imperative that restrictions be placed on Automatic Number Identification. As the new information age evolves, it is uncertain how this information will be applied for marketing purposes in the future. This legislation will provide consumers with safeguards to maintain their privacy rights.

I think all of the points have really been made, but there are two things I would like to urge you to look for in your deliberations among yourselves and with the public.

When I first started getting into this, particularly the Caller ID area, I found that really the information that was being furnished to the Public Service Commission, as well as to the general public and to the press, was not adequate or full. I think you really have to ferret out the information.

One example there that I would like to point out is that, under the Bell proposals, or the Caller ID proposals that are out there, that are put on the table and were put on the table before the Florida Public Service Commission, they do provide blocking for the caller to Caller ID. However, it is very hard to see that call blocking is provided if you make a local, operator-assisted call, or a credit card local call. So that an obscene caller or a harassing caller can make the call and block his number off of the Caller ID screen by paying a fee to Bell. That is inherent in the system that

they are offering. This is not explained to the press and in most cases not explained to the Public Service Commissions.

The general public, as you go to the hearings, you will find that they do not understand this. So call blocking is not the issue, but whether or not the telephone company will receive a fee for that call blocking.

The other item I would like to mention that Representative Rinaldo mentioned is Call Trace. In New Jersey, the New Jersey system is being used as the example around the country to sell Caller ID. However, they fail to mention that Call Trace was put in place in New Jersey on a per-call basis, which is exactly what you should have on the per-call basis. Most of the telephone companies that are pushing Caller ID fail to offer Call Trace on a per-call basis but offer it on a subscription or monthly basis only. This is not sufficient.

In Florida, I petitioned for Call Trace after the Caller ID had been requested by Southern Bell. Call Trace is the most effective deterrent to obscene phone calls and harassing phone calls. This was borne out by the entire law enforcement community and the attorney general. So Call Trace should be there, whether or not you have Caller ID, and make it on a per-call basis and not a subscription basis. That way it is available to every individual whenever they might receive an obscene phone call or harassing phone call.

Caller ID, generally speaking, is only going to be available to a very small percentage of the people that take it, and then, even under the systems that are being offered by the telephone companies, blocking is available and an obscene phone call can be made for a fee.

Thank you.

[Testimony resumes on p. 86.]

[The prepared statement and attachments of Mr. Shreve follow:]

55

### TESTIMONY OF
### JACK SHREVE
### PUBLIC COUNSEL OF THE STATE OF FLORIDA
### ON BEHALF OF THE FLORIDA OFFICE OF THE PUBLIC COUNSEL AND
### THE NATIONAL ASSOCIATION OF STATE UTILITY CONSUMER ADVOCATES

Mr. Chairman and members of the Subcommittee, my name is Jack Shreve. I am the Public Counsel of Florida and a member of the National Association of State Utility Consumer Advocates (NASUCA). NASUCA consists of 43 consumer advocate offices in 38 states and the District of Columbia. NASUCA represents consumers in utility matters before state and federal regulatory commissions and courts. We commend the Subcommittee for holding this hearing on issues concerning telephone consumer protection and privacy rights.

Over the last decade we have seen a rapid change in telecommunications technology. New information services seem to be appearing at a rate which is difficult for the average consumer to assimilate. Looking at our telecommunications world today consumers are faced with Caller ID, ANI, facsimile machines, ISDN, new telemarketing techniques, and computer databases, to name a few. These services provide great benefits to consumers, but the benefits need not come at the expense of giving up privacy.

While we welcome this new information age, NASUCA believes that restrictions must be put into place to protect consumers and to maintain the level of privacy rights they have come to know and expect.

1

page 300
Exhibit 23

NASUCA supports the passage of H.R. 1304 and H.R. 1305. We believe this proposed legislation will provide needed protection for consumers while providing consumers new information age services. NASUCA has adopted two Resolutions which call on Congress and other authorities to take steps to provide restrictions and protection for consumers. The first Resolution calls for the right of privacy protections from unsolicited telemarketing calls, automatic dialing machines, cordless phones and selling of telephone lists to a third party (Appendix A). The second Resolution calls for Caller ID to, at the very least, be offered with universal free per-call blocking (Appendix B). H.R. 1304 and H.R. 1305 answer many of the concerns expressed in our resolutions.

Mr. Chairman, my comments today will not attempt to address each provision of H.R. 1304 and H.R. 1305, rather I will focus on our concerns, our experience and what possible effects this proposed legislation might have.

H.R. 1304 provides for protection of the telephone subscriber's privacy rights to avoid receiving telephone solicitations and establishing a single national database list of telephone subscribers who object to telephone solicitations.

2

57

In 1990, the Florida legislature passed the Telephone Solicitation Act (Appendix C). Consumers can now register with the Florida Department of Agriculture and Consumer Services, Division of Consumer Services. Consumer's telephone numbers are then placed on a list and sold to telephone solicitors to inform them that the registered consumers do not wish to receive telemarketing calls. The statute prohibits telephone solicitors from calling consumers if they are registered. It also prohibits calls to mobile telephones and telephonic paging devices. There are some exceptions to the law. For example, a solicitor can still call a consumer, but usually this is where the consumer has had a prior relationship with the solicitor or in response to an expressed request of the person called.

Since October 1, 1990, the Division of Consumer Services has registered 20,777 consumers for no solicitation calls. The division initially projected reaching 5,000 - 6,000 consumers. Consumer Services believes this program has real potential, because consumers have expressed that they really want this type of protection from telemarketers. They report receiving on an average 250 written complaints per month and double that amount of telephone complaints per month, regarding problems about unsolicited calls. Businesses like the solicited

3

page 302
Exhibit 23

58

call program, because they are able to reach a target audience who wants to hear from them, instead of being an annoyance to consumers.

NASUCA believes that telephone subscribers who do not wish to receive telemarketing calls should have available a procedure whereby they may avoid receiving such calls. A single national database could provide this. Presently, individual states have implemented programs, such as the Florida example I just mentioned. However, NASUCA believes it is important to have one national database, to eliminate duplication of effort and provide adequate protection to all consumers nationwide.

NASUCA suggests for your consideration another possible alternative might be to have a symbol printed next to consumer names in the telephone directory to indicate they do not wish to be solicited. This form of protection to consumers can be easily accomplished when each telephone directory is published. This method will also save time, aggravation and money for consumers and businesses alike.

H.R. 1304 also addresses NASUCA's concerns of the use of any telephone facsimile machine, computer or electronic device to send unsolicited

4

59

advertisements or calls to emergency telephones or pagers to be received by hospitals, physicians, fire protection or law enforcement agencies. We fully support this idea to limit the amount of burdensome or "junk" calls, so emergency telephones can be used only in times of true emergency situations. We know that health, fire and law enforcement professionals are already taxed during a 24 hour day. Limiting the information these professionals must screen each day will provide consumers with better, more efficient service. Consumers with true emergencies will be able to get the help that they need.

The use of automatic dialing machines which play recorded messages need to be reasonably restricted, except where a called party has given prior consent to receive the recorded message. H.R. 1304 also provides that all prerecorded telephone messages shall clearly state the identity of the business, and telephone number.

NASUCA has also adopted a Resolution on prohibiting the use of automatic telephone dialing systems and telephone facsimile machines (Appendix D). The Resolution calls for prohibiting the use of this technology to send unsolicited advertisements to persons who specifically object to receiving unsolicited advertisements. We consider this an unnecessary infringement on personal

5

60

privacy. It is important for consumers to understand who has called and this restriction will provide information to a consumer to determine if they desire to return such a call. Once again, this will prevent irritation and misunderstandings on the consumer's part.

H.R. 1305 is absolutely essential for consumers. This bill would establish a national policy of privacy protection for Caller ID and ANI service, which is presently not in place. NASUCA fully endorses H.R. 1305.

As you know, Caller ID has become a very controversial and debated subject. Many state commissions have decided to allow Caller ID with universal free per-call blocking and other state commissions are just beginning to look at Caller ID. For your convenience, I have attached a survey recently conducted by the North Carolina Attorney General and Public Staff (Appendix E) on the status of Caller ID in each of the fifty states. The survey shows that ten states have decided to offer Caller ID with some form of per-call blocking. This supports the need for a national policy on Caller ID.

While we recognize that the state commissions are currently deciding this matter, NASUCA hopes that a national policy could be developed to prevent

8

further burdensome deliberation of this matter on a state-by-state basis. NASUCA's Resolution on Caller ID advocates that if Caller ID is to be permitted it must be offered at least with universal free per-call blocking. NASUCA submits to you that a consistent national policy on Caller ID is necessary in order to alleviate ratepayers from an increase in telephone rates, erosion of privacy and to make sure individual lives are not jeopardized.

To illustrate this problem I would like to share some events that took place in Florida on Caller ID, however, this case is very similar to what other NASUCA members have experienced around the country. Last week the Florida Public Service Commission approved Caller ID with universal free per-call blocking, but this decision did not come about easily. It took approximately two years to resolve this docket. In Pennsylvania, Caller ID service was not allowed, the case is currently on appeal and has taken significantly longer than the Florida case.

In Florida, Southern Bell filed a tariff on Caller ID, which was originally approved without blocking, except for certain segments of society by the Commission. The Commission directed Southern Bell to file a separate tariff to provide limited blocking for law enforcement, shelters and help lines. Customer testimony by consumers, law enforcement officers, physicians, guardians ad litem

7

volunteers and domestic violence intervention agencies revealed that customers did not want Caller ID, or wanted it only with universal free per-call blocking.

Consumers are concerned with the invasion of privacy and are extremely concerned about the potential loss of privacy they would experience under Caller ID. Many surveys indicate that a large segment of the population feel that forwarding their number will decrease privacy.

The importance of customer's expectations of privacy about their telephone number is perhaps most clearly shown by the number of people willing to pay Southern Bell today to maintain either a nonpublished or unlisted number. Nonpublished and unlisted numbers amount to over a million subscribers in Southern Bell's territory, out of about 3.2 million residential access lines. All of these customers pay to be nonpublished or unlisted, which provide privacy of customers' telephone numbers. Yet, without free per-call blocking they would be required to pay an additional fee to the phone company to remain anonymous. Nonpublished subscribers feel the minute they make a phone call with Caller ID, their phone number is now published, unless blocking is available. The Maryland Public Service Commission has also recognized that subscribers to unlisted and

8

nonpublished services may experience an erosion in the value of that service if a blocking option is not available to them.

The law enforcement community is especially troubled by Caller ID without blocking. The principal concern in any consideration of Caller ID without blocking is the jeopardy to the safety of law enforcement personnel, operatives and even extends to family members. If blocking is not allowed it shifts the balance of control toward the criminal.

The safety of undercover law enforcement officers will be jeopardized by this system. Once a phone number is displayed an address may be easily obtained in a cross reference directory to harm a police officer's family. Criminals will take advantage of Caller ID to screen calls while engaged in illegitimate acts. For example, a drug task force in Maryland arrested a heroin dealer who was using Caller ID to force his customers to call from specific phone numbers in order to transact business.

If blocking is available to the public at large, then a higher level of safety may be obtained for undercover officers, confidential informants, and cooperating victims and witnesses. Alternatives to blocking which have been offered to law

9

enforcement by the phone companies tends to ignore their special needs, such as, their work in fast moving and ever changing drug investigations.

Domestic violence intervention agencies believe Caller ID without blocking would be lethal to battered women and their children. While spouse abuse shelters need per line blocking, there are many women who do not come to shelters and flee for their very lives and the lives of their children from an abusive spouse. They are the ones who need protection first and foremost. Any phone company alternatives offered to spouse abuse centers have been rejected due to fear for personal safety, fear of compromise of the location or identity of battered spouses, their families and friends, and also for not wanting to be labeled or certified "battered spouse." Don't these women and children have a right to maintain their anonymity in society?

Southern Bell was opposed to offering blocking because they believe it would devalue the service, however, their primary opposition stemmed from possible losses in company revenues. Any blocking alternatives offered by the phone company were offered at a fee, allowing Southern Bell to increase revenues. For example, Southern Bell offered various blocking alternatives such as, calls from cellular phones, calls from other areas (long distance calls), calling

10

card calls, operator assisted calls, and calls made from an area in which the display of an originating number can be blocked will not display the originating number. This is in direct opposition to the present situation, a customer does not have to spend money to avoid displaying his or her phone number when calling a party. Having Caller ID in place with blocking would maintain the status quo.

It is also interesting to note that Central Telephone Company of Florida offered a tariff in Florida offering Caller ID with universal free per-call blocking. Centel firmly believes that the customer, not the serving telephone company, should decide what services the customer will use, including the disclosure of customers' telephone numbers. The cost of blocking can and should easily be absorbed through the charges of Caller ID itself. The cost of preserving the current privacy rights of all subscribers should be borne by those who want to see the incoming numbers.

While there are benefits to Caller ID, any consideration of the service must keep the significant detriments in mind. No amount of benefit is worth jeopardizing personal safety and placing individuals at risk. Caller ID without blocking would also strip away the expectations of privacy people now have and replace it with a new system where privacy may be obtained only by paying an

11

additional fee to the phone companies for each call. We urge that a national system of uniformity be created to protect consumer's privacy on Caller ID.

My final comments will be on the automatic number identification provisions of H.R. 1305. A NASUCA Resolution I discussed earlier calls for telephone companies to be prohibited from releasing to a third party, to the marketing operation of the telephone company or to an affiliated corporate marketing organization, any personal information about their customers. This would include names, telephone numbers, credit information, calling patterns and customer proprietary network information unless the personal information is published in the telephone directory. Although ANI is being used today, as new information services evolve it is uncertain how this information will be applied for marketing purposes in the future. It is imperative that restrictions are put into place before it is too late to protect consumers.

Technology is rapidly changing and consumers are already having a difficult time maintaining the level of privacy they have come to know and expect. NASUCA believes that H.R. 1304 and H.R. 1305 will help protect consumers and maintain their level of privacy.

Thank you for letting me have the opportunity to speak here today.

page 311
Exhibit 23

APPENDIX A

1990 - 16

NATIONAL ASSOCIATION OF STATE UTILITY CONSUMER ADVOCATES

RESOLUTION

Proposing Privacy Protections for Telephone Customers

WHEREAS,   the right of privacy is a fundamental right in our society; and

WHEREAS,   the right of privacy is protected by the United States Constitution and various federal and state laws and regulations; and

WHEREAS,   the deployment of telecommunications technology has led (and will lead) to the introduction of new services and equipment which may compromise consumers' privacy; and

WHEREAS,   such new services and equipment may raise privacy concerns not contemplated or covered by existing laws or regulations; and

WHEREAS,   these privacy intrusions may give rise to telephone company attempts to charge consumers for maintaining the same level of privacy they previously enjoyed with their telephone service; and

WHEREAS,   NASUCA members represent the interests of telephone customers.

THEREFORE BE IT RESOLVED, that telephone privacy should be protected, in at least the following ways:

    1)   Public hearings should be held by regulatory commissions prior to the approval of any telephone service which might have a negative impact on privacy;

    2)   In addressing consumer inquiries regarding telephone privacy matters, telephone companies should advise customers of all options which could serve the consumers' needs (rather than merely the telephone companies' marketing objectives). This should allow customers to make informed decisions as to how best to resolve their concerns;

3)   Caller ID should be prohibited unless adequate blocking is concurrently made available without charge;

4)   Where technically feasible, telephone companies should offer Automatic Call Trace (on a per call basis) and Call Screen at reasonable prices;

5)   Telemarketing should be reasonably restricted so that telephone subscribers who do not wish to receive telemarketing calls should have available to them a procedure whereby they may avoid receiving such calls. For example, they could arrange to have a symbol printed next to their names in the telephone directory to indicate that they do not wish to receive such calls. For purposes of this section, telemarketing does not mean soliciation which serves a non-commercial purpose, including charitable, political or educational purpose.

6)   Unless specifically authorized in advance by a customer, or unless otherwise authorized by law, telephone companies should be prohibited from releasing to a third party, to the marketing operation of the telephone company or to an affiliated corporate marketing organization, any personal information about their customers, including but not limited to names, telephone numbers, credit information, calling patterns and customer proprietary network information unless the personal information is published or is scheduled to be published in the telephone directory.

7)   The use of automatic dialing machines which play recorded messages should be reasonably restricted, except where a called party has given prior consent to receive the recorded message;

8)   Telephone company personnel should be required to inform customers of the possibility that a supervisor may be monitoring conversations between customer service representatives and customers (if such monitoring is the telephone company's practice); and

9)   Regulations or laws should be adopted which provide users of cordless telephones with the same legal privacy protections applicable to wireline telephone usage.

BE IT FURTHER RESOLVED, that NASUCA supports the adoption of these privacy protections through administrative regulations or statutory changes.

BE IT FURTHER RESOLVED, that NASUCA authorizes its Executive Committee to develop specific positions and to take appropriate actions consistent with the terms of this resolution. The Executive Committee shall advise the membership of any proposed action prior to taking such action if possible. In any event, the Executive Committee shall notify the membership of any action taken pursuant to this provision.

Approved by NASUCA:                 Submitted by:

___Orlando, Florida___              NASUCA Telecommunications Committee
Place
                                    _____
                                    Date

___November 14, 1990___
Date
                                    Committee Members
                                    Jack Shreve (FL), Chairman
                                    Ron Binz (CO)
                                    Doug Brooks (AZ)
                                    David Conn (IA)
                                    John Glynn (MD)
                                    Martha Hogarty (MO)
                                    Bob Johnson (IN)
                                    Philip McClelland (PA)
                                    Michael McRae (DC)
                                    Richard McIntire (MN)
                                    Phil Shapiro (NY)
                                    Bruce Weston (OH)

APPENDIX B

1989-15

THE NATIONAL ASSOCIATION OF STATE UTILITY CONSUMER ADVOCATES

RESOLUTION

Resolving That Calling Number Identification Services
Should Only Be Offered If A Caller *ID
Blocking Mechanism Is Offered At The Same Time

WHEREAS,   Telecommunications Companies are offering or are planning
           to offer services which will display on separately
           purchased Customer Premises Equipment the telephone
           number of the calling party before a call is answered;
           and

WHEREAS,   Such services, of which Caller*ID is the most prevalent,
           while providing benefits to people receiving calls and to
           emergency service providers, also pose threats to those
           making calls; and

WHEREAS,   Calling number delivery services which do not offer the
           ability to the caller to block the transmission of his or
           her phone number when a call is made ("unblockable
           calling number delivery services") would create a threat
           to individuals subject to domestic violence by providing
           a means for abusers to track them down or to locate
           shelters and harass shelter workers; and

WHEREAS,   Unblockable calling number delivery services pose threats
           to crisis hotlines for suicide, drugs, alcohol, mental
           illness and the like by threatening a caller's ability to
           make calls without betraying his or her anonymity; and

WHEREAS,   Unblockable calling number delivery services pose threats
           to law enforcement by threatening their ability to
           conduct undercover activities as well as by reducing the
           chances that citizens will report crimes or "tips" if
           their anonymity is not assured; and

WHEREAS,   Unblockable calling number delivery services create
           inconvenience and hardship for doctors, psychiatrists,
           social service workers, lawyers, newspaper reporters,
           teachers and others who return or make calls from their
           homes but who ordinarily do not give out their private
           telephone number; and

WHEREAS,   The state of California has enacted a law which requires
           that if a calling number delivery service is offered in
           that state, it must be accompanied by a means to block
           the display of a phone number on individual calls at no
           charge to the caller; and

WHEREAS,   Telephone company-sponsored marketing studies indicate
           that just as many people are concerned about the privacy
           intrusions caused by calling number delivery services as
           find the service valuable; and

71

WHEREAS,   The telecommunications system which makes possible the
CLASS family of services, of which Caller-ID is one, is
already designed and programmed to provide Caller-ID
Blocking, so that no extra cost or delay would be caused
by ordering a Caller-ID blocking ability; and

WHEREAS,   Other CLASS services, such as Call-Trace, Call-Block and
Call-Return have been found by customers to be just as
effective in responding to annoying or obscene calls and
these services still would be available to a Caller-ID
customer if he or she received an abusive call from
someone who had chosen to block his or her phone number
from being displayed on the Caller-ID screen.

THEREFORE, BE IT RESOLVED by the National Association of State
Utility Consumer Advocates that if calling number
delivery services are to be permitted to be offered to
the public, such services must be offered with a
mechanism which allows customers to block the
transmission of their phone number at least on a per-call
basis and at no additional charge to the caller.

BE IT FURTHER RESOLVED, that the National Association of State
Utility Consumer Advocates authorizes its Executive
Committee to develop specific positions consistent with
the terms of this resolution on a legislative bill,
regulation, or any other type of proposal which concerns
the subject of the resolution including the preparation
of policy papers and communications reflecting NASUCA's
position to the United States Congress. The Executive
Committee shall advise the membership of any other
proposed actions prior to taking the action, if
possible. In any event, the Executive Committee shall
notify the membership of any action taken under this
provision.

Approved by NASUCA:              Favorably Reported By:

**Boston, Massachusetts**        **NASUCA Telecommunications**
Place                            Committee

                                 **November 6, 1989**
                                 Date

                                 Committee Members:

**November 12, 1989**            Jack C. Shreve (FL), Chairman
Date                             Robert Johnson (IN)
                                 Fred Hoover (MD)
                                 Phil Shapiro (NY)
                                 Dan Clearfield (PA)
                                 Ron Binz (CO)
                                 David Conn (IA)
                                 Bruce Weston (OH)
                                 Nick Singh Gumer (DC)
                                 Doug Brooks (AZ)

page 316
Exhibit 23

APPENDIX C

**501.059  Telephone solicitation.—**

(1)  As used in this section:

(a)  "Telephonic sales call" means a call made by a telephone solicitor to a consumer, for the purpose of soliciting a sale of any consumer goods or services, or for the purpose of soliciting an extension of credit for consumer goods or services, or for the purpose of obtaining information that will or may be used for the direct solicitation of a sale of consumer goods or services or an extension of credit for such purposes.

(b)  "Consumer goods or services" means any real property or any tangible or intangible personal property which is normally used for personal, family, or household purposes, including, without limitation, any such property intended to be attached to or installed in any real property without regard to whether it is so attached or installed, as well as cemetery lots and time-share estates, and any services related to such property.

(c)  "Unsolicited telephonic sales call" means a telephonic sales call other than a call made:

1.  In response to an express request of the person called;

2.  Primarily in connection with an existing debt or contract, payment or performance of which has not been completed at the time of such call;

3.  To any person with whom the telephone solicitor has a prior or existing business relationship; or

4.  By a newspaper publisher or his agent or employee in connection with his business.

(d)  "Commission" means the Florida Public Service Commission.

(e)  "Telephone solicitor" means any natural person, firm, organization, partnership, association, or corporation, or a subsidiary or affiliate thereof, doing business in this state, who makes or causes to be made a telephonic sales call, including, but not limited to, calls made by use of automated dialing or recorded message devices.

(f)  "Division" means the Division of Consumer Services of the Department of Agriculture and Consumer Services.

(g)  "Consumer" means an actual or prospective purchaser, lessee, or recipient of consumer goods or services.

(h)  "Merchant" means a person who, directly or indirectly, offers or makes available to consumers any consumer goods or services.

(i)  "Doing business in this state" refers to businesses who conduct telephonic sales calls from a location in Florida or from other states or nations to consumers located in Florida.

(j)  "Department" means the Department of Agriculture and Consumer Services.

(2)  Any telephone solicitor who makes an unsolicited telephonic sales call to a residential, mobile, or telephonic paging device telephone number shall identify himself or herself by his or her true first and last names and the business on whose behalf he or she is soliciting immediately upon making contact by telephone with the person who is the object of the telephone solicitation.

(3)(a)  Any residential, mobile, or telephonic paging device telephone subscriber desiring to be placed on a "no sales solicitation calls" listing indicating that the sub-

scriber does not wish to receive unsolicited telephonic sales calls may notify the division and be placed on that listing upon receipt by the division of a $10 initial listing charge. This listing shall be renewed by the division annually for each consumer upon receipt of a renewal notice and a $5 assessment.

(b)  The division shall update its "no sales solicitation calls" listing upon receipt of initial consumer subscriptions or renewals and provide this listing for a fee to telephone solicitors upon request.

(c)  All fees imposed pursuant to this section shall be deposited in the General Inspection Trust Fund as created in s. 570.20, for the administration of this section.

(4)  No telephone solicitor shall make or cause to be made any unsolicited telephonic sales call to any residential, mobile, or telephonic paging device telephone number if the number for that telephone appears in the then–current quarterly listing published by the division.

(5)(a)  A contract made pursuant to a telephonic sales call is not valid and enforceable against a consumer unless made in compliance with this subsection.

(b)  A contract made pursuant to a telephonic sales call:

1.  Shall be reduced to writing and signed by the consumer.

2.  Shall comply with all other applicable laws and rules.

3.  Shall match the description of goods or services as principally used in the telephone solicitations.

4.  Shall contain the name, address, and telephone number of the seller, the total price of the contract, and a detailed description of the goods or services being sold.

5.  Shall contain, in bold, conspicuous type, immediately preceding the signature, the following statement: "You are not obligated to pay any money unless you sign this contract and return it to the seller."

6.  May not exclude from its terms any oral or written representations made by the telephone solicitor to the consumer in connection with the transaction.

(c)  The provisions of this subsection do not apply to contractual sales regulated under other sections of the Florida Statutes, or to the sale of financial services, security sales, or sales transacted by companies or their wholly owned subsidiaries or agents, which companies are regulated by chapter 364.

(6)(a)  A merchant who engages a telephone solicitor to make or cause to be made a telephonic sales call shall not make or submit any charge to the consumer's credit card account until after the merchant receives from the consumer a copy of the contract which complies with this section.

(b)  A merchant who conducts a credit card account transaction pursuant to this section shall be subject to the provisions of s. 817.62.

(c)  The provisions of this subsection do not apply to a transaction:

1.  Made in accordance with prior negotiations in the course of a visit by the consumer to a merchant operating a retail business establishment which has a fixed permanent location and where consumer goods are displayed or offered for sale on a continuing basis;

2.   In which the consumer may obtain a full refund for the return of undamaged and unused goods or a cancellation of services notice to the seller within 7 days after receipt by the consumer, and the seller will process the refund within 30 days after receipt of the returned merchandise by the consumer;

3.   In which the consumer purchases goods or services pursuant to an examination of a television, radio, or print advertisement or a sample, brochure, or catalogue of the merchant that contains:

a.   The name, address, and telephone number of the merchant;

b.   A description of the goods or services being sold; and

c.   Any limitations or restrictions that apply to the offer; or

4.   In which the merchant is a bona fide charitable organization or a newspaper as defined in chapter 50.

(7)(a)   No person shall make or knowingly allow a telephonic sales call to be made if such call involves an automated system for the selection or dialing of telephone numbers or the playing of a recorded message when a connection is completed to a number called.

(b)   Nothing herein prohibits the use of an automated telephone dialing system with live messages if the calls are made or messages given solely in response to calls initiated by the persons to whom the automatic calls or live messages are directed or if the telephone numbers selected for automatic dialing have been screened to exclude any telephone subscriber who is included on the division's then–current "no sales solicitation calls" listing or any unlisted telephone number, or if the calls made concern goods or services that have been previously ordered or purchased.

(8)   The division shall investigate any complaints received concerning violations of this section. If, after investigating any complaint, the division finds that there has been a violation of this section, the division or the Department of Legal Affairs may bring an action to impose a civil penalty and to seek such other relief, including injunctive relief, as the court deems appropriate against the telephone solicitor. The civil penalty shall not exceed $10,000 per violation and shall be deposited in the General Revenue Fund, unallocated. This civil penalty may be recovered in any action brought under this part by the division, or the division may terminate any investigation or action upon agreement by the person to pay a stipulated civil penalty. The department or the court may waive any such civil penalty if the person has previously made full restitution or reimbursement or has paid actual damages to the consumers who have been injured by the violation.

(9)(a)   In any civil litigation resulting from a transaction involving a violation of this section, the prevailing party, after judgment in the trial court and exhaustion of all appeals, if any, shall receive his reasonable attorney's fees and costs from the nonprevailing party.

(b)   The attorney for the prevailing party shall submit a sworn affidavit of his time spent on the case and his costs incurred for all the motions, hearings, and appeals to the trial judge who presided over the civil case.

(c)   The trial judge shall award the prevailing party the sum of reasonable costs incurred in the action plus a reasonable legal fee for the hours actually spent on the case as sworn to in an affidavit.

(d)   Any award of attorney's fees or costs shall become a part of the judgment and subject to execution as the law allows.

(e)   In any civil litigation initiated by the division or the Department of Legal Affairs, the court may award to the prevailing party reasonable attorney's fees and costs if the court finds that there was a complete absence of a justiciable issue of either law or fact raised by the losing party or if the court finds bad faith on the part of the losing party.

(10)   The commission shall by rule ensure that telecommunications companies inform their customers of the provisions of this section. The notification may be made by:

(a)   Annual inserts in the billing statements mailed to customers; and

(b)   Conspicuous publication of the notice in the consumer information pages of the local telephone directories.

History.—s. 1, ch. 87-253; s. 1, ch. 90-143.
¹Note.—The word "preceding" was substituted for the word "proceeding" by the editors for contextual conformity

**501.131   Consumer protection organizations.**—[Repealed by s. 1, ch. 90–193.]

**501.1375   Deposits received for purchase of residential dwelling units; placement in escrow required; exceptions.**—

(1)   DEFINITIONS.—

(a)   "Building contractor" means any person who, for compensation, constructs and sells one–family or two–family residential dwelling units, except for a person who sells or constructs less than 10 units per year statewide.

(b)   "Developer" means either a building contractor who offers new residential dwelling units for sale or any person who offers a new one–family or two–family residential dwelling unit for sale, except for a person who sells or constructs less than 10 units per year statewide.

(c)   "Closing" means that point in time at which legal title to the real property shall transfer from grantor thereof to grantee.

(d)   "Default" means the failure of the buyer to close the transaction after issuance of the certificate of occupancy or the failure of the buyer to comply with any of the buyer's obligations under the terms of the purchase contract.

(e)   "Escrow" or "to place in escrow" means the delivery to or deposit with a third party, the escrow holder, of money or documents to be held and disbursed by such escrow agent consistent with the provisions of this section.

(2)   NOTICE TO BUYER OF RIGHT TO HAVE DEPOSIT PLACED IN ESCROW ACCOUNT.—In all offers to purchase, sales agreements, or written contracts made between a building contractor or a developer and a prospective buyer of a one–family or two–family residential dwelling unit, the building contractor or developer shall notify the prospective buyer that any deposit (up to 10 percent of the purchase price) made by the buyer to the building contractor or developer shall, unless waived in writing by the buyer, be deposited

1422

APPENDIX D

1989-16

THE NATIONAL ASSOCIATION OF STATE UTILITY CONSUMER ADVOCATES

RESOLUTION

Supporting the Telephone Advertising Regulation Act

WHEREAS,   in recent years the use of automatic telephone dialing
           systems and telephone facsimile machines to send
           unsolicited advertisements has proliferated; and

WHEREAS,   H.R. 2921 would prohibit the use of this technology to
           send unsolicited advertisements to persons who
           specifically object to receiving such unsolicited
           advertisements; and

WHEREAS,   such use of this technology is an unnecessary
           infringement on persons' privacy.

THEREFORE BE IT RESOLVED that the National Association of State
           Utility Consumer Advocates strongly supports the passage
           of the Telephone Advertising Regulation Act (H.R. 2921).

BE IT FURTHER RESOLVED, that the National Association of State
           Utility Consumer Advocates authorizes its Executive
           Committee to develop specific positions consistent with
           the terms of this resolution.  The Executive Committee
           shall advise the membership of any proposed action prior
           to taking such action if possible.  In any event, the
           Executive Committee should notify the membership of any
           action taken pursuant to this provision.


Approved by NASUCA:                 Favorably Reported By:

Boston, Massachusetts               NASUCA Telecommunications
Place                               Committee

                                    November 6, 1989
                                    Date

                                    Committee Members:

November 12, 1989                   Jack C. Shreve (FL), Chairman
Date                                Robert Johnson (IN)
                                    Fred Hoover (MD)
                                    Phil Shapiro (NY)
                                    Dan Clearfield (PA)
                                    Ron Binz (CO)
                                    David Conn (IA)
                                    Bruce Weston (OH)
                                    Nick Singh Gumer (DC)
                                    Doug Brooks (AZ)

APPENDIX E



### State of North Carolina
Department of Justice
P.O. BOX 629
RALEIGH
27602-0629

LACY H. THORNBURG
ATTORNEY GENERAL



March 15, 1991

Office of
Public Counsel

Ms. Geneva T. Thigpen, Acting Chief Clerk
North Carolina Utilities Commission
Post Office Box 29510
Raleigh, North Carolina  27626-0510

                Re:  Caller ID, Docket No. P-55, Sub 925

Dear Ms. Thigpen:

        Attached is the Attorney General's and Public Staff's joint filing in
response to the Commission's Order of March 5th, 1991 requesting information
on the status of Caller ID throughout the country.  This filing contains the
results of a survey made in the past week of Caller ID activities in the 50
states and the District of Columbia.

        The information was elicited by faxing a survey to consumer advocates
and/or commissions in each jurisdiction.  A copy of the survey questionnaire
is incorporated in the filing.  Further, one copy only of the individual
responses is presented for filing with you for reference by the Commission or
any party.  Of particular interest in the background documents are two status
reports prepared by United Telephone and dated January 28 and February 25,
1991.  Though not used as the source of the attached report and neither inclu-
sive of all states nor of events of recent weeks (in Indiana, New York, Massa-
chusetts and Vermont), the United documents are excellent cross-references.

        By copy of this letter we are serving all parties of record with our
report.

Ms. Geneva T. Thigpen
March 15, 1991
Page 2

       Thank you for your assistance.

                   Very truly yours,

                   LACY H. THORNBURG
                   Attorney General

                   *Jo Anne Sanford*

                   Jo Anne Sanford
                   Special Deputy Attorney General

                   ROBERT P. GRUBER
                   Executive Director of Public Staff

                   *Antoinette R. Wike*

                   Antoinette Wike, Chief Counsel
                   Public Staff
                   P. O. Box 29520
                   Raleigh, NC 27626-0520

JAS/jw

Enclosures

cc:  Parties of Record

CALLER ID QUESTIONNAIRE FOR _____

[Please respond by return FAX (919/733-9565) on this
sheet to N. C. Attorney General by Monday, March 11]

1.   Has a Caller ID tariff been filed?   If so, by which company(s) and when?


2.   If the service has been approved:

   (a)   What was the approval date?
   (b)   Does it include per-call blocking?

      (1)   If so, is it for all customers or only for "vulnerable"
            or "at risk" groups such as law enforcement?
      (2)   Is it free?
      (3)   If not, what is the cost?

   (c)   Does it include per-line blocking?

      (1)   Is it for all customers or only for "at risk" groups?
      (2)   Is it free?
      (3)   If not, what is the cost?

   (d)   Is the matter on appeal or has a motion for reconsideration
         been made?   If so, by whom and on what basis?


3.   If the service has not yet been approved, please state whether each
     company's filed proposal includes:

   (a)   Per-call blocking? _____   For all customers or limited
         to "certain" groups? _____   At what cost? _____

   (b)   Per-line blocking? _____   For all customers or
         limited to "certain" groups? _____   At what cost? _____


4.   If any of your telcos or BOCs have announced an intention to file for
Caller ID approval, have they announced a plan for blocking? _____   If so, is it
to be per call and/or per line?   Free or at a charge? (Circle correct answers)


5.   Has legislation concerning Caller ID been announced or filed in your state?
Briefly, what does it provide?

SUMMARY OF CALLER-ID ACTIVITY
NORTH CAROLINA ATTORNEY GENERAL
AND PUBLIC STAFF
MARCH 15, 1991


U. S. Congress

Last session: Sen. Kohl (WI) introduced a bill to amend the Electronic Communications Privacy Act (ECPA) to allow CID but to require blocking.  Companion bill was introduced by Rep. Kastenmeier (WI) in House, but neither came to a vote.

This session: Sen. Kohl offering an amended version of the previous bill, which amends the ECPA.  It would require that free blocking be available to block receipt of any identifying information, presumably either name, number or picture. (S.652.) Titled the "Telephone Privacy Act of 1991," it was introduced this week.

Rep. Markey's (MA) H.R. 1305 would amend the Communications Act (instead of the ECPA) to require free per call blocking. This approach differs from Sen. Kohl's in that it would direct the FCC to promulgate rules requiring free per call blocking.

FCC

Joseph Baer has petitioned the FCC to permit use of alternate identity codes in lieu of directory or billing numbers for non-published subscribers. He further requests an FCC stay of all state action pending resolution of his petition. No decision yet.

Corporate Policies  [Note:  These are policies that companies support, not necessarily those followed by PUC's in service area.]

Regional Bell Operating Companies

| | |
|---|---|
| NYNEX (7 states) | Proposes free per-call blocking |
| S.W. Bell (5 states) | Proposes free per-call blocking |
| U.S. West (14 states) | Proposes free per-call blocking |
| PacTel (2 states) | Proposes free per-call blocking |
| Bell South (9 states) | Proposes "All Number Delivery" |
| Ameritech (5 states) | Proposes "All Number Delivery" |
| Bell Atlantic (7 states) | Proposes "All Number Delivery" |

79

| | |
|---|---|
| Centel | Proposes free per-call blocking |
| Contel | Proposes unrestricted Caller ID |
| GTE | Proposes unrestricted Caller ID; offers Protected Number Service for privacy concerns. |
| Rochester Tel. | Supports free per call blocking (Though as a N.Y. company, is subject completely to March 1991 PUC order which sets forth the requirements of free per-call and per-line blocking). |
| United | Favors unrestricted Caller ID but varies between "no blocking" and free per-call blocking among filings in four states. |

<u>States</u>

    Attached

| STATE | CID FILED | CID APPROVED | UNIVERSAL PER-CALL BLOCK | UNIVERSAL PER-LINE BLOCK | CHARGE FOR BLOCKING NOTICE | APPEAL/ MOTION PENDING | CID PROPOSAL PENDING | UNIVERSAL PER-CALL BLOCK | UNIVERSAL PER-LINE BLOCK | CHARGE FOR BLOCKING | CID PROPOSAL ANNOUNCED | UNIVERSAL PER-CALL BLOCK | UNIVERSAL PER-LINE BLOCK | CHARGE FOR BLOCKING | PROPOSED/ FILED LEGISLATION | COMMENTS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| AL | 2/12/90 | 12/4/90 | YES | YES | FREE | YES | NO | -- | -- | -- | -- | -- | -- | -- | NO | SOUTH CENTRAL BELL ALLOWED ONE YEAR TRIAL IN BIRMINGHAM. BLOCKING ORDERED OVER BELL'S OBJECTION. COMPANY'S MOTION FOR RECONSIDERATION OR REHEARING PENDING. |
| AK | NO | -- | -- | -- | -- | -- | NO | -- | -- | -- | NO | -- | -- | -- | NO | |
| AZ | NO | -- | -- | -- | -- | -- | NO | -- | -- | -- | NO | -- | -- | -- | NO | NO ARIZONA-SPECIFIC ANNOUNCEMENT, BUT U.S. WEST HAS ANNOUNCED A CORPORATE POLICY TO PROPOSE FREE PER-CALL BLOCKING IN SERVICE AREA. |
| AR | CONTEL 2/15/91 | -- | -- | -- | -- | -- | YES | NO | NO | -- | NO | -- | -- | -- | NO | CONTEL REQUESTED CID SERVICE ON AN INTERIM BASIS. COMMISSION STAFF RECOMMENDED PER-CALL BLOCKING. S.W. BELL'S CORPORATE POLICY IS TO PROPOSE FREE PER-CALL BLOCKING. NO ARKANSAS-SPECIFIC ANNOUNCEMENT YET |
| CA | PACBELL 12/9/90 | -- | -- | -- | -- | -- | YES | YES | NO | FREE | -- | -- | -- | -- | YES | LEGISLATION REQUIRING FREE BLOCKING PASSED IN 1989. THREE BILLS NOW PROPOSED TO REQUIRE FREE PER-CALL BLOCKING AS WELL. |
| | CONTEL 12/28/90 | -- | -- | -- | -- | -- | YES | YES | NO | FREE | -- | -- | -- | -- | | |
| | GENERAL 1/31/91 | -- | -- | -- | -- | -- | YES | YES | NO | FREE | -- | -- | -- | -- | | |
| CO | NO | -- | -- | -- | -- | -- | NO | -- | -- | -- | YES | YES | NO | FREE | NO | U.S. WEST'S CORPORATE POLICY IS TO PROPOSE FREE PER-CALL BLOCKING. FILING EXPECTED LATE 1991 - 1992. CO. HAD ONE TRIAL OF "MAD'S CALL-ING"--STATICIZED VOICE ANNOUNCEMENT OF NAME OF CALLER. |
| CT | NO | -- | -- | -- | -- | -- | NO | -- | -- | -- | NO | -- | -- | -- | NO | BELL ATLANTIC'S CORPORATE POLICY IS "ALL NUMBER DELIVERY." |
| DE | DIAMOND STATE 3/2/90 | 1/91 | YES | NO | FREE | NO | -- | -- | -- | -- | -- | -- | -- | -- | NO | PUC TO REGISTER TECHNOLOGY OF AUTO-MATIC REJECTION OF UNIDENTIFIED CALLS. ANNUAL REPORTS REQUIRED OF DIAMOND STATE TELEPHONE. |
| DC | C&P 10/89 | 1/30/90 & 7/90 | YES | NO | FREE | YES | -- | -- | -- | -- | -- | -- | -- | -- | NO | CHESAPEAKE & POTOMAC (BELL ATLANTIC) OPPOSED BLOCKING. PEOPLE'S COUNSEL FILED APPLICATION FOR RECONSIDERATION ON 3/1/90 BASED ON: VIOLATION OF ELECTRONIC COMMUNICATIONS PRIVACY ACT AND VIOLATION OF C & P NON-PUBLISHED NUMBER TARIFF. |

80

| STATE | CID FILED | CID APPROVED | PER-CALL BLOCK | PER-LINE BLOCK | CHARGE FOR BLOCKING | APPEAL/ MOTION | CID PROPOSAL PENDING | PER-CALL BLOCK | PER-LINE BLOCK | CHARGE FOR BLOCKING | CID PROPOSAL APPROVED | PER-CALL BLOCK | PER-LINE BLOCK | CHARGE FOR BLOCKING | PROPOSED LEGISLATION | COMMENTS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| FL | SO.BELL 9/29/89 | -- | -- | -- | -- | -- | YES | NO | NO | -- | -- | -- | -- | -- | YES | -BELL (BELL SOUTH) HAS CORPORATE POLICY OF "ALL NUMBER DELIVERY" - OPPOSES UNIVERSAL BLOCKING OF EITHER TYPE. CONTESTED HEARINGS COMPLETED; PUC DECISION EXPECTED 4/10/91. |
| | CENTRAL 8/6/90 | -- | -- | -- | -- | -- | YES | YES | NO | FREE | -- | -- | -- | -- | | -CENTRAL'S CORPORATE POLICY IS TO PROPOSE FREE PER-CALL BLOCKING. UNIVERSALLY AVAILABLE. |
| | UNITED 12/20/90 | -- | -- | -- | -- | -- | YES | YES | NO | FREE THEN | -- | -- | -- | -- | | -UNITED PROPOSES FREE PER-CALL BLOCKING BY SUBSCRIPTION, WHICH WOULD BE FREE ON NEW SERVICE REQUESTS OR DURING FIRST 60 DAYS AFTER TARIFF APPROVED, $1.50 THEREAFTER. UNITED ALSO PROPOSES A VARIETY OF SPECIAL ARRANGEMENTS FOR LAW ENFORCEMENT AND SOCIAL SERVICE AGENCIES. |
| | GTE 12/31/90 | -- | -- | -- | -- | -- | YES | NO | NO | -- | -- | -- | -- | -- | | -GTE - NO BLOCKING PROPOSED; OTHER ARRANGEMENTS PROPOSED FOR "AT-RISK" GROUPS. -PUBLIC COUNSEL HAS DRAFTED CID/CALL TRACE LEGISLATION TO REQUIRE FREE, UNIVERSAL PER-CALL AND PER-LINE BLOCKING AND TO REQUIRE CALL TRACE WITHOUT PRE-SUBSCRIPTION AT $1.00/SUCCESSFUL TRACE. |
| GA | BELL 3/12/90 | 12/12/90 | NO | NO | -- | YES | -- | -- | -- | -- | -- | -- | -- | -- | NO | APPROVED FOR ONE YEAR TRIAL. FREE PER-CALL BLOCKING FOR "AT RISK" GROUPS ONLY. MOTION FOR RECONSIDERATION DENIED. |
| HI | NO | -- | -- | -- | -- | -- | NO | -- | -- | -- | NO | -- | -- | -- | YES | 1991 LEGISLATION REQUIRING ADOPTION OF UNRESTRICTED CID FAILED UPON OPPOSITION BY CONSUMER ADVOCATE, ACLU AND PUC. |
| ID | U.S.WEST 2/18/91 YES | YES | NO | FREE | NO | -- | -- | -- | -- | -- | -- | -- | -- | -- | YES | ACLU LEGISLATIVE PROPOSAL TO GIVE PUC FULL REGULATORY AUTHORITY OVER CID FAILED. U.S. WEST ALLOWED 6 MONTH TRIAL IN BOISE WHILE PUC CONTINUES PRIVACY INVESTIGATION. SERVICE DISCLOSES NAME AND NUMBER, OVER COMPACT NO OBJECTIONS. LINE BLOCKING AVAILABLE FOR "AT RISK" CUSTOMERS ONLY - RESIDENTIAL AND BUSINESS - UPON DEMONSTRATED RISK OF PERSONAL INJURY. PUC ORDERED U.S. WEST TO LIBERALIZE LINE-BLOCKING POLICY. APPEAL FROM DENIAL OF LINE-BLOCK IS TO PUC. |

81

| STATE FILED | CID FILED | CID APPROVED | PER-CALL BLOCK | PER-LINE BLOCK | FOR BLOCKING | APPEAL/ NOTION | PROPOSAL PENDING | PER-CALL BLOCK | PER-LINE BLOCK | FOR BLOCKING | CID PROPOSAL AUTHORIZED | PER-CALL BLOCK | PER-LINE BLOCK | FOR BLOCKING | FILED LEGISLATION | COMMENTS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| IL | CENTEL 11/9/90 | -- | -- | -- | -- | -- | YES | YES | NO | FREE | -- | -- | -- | -- | YES | LEGISLATION REQUIRING FREE PER-CALL BLOCKING FILED. UNRESTRICTED CID (AMERITECH'S POLICY) IS BEING STRONGLY CONTESTED. |
| | ILL. BELL 12/4/90 | -- | -- | -- | -- | -- | YES | NO | NO | -- | -- | -- | -- | -- | | |
| IN | BELL 5/90 | -- | -- | -- | -- | -- | YES | NO | NO | -- | -- | -- | -- | -- | NO | BELL REQUEST AWAITING PUC DECISION. GTE'S REQUEST TO CONDUCT TRIAL REJECTED DUE TO LACK OF BLOCKING COMPONENT. PUC HAS AUTHORIZED CID. TO REFILE ONLY IF IT OFFERS: UNIVERSAL FREE, PER-CALL BLOCKING; AND UNIVERSAL PER-LINE BLOCKING FOR $5.00, NON-RECURRING CHARGE; AND CALL TRACE ON DEMAND AT $1.00/ACTIVATION. |
| | GTE 3/26/90 | NO | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | | |
| IA | NO | -- | -- | -- | -- | NO | -- | -- | -- | -- | U.S. WEST CENTEL GTE CONTEL | YES YES NO NO | NO NO NO NO | FREE FREE -- -- | NO | |
| KS | NO | -- | -- | -- | -- | NO | -- | -- | -- | YES | YES | NO | FREE | NO | | |
| KY | GTE 4/90 | 10/3/90 | YES | NO | FREE | NO | -- | -- | -- | -- | -- | -- | -- | -- | NO | |
| LA | NO | -- | -- | -- | -- | NO | -- | -- | -- | NO | -- | -- | -- | -- | NO | |
| ME | NET 10/12/90 | 11/29/90 | YES | NO | FREE | YES | -- | -- | -- | -- | -- | -- | -- | -- | YES | NEW ENGLAND TEL. HAS ONE YEAR TRIAL. LEGISLATION REQUIRING FREE PER-CALL BLOCKING PROPOSED. NYNEX'S CORPORATE POLICY HAS CHANGED (D SEPT. 1990 TO ONE OF PROPOSING FREE, PER-CALL BLOCKING. "TECHNICAL SOLUTIONS" AVAILABLE FOR FOR "AT-RISK" GROUPS. |
| MD | CLP 8/31/89 | 9/27/89 12/90 | YES | NO | FREE | YES | -- | -- | -- | -- | -- | -- | -- | -- | | INITIALLY WAS NO BLOCKING, BUT ON COMMISSION STAFF'S MOTION FOR RECONSIDERATION, PUC ORDERED FREE PER-CALL BLOCKING. MOTION FOR RECONSIDERATION OF THAT DECISION DENIED. BELL ATLANTIC'S POLICY IS "ALL NUMBER DELIVERY." |
| MA | NET 3/11/91 | -- | -- | -- | -- | YES | YES | NO | FREE | -- | -- | -- | -- | | NO | |
| MI | NO | -- | -- | -- | -- | NO | -- | -- | -- | NO | -- | -- | -- | | | |

| STATE | CID FILED | CID APPROVED | UNIVERSAL PER-CALL BLOCK | UNIVERSAL PER-LINE BLOCK | CHARGE FOR BLOCKING | APPEAL/ MOTION PENDING | CID PROPOSAL PER-CALL BLOCK | UNIVERSAL PER-CALL BLOCK | UNIVERSAL PER-LINE BLOCK | CHARGE FOR BLOCKING | CID PROPOSAL ANNOUNCED | UNIVERSAL PER-CALL BLOCK | UNIVERSAL PER-LINE BLOCK | CHARGE FOR BLOCKING | PROPOSED/ FILED LEGISLATION | COMMENTS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| AL | NO | -- | -- | -- | -- | -- | NO | -- | -- | -- | YES | YES | NO | FREE | NO | |
| AS | NO | -- | -- | -- | -- | -- | NO | -- | -- | -- | NO | -- | -- | -- | NO | |
| AO | NO | -- | -- | -- | -- | -- | NO | -- | -- | -- | YES | YES | NO | FREE | NO | SOUTHWESTERN BELL'S ANNOUNCED CORPORATE POLICY IS TO PROPOSE FREE PER-CALL BLOCKING. |
| AT | NO | -- | -- | -- | -- | -- | NO | -- | -- | -- | NO | -- | -- | -- | NO | |
| AE U.S. WEST 9/90 | 9/90 | YES | NO | FREE | NO | -- | -- | -- | -- | -- | -- | -- | -- | -- | NO | APPROVED FOR ONE YEAR TRIAL. |
| LINCOLN TEL 9/90 | 10/90 | YES | NO | FREE | NO | -- | -- | -- | -- | -- | -- | -- | -- | -- | | |
| NY CONTEL 3/90 | 8/29/90 | YES | YES | FREE | NO | -- | -- | -- | -- | -- | YES | YES | NO | FREE | NO | PER-LINE BLOCKING AVAILABLE (ONLY) TO ALL RESIDENTIAL CUSTOMERS. BLOCKING IS FREE FOR NEW CUSTOMERS AND FOR EXISTING CUSTOMERS DURING VEREEN PERIOD. PACTEL'S ANNOUNCED CORPORATE POLICY IS TO PROPOSE UNIVERSAL, FREE PER-CALL BLOCKING. |
| AN | NO | -- | -- | -- | -- | -- | NO | -- | -- | -- | NO | -- | -- | -- | NO | ATNEX'S ANNOUNCED CORPORATE POLICY IS TO PROPOSE FREE PER-CALL BLOCKING. NET HAS MADE NO NEW ANNOUNCED SPECIFIC ANNOUNCEMENT. |
| NJ N.J BELL | 10/AN | NO | NO | -- | NO | -- | -- | -- | -- | -- | -- | -- | -- | -- | NO | BELL: ARRANGEMENTS MADE FOR "AT RISK" AGENCIES ONLY ON A CASE BY CASE BASIS. |
| UNITED 5/4/90 9/17/90 | 9/17/90 | NO | NO | -- | NO | -- | -- | -- | -- | -- | -- | -- | -- | -- | | UNITED: 1 YEAR EXPERIMENT IN ONE EXCHANGE. |
| NN | NO | -- | -- | -- | -- | -- | NO | -- | -- | -- | YES | YES | NO | FREE | NO | U.S. WEST'S ANNOUNCED CORPORATE POLICY IS TO PROPOSE FREE PER-CALL BLOCKING, THERE IS NO N.N. SPECIFIC ANNOUNCEMENT, BUT EXPECTATION IS FOR U.S. WEST OFFERING OF UNIVERSAL, FREE PER-CALL AND LIMITED FREE PER-LINE. |
| NY G C. TEL | 40 | -- | -- | -- | -- | -- | NO | -- | -- | -- | -- | -- | -- | -- | NO | RCENESTED TEL CONDUCTED A TRIAL WITH FREE, UNIVERSAL PER-CALL AND PER-LINE BLOCKING. P.S.C. DENIED BOTH CO'S TARRIFFS ON 3/5/91. DIRECTING THEM TO PROVIDE FREE, UNIVERSAL PER-CALL AND PER-LINE BLOCKING IF THEY RE-FILE. |
| ROCHESTER | NO | -- | -- | -- | -- | -- | NO | -- | -- | -- | -- | -- | -- | -- | | |

83

| STATE | CID FILED | CID APPROVED | UNIVERSAL PER-CALL BLOCK | UNIVERSAL PER-LINE BLOCK | CHARGE FOR BLOCKING | APPEAL/ MOTION | CID PROPOSAL PENDING | UNIVERSAL PER-CALL BLOCK | UNIVERSAL PER-LINE BLOCK | CHARGE FOR BLOCKING | CID PROPOSAL ANNOUNCED | UNIVERSAL PER-CALL BLOCK | UNIVERSAL PER-LINE BLOCK | CHARGE FOR BLOCKING | PROPOSED/ FILED LEGISLATION | COMMENTS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| NC | SO. BELL 10/30/89 | -- | -- | -- | -- | -- | YES | NO | NO | -- | -- | -- | -- | -- | NO | BELL (A BELL SOUTH CO.) AGREES TO FREE PER-LINE BLOCKING FOR LAW ENFORCEMENT, NON-PROFIT SOCIAL SERVICE OR INTERVENTION-TYPE AGENCIES AND FOR GOVERNMENTAL AGENCIES. UPON CERTIFICATION BY AGENCY HEAD, PER-LINE BLOCKING WILL BE AVAILABLE FOR AGENCY, EMPLOYEES, VOLUNTEERS AND CLIENTS. |
| | LEXINGTON 3/11/91 | -- | -- | -- | -- | -- | YES | YES | NO | FREE | -- | -- | -- | | | |
| ND | NO | -- | -- | -- | -- | -- | NO | -- | -- | -- | NO | -- | -- | -- | YES | U.S. WEST'S ANNOUNCED CORPORATE POLICY IS TO PROPOSE FREE PER-CALL BLOCKING. THERE IS NO N.D.- SPECIFIC ANNOUNCEMENT. PROPOSED LEGISLATION WOULD PROVIDE FREE, PER-CALL BLOCKING. |
| OH | BELL 2/20/90 | -- | -- | -- | -- | -- | YES | NO | NO | -- | NO | -- | -- | -- | NO | ALL NINE INTERVENORS EITHER OPPOSE OUTRIGHT OR OPPOSE UNLESS BLOCKING OFFERED. |
| OK | S.W. BELL 1/17/91 | -- | -- | -- | -- | -- | YES | YES | NO | FREE | NO | -- | -- | -- | NO | S.W. BELL REQUESTED ONE YEAR TRIAL FOR ONE EXCHANGE. CORPORATE POLICY IS FREE PER-CALL BLOCKING. |
| OR | NO | -- | -- | -- | -- | -- | NO | -- | -- | -- | NO | -- | -- | -- | YES | LEGISLATION PROPOSED TO REQUIRE FREE BLOCKING. |
| PA | BELL 3/18/89 | 11/9/89 | NO | NO | -- | YES | YES | -- | -- | -- | NO | -- | -- | -- | YES | COMMONWEALTH COURT FOUND CID ILLEGAL ON STATUTORY AND CONSTITUTIONAL GROUNDS. APPEAL PENDING IN PA. SUPREME COURT. BILL INTRODUCED LAST YEAR TO REQUIRE FREE BLOCKING IF CID ALLOWED. |
| RI | NO | -- | -- | -- | -- | -- | NO | -- | -- | -- | NO | -- | -- | -- | NO | |
| SC | BELL 12/6/89 | 4/19/90 | NO | NO | -- | YES | YES | -- | -- | -- | NO | -- | -- | -- | NO | BELL: CONSUMER ADVOCATE APPEALED ON LEGALITY VIS-A-VIS TRAP AND TRACE LAW. NOV. 26, 1990 COMM. ORDER FOUND SERVICE TO BE LEGAL; C.A. APPEALED TO SUPREME COURT. |
| | CARTREE 3/13/91 | -- | -- | -- | -- | -- | YES | YES ? | YES ? | $2.00 - $2.50/MO | -- | -- | -- | -- | | |
| SD | NO | -- | -- | -- | -- | -- | NO | -- | -- | -- | NO | -- | -- | -- | NO | U.S. WEST'S ANNOUNCED CORPORATE POLICY IS TO PROPOSE FREE PER-CALL BLOCKING. THERE IS NO S.D.- SPECIFIC ANNOUNCEMENT. |
| TN | BELL 9/29/89 | 11/7/89 | NO | NO | -- | NO | -- | -- | -- | -- | NO | -- | -- | -- | NO | |

| STATE | CID FILED | CID APPROVED | PER-CALL BLOCK | PER-LINE BLOCK | FOR BLOCKING NOTION | APPEAL/ MOTION | PROPOSAL PENDING | PER-CALL BLOCK | PER-LINE BLOCK | FOR BLOCKING | PROPOSAL ANNOUNCED | PER-CALL BLOCK | PER-LINE BLOCK | FOR BLOCKING | FILED LEGISLATION | COMMENTS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| TX | NO | -- | -- | -- | -- | -- | NO | -- | -- | -- | YES | -- | -- | -- | YES | S.W. BELL'S ANNOUNCED CORPORATE POLICY IS TO PROPOSE FREE PER-CALL BLOCKING. THERE IS NO TEXAS-SPECIFIC ANNOUNCEMENT. LEGISLATION TO ELIMINATE WIRETAP LAW OBSTACLE TO CID DISCUSSED. |
| UT | NO | -- | -- | -- | -- | -- | NO | -- | -- | -- | NO | -- | -- | -- | NO | U.S. WEST'S ANNOUNCED CORPORATE POLICY IS TO PROPOSE FREE PER-CALL BLOCKING. THERE IS NO UTAH-SPECIFIC ANNOUNCEMENT YET. |
| VT | R.C. TEL 4/90 3/90 | 4/90 | YES | NO | . FREE | YES | -- | -- | -- | -- | -- | -- | -- | -- | YES | -UNDER CONTINUING INVESTIGATION; HEARINGS HELD MARCH 12-13, 1991. CONSUMER ADVOCATES REQUESTING ADDITION OF UNIVERSAL PER-LINE BLOCKING. -INITIALLY WAS NO BLOCKING; NYNEX CHANGED CORPORATE POLICY IN SEPT., 1990 TO ONE OF FREE PER-CALL BLOCKING. -LEGISLATION PROPOSED WHICH WOULD REQUIRE "FAIR AND EQUITABLE PROVISIONS FOR THE TREATMENT OF CUSTOMER PRIVACY INTERESTS." |
| VA | C & P 9/1/89 | 10/1/89 | NO | NO | -- | NO | -- | -- | -- | -- | -- | -- | -- | -- | YES | S.B. 103, 1990 SESSION, WOULD HAVE REQUIRED FREE BLOCKING - IT FAILED TO PASS. |
|  | UNITED 8/1/90 | 9/1/90 | NO | NO | -- | NO | -- | -- | -- | -- | -- | -- | -- | -- |  |  |
| WA | NO | -- | -- | -- | -- | -- | NO | -- | -- | -- | YES | YES | NO | FREE | YES | U.S. WEST'S ANNOUNCED CORPORATE POLICY IS TO PROPOSE FREE PER-CALL BLOCKING. THERE IS NO WASHINGTON-SPECIFIC ANNOUNCEMENT. P.U.C. HAS ADVISED LEGISLATURE THAT IT WILL REQUIRE OPTIONAL, FREE PER-CALL BLOCKING. LEGISLATION CONSIDERED TO AMEND TRAP AND TRACE LAW TO ALLOW CID. |
| WV | C & P 5/89 | 8/89 | NO | NO | -- | NO | -- | -- | -- | -- | -- | -- | -- | -- | NO |  |
| WI | NO | -- | -- | -- | -- | -- | NO | -- | -- | -- | NO | -- | -- | -- | YES | AMERITECH'S POLICY IS UNRESTRICTED CID. A LEGISLATIVE COMMITTEE ON PRIVACY IS RECOMMENDING: (1) FREE PER-LINE BLOCKING AS THE STANDARD - CUSTOMER HAS TO OPT TO BE UNBLOCKED, AND (2) "DOUBLE-BLOCKING" - IF CALLER BLOCKS THEN RECIPIENT'S CID DEVICE REFUSES CALL. |
| WY | NO | -- | -- | -- | -- | -- | NO | -- | -- | -- | NO | -- | -- | -- | NO | U.S. WEST'S ANNOUNCED CORPORATE POLICY IS TO PROPOSE FREE PER-CALL BLOCKING. THERE IS NO WYOMING-SPECIFIC ANNOUNCEMENT. |

Mr. Markey. The gentleman's time has expired, and all time for witnesses on this first panel has expired.

I just want to get one thing clarified before I recognize the gentleman from New Jersey.

Mr. Cooper, on the subsequent panel which we are going to hear from this morning, Mr. Brown of Illinois Bell will refer to the demonstrated effectiveness of Caller ID in New Jersey as a basis for opposing the per-call blocking requirement contained in H.R. 1305. In your testimony, you outlined a thorough refutation of what you considered to be propaganda published by New Jersey Bell, purporting to prove that forced, unblockable Caller ID is not a great success, and you reference four formal proceedings in Pennsylvania, the District of Columbia, Maryland and Delaware, where these issues were argued.

Can you provide us with some information about the reported success of the New Jersey experience and some details on the findings of these proceedings?

Mr. Cooper. Well, as I said in my testimony, I have been in 10 Caller ID cases—4 of them have been in Bell Atlantic jurisdictions—where you can't get away with press releases. You have to put the data in the case. When you put the data in the case, and you get the underlying data and you analyze it, you discover that this 50 percent reduction, which is one of the press releases that has been out numerous times—and Mr. Rinaldo cited it and then, to his credit, he looked past it—if you look at that 50 percent, you can't find it. It's not based on a set of facts that are actually demonstrable, subject to cross-examination.

So what you will find in some cases is that it's based on survey evidence, in which more people said they had a reduction in their harassing and annoying calls than ever claimed to have got them in the first place. You discover it's an artifact of the structure of the questionnaire.

When you go and look for this big reduction in the Annoyance Call Bureau, you discover that it's just being handled in a different way. The business office now deflects problems in a different direction, or they are expressed as automatic call traces.

In the old days you had trouble with Call Trace. It took weeks and most people didn't go through it. Now you have automatic call trace. There is over 30,000 call traces a month in New Jersey. Now, Call Trace is supposed to be for serious problems. The number is there. It's a huge number. The way I calculate it, there's been not much of a decline in the 2 years in those automatic call traces. Now, if people are getting bothersome calls, sufficiently bothersome to trace them, the problem hasn't gone away.

The difficulty is that this evidence has been put in these proceedings subject to protective cover, so you can only get at bits and pieces of it in the public. But in these proceedings, in Delaware, the District of Columbia, Maryland and Pennsylvania, when you get at the underlying data, you discover that the 50 percent number evaporates, and when those bodies are balanced, they have come to the same conclusion that Mr. Rinaldo has, that per-call blocking is in the public interest.

Mr. Markey. My time has expired.

I recognize the gentleman from New Jersey, Mr. Rinaldo.

Mr. RINALDO. Thank you, Mr. Chairman.

Before I begin with my questions, I would like to request unanimous consent that Mr. Rotenberg, who testified that there is a Lou Harris poll—and he responded to that in his testimony—I would like to request that you submit that poll for the record. I think it would form an important and integral part of the record.

Mr. ROTENBERG. Mr. Rinaldo, it is attached to my testimony.

Mr. RINALDO. OK. Thank you.

I would like to continue with Mr. Cooper. Mr. Cooper, I am concerned that some unscrupulous merchants within the local exchange area may use Caller ID to mask customer information that they can either sell or use themselves in ways that may lead to unsolicited and unwanted telemarketing efforts.

For example, the Bells already would like to obtain the right to utilize reverse directories so that they can sell access to their electronic listings so that marketers can find out the name and addresses that belong to certain phone numbers. You would get the phone number, you would look it up, and then that person can be subjected to all types of sales calls.

Wouldn't per-call blocking provide consumers making purchases over the telephone with an effective protection against such practices?

Mr. COOPER. I think it would, and I think there are two pieces of evidence available in these cases that make it clear. One is that if you ask consumers what the largest source of annoying phone calls is—and there have been a series of studies—telemarketing beats and band. If there is noise and garbage on the network, it is telemarketing that they worry about.

If you ask them on what kinds of calls they don't want to forward their number, it's business transactions. They don't want to call a used car salesman and have that number pop up on the used car salesman's Caller ID box.

There has been a great debate in these cases over whether or not this is a useful way to compile a list. Frankly, it seems to me that if you call a BMW dealer expressing an interest in BMW's, and he has your phone number, that becomes a very useful sort of market segmentation. You're obviously at the high end of the market. He can sell his list that way. That's a valuable piece of information.

The thing that Caller ID does, as opposed to the phone book, it transfers your number in the context of a personal transaction. That becomes a more valuable piece of information. So if you look at the polls, and in these proceedings, the thing that people worry about is giving their numbers up in commercial transactions.

So I do believe these will become another source—local merchants don't use 800 numbers—this will become their source for compiling these kinds of lists, lists which have the added value of saying "this person expressed this kind of interest, and my list is the BMW prospects list with all those numbers I have gathered from Caller ID."

Mr. RINALDO. Thank you very much.

Miss Goldman, in my view, calling parties have an expectation of privacy that must be balanced with the privacy right of the called party. Do you believe the free per-call blocking approach of H.R.

1305, coupled with the option of a per-line block for those paying for unlisted numbers, accomplishes this result?

Ms. GOLDMAN. We absolutely support the per-call blocking option in this bill. In fact, we have supported it in other similar bills in the House and Senate that would amend Federal law.

The per-line blocking is a more difficult issue for us. A number of our affiliates have supported the per-line blocking option. I think it makes sense. It is very difficult, though, to imagine how you would allow certain per-line and per-call blocking options to work. But our main position is that we do absolutely support the right of people to be able to control personal information about themselves.

Mr. RINALDO. How about a person with an unlisted number? They're paying a fee. I guess the fee can range over $1 a month in some cases. Shouldn't they have a right to automatically have the option as to whether or not they want to protect that number? Presumably, that's the reason why they are paying for an unlisted number to begin with.

Ms. GOLDMAN. Clearly, they have a stronger interest in protecting their privacy. But in our position, what we have determined is that the privacy interest of the person on the receiving end outweighs the privacy interest of the caller, which is why we place the burden in our position on the caller to have to block on a per-call basis.

Mr. RINALDO. I would like to ask Mr. Rotenberg his opinion on that.

Mr. ROTENBERG. Well, our position, Mr. Rinaldo, differs only slightly from the ACLU's, in that we don't see it as a zero sum situation. The problem with the balancing analogy in the Caller ID setting is that it assumes what the call receiver gives up in privacy the person who makes the call gains. It is not at all clear that that's the case.

The call originator can choose not to disclose their number, and the call recipient can choose not to accept calls from people who don't disclose their numbers. In fact, this is precisely the approach that is being followed in Europe, where they are struggling with the same issue of Caller ID that we are in this country.

It is for this reason it is not a zero sum privacy situation. We believe the caller's current expectation of privacy, which is that their number will not be disclosed unless they take an affirmative step, should be protected. But we certainly agree with you, that a caller has a heightened privacy interest if he has selected an unlisted or unpublished service, because in that case, to disclose the numbers is to undermine the service.

Mr. RINALDO. And the fee he is paying.

Mr. ROTENBERG. Absolutely.

Mr. RINALDO. Mr. Cooper, aren't there also constitutional rights at stake in the Caller ID debate that we are currently going through? What is your analysis of the proper balancing of those constitutional rights?

Mr. COOPER. I'm not a lawyer. The constitutional question has been engaged in one State, for instance, in Pennsylvania.

In my testimony I make the following point. We might find that Caller ID is constitutional. We find lots of things constitutional, but that doesn't make them good public policy. For instance, in South

Carolina, which is an example that's been used, the original court judge found that, in his opinion, the service did not violate the Constitution or the State's "trap and trace" law. But he put a cover letter on it that said, "If I could decide this on substance as opposed to constitutionality, it's crummy public policy and there ought to be blocking."

I think this committee's decision to take a legislative approach is exactly right. This is a matter of public policy. Lots of things are "constitutional", but they don't make good economic or public policy sense. So I don't think we even need to get to that level.

You might find differences of opinion here, but I think we all agree that, as a matter of public policy, there ought to be the ability for consumers to protect and defend their telephone numbers and keep them private.

Mr. RINALDO. Thank you.

Thank you, Mr. Chairman.

Mr. MARKEY. The gentleman's time has expired.

The Chair recognizes the gentleman from Texas, Mr. Barton.

Mr. JOE BARTON. Thank you, Mr. Chairman.

I want to ask some simple questions to Mr. Beard and Mr. Shreve. I'm a new member of the subcommittee and I don't claim that I know all the buzz words that you're talking about. Could you explain to me the difference in layman's terms between caller identification and call tracing?

Mr. SHREVE. I think that's a large part of the confusion. I don't think there is enough information put out on the very basics of the whole program.

On Caller ID, the person who takes the Caller ID service would purchase the screen and then subscribe to the service and pay a monthly fee so that the calls coming in would appear on that screen, the number of the caller.

Mr. JOE BARTON. This would be a screen at the recipient's home?

Mr. SHREVE. That's right. Anyone that subscribed to that would have a Caller ID screen, and the person who is calling them, their number would appear on the screen.

Mr. JOE BARTON. What actually appears on the screen? Just the telephone number?

Mr. SHREVE. The telephone number only.

Mr. JOE BARTON. Not the name; just the phone number?

Mr. SHREVE. Just the phone number. The telephone number appears on the screen.

Now, where I think a large part of the consuming public misunderstood from the first press releases that came out was—I think we can all agree, anyone that's responsible, can say we would like to have a deterrent to obscene phone calls and harassing phone calls. However, under that plan—and it is not made obvious by the telephone companies—if I want to make an obscene phone call, even though you have a Caller ID screen, I can block that call by making a local, operator-assisted call, or a credit card call, or using a cellular phone, or they also could go to the pay phone down the street.

Mr. JOE BARTON. I understand the pay phone, but is the other simply because the particular telephone company in Florida does it that way?

Mr. SHREVE. I think that's going to be inherent, as I understand it, in all the systems that will be offered at this point. But that is not made obvious.

Frankly, when I first started getting into this, I had not taken a position. My statutory authority is to represent the citizens of the State of Florida. I wanted to see where they were coming down. They never understood this. I don't think the press understood this. You had editorials all in favor of deterring obscene and harassing phone calls, but it was never made obvious to them that the question was not really whether to allow blocking or not because blocking was available.

Then, when the people who had unlisted or unpublished telephone numbers started objecting to giving up their number, then you find the telephone company tells them not to worry, all you have to do is make a credit card call or an operator-assisted local call, or use a cellular phone, or go down the street to the pay phone.

The only problem is, in each one of those blocking opportunities, the opportunities available to the person with the unlisted phone number to block pays Southern Bell, in our case, either 75 cents or $1. So the question wasn't whether to block or not; it was whether to pay Southern Bell to block or not. Now, that's the part of Caller ID.

Now, Call Trace is where the number—and this is available and has been available in some places on a per-call basis, and in some places on a subscription basis. Call Trace is where, if I make—I think I'm going to change this. Instead of me making the obscene phone call, I'm going to have somebody calling me making the obscene phone call.

If someone calls me and makes an obscene or harassing phone call, I can key in certain numbers or a certain code. That number will not appear on the screen anywhere, but it will be locked in with the telephone company and is available to law enforcement——

Mr. JOE BARTON. I want to make sure I understand this.

My wife is home, in my home town—and we don't get obscene phone calls. I don't want to mislead the committee. I'm not getting all kinds of perverted phone calls at my home. Basically what I get is calls from people and then they hang up. They just call and—maybe I'm not voting right. I don't know. But they hang up on me.

If it's a Call Trace, a call is received, what do I have to do to trace that call under Call Trace?

Mr. SHREVE. All right. There are a couple of things available. On Call Trace, you would key in the key for that local telephone company. It would usually be three digits that you would punch on the phone.

Mr. JOE BARTON. When I get the call?

Mr. SHREVE. When you get the call.

Mr. JOE BARTON. Immediately?

Mr. SHREVE. Yes, when you hang up.

Mr. BEARD. In our case you punch "Star 69" after they've hung up, and that number will be recorded at the central office, at the switch. You will not have access to that number at your home, but the telephone company will. You pick up the phone and you call

the telephone company. You say, "my number is such-and-such and I've just keyed in Call Trace because I've had an obscene phone call, or I've had them hanging up on me repeatedly."

I had a situation where I was getting a phone call every 30 minutes and then hanging up. I came to find out that a computer had been programmed with the wrong telephone number and it was trying to interface with a modem. Unfortunately, I wasn't a modem. It kept redialing, trying to get to me.

It was at the office, so I put Call Trace on it. They backtracked through it, and in that instance Call Trace was more effective than Caller ID would have been, because we found out what the problem was.

Mr. JOE BARTON. If I key in this three-digit code, what happens to that? Can I find out?

Mr. BEARD. No.

Mr. SHREVE. No. You would contact the telephone company or law enforcement, depending on how it's set up, and if it is an obscene or harassing phone call, that person can be prosecuted. But the person receiving the phone call would not have the phone number.

What law enforcement doesn't like about Caller ID, or part of it, is vigilante justice. You would not have that telephone number, but it would be locked in and available.

There is another thing available, too. It's called Call Return, where you can just key in certain numbers and that call is immediately returned to the party that made the call. If they called you and hung up, you could call back and talk to them, find out if they——

Mr. JOE BARTON. I want to make sure I understand this. For caller identification, there is a screen in the home and the phone number is actually displayed on the screen.

Mr. BEARD. Right.

Mr. SHREVE. That's correct.

Mr. JOE BARTON. Call Trace, the recipient of the phone call has to make an affirmative action to key in some sort of a code and that identifies at the telephone company what that phone call is but that's all. I mean, I don't know who it is——

Mr. SHREVE. That's right.

Mr. JOE BARTON [continuing]. So I can't do anything.

Mr. BEARD. It operates just as a trace and trap would today. That number is located at the central office, the phone company has it. You, as the end user, do not.

Mr. JOE BARTON. What do I do if I want to complain about that?

Mr. BEARD. What happens is, just as in trap and trace today, one is not going to do it. It is going to have to be a repeated problem. You're going to have to go to law enforcement and they're going to have to investigate it, just as trap and trace would occur today, from a law enforcement standpoint.

It only streamlines the process in that you, in each instance when it occurs, you can do something about it affirmatively. But you don't have that information, nor will you be given that, either.

Mr. JOE BARTON. The chairman has been very kind to me, but let me ask one final question.

Why is there a right for somebody to invade my privacy anonymously? I don't understand that. I don't understand why at least the tenet of this bill is that somebody who is trying to contact an individual has a right to do that anonymously. Mr. Cooper?

Mr. COOPER. Yes, I've had this dialogue with a lot of PUC commissioners and others. The interesting thing is, the placing of a phone call you have defined as an invasion of your privacy. Most phone calls are not seen that way.

Mr. JOE BARTON. I understand that.

Mr. COOPER. The vast majority are seen as efforts to communicate. You can also use the "knock on the door" analogy. There is no right to invade your privacy. I can knock on your door, I have a right to walk up and knock on your door, and I have a right to dial your number and ring it. You have a right to walk to the door and say "Who is it?" If I don't respond, you say "I'm not interested. Go away from door," et cetera, and I may turn around and walk away.

When I ring your phone, you pick it and you have the same right to say "who is it?" If I don't answer, you say "I'm not going to talk to people who don't identify themselves" and you hang up. Essentially, there is no right to do anything anonymously. You control the exchange of information by saying "who is it".

When someone walks up to your door and if I'm wearing a gorilla mask or a Groucho Marx mask, I still have the right to knock on your door. You look out and you say "I don't recognize that guy; who is it?" That's a perfectly balanced right.

Now, if I stand there and keep knocking on your door, I suppose you can open the door and grab me and throw me down the street, which is a bit of vigilante justice, or you could call the police and say I've got some guy over here trespassing and harassing me. I think that's the way law enforcement would rather have you deal with it, rather than go out and grab the guy.

That's exactly the situation with Caller ID. Suppose your wife gets the number on the box. What do you want her to do with it?

Mr. JOE BARTON. We're going to call the local police or whoever the local authorities are——

Mr. COOPER. You're not going to have her open the door and get in a fight with the guy. That's exactly the point.

Well, Call Trace does that for you. You get a trace, you call the police, and you invoke the authorities. So Caller ID really hasn't given you a great deal in your situation where you have this problem.

Mr. JOE BARTON. It gives me more than I have now, which is nothing.

Mr. COOPER. That's right.

Mr. JOE BARTON. I yield back to the chairman.

Mr. MARKEY. The gentleman's time has expired.

I have to ask just a couple of questions to this panel before we complete this group and then move on quickly to the last panel.

Mr. Shreve, quickly, please, again, on the next panel, one witness will suggest that a federally-mandated blocking requirement is unnecessary and preemptive and that each State should decide the appropriate form of Caller ID. In your testimony you discussed the current environment of State regulation.

Do you believe the current patchwork-quilt of differing State laws and regulations can adequately protect the privacy interests of makers of phone calls?

Mr. Shreve. I think in this situation—and I think all of you have been raising balance, that you're all looking for something here that will give us a balance and try to give the best of all worlds to everyone.

Without even carrying it all the way to a State-by-State basis, in our State—and I don't think this is going to happen, but it is possible, and we have been concerned about it, and law enforcement has been concerned about it—in our State, Southern Bell offered the Caller ID without any blocking, except for that by credit card calls or——

Mr. Markey. Is Federal legislation necessary? That's all I need to know, please. I have to move on quickly.

Mr. Shreve. I think so, and my reason is because Centel, on the other hand, within our State, offered it a different way. If you come up within a State with two different types of proposals or approvals, then you're going to have a real problem for law enforcement.

Mr. Markey. Thank you.

Miss Goldman, in your testimony you support the establishment of a national "do not call" list, and state that "opt out" databases where people can elect not to be on a list provides an appropriate balance between the legitimate privacy rights of the individual and the societal value of receiving commercial solicitations.

You also highlight the fact that the Direct Marketing Association, which will testify on the next panel, operates a telephone and mail preference service of computerized lists of people who have contacted the association to request that their names be removed from telephone and mailing lists.

While the Direct Marketing Association encourages member companies to purchase and abide by the lists, what do you feel are the shortcomings or problems of the Direct Marketing Association approach? Very quickly, please.

Ms. Goldman. Mr. Chairman, I say in my statement that while DMA has such a list, it is a voluntary list, voluntary to their members and certain nonmembers. They can choose to use it if they want. It is unenforceable. So when a person decides that they want to remove their name from a mailing list or a telemarketing list, they can put it on the DMA's list and there is no assurance that it will actually keep them from being called.

Mr. Markey. OK. So it's lack of enforceability, it's strictly voluntary, and there is no guarantee that the individual is going to be protected?

Ms. Goldman. Absolutely.

Mr. Markey. Finally, Mr. Beard, can you tell the committee how many complaints per month have been received by the Florida Division of Consumer Services regarding problems from unsolicited calls? In your testimony, you noted that Florida recently passed a statute that prohibits telephone solicitors from calling consumers who are registered on a list of persons who do not wish to receive telemarketing calls. Can you provide the committee, you or Mr.

Shreve, with details about the success of this opt-out list in Florida?

Mr. BEARD. I don't have a specific number. The complaints are growing. The enforceability is tough. I would agree with what she said.

Mr. MARKEY. OK.

Mr. Shreve or Mr. Beard, if you could provide that, it would be enormously helpful to us.

Mr. SHREVE. We would be happy to.

Mr. MARKEY. I apologize to the panel. You've been very good and constructive in your presentations. We are going to be working closely with you. There is some tension that exists on this panel, although not as much as with the next panel. Amongst all of you, we're going to have to work closely together if we are to construct a bill, because we are going to move quickly this year. Thank you all very, very much.

Our next panel is Mr. Donald MacKenzie, President of NYNEX Information Resources Company; Mr. Richard Barton, Executive Director for the Direct Marketing Association; Mr. Richard H. Brown, President of Illinois Bell; and Mr. Michael J. Frawley, President of Gold Coast Paging, Inc.

Gentlemen, I very much appreciate your cooperation and participation in our hearing today. Again, we are under some time constraints. If you could keep your opening statements down to 5 minutes, that would still leave us with 15 minutes or so to go through our question and answer period.

We will begin with you, Mr. Brown. Whenever you feel comfortable, please feel free to begin.

STATEMENTS OF RICHARD H. BROWN, PRESIDENT, ILLINOIS BELL; RICHARD A. BARTON, VICE PRESIDENT, DIRECT MARKETING ASSOCIATION; MICHAEL J. FRAWLEY, PRESIDENT, GOLD COAST PAGING, ON BEHALF OF TELOCATOR; AND DONALD MACKENZIE, PRESIDENT, NYNEX INFORMATION RESOURCES CO., ON BEHALF OF YELLOW PAGES PUBLISHERS ASSOCIATION

Mr. BROWN. Thank you, Mr. Chairman, and members of the subcommittee. I am delighted to be here. My name is Dick Brown and I'm the President of Illinois Bell.

Illinois Bell and Ameritech oppose Federal Caller ID legislation because it would curtail discussion on the issues at the State level at this time. Public utility commissions throughout the country are already exploring how to best offer Caller ID in their respective jurisdictions. State commissions are responding to the needs of their constituents in different and sometimes experimental ways. Such experimentation would be stifled by preemptive Federal regulation at this time.

Illinois Bell recently filed for permission to offer Caller ID without blocking. The Illinois Commerce Commission staff has since recommended that our proposal be adopted on a 2-year trial. I might add that another telephone company, Centel, in Illinois, has offered to offer this service on a per-call blocking basis, and the staff recommendation at this time is to allow that trial to also take

place, in concert with ours, on a 2-year trial basis. The proposed Federal legislation would preempt the Illinois Commerce Commission's efforts at this point.

There is no doubt about the public's interest in Caller ID. Though it is not yet available in Illinois, our customers very seriously expressed a great interest in Caller ID, more than in any other new service we offer.

Our research indicates why. According to a survey we conducted last August, nearly 30 percent of Illinois Bell resident customers told us they had received one or more obscene telephone calls in the last 12 months. That translates to more than 1 million Illinois residential customers receiving obscene calls. More than 10 percent of our customers had received harassing and threatening telephone calls, and that translates to more than 300,000. The most serious complaints are referred to our Annoyance Call Bureau. The number of calls the Bureau handles rose 8 percent last year, to nearly 66,000.

Ninety percent of Illinois Bell's customers in our surveys of interviews said they had received problem calls within the last year. Not surprisingly, many were unsolicited telemarketing calls. There is a lot of concern that businesses have about misusing Caller ID and to assemble database files on customers. However, businesses do not do that today, rather, without the fact that Caller ID is in place, and Caller ID can actually protect customers from inconvenient business calls.

Other services, such as Call Trace, as was mentioned, do not provide the same benefits and are not realistic substitutes, in my estimation, for Caller ID. For example, poison control centers and suicide hot lines need immediate access to a caller's telephone number to save lives.

For the vast majority of our customers, Caller ID without blocking is no more intrusive than automobile license plates. Our customers view this service as giving the called party parity with the person calling. Illinois Bell recognizes that certain groups, such as domestic violence shelters, undercover law enforcement and so forth need to retain their anonymity when placing some of their phone calls, and we are working very closely with such groups. Many value the benefits of Caller ID. They are satisfied with the technological alternatives we have developed that guarantee anonymity to them. It is important to address the needs of such groups creatively, but not to do so by limiting new technological developments.

It is also important to draw a distinction between a right to privacy and a right to anonymity. We support everyone's right to privacy and believe that Caller ID can help ensure that right. We do not believe that anyone has the right to harass or threaten other people by hiding behind a mask of anonymity. Federal legislation mandating blocking would hamstring the effectiveness of Caller ID.

Illinois Bell and Ameritech unequivocally favor Caller ID without blocking, with accommodations for groups with legitimate needs for anonymity. Regulatory commissions in Illinois, Indiana and Ohio in our region are evaluating proposals to offer this service. It is the most effective method for combatting telephone abuse. We believe that every State should continue to be free to decide

how to regulate Caller ID for its citizens. Where needs vary, rulings may differ. However, there is no need to mandate Federal restrictions at this juncture.

Thank you, Mr. Chairman.

[The prepared statement and attachment of Mr. Brown follow:]

STATEMENT OF RICHARD H. BROWN, PRESIDENT, ILLINOIS BELL

My name is Richard H. Brown. I am the president of Illinois Bell. I also chair Ameritech's consumer and small business strategy group. The Ameritech Bell Group, in addition to Illinois Bell, consists of Indiana Bell, Michigan Bell, Ohio Bell, and Wisconsin Bell.

My testimony will explain why there is no need for Federal Caller ID legislation, and no need for a Federal Caller ID blocking requirement. Such legislation is unnecessary and pre-emptive. Each State should be able to evaluate the needs of its residents and decide which form of Caller ID is best suited for them.

We have researched the problems and needs of Illinois customers and evaluated the success of the New Jersey Bell Caller ID service. We have filed with the Illinois Commerce Commission for permission to offer the service without blocking. The Illinois Commerce Commission staff recently has recommended that our proposal for Caller ID without blocking be approved for a 2-year trial. The staff recommends that Illinois consumers have the opportunity to use Caller ID to meet their needs.

At Illinois Bell, we have spent thousands of hours talking to our customers about Caller ID. Customers request Caller ID more than any other new service. They tell us that they want the advantages of Caller ID. They want a service that will enhance their privacy, that will add to their sense of security, that will give them a share of the control that today is in the hands of the person making the call.

Today the callers hold all the cards—they know your number, probably your name, and definitely the reason why they are calling. Caller ID balances the equation—it gives the persons receiving the call a piece of information that they can use in determining how to handle that call.

We believe that everyone has a right to privacy. No one has a right to anonymity.

It is our view based upon interviews with Illinois customers and studies of New Jersey's experience over 3 years with Caller ID without blocking that:

—The vast majority of customers rarely, if ever, make calls where they must retain their anonymity.

—There is a relatively small number of people who have legitimate needs to make some phone calls anonymously. We have solutions for these people.

—Society has serious and increasing problems with telephone crime and telephone abuse:

  —Troubled individuals destroy peace of mind with their obscene phone calls.
  —Sadists make false bomb threats. Terrorists make real ones.
  —Con artists misuse the telephone to defraud the elderly and vulnerable.
  —Kidnappers misuse the telephone to make their ransom demands.
  —Pranksters place false telephone orders with small businesses.
  —Racists make threatening phone calls.
  —Burglars misuse the telephone to check for vacant residences.
  —The list goes on.

In 1990, Illinois Bell representatives received an estimated 200,000 calls from customers who had received problem calls. About 66,000 of these calls were serious enough to be referred to the Illinois Bell Annoyance Call Bureau. The Annoyance Call Bureau handles customer inquiries about abusive calls once it has been determined that other methods of addressing unwanted problem calls are not proving effective. This was an increase of about 8 percent from the number of reported problem calls from a year earlier. These 200,000 calls to our representatives and 65,000 calls to the Annoyance Call Bureau are in addition to the substantial number of such calls that go unreported to Illinois Bell.

In August of last year, Illinois Bell conducted research which confirmed the serious problem that exists with abusive phone calls. The attached chart demonstrates the results of this research.

The study of Illinois Bell customers shows that almost 90 percent of those interviewed said that they had experienced problem calls within the last year. Almost half of the customers had received prank calls during this same period. Additionally, almost one-third (over one million customers) had received an average of six obscene calls, and one in ten (over 320,000 customers) had received as many as ten

threatening or harassing calls during the same period. Of the customers surveyed who had received problem calls:

—Twenty seven percent said they had contacted the telephone company for assistance or advice.

—Eighteen percent said it was necessary to change their telephone number to attempt to control the problem.

—Ten percent contacted the police.

Problem calls have other adverse societal impacts as well. For example, the Chicago Fire Department has responded, on average, to 8,300 false fire alarms per year over the past 3 years. This means that the City of Chicago, alone, is spending over $20 million annually responding to malicious false fire alarms. this number does not include false requests for emergency medical services or bomb threats.

These false alarms are costly, life threatening, and take away from the more important duties of public safety, law enforcement agencies and security departments to respond to true emergencies.

We have received many favorable comments and letters of support for our proposal. For instance, customers have told us how Caller ID would be used as an aid in suicide prevention, to help "latchkey children," to assist in eliminating prank calls and bomb threats, to prevent computer hacking, to save lives, to aid the handicapped.

Many customers have related specific instances of how Caller ID could have helped them. Such stories range from nuisance calls to much more serious problems, such as bomb threats or the need to know the location of the calling number in domestic violence situations. These discussions with customers have influenced our decision to offer Caller ID without blocking.

To substantiate our findings from the studies and interviews we have done with our own customers, we have investigated Caller ID trials and service offerings in other jurisdictions. We have particularly concentrated on the actual Caller ID experiences in New Jersey, because the service has been in place the longest there, and the service has been closely monitored.

We have learned several things from the New Jersey experience:

—Caller ID without blocking has enabled customers to end telephone abuse immediately and decisively without the protracted involvement of either the telephone company or the police.

—Caller ID has enabled emergency service providers in New Jersey to respond more quickly in emergency situations.

—Caller ID's ability to benefit the public in dealing with bomb threats has been demonstrated in New Jersey, both in apprehending persons making such threats and in curtailing the number of such threats.

—Caller ID has been credited with having a substantial deterrent effect upon telephone false fire alarms.

—Caller ID service has saved municipalities and police departments time and manpower requirements for trapping and arresting telephone abusers. These are funds that are now available for other law enforcement activities.

An important point to remember is that Caller ID without blocking benefits all consumers, not just Caller ID subscribers. The person placing a call has no way of knowing whether the called party has Caller ID, but will know that the possibility exists. This uncertainty produces a greater reluctance to engage in abusive calling practices. Therefore, simply making Caller ID service available without blocking will reduce substantially the overall number of abusive calls to everyone, subscribers and nonsubscribers alike. For example, the reports of problems calls in New Jersey have decreased substantially since the introduction of Caller ID service even though less than 5 percent of the customers subscribe to the service.

In Illinois, we have found that customers see the same benefits to Caller ID. They want to subscribe to Caller ID without blocking. They believe that Caller ID would help control their unwanted and problem calls.

Most customers also believe that anonymity is unacceptable and they do not have more than an occasional need to make anonymous calls. For these occasional needs blocking is not needed.

As I indicated earlier, a large majority of Illinois Bell customers have experienced problem phone calls and a number of these customers have gone to great lengths to attempt to remedy the situation, e.g., number changes, contacting Illinois Bell or involving the police. Three quarters of the customers surveyed felt that Caller ID would be helpful to them in preventing these problem calls.

Illinois Bell recognizes that certain groups, such as domestic violence shelters and undercover law enforcement agencies, have legitimate needs for anonymity. In Illinois, we have met with over 500 different groups to address any concerns.

The vast majority of these groups recognize the value and benefits of unrestricted Caller ID. We are working individually with these groups to understand their special needs, and provide solutions that utilize services already available. We believe we can satisfy any unique needs without sacrificing the benefits of Caller ID to all of our customers.

In the early years of the telephone industry, the persons receiving calls knew the identity of the calling party because the operator who placed the call would announce the calling party. That right to know who was calling, however, was lost as direct dialing was developed and implemented. It is our view that Caller ID without blocking will restore the balance between the calling and called party.

Today, persons initiating calls knows your telephone number, the purpose of the call, and possibly your name and address. They choose the time of the call. On the other hand, the called party has no knowledge of the purpose of the incoming call, does not control the time the call is received, and does not know the identity of the caller prior to answering, and even then only if the caller chooses to identify him or herself.

Caller ID without blocking restores the balance by allowing the called party the opportunity to help identify the calling party, through the display of the incoming telephone number, plus allows some degree of control over the timing of the call.

If a person is at home alone late at night and receives a knock at the door, chances are that he or she will not open the door without looking through the peephole or window to identify the visitor. On the other hand, a person receiving a late night call has no such option, and can only identify the caller by answering the phone. Upon answering, the person can become the victim of an obscene, threatening or otherwise abusive call.

With Caller ID the called party can begin to have some of the same rights with the telephone that they have when they go to the door. However, in order to effectively balance the rights of both the calling and called parties, Caller ID also must be available without blocking.

Caller ID gives customers a means to identify telephone visitors before allowing them into the privacy of their home. It is the electronic equivalent of a "peephole" in a door.

I believe that this is the proper perspective of Caller ID. Unfortunately, there are those that see Caller ID differently, as a tool for unscrupulous telemarketers or other businesses to build personal data files.

Certainly, unethical use of personal information is a real concern to all of us. However, it is the secondary use of personal information that needs to be addressed, not Caller ID. Federal Caller ID restrictions will not stop businesses from amassing immense amounts of personal information, as they do today.

Caller ID is a service for residential and small business customers. It is inefficient for building new lists. It is expensive and unreliable since telephone numbers alone do not provide personal information.

Federally mandated Caller ID blocking will attack technology, not the problem of personal database proliferation. Blocking will only take away the ability of customers to deal with unsolicited or other unwanted calls. The bad guys will abuse blocking, more than the good guys will benefit from it.

By making the calling number available to customers, Caller ID provides them with added convenience by allowing them to screen and manage incoming calls.

It promotes safety by providing information to emergency services, friends or relatives.

It can be of assistance to many of our elderly or handicapped customers.

Caller ID also has many applications for business customers, such as providing an easy of verifying accuracy of location of the calling party for pizza or other delivery services or by curtailing computer hacking.

Should a caller prove to be abusive or threatening, customers with Caller ID will be able to handle the matter themselves or to refer the matter to the appropriate authorities. For example, customers can, and should, handle a teenager's prank calls without burdening law enforcement authorities.

In Illinois Bell's view, the blocking option would shift the power and control back to the caller and away from the person receiving the call. The equation again becomes unbalanced.

Per call blocking would diminish essential benefits that Caller ID service offers. Problem phone calls will not be curtailed with per call blocking because abusers of phone service will be able to continue making annoying, obscene or threatening calls anonymously. Caller ID customers will lose the ability to manage incoming calls because the incoming numbers on blocked calls will not be available for later call back. Computer hackers will be able to probe access lines freely. Unethical tele-

marketers will continue to prey on unsuspecting customers. Businesses will not have the same ability to provide improved customer service if numbers for incoming calls were blocked. And the general public will see no benefit from the service because bomb threats, false fire alarms, and other threatening calls will continue unabated if blocking is allowed.

Caller ID critics claim that other services, such as Call Trace and Call Screening, are just as effective as Caller ID in dealing with telephone abuse. I disagree.

When a customer uses Call Trace, the number is provided only to the police. The Chicago Police Department has expressed serious concerns about its ability to handle the volume of Call Trace requests from an Illinois Bell trial scheduled to begin in May. Unfortunately, higher priorities prevent them from adequately dealing with obscene and harassing calls.

In some areas where Call Trace is offered, police require victims of harassing calls to document as many as ten calls before taking any action. The legal process is lengthy, frustrating, and requires prosecution, when most people just want the calls to stop.

Call Trace has not proven to provide the same societal benefits as Caller ID in deterring threatening, obscene and annoying calls. Also, unlike Caller ID, Call Trace does not afford the opportunity for immediate resolution of the problem, such as prank calls from children. Additionally, Call Trace does not provide the immediate calling number information to the customer which would give the customer potentially useful security information. Call Trace does not work in situations, such as suicide calls, where the person called must stay on the telephone line.

In summary, Call Trace is useful in dealing with cases of serious criminal abuse. It does have limitations. It is resource-intensive, requires proactive and accurate customer interaction, is necessarily time consuming, and lacks immediacy. On the other hand, Caller ID without blocking deters both serious criminal offenses and the less serious abuses of telephone services such as prank calls without the limitations associated with Call Trace.

Illinois Bell has made Call Screening available for over a year. Call Screening allows customers to prevent calls from certain numbers from reaching them. Like Call Trace, Call Screening does not provide any information to the subscriber. It is not immediate. And, while Call Screening has its applications, it has not reduced the number of obscene and harassing call complaints in the area it is offered.

Proponents of Caller ID with blocking allege that a service under development called "block the block," a service that would prevent the completion of blocked calls to a Caller ID subscriber, would deter telephone abuse. I do not believe this to be true.

Block the Block is years away from field introduction. And, by its nature, "block the block" will constrict the telecommunications network.

The proponents of blocking, by endorsing "block the block", recognize that blocking will permit phone abuse to continue. Abusive, threatening, or harassing callers will block their numbers before making a call. Proponents of blocking suggest that "block the block" will solve these problems. Unfortunately, a person experiencing a problem will have to subscribe to Caller ID and "block the block" just to avoid these calls. The Caller ID subscriber will receive no information about the call.

More importantly, however, the non-subscribers will lose the deterrent benefit of Caller ID without blocking. The caller will continue to make calls until reaching a non-subscriber, or a subscriber that will answer a blocked call. The caller can continue to make anonymous calls without threat of identification.

Illinois Bell believes that each State must study and assess the needs of its own customers and decide which method of providing the service best fits those needs. Although some States have reached different decisions, those decisions were based on the needs of those States and should not be forced on others. After careful consideration, we have determined that Caller ID without blocking best fits the interest and needs of our customers and maximizes the benefits to be derived from the service.

Mr. Chairman, the problem with mandating blocking is that it will return anonymity to the malicious callers, to the abusive callers, to the obscene callers . . . and will perpetuate the serious problems facing our customers today. The point is a simple one: the bad guys will abuse blocking, more than the good guys will benefit from it.

We have the technology to combat these widespread problems and help our constituents. Technology should not be feared. Change should not be feared. Over time, we have embraced VCR's, fax machines, personal computers, and the like. Because of the societal benefits, we also ought warmly to embrace the Caller ID service without blocking.

page 344
Exhibit 23

100

Illinois Bell and Ameritech favor unrestricted Caller ID because it restores full accountability when using the public telephone network. Our customers want and should be able to experience Caller ID without blocking. It is the only proven method to combat phone abuse, and we believe it is the right thing to do.

Each State should continue to be free to decide how to best balance the interests of its own citizens. There is no need for national legislation on Caller ID or related services.



# Customers With Problem Calls
## (At Least 1)

**SOURCE**

Caller ID Profile
Product Effect Study
Illinois Bell Business Research
November 1990

page 346
Exhibit 23

101

Mr. MARKEY. Thank you, Mr. Brown, very much.

Our next witness is Mr. Richard Barton, Executive Director of the Direct Marketing Association.

### STATEMENT OF RICHARD A. BARTON

Mr. RICHARD BARTON. Mr. Chairman, it is a pleasure to be here. We appreciate your inviting us to testify on these very important issues and very important bills.

I represent the Direct Marketing Association, which is an association of approximately 3,000 domestic companies that deal in all forms of direct marketing, including primarily mail and telephone, so these issues are very important to us.

I want to emphasize at the beginning, as has been touched on by the previous panel, that this association has been very deeply dedicated to the concept of self-regulation to the extent it's possible, but also to enlighten good regulation on a Federal or State level, when it is necessary. Therefore, we approach the bills you have here with a little bit of a mixed feeling—and I will explain that to you as we move along.

Last year we had very good working relationships with you and your staff and came out with a bill on fax and automatic dialing machines that we thought was a good bill, which is the kind of good regulation that we're talking about, trying to get at specific problems that the technology created and to prevent those problems from happening.

The bill, which was finally agreed to but never passed and sent to the President, did things like prohibiting sequential dialing for ADRMP's, established automatic disconnect rules, required identification of the calling parties on prerecorded messages, and prohibited those machines from calling critical numbers such as hospitals and things of that nature. We thought that was a good bill and still think it's a good bill. So those aspects of H.R. 1304 that are still there we support.

However, we were a little bit surprised—and I have to say dismayed—when the new bill came out and we have found the bill itself and its intention has gone far broader than trying to solve specific problems that technology has created. We are now into the rather murky area of either banning or significantly regulating, with civil penalties, unsolicited phone calls made not by machines but made by live operators. We think we have to look very carefully at this before we decide we can move ahead with the bill.

As specific problems, in terms of the unsolicited phone calls and having to run by a federally-maintained list of "do not call", lie in 2 or 3 different areas. First, we are concerned about a scope of coverage through the definition of what telephone solicitation is. It covers basically commercial solicitations, so as I will say in a second, it is not exclusively commercial. It says that if you're going to make a call to sell goods and services, et cetera, that you have to run it by a national list. But it is not content neutral. In the first place, we do not include fundraising calls; we do not include political calls asking people to vote; we do not include surveys in this. There is no indication anywhere that, in fact, these calls are any

less intrusive or less annoying to people than the calls that you do require follow this.

I think this is a serious problem that we need to look at. It is not a content neutral bill. You specifically say here that, for one reason or another, we have to subject to Federal regulation unsolicited calls of a particular nature but not unsolicited calls of another nature. I think we need more proof that, in fact, those calls that are not included in this bill are for some reason or other not as intrusive.

The second problem is that this does not now include any recognition of a preexisting relationship. Therefore, if I have subscribed to a magazine for 50 years and somebody finds my subscription is about to expire, under this bill I cannot be called by Time, Inc. or New Republic and asked if I want to subscribe, unless this company runs the calls by this "do not call" list.

This brings me to the final thing. We maintain a national "do not call" list, too, and one of our real concerns is that, as has been pointed out here, it is imperfect. We are trying to make it more and more perfect, but these lists are, by nature, imperfect. We believe that self-regulation, strongly pushed, would be better than having to subject literally thousands of national and local callers to Federal penalties if they call someone who is on this list when the list itself, we think, is not going to be a very good list in the first place.

I will continue on about H.R. 1304, if you would like to discuss that in questions, but I would like to go to the ANI, the caller identification, for just a moment, since this is a big concentration.

We have supported——

Mr. MARKEY. Mr. Barton, I'm sorry. You're 5 minutes are up. I apologize to you.

Mr. RICHARD BARTON. Very well.

Well, we support the concepts, with one exception in our testimony, and we agree with the caller blocking.

[The prepared statement of Mr. Barton follows:]

STATEMENT OF RICHARD A. BARTON, SENIOR VICE PRESIDENT FOR GOVERNMENT AFFAIRS, DIRECT MARKETING ASSOCIATION

Mr. Chairman and members of the subcommittee: My name is Richard A. Barton, and I am the Senior Vice President for Government Affairs of the Direct Marketing Association ("DMA").

The DMA, with offices in New York City and Washington, D.C., is a national trade association representing over 3,000 companies and organizations that market products and services through the mail, electronic and print media, and through telemarketing.

Members of the DMA embrace a broad range of telemarketing practices in their efforts to productively communicate with the American consumer. Some DMA members use telemarketing only on an "in-bound" basis, as an order-taking service for their customers' convenience. Others engage primarily in "out-bound" telemarketing, as an effective way to advertise and sell their products and services. Some DMA members are "service bureaus" which use telemarketing to advertise and sell the products and services of other companies.

All DMA members—including the many charitable, religious, educational, and political organizations who widely make use of telemarketing for fund-raising campaigns—recognize that the success of their telemarketing efforts largely depends upon the consumer's understanding and acceptance of telemarketing practices.

This simple fact has led the DMA to publish guidelines for businesses and consumers on how to market and shop by telephone. Based on the success of its earlier-established Mail Preference Service ("MPS"), which permits consumers to have

their names removed from many national mailing lists by request, the DMA also created its Telephone Preference Service ("TPS"), a similar program of self-regulation through which DMA members can facilitate a consumer's desire to be removed from national telephone solicitation lists. More importantly, the DMA has worked and continues to work in close cooperation with consumer organizations, and with Federal and State regulatory agencies, to actively combat telemarketing fraud and to address other consumer problems arising in the context of telemarketing.

The DMA and its members thus share a keen interest in pending legislative proposals to regulate telephone solicitation practices (H.R. 1304 and H.R. 1589) and the impact of caller identification services and automatic number identification systems on telephone user privacy (H.R. 1305). I will briefly address each in turn:

The DMA and its members are surprised and dismayed to see that H.R. 1304, the current proposed version of last year's so-called "autodial/FAX" legislation, reaches far beyond problems associated with telemarketing use of those technologies. H.R. 1304 would create a "national asterisk law" that would impose new restrictions, costs and legal liabilities on the more general practice of "telephone solicitation."

Similarly, we are puzzled by the proposal in Representative Unsoeld's bill (H.R. 1589), which would flatly prohibit "the use of automatic dialing and announcing devices for purposes of commercial solicitation."

In May of 1989, I presented testimony on behalf of the DMA at a hearing held by this subcommittee on problems associated with telemarketing uses of "automatic dialer recorded message players" ("ADRMP's") and facsimile ("FAX") machines. See "Telemarketing Practices": Hearing on H.R. 628, H.R. 2131, and H.R. 2184 Before the Subcommittee on Telecommunications and Finance of the House Committee on Energy and Commerce, 101st Congress, 1st Session 27 (1989)

The hearing focused on complaints of telephone subscribers who receive unsolicited FAX transmissions or prerecorded messages via ADRMP's, and find the telemarketing "solicitation" uses of these technologies to be "unacceptably intrusive," primarily because of the calling party's temporary "seizure" of the called party's telephone line and consequent interference with the called party's telephone line and consequent interference with the called party's ability to make or receive other calls. Id. at 1–4. As the chairman noted, this problem can become a hazard, especially when ADRMP's are programmed to sequentially dial blocks of numbers, which may include hospitals, fire stations, pagers, and the like. Id. at 1.

During the remainder of the 101st congress, the DMA worked closely with the chairman and his subcommittee staff on the ADRMP provisions of the proposed "Telephone Advertising Regulation Act" (H.R. 2921), a bill designed to address the problems that were discussed at the hearing, and the predecessor of this year's proposed "Telephone Advertising Consumer Rights Act" (H.R. 1304).[1]

The DMA continued to have problems with some of H.R. 2921's definitions, its "list clearinghouse" proposal, and a few other aspects of its provisions as they were approved by the House. However, we made it clear that the DMA had absolutely no objections to key provisions in the bill which sought to:

—prohibit sequential autodialing;

—establish a reasonable automatic "disconnect" requirement;

—require caller identification on prerecorded messages; and,

—prohibit autodial calls to critical social services and to numbers assigned to paging or cellular telephone services.

These provisions would directly address the problem of "line seizure" that occurs when a call fails to disconnect after the called party has hung-up the phone. They would also promote caller accountability through identification, and eliminate irresponsible ADRMP practices which pose a danger of interference with public access to critical social services. Moreover, each of these requirements would apply to any and all ADRMP use, without having to determine whether the use involves "solicitations" or has a "commercial" purpose.

The DMA also appreciated the fact that the committee report which accompanied H.R. 2921 recognized the importance of "legitimate business uses" of ADRMP's which should not be restricted under the bill's provisions. See H. Rep. No. 101–633, p. 7–8. Although the bill sought to restrict ADRMP calls that have the "principal purpose" of encouraging purchases, it acknowledged and sought to protect the use of ADRMP's to "eliminate costly labor" when communicating notice of any relevant development in "situations involving prior existing relationships" between the calling and called parties. Id.

---

[1] The DMA had no objections regarding the FAX provisions of the bill.

105

In light of this history of the subcommittee's recent activity in this area, the DMA believes that H.R. 1304 and H.R. 1589 reach objectionably and unjustifiably beyond the more "light-handed" kind of regulation that was evolving in the last Congress. Both of the current bills, as introduced, would unnecessarily burden legitimate tele-marketing activities with new costs and legal liabilities without any clear evidence that there is a justification to do so.

The DMA believes that the case against a flat ban on the use of ADRMP's has already been recognized by the House Energy and Commerce Committee, as noted above in our reference to last year's committee report accompanying H.R. 2921. We know of no facts or circumstances which would support the conclusion that a complete prohibition of ADRMP use for commercial solicitation is necessary or justified.

In addition to addressing ADRMP and FAX usage in provisions similar to those in last year's House-passed bill (H.R. 2921), H.R. 1304, as introduced, would make it unlawful for any person to make a "telephone solicitation" to any telephone sub-scriber who has notified the telephone company of objections to receiving such calls.

Through FCC establishment of an electronic database of "objecting" persons, and the requirement for telemarketers to purchase and check database "lists" of such persons, H.R. 1304 would establish a legal obligation for telemarketers—subject to civil penalties under the Communications Act—to avoid calling persons who object to receiving telephone calls "for the purpose of encouraging a person to purchase, rent or invest in property, goods or services without that person's prior express invi-tation or permission".

Unlike last year's House-passed bill, H.R. 1304 would directly inhibit the most common form of telemarketing which is used by a wide variety of American busi-nesses—outbound telemarketing by live operators. it would, for example, affect newspapers, magazines, cable TV system operators, gardening and pest control serv-ices, and all other kinds of distributors of goods or services who solicit subscriptions and renewals by telephone.

It would also affect retail and wholesale business use of the telephone to advertise sales, or new products or services, or to sell or extend warranty coverage. Its reach would be comprehensive in dampening today's major telemarketing practices.

From the DMA's perspective, the major problems with H.R. 1304 lie in its defini-tion of "telephone solicitation" and its scheme to require the Federal Communica-tions Commission to create and implement the operation of a national "Electronic Data Base of Objecting Persons."

The first problem with H.R. 1304's definition of "telephone solicitation" is that it is not "content-neutral." Instead, it depends for its scope on whether the caller is seeking to get the called party's agreement to exchange payment for the acquisition of an interest in property, goods, or services. This would seem to exclude "solicita-tions" for information (as in a survey or poll), votes (as in political canvassing), or funds (as in a political or charitable fund-raising effort).

However, the subcommittee's hearing record in no way shows that the likelihood or degree of (1) intrusion on a called party's privacy or (2) interference with a called party's use of their line is somehow a function of whether the solicitation has a com-mercial or noncommercial purpose. In fact, we know of no evidence that a call to solicit a called party's "business" is generally regarded as more intrusive or annoy-ing per se to the recipient than a call to survey public opinions, solicit political sup-port, or raise funds for charitable purpose.[2]

Clearly, this attempt to regulate "annoyances" is problematic. The success that many legitimate businesses have enjoyed as the result of their telemarketing efforts confirms that large segments of the American people find telemarketing to be a con-venient and inexpensive way to learn about or acquire goods or services that they need or want. We know of no empirical data demonstrating that American consum-ers are generally opposed to current "live operator" telemarketing practices, and we are uncertain what standards or measures would be appropriate to gauge consumer attitudes if such data were available. However, we would note, with some irony, that any attempt to gather such data would almost certainly rely extensively on public opinion surveys and polls conducted by means of unsolicited "live operator" telephone calls.

Paradoxically, the definition of "telephone solicitation" in H.R. 1304 appears to embrace all commercial and noncommercial solicitations in which the caller seeks to obtain something of value from the called party in exchange for acquiring certain

---

[2] Indeed, the same problem arises with the bill's ADRMP and FAX provisions, since there is no evidence that serial dialing, failure to promptly disconnect, or any other problem of intrusion or interference arising from such technologies are uniquely or even primarily associated with solicitations that have a "commercial" purpose.

rights with respect to property, goods, or services. Thus, even a nonprofit organization's call to sell tickets to a charity concert would be treated like a merchant's call to take orders for goods or services, even if the proceeds of the concert go to charity and the ticket price is tax-deductible.

However, if the caller intends the called party to give value without receiving anything in exchange, this kind of "telephone solicitation" would apparently fall outside the bill's definition of the term. Thus, solicitations in which the caller expects to acquire money, property, or anything else of value from the called party in exchange for nothing in return would not be covered by the bill.

Of course, a restriction truly applying to all "telephone solicitations" could place commercial and noncommercial callers on "content-neutral" because it would require "solicitations" to be distinguished from other messages communicated through telephone calls initiated without the called party's "prior express invitation or permission." Once again, there is no evidence that "solicitations"—as distinct from other kinds of messages—are uniquely or even primarily disfavored by telephone subscribers. Nor is there evidence to support equating the general practice of telemarketers with the special problems associated with serial dialing, failure to promptly disconnect, and similar problems identified in the subcommittee's hearings during the last Congress.

The DMA does not favor restricting any party's opportunities to access the Nation's public-switched, common carrier telephone network on the basis of the content or purpose of their message. However, as we read the definition in H.R. 1304, all commercial solicitations would appear to be covered, while some noncommercial solicitations would be covered and some would not. There does not appear to be any rational policy basis for these distinctions in terms of addressing unwarranted intrusion and interference. More importantly, there are first amendment problems in casting such distinctions based on the contents of communications; they are not only unfair and unwarranted, but run afoul of the first amendment protection for commercial speech.[3]

The second problem with H.R. 1304's definition of "telephone solicitation" is that it restricts such calls even when there is a preexisting business relationship between the calling and called parties. These types of calls typically concern subscription or service renewals; warranties; repairs; service contracts; "rainchecks;" deliveries & pick-ups; catalog orders; and other matters of established interest to the called party based on the prior relationship.

Such "preexisting relationship" calls are probably much less likely to annoy the called party than are "cold-call" political pitch, opinion survey, or fund-raising solicitation calls from a business or organization that the called party has not previously dealt with. However, the latter would not be restricted under the bill's definition, while the former would be restricted under the definition's coverage of calls initiated without the called party's "prior express invitation or permission."

The DMA's concerns regarding the scope of restrictions on "telephone solicitations" are compounded by H.R. 1304's proposed requirement for the FCC to establish a national "Electronic Data Base of Objecting Persons" from which telemarketers would be required to purchase lists of telephone subscribers who object to receiving "telephone solicitations."

Although H.R. 1304 clearly intends to give the FCC flexibility in its mandated rulemaking by permitting the Agency to choose some "other means," in lieu of the "data base," to provide "equivalent protection" to such subscribers "in a more efficient, effective, and economic manner," the language and structure of proposed new subsection 227(c) clearly indicates that the "data base" is the legislation's preferred mechanism and that, in any event, some sort of a "listing" scheme is contemplated which will place new legal and financial burdens and liabilities on telemarketers to avoid calling "objecting persons."

The DMA is concerned about this apparent desire and intent to create a "national asterisk law" for several reasons.

---

[3] Even "pure commercial speech," which does no more than propose a commercial transaction, receives first amendment protection "so long as it concerns a lawful activity and is not misleading or fraudulent." *Posadas de Puerto Rico Assoc.* v. *Tourism Co.,* 478 U.S. 328, 340 (1986). Although such speech may be subject to government regulation in furtherance of "a sufficiently strong, subordinating interest that the [government] is entitled to protect," the First Amendment limits such regulation to reasonable "time, place and manner" restrictions that are, among other things, "justified without reference to the content of the regulated speech." See, e.g., *Village of Schaumburg* v. *Citizens for a Better Environment,* 444 U.S. 620, 636 (1980); *Heffron* v. *Int'l Society for Krishna Consciousness, Inc.,* 452 U.S. 640, 648 (1981).

First, the compilation and maintenance of the single national electronic database, perhaps involving tens of millions of telephone numbers, is a much more formidable administrative task than proponents of such a data base would appear to believe. Even if Federal budgetary constraints are somehow avoided to permit the dedication of sufficient resources to manage or oversee the project, there would be little assurance that the lists derived from the data base could be maintained and made available to telemarketers with any real degree of certainty regarding their current accuracy and completeness under any "mechanism" the FCC might establish.

Because the system would be enforced through civil penalties under the Communications Act, its susceptibility to inaccuracies and outdated data would place telemarketers at risk of almost constant violation of solicitation restrictions. While some may argue that the DMA's "opt-out" program is strictly voluntary and, therefore, without any real enforcement mechanism, it is a self-regulation approach which, from the perspective of American business, is much more fair and reasonable than a government regulatory approach placing telemarketers in constant jeopardy of penalties, notwithstanding their good faith efforts to accommodate the interests of some, but by no means all, consumers.

Second, H.R. 1304 makes clear that "the costs involved in notifying, collecting, updating, disseminating, and selling, and other activities relating to" the lists "that are incurred by the entities carrying out those activities" are to be recovered from the persons obtaining the lists. Thus, the entire burden of the substantial costs for the listing and the bureaucracy that compiles and maintains it will be borne by telemarketers, who alone require (and would be required to obtain) access to the listing in order to avoid making prohibited calls to objecting subscribers.

For the many small companies that utilize telemarketing as a cost-effective way of communicating with their customers, such costs could have a severe adverse "bottom-line" impact. For large and small companies alike, the costs and risks that the bill would add to telemarketing operations could lead to a cutting-back of activities and the loss of jobs for many of the tens of thousands of individuals who are currently employed in this field.

Third, despite the "national" data base concept, H.R. 1304 would not preempt more restrictive, or even prohibitive, State laws regarding intrastate use of FAX and ADRMP systems, and would "permit and encourage States to use the data base mechanism selected by" the FCC for purposes of enforcing State telemarketing laws. The DMA believes that, instead of promoting the likelihood of multiple restrictions and confusion for telemarketers who attempt to comply with all Federal and State restrictions, any legislation in this area should have the objective of establishing a single, uniform nationwide policy in order to better serve both telemarketers and consumers.

Beyond these concerns regarding H.R. 1304, the DMA continues to believe that further adjustments should be made to the bill's ADRMP provisions. For example, the restrictions in H.R. 1304 on the use of an "automatic telephone dialing system" are keyed to a definition of that term which is based on the "capacity" of the equipment to, among other things, "deliver, without initial live operator assistance, a prerecorded voice message to the number dialed, with or without manual assistance."

It is clear that the intent here is to address the problem of "line seizure" which occurs when the call fails to automatically disconnect after the called party hangs up. However, the way in which the definition is written and applied fails to recognize that it is not the capacity of the equipment which justifies restriction but only the use of that capacity without adequate protections to prevent "seizure" problems for the called party.

It is only where an autodial system is actually used in combination with a prerecorded message but without live operator assistance that there is a risk regarding disconnect capability. Only in such cases is the called party threatened with an unsolicited call which does not disconnect promptly when the called party hangs up. Use of the autodial system with a live voice message, or use with a prerecorded message transmitted with live operator assistance does not present this threat and should not be restricted in the same manner.

Ten years ago, after an extensive 2-year Inquiry, the FCC decided not to regulate unsolicited telephone calls because it found that "only a small percentage of such calls are interstate, regulation would involve sensitive First Amendment concerns, restrictions would be costly and of questionable efficacy, there are substantial forces for industry self-regulation, and Bell's relevant interstate tariffs prohibit unreasonable telephone solicitations." In the Matter of Unsolicited Telephone Calls, 77 FCC 2d 1023 (1980). In its Order, the FCC, agreeing with the National Telecommunications and Information Administration (NTIA), concluded that restrictions on the

ADRMP were not warranted because "it does not appear to be in widespread use." Id. at 1031.

Conditions have undoubtedly changed over the past decade. The problem, however, is that neither we nor the Congress nor the FCC currently have the empirical data necessary to identify and understand precisely what changes have occurred and how they have affected telemarketing practices and their impact on the American public.

In these circumstances, the DMA urges the subcommittee not to go forward with a broad "telephone solicitation" bill which would impose complicated and burdensome legislative requirements for the implementation of a "national asterisk law." Instead, we urge the subcommittee to revise H.R. 1304 so that Congress may enact the noncontroversial ADRMP and FAX restrictions from last year's House-passed bill (H.R. 2921), while requiring the FCC to conduct a new Inquiry to determine whether developments in technology and in telemarketing practices since 1980 make it appropriate to consider additional legislative and/or regulatory action in this area.

H.R. 1305 arises from ANI technology and Caller ID services, which provide significant technological advancements for direct marketers and the consumers that they serve.

When a consumer calls a marketer, the consumer's primary interest is to communicate as accurately as possible and get off as quickly as possible. For the service provider speed and accuracy are also both important. ANI, by providing a means to link incoming calls with existing files, goes a great way to further the goals of speed and accuracy.

The current application of ANI technologies allows an operator to see customer account information when she or he first says "hello." Once it is verified that the person calling is in fact the person identified by ANI, the operator can verify information which already appears in the caller's file rather than having to re-enter it for every call. Also, in some cases, particularly for on-line services like home banking, ANI will be very helpful in making sure that the person calling is in fact the authorized consumer. All of this will allow for faster, more accurate and more secure transactions.

ANI technology provides marketers not only with the opportunity to use the number of the calling party for the above purposes, but also with the opportunity to retain these telephone numbers for billing and other purposes.

ANI technology is not new. DMA members for many years have received on a periodic basis from their long distance carriers the telephone numbers of people who have called their 800 or 900 numbers. Since the marketer is paying for these services, it is appropriate that the marketer be informed of who made the call for billing purposes. Today, most marketers use either 800 or 900 numbers. Very little national marketing is done on the "regular" local or long distance network. ANI in the past has come in the form of paper printouts or computer tape.

What is new is the instantaneous delivery of the ANI number to the marketer at the time the call is received. What also is new is that this type of service can now be economically used by most marketers and not just the very large ones. The DMA believes that this is an important and essentially pro-consumer technology and that it should be able to develop with a minimum of regulation.

DMA also acknowledges that privacy concerns may arise with the use of this technology. These concerns relate to consumer knowledge. If a consumer has an unpublished number or has sought to block his or her number through a Caller ID service, then he or she reasonably expects that such numbers will not be given to anyone else. Moreover, ANI technology should not be a basis for creating marketing lists unless the consumer has been so informed and is given an opportunity to limit having his or her phone number disseminated.

The marketing industry generally uses ANI services, not the more locally based Caller ID services. While we believe that there is no threat to privacy by our industry's use of ANI services, we do recognize that there may be some positive steps that can be taken to avoid even perceived problems. H.R. 1305 seeks to take some of these steps.

H.R. 1305 seeks to give consumers the means of limiting the dissemination of the telephone numbers from which they place their calls. DMA has long supported giving consumers the opportunity to limit the dissemination of information about themselves. For example, we have operated for 20 years a name removal file for mail marketing—the Mail Preference Service ("MPS")—and set up a similar file for telephone marketing in 1985—the Telephone Preference Service ("TPS"). More recently, we supported the "Video Privacy Protection Act" which was enacted in 1988.

That law provides video consumers with the means of controlling the dissemination of information about them.

Thus, in the case of H.R. 1305, DMA's long-standing principles and practices lead it to enthusiastically support the bill's objective. For Caller ID services, we also support the method by which the bill seeks to implement that objective. We have, however, a fundamental objection to the different approach taken in accomplishing this objective in the context of ANI technology.

DMA believes that it is sound public policy to inform consumers of ANI and related services and give them an opportunity to limit the dissemination of information about them. Per call blocking is the best way to do that. Blocking allows the consumer to control the release of the information in the first place upon making a call. This will provide the consumer a vehicle for privacy protection without undue burden.

For Caller ID services, the bill would require the FCC to promulgate regulations mandating per call blocking. DMA supports this provision—a new subsection 227(b) of the Communications Act. (A copy of DMA's policy supporting this approach is attached as an exhibit to this testimony.)

While the blocking of Caller ID services is by and large a readily available technology, the blocking of ANI signals for 800 and 900 services is more difficult and not currently available. We understand that, as Signalling System Seven is implemented through the country, Caller ID services and the ability to block on a per call basis will be available for long distance and 800 and 900 numbers. When that technology is available, then per call blocking will be the appropriate solution, and H.R. 1305 should be amended to allow the FCC to shift to per call blocking for 800 and 900 numbers at that time. However, before Signalling System Seven is available for these services, a different approach is needed to permit consumers to limit the dissemination of their telephone numbers while continuing to permit the benefits of ANI.

DMA guidelines, for example, require that the marketer inform the consumer if information obtained as the result of a telephone contact is to be collected and made part of a mailing list rented, sold or exchanged with others, and provide a consumer with an opportunity to have his or her name stricken from that list. (A copy of DMA's guidelines are attached as an exhibit to this testimony.) As we testified in the Senate last year, telephone companies should be encouraged to develop means to communicate the desires of consumers for blocking of their phone numbers for non-billing purposes. If someone does not want his or her name or telephone number on a marketing list, our industry believes that they should not be one.

However, H.R. 1305, through its proposed new subsection 227(c) of the Act, does not provide consumers with the means by which they can express their desire to block the use of their phone numbers for non-billing purposes. Rather, it would effectively require consumers to affirmatively express their desire to have their phone numbers so used. This would mark a major and unwise departure from the approach taken in other Federal laws, as well as from industry practice.

The industry practice is predicated on a policy of notification and ability to opt out, rather than affirmative consent. Typically, a catalog company, credit grantor, or other company will inform its customers that it may make available its mailing list to others. It then informs customers how to easily have their names suppressed from lists made available to outside sources for marketing purposes.

This approach was endorsed by the U.S. Privacy Protection Study Commission in 1977, and has been adopted in Federal legislation such as the Cable Communications Policy Act of 1984 (47 U.S.C. section 551(c)(2)(C)) and the more recent Video Privacy Protection Act of 1988 (18 U.S.C. section 2710(b)(2)(D)). It also is similar to the approach endorsed by the FCC for billing for non-adult services offered through 900 numbers. *Cf. In re Regulations Concerning Indecent Communications by Telephone*, 5 FCC Rcd 4926 (1990).

The affirmative consent approach adopted in this bill serves as a barrier to the free flow of information and to legitimate uses of personal data in the direct marketing industry. It is unprecedented where the intrusion consists of solicitation for non-adult services or products, and the personally identifiable information collectable is as rudimentary as telephone numbers, or names and addresses. By way of illustration, the 1984 Cable Act and 1988 Video Act we believe strike the proper balance, requiring notice and opt out for disclosure of names and addresses while requiring prior consent for disclosure of subscriber viewing habits or personal transactions. The Electronic Communications Protection Act of 1986 also recognizes these distinctions in imposing more rigorous safeguards against government interception of the content of a telephone conversation than it does against such interception of only telephone numbers. *Compare* 18 U.S.C. section 2518 with 18 U.S.C. section 3123.

The bill's affirmative consent approach imposes unduly burdensome requirements on commercial users of consumer data, without substantially benefitting individual consumers. Notice and opt out is a better way of helping someone who does not want his or her name or telephone number on a marketing list to get it removed.

H.R. 1305, in the ANI context, should provide consumers with the means by which they can express their desire to block the use of their phone numbers for non-billing purposes. An approach of notifying individuals at the time of their call of the potential use of their phone numbers for non-billing purposes, and advising them of their right to object to such use, can easily be added to the current structure of H.R. 1305. This approach would receive the support of our industry.

DMA stands prepared to work together with this subcommittee to devise an appropriate method to achieve our shared objective of consumer privacy protection in the context of ANI services. In the meantime, however, we oppose the affirmative consent approach taken in the bill's proposed new subsection 227(c). We also urge that the FCC be allowed to adopt per call blocking when that becomes technically available in the near future.

In closing, I want to thank you again for the opportunity to present the views of the Direct Marketing Association on these important subjects. The DMA is ready to work cooperatively with the chairman, the members of the subcommittee, and their staff to ensure that any legislation which the subcommittee may produce will help both telemarketers and consumers to enjoy the benefits of using today's telecommunications capabilities in the marketplace.

Mr. MARKEY. Thank you, sir.

Our next witness is Mr. Michael Frawley, who is the President of Gold Coast Paging from Miami Lakes, FL. Welcome, sir.

## STATEMENT OF MICHAEL J. FRAWLEY

Mr. FRAWLEY. Thank you, Mr. Chairman, and members of the subcommittee. You have my statement for the record.

Gold Coast Paging and Telocator would like to thank you for this opportunity to express our views, and we wholeheartedly support H.R. 1304. Chairman Markey and Congressman Rinaldo, we would like to thank you for your leadership in bringing this to fruition here.

My name is Michael Frawley and I am the President of Gold Coast Paging in southeast Florida, and I have been in the communications business for 34 years. I am a member and a director of Telocator, our trade association with over 650 members, representing paging and cellular subscribers to the tune of over $15 million in the United States.

I am also very active in our Southeastern Radio Common Carrier Association, and I have been a director of the Florida Radio Telephone Association for the past 13 years. It is indeed a pleasure to sit on this side of the table with some of my colleagues from the Florida Public Service Commission instead of the other side.

In the 34 years that I've been in the telecommunications business, my objective every day when I come to work is one thing and one thing only; to provide service to the public. In the 34 years since I graduated from high school, that is the only thing I have known. And I point that out in deference to the folks who might be in a retail operation and come to work every day to make a profit on a certain item, or a wholesaler who probably works on a lesser profit and more volume, or a politician who's objective is whatever it is why you come to work. But I come to work every day to give service.

It is really rough when you come to work every day with the objective of giving service when you have outside influences that can

111

alter that objective. When I say outside influences, I'm talking about autodialers that seize up our blocks of numbers. For example, I have 10,000 numbers in a 363 exchange, and if an autodialer gets into that 363 exchange and attacks numbers in 100 groups, it can tie up that exchange and impede the service to all of my customers. The Coast Guard, national defense organizations, police, fire department, hospitals, doctors, you name it; they're all affected.

Now, this has been a problem for many years. As a matter of fact, back in 1987 we convinced the FCC to issue a public notice, warning telemarketing firms that numbers assigned to paging and cellular subscribers should be avoided. Indeed, Telecator pointed out the simple solution would be to have these lists excluded from the autodialers completely.

Mr. Chairman, it is 4 years later and the problem persists. The falsing of these blocks of numbers causes confusion to our customer and it causes a tremendous expense to the radio common carriers when customers call in and say my beeper isn't working or it's falsing and we have to exchange it. We're looking at an expensive proposition to go out and exchange it and send it into our repair shop to be looked at when, indeed, there is nothing wrong with it.

I don't believe it helps the telemarketing firms, either, to get into a block of cellular or paging numbers. If they have an objective to sell whatever their product is, it certainly doesn't help them to come into a paging organization and just go down the list. They're just wasting their time as well as confusing our customers and hurting us.

Sometimes these efforts are very, very traumatic. For example, we have a LifePage program, which is a Telecator program where we provide free service to recipients of heart and liver transplants. These folks rely on and they wait for a "beep" to see if an organ has been found. This is a service that we provide at no cost to these folks. It is pretty traumatic to have a beep from some telemarketing firm, getting their hopes up, that maybe I've found a liver that I need for my very existence or my life.

To avoid confusion, the way we work this is we give them a free beeper, but only the transplant coordinator and the transplant center have the number. Nobody else has that person's number.

Last week in my shop a fellow came in and rented a beeper from us, and he was the parent of one of the victims of the Gainsville murders. The only reason he is carrying that beeper is because the police in Gainsville have asked him to do so. For some reason they want to beep him, he thinks, in the near future. I think it would be extremely traumatic in the same situation for that guy to get a beep—he cried in my office. It would be traumatic for this guy to get a beep thinking, "oh, my god, this is it" and have some telemarketing person come on.

We just recently had a doctor who was with one of his patients on his death bed. He was with the family members. A voice beeper went off and tried to telemarket some kind of a product. The doctor was very upset and wrote this letter. With your permission, Mr. Chairman, I would like to submit this letter as an attachment to my testimony.

page 356
Exhibit 23

I will expedite this because I know we're in a hurry. I would like to point out that our customers pay for this kind of a service. Our customers in cellular, as you know, pay for air time. Many paging subscribers also pay for usage over a certain amount. We think it is unfair that our customers are being forced to underwrite the cost of unwanted calls generated by autodialers.

Mr. MARKEY. Mr. Frawley, I hate to give you the news, but I'm afraid your time has expired.

Do you have any final comments you want to make?

Mr. FRAWLEY. Yes. I would wind up by saying we wholeheartedly support H.R. 1304 and we also support H.R. 1305, which concerns the offering of Caller ID services. However, we would like to clarify that paging is a permitted use of Caller ID capability under the proposed legislation.

Thank you very much.

[The prepared statement and attachment of Mr. Frawley follow:]

STATEMENT OF MICHAEL J. FRAWLEY, PRESIDENT, GULF COAST PAGING, ON BEHALF OF TELOCATOR

Mr. Chairman, members of the subcommittee. Thank you for this opportunity to appear before you this morning to speak in support of H.R. 1304 and, in particular, its specific prohibition of unsolicited automatic dialer calls to telephone numbers assigned to paging and cellular services. Automatic telephone dialing systems currently pose a significant threat to the operation of paging and cellular systems. As presently operated, "audodialers" increasingly interfere with the public's use of these important, and sometimes life-saving, mobile communications services. For this reason, H.R. 1304's carefully crafted safeguards are a reasonable—and necessary—solution to the problem.

My name is Michael J. Frawley. I am the President of Gold Coast Paging and have been in the telecommunications industry for 34 years and the paging industry since 1972. In addition to running my company, I also serve as a member of the Board of Directors of Telocator, the national trade association representing the mobile telecommunications industry. Telocator's more than 650 members include common carriers providing paging and cellular telecommunications services. I have also been an officer of the Florida Radio Telephone Association (FRTA) for the past 13 years and an active member of the Southeastern RCC Association.

I am here today because my company and Telocator have long shared the subcommittee's concerns about the growing problems associated with automatic telephone dialers. Indeed, Telocator testified before this subcommittee in 1989 regarding the serious problems its members were experiencing because of these devices, and the need for paging and cellular numbers to be protected from such telemarketing activities. Today, computerized telephone solicitation remain a significant threat to this country's essential telecommunications services and an ever increasing source of inconvenience, cost, disruption, and frustration to the American public—particularly the approximately 10 million paging customers and over 5 million cellular subscribers currently served by the mobile communications industry.

Accordingly, Telocator commends you, Mr. Chairman and the ranking minority member, Congressman Rinaldo and the 34 other cosponsors of this legislation, for recognizing the unique vulnerability of paging and cellular services to automatic telephone dialers, and for incorporating the necessary prohibition into the proposed legislation.

Moreover, Telocator especially appreciates your efforts to reintroduce this important legislation early in the new Congress.

As you know, automatic telephone dialing systems can be used to dial a sequential block of telephone numbers, and then transmit a pre-recorded message. Personal computers can be programmed to perform a similar function. The widespread use of these technologies has increased the incidence of unsolicited calls not only to regular telephone subscribers, but also to paging and cellular customers.

Programmed "autodialer" calls can and have run through whole blocks of numbers assigned to mobile users, unnecessarily setting off pagers and producing unwanted and expensive calls to cellular subscribers. Moreover, because many of these machines do not release the connection until the entire pre-recorded message has

113

played, these automatic dialers frequently tie up mobile facilities for hours. During that time, they can effectively block cellular and paging users from receiving service, including what might be a critically important call.

Mobile telecommunications users and service providers are particularly vulnerable to automatic telephone dialing systems in several respects:

First, calls generated by telemarketers to phone numbers used for paging produce false pages and enormous confusion. Because most pagers are not capable of receiving the aural message transmitted by the automatic dialer, the paging customer cannot determine who is trying to reach him or her. Consequently, he or she is left concerned and befuddled regarding the caller and whether there is some family or business emergency. The net effect is that the call does not serve its telemarketing objective, the paging subscriber is seriously inconvenienced, and the paging carrier receives complaints about false pages.

Moreover, even in the case of a voice pager, which can transmit the pre-recorded message, the broadcast of the message is usually disruptive and inappropriate. One of Telocator's members recently received a complaint from a Pennsylvania doctor whose commiseration with bereaved family members at the deathbed of a patient was interrupted by a loud and obnoxious sales pitch from his voice pager. For the vast majority of paging customers who use their paging units to be alerted to important or emergency calls, unsolicited telemarketing calls are not only disruptive, but wholly inappropriate. With your permission, Mr. Chairman, I would like to submit this letter as an attachment to my testimony.

Second, these unsolicited telemarketing calls could undermine important emergency, safety and public health services. For example, under the LifePage Program sponsored by Telocator, pagers and paging services are provided to organ transplant candidates throughout the country. This service is provided free by a local paging company while the patient is registered for a transplant. In order to lessen any possible confusion only the transplant center and transplant coordinator are given the pager number. We are greatly concerned that false pages generated by automatic dialers will cause extreme emotional distress to the candidates and their families. Telocator frequently receives requests for new pagers due to consistent falsing and because the pagers used in this program are tone only, it is likely that some of the falses are due to autodialers. Similarly, emergency services provided by hospitals, police, fire departments, and even national defense organizations depend upon reliable paging services to alert them to genuine emergencies, rather than false signals caused by unrequested telemarketing solicitations.

Third, cellular and paging subscribers who are recipients of these unsolicited calls are unfairly forced to absorb the sometimes substantial cost of the call. Under general industry practice, cellular subscribers are billed for air time when they originate or receive calls. Moreover, many paging customers are often billed for each call over a certain call limit. As a result, telemarketing messages generated by automatic dialers to phone numbers used for cellular and paging services are billed to the cellular or paging subscriber. This effectively forces the cellular or paging subscriber to underwrite the costs of the unwanted calls.

Fourth, and most importantly, sequential calling by automatic telephone dialing systems can effectively saturate mobile facilities, thereby blocking the provision of service to the public. Because mobile carriers obtain large blocks of consecutive phone numbers for their subscribers, automatic dialer-transmitted calls can run through whole groups of paging and cellular numbers at one time. This can result in a seizure of a paging carrier's facilities that effectively blocks service to its customers. This problem is further exacerbated by the fact that many automatic dialers do not release the phone connection until the entire message has been transmitted. The effects of this can be catastrophic. In November of last year, the system of a Hawaiian mobile carrier was effectively shut down for 20 minutes during one of its busiest calling periods while an automatic dialer transmitted the message and 900 number of a New Jersey promoter. During that time, the system's customers could neither make nor receive calls, include emergency notifications to medical personnel who depend on the system.

As we have reported to this committee previously, another one of our carriers has had its system seized by autodialers three separate times for approximately 3 hours each time, during which time the service was totally disrupted to almost 1,000 customers.

In addition to these problems caused by "legitimate" uses of automatic dialers, paging customers have increasingly been victimized by fraudulent automatic dialer scams. For example, a scheme was recently exposed in which an individual was using a computer to generate thousands of calls to pagers in New York, New Jersey and Connecticut, leaving a return telephone number. When the unsuspecting paging

114

subscriber dialed this number—thinking he was returning an important call—he or she heard a 20 second message about credit cards and was billed $55 for the call.

Mr. Chairman, Telocator has been concerned about this issue for some time. In 1987 we convinced the Federal Communications Commission to issue a Public Notice, warning telemarketing firms that numbers assigned to paging and cellular subscribers should be avoided. As Telocator requested, the Public Notice pointed out that the simple solution to this problem would be for telemarketing concerns to contact local radio common carriers to get lists of numbers that could be excluded from computer-programmed solicitations. Moreover, the FCC warned that further action might be taken if problems continued.

Notwithstanding the FCC's warnings, the autodialer problem continues to plague the radio common carrier industry. Imagine being unable to reach a pager because a carrier's terminal is rendered useless by an automatic dialer quits, or reaches the last of the numbers. Yet, as a carrier all we can do is stand by, watching the dialer call each and every pager number, one by one, until the dialer has done its job and all calls are completed. Worse yet, we are forced to watch this happen while trying to explain to our customers, and their callers, why they are unable to reach the pagers they are calling.

In light of these continuing difficulties, Gold Coast Paging Telocator strongly endorse H.R. 1304, and its specific prohibition of unsolicited automatic dialer calls to telephone numbers assigned to paging or cellular services, as a reasonable, responsible and necessary solution to the dilemma. The legislation appropriately recognizes that messages to paging numbers generally cannot be completed and that cellular customers are literally paying the price for these unwanted solicitations. Moreover, the legislation would prevent the price for these unwanted solicitations. Moreover, the legislation would prevent the saturation and seizure of cellular and paging networks by unwanted solicitation calls.

I would also like to take this opportunity to comment briefly on H.R. 1305, which concerns the offering of Caller ID services. Telocator also supports this legislation as a reasonable means for offering new telecommunications capabilities while balancing the privacy rights of telephone subscribers. Specifically, the bill permits the general provision of Caller ID services after notification to customers, while also enabling callers to withhold their number free of charge on a per-call basis. However, Telocator would like it clarified that paging is a permitted use for Caller ID capabilities under the proposed legislation. Indeed, it would be particularly advantageous to paging users if a caller did not need to input any digits in order for his telephone number to be transmitted to the paging unit, but rather that the number appeared automatically. Such automatic transmission of the caller's number would not only speed the transmission of the paging message, but facilitate the use of paging services by the public.

Thank you for your kind attention.

PETER S. NOVOSEL, M.D.,
*446 West Chestnut Street,*
*Lancaster, PA, March 25, 1991.*

ACCESS TELECOMMUNICATIONS NETWORK,
*3040 Industry Drive,*
*Lancaster, PA.*

DEAR SIR: I am continuously bothered, aggravated and annoyed by obnoxious messages coming through on the voice pager from automatic telephone dialing machines announcing at many decibels "Congratulations, you have just won . . ." or "Nothing to buy, nothing to buy", etc. Many of these messages seem to come through repeatedly week after week. The most recent time this happened was when I was at the bedside of a patient who had just died surrounded by bereaved family members and the inappropriateness of this intrusion was especially poignant.

I understand that there are methods available to block access of these messages to one's telephone. I am sure that many other subscribers to your service would join me in profound appreciation if you would take measures to do so. You would be providing a very welcome service to your subscribers by sparing us from this obnoxious practice.

Yours truly,

PETER S. NOVOSEL, M.D.

Mr. MARKEY. Thank you, Mr. Frawley.

Our final witness is Mr. Donald MacKenzie, the president of NYNEX Information Resources Company. Welcome, Mr. MacKenzie.

## STATEMENT OF DONALD MACKENZIE

Mr. MacKenzie. Thank you, Chairman Markey, and subcommittee members. I am president of NYNEX Information Resources Company and chairman of the Yellow Pages Publishers Association's Public Policy Committee. I am testifying today on behalf of the Association.

I wish to thank you for the opportunity of appearing before the subcommittee today to discuss H.R. 1305 and the increasingly important use of consumer privacy in connection with new telecommunications services.

The Yellow Pages Publishers Association, otherwise known as YPPA, is a trade group formed in 1988 that represents 140 publisher members who produce more than 90 percent of the Yellow Page directories in the United States. Today our industry is in the forefront of information technology with the advent of the "talking" Yellow Pages. Talking Yellow Pages services are for everything from weather and stock quotes to topical additions to printed advertising messages and appear in hundreds of classified directories across the country. It is a rapidly-expanding business and is expected in the near future to be virtually as universal as the traditional Yellow Pages.

This new and unique aspect of Yellow Pages has fostered a sincere and pervasive concern throughout the industry for maintaining the good will of our customers. The industry has long been guided by widespread recognition of the need to be sensitive to consumer interests. Certainly a part of those interests involve the legitimate privacy expectations of its users.

It was against this backdrop that YPPA decided last year to adopt its privacy protection policy that we believe is consistent with the goals and objectives of the ANI provisions of H.R. 1305. As does H.R 1305, YPPA's policy requires a caller's consent before any personal information can be sold to a third party or used for any purpose other than that for which the call was made.

Although we encourage all information businesses to adopt the same kinds of internal pro-consumer policies, we nonetheless believe that H.R. 1305 is necessary to ensure consumers that their privacy will not be subject just to ad hoc protection.

Finally, YPPA believes it is crucially important that policymakers and business leaders alike recognize that identical privacy issues are raised when customer proprietary information is gathered by means other than the telephone network. The restrictions in H.R. 1305 are a strong first step. The next step is to ensure that similar restrictions govern the customer information collection activities in all areas of the marketplace.

Again, Mr. Chairman, YPPA strongly endorses the ANI provisions of H.R. 1305 and applauds your efforts in this area. As an organization interested in protecting consumer privacy, we pledge to work with you.

Thank you for your attention.

[The prepared statement of Mr. MacKenzie follows:]

STATEMENT OF DONALD MACKENZIE, PRESIDENT, NYNEX INFORMATION RESOURCES COMPANY, ON BEHALF OF YELLOW PAGES PUBLISHER ASSOCIATION

Chairman Markey and subcommittee members: My name is Donald MacKenzie, and I am President of NYNEX Information Resources Company and Chairman of the Yellow Pages Publishers Association's Public Policy Committee. I am testifying today on behalf of the Association. I wish to thank you for the opportunity to appear before the subcommittee today to discuss H.R. 1305 and the increasingly important issue of consumer privacy in connection with new telecommunications services. I congratulate Chairman Markey for introducing H.R. 1305 and for recognizing the enormous advantages to both the public and the information industry in protecting consumer privacy.

The Yellow Pages Publishers Association ("YPPA") is a trade association that represents 140 publisher members who produce more than 90 percent of Yellow Pages directories published and 99 percent of revenues generated by Yellow Pages advertising. Since the first Yellow Pages directories appeared shortly after the invention of the telephone, the Yellow Pages industry has grown into a multi-billion dollar national industry that has a major impact on virtually all aspects of life and commerce. YPPA, formed in 1988, is the leading voice for this dynamic industry.

The Yellow Pages are a lot more than just a phone book. In 1990, the Yellow Pages was an $8.3 billion industry, making it the fourth-largest, revenue-producing advertising medium in the country. Yellow Pages is the second fastest-growing advertising medium, and the industry is constantly evolving to meet changing culture and buying habits for new products and services. Virtually all of our directories offer a variety of consumer and public service information. Increased competition and the growth of specialty directories has resulted in a better product for both the advertiser and the consumer.

In addition, the industry is at the forefront of information technology and is poised for even greater success in the 21st century, particularly with the advent of "talking" Yellow Pages. Talking Yellow Pages services offer everything from weather and stock quotes to recipes and games and appear in hundreds of classified directories across the country. It is a rapidly expanding business and is expected to be virtually as universal as the printed Yellow pages in the near future.

Studies have shown that the Yellow Pages is consumers' advertising medium of choice. For consumers, it is a dependable information resource about goods and services they need and want. Unlike other advertising media, such as television, magazines and billboards, the Yellow Pages is a medium that consumers actively seek out. Yellow Pages advertising is not forced on consumers by being interspersed with other entertainment and news information. Rather, people come to us when they are interested in buying goods or services.

This unique aspect of Yellow Pages has fostered a sincere and pervasive concern throughout the industry for maintaining good will with our customers. The industry has always been guided by widespread recognition of the need to be sensitive to consumer concerns. As a result, the Yellow Pages industry has long been in the forefront of American business in displaying concern and regard for the legitimate privacy expectations of its users. Consumers' positive feelings toward the Yellow Pages is an important asset of the industry—an asset which we constantly work to maintain and strengthen.

It was against this backdrop that YPPA decided last year to adopt its privacy protection policy that we believe is consistent with the goals and objectives of the ANI provisions of H.R. 1305. The Yellow Pages industry is potentially one of the largest collectors of calling party information through the offering of talking Yellow Pages. The collection of calling party information through manual means has existed for many years now. With the introduction of signalling system 7 technology into the network by many telephone companies and the offering of ANI information directly to information providers under open network architecture plans, more attention than ever before is being paid to the privacy concerns raised by the collection and secondary dissemination of this information.

As the talking Yellow pages branch of the industry began developing and ANI services began to become available, we recognized the many new marketing opportunities presented by instant accumulation of information about consumer demographics, interests, needs and buying habits. The development of specialized lists can become an important source of income for Yellow Pages publishers and enhance their existing direct marketing operations. It can also significantly improve the quality of segmented customer lists which could be used in affiliated direct marketing operations or sold to other direct marketers. However, failure to properly handle the collection, use or distribution of the information could have negative repercus-

sions. The receipt of unwanted junk mail and unsolicited phone calls is viewed by many consumers as a troubling invasion of privacy.

In June of 1990, YPPA adopted a pro-consumer privacy policy regarding consumer information collected through talking Yellow Pages services. As does H.R. 1305, YPPA's policy requires a caller's consent before any personal information can be sold to a third party or used for any purpose other than that for which the call was made.

The YPPA Public Policy Committee developed the YPPA privacy protection policy to serve as a guideline for all publisher members. By adopting this policy, YPPA publicly acknowledged that users of talking Yellow Pages deserve protection against the unwanted sale or use of their names, phone numbers or addresses which can be obtained from this emerging technology.

The policy statement, which is attached to this testimony, urges all YPPA members to protect "calling party information" collected as part of the provision of talking Yellow Pages services. "Calling party information" means information about the telephone number, name and/or the address of a caller to a talking Yellow Pages service. It does not include mere statistical or demographic information collected by a talking Yellow Pages provider about the quantity or location of callers.

The policy states that "secondary dissemination" and "secondary uses" of calling party information should only take place with the affirmative consent of the calling party. Secondary dissemination is the sale or other commercial distribution of calling party information to an entity other than the talking Yellow Pages offeror. It also includes any further sale or commercial distribution of calling party information by an entity receiving such information from a talking Yellow Pages offeror. Secondary use means the utilization of calling party information by a direct marketing company or other company affiliated with the offeror of the talking Yellow Pages.

Consent may be collected on any reasonable basis—it need not be for a single secondary dissemination or use but can be given on a blanket basis. So long as fair and reasonable notice is given to the calling party of the nature of the request for consent to secondary dissemination or use, the affirmative consent requirement fully protects the caller's privacy interests. Consent will normally be signalled by taking a requested action such as pushing the pound button in response to an invitation.

The policy states that "primary use" of the calling party information, on the other hand, does not require any additional consent because such consent can reasonably be inferred from the making of the call. Primary use means a use of calling party information which can be consented to by the caller's making of the call to the talking Yellow Pages number. For example, where a caller utilizes a back of the book talking Yellow Pages service for the purpose of placing an order with an advertiser, the utilization of calling party information for order verification is a primary use.

Not only does YPPA's privacy protection policy allow the industry to maintain good will with consumers, it also makes good business sense. The secondary use of names collected by talking Yellow Pages will be much more profitable if those names identify only consumers who have consented to receipt of additional information or solicitations. As any direct marketer will verify, a list of people who are not receptive to what you have to sell is of little value, no matter how long or accurate the list is. Pure and simple, a low response rate amounts to wasted dollars. On the other hand, direct mail or telemarketing to consumers who have already taken an affirmative step to consent to receipt of particular information will be much more successful. Not only will such consumers not feel they are being bombarded with unwanted solicitations, but they will be much more likely to purchase the product or services being offered.

The protection of consumer privacy is even more important as the Yellow Pages industry considers the development of new, nationally oriented services. YPPA, in addition to being a trade association, also is the administrator of national Yellow Pages services.

YPPA believes that it is the first information medium to adopt the "affirmative consent" rule to protect an individual's privacy, and hopes that it can become the standard for the entire advertising industry. Although we encourage all information businesses to adopt the kind of internal pro-consumer policies that the Yellow Pages industry has, we nonetheless believe that H.R. 1305 is necessary to ensure consumers that they privacy will not be subject to ad hoc protection.

Finally, YPPA believes it is crucially important that policymakers and business leaders alike recognize that identical privacy issues are raised when customer proprietary information is gathered by means other than the telephone network. All the advantages to be enjoyed by the information services and technology available

page 362
Exhibit 23

today will be overshadowed if we do not actively seek to preserve our long-held tradition of protection personal privacy in all areas of the marketplace. The restrictions in H.R. 1305 are only a first step. The next step is to ensure that similar restrictions govern the customer information collection activities of all advertisers and information providers.

Again, Mr. Chairman, YPPA strongly endorses the ANI provisions of H.R. 1305 and applauds your efforts in this area. As an organization that is at the forefront of protecting consumer privacy, we pledge to continue to work with you. Thank you.

Mr. MARKEY. Thank you, Mr. MacKenzie, very much. We thank all of you for your statements.

Let me recognize myself for a quick round, and then we will move down to the other members.

Mr. Brown, Call Trace allows the called party to automatically trace any incoming call and have that number stored in the telephone company's central office switch. That number can then be relayed to the proper authorities even if the harassing caller blocked his or her number. In essence, this service can catch the "obscene breather" while giving the innocent callers the right to "breath easier" because their unlisted numbers are not being divulged to the world when they call.

As you know, there are other technologies and services, such as Return Call, which allows you to call back the last person who called you and to confront them, and a "block the blocker" technology that will reject any call to your home phone from someone blocking their phone number.

Now, all of these technologies avail the public of the opportunity to combat the same problem calls that you purport is the rationale for offering Caller ID without blocking. Yet these technologies can catch the bad guys while also protecting the legitimate privacy rights of people who have unlisted numbers.

How does Illinois Bell propose to balance the legitimate rights of Illinois residents with unlisted telephone numbers—in some States this is 10, 20 or 30 percent of the population—if it does not offer them an opportunity to continue to protect their right to disclose their number?

Mr. BROWN. Chairman Markey, that is a good question, and it has several parts. Let me come at it this way.

Somebody mentioned earlier in the panel about offering Call Trace. I believe that Call Trace should certainly be offered when any company offers the product Caller ID. One of the dilemmas we have—and we have not offered Call Trace yet, and Illinois Bell has not offered Caller ID. We hope to get approval on both before year end. But on Call Trace, we have been cautioned by the Chicago Police Department and other police departments that they simply will not be able to handle the volume of customer requests on a trace basis when that service goes in. In fact, there are police departments in States that have Call Trace today that severely limit the critical condition under which they will even get involved, because they've got more important things to do.

So Caller ID picks up for the mass of people who suffer from the kinds of problems I outlined with caller abuse, whereas Call Trace is only going to get the assistance of the police, I believe, in extreme cases.

Mr. RINALDO. Would the gentleman yield for a moment?

Mr. MARKEY. I would be glad to yield.

Mr. RINALDO. You know, that was an interesting response you gave. Do you mean that, since the police are too busy, that with Caller ID the individual should then take the law into his own hands?

Mr. BROWN. Well, Congressman, it's a touchy issue. But we found, when we looked at what kinds of calls our customers are getting that they don't want, calling and hanging up is one of the most common examples. Teenagers calling one another, we find that families with teenage children are subject, because of their kids, to this sort of prankster calling or, as a parent would see it, harassing calling. I think there are conditions here where a party in a residence could get involved, knowing the number calling them, where the police would simply say "well, I would like to help you, but I've got more important things to do." They have got some very serious, life-threatening situations, I think, where the pure logistics of the situation would force them to attend to first.

Last year we estimate we've had 200,000 calls made to our offices from people who are seeking help on unwanted calls. Now, the 66,000 calls I mentioned, that went to our Annoying Call Bureau, are the most severe cases. Of that, probably some number substantially less than that could even be accommodated by police.

Mr. MARKEY. Let me follow up and try to complete my round quickly.

Then is Illinois Bell going to give to those subscribers with unlisted telephone numbers that service free of charge, if you implement Caller ID without blocking systems, since in large measure now each one of their telephone numbers might be in the hands of whomever they call, thereby vitiating the entire purpose of their unlisted telephone number?

Mr. BROWN. Mr. Chairman, we have no plans to do that. Ironically, in talking with the New Jersey people—and they are perhaps the only laboratory for this of any substantial period of time—my understanding is that many of the people who have subscribed to Caller ID also have unlisted telephone numbers. Basically, they have gotten those unlisted telephone numbers in many cases because they had been victims of harassing or otherwise unwanted calls. So they are subscribers of both.

We would continue to charge, as we presently plan to do it, for an unlisted number, which keeps the number out of the telephone directory as a commitment, the address and the telephone number, and also charge for Caller ID.

Mr. MARKEY. So they have to pay more for what they already have today?

Mr. BROWN. Well, I think they would want to have the right to know who calls their home, in the privacy of their home. I don't see it as a conflict.

Now, you know, we're not there yet, and continued public hearings on the issue have to take place.

Mr. MARKEY. In your testimony you implore this committee not to destroy Caller ID with federally-mandated blocking. I don't believe that the free per-call blocking required in this legislation will destroy or even decrease, for that matter, the value or effectiveness of the Caller ID service. I feel that quite strongly.

I have been working with the minority in terms of trying to develop legislation that can accomplish that goal, while not destroying the value of Caller ID. I think the technology is out there that makes it possible for us to accomplish those goals. I would regret if this discussion deteriorated to a point where we wound up with polarized positions on an issue which clearly we're going to have to reconcile the differences. That is the intention of the subcommittee.

Mr. BROWN. We certainly want to work with you, Mr. Chairman. I think, if I may say so, the area of the legislation, the broad area, addresses a serious need in this country. I support the continued look at this.

Mr. MARKEY. Thank you. My time has expired.

I recognize the gentleman from New Jersey, Mr. Rinaldo.

Mr. RINALDO. Thank you very much, Mr. Chairman.

Mr. Chairman, let me say at the outset that I, too, want to work with you, and certainly with the affected parties, in crafting the kind of legislation that will serve the best interests of the consumers of this country.

As you know, Mr. Brown, in many States a significant percentage of telephone subscribers have unlisted numbers. In my home State of New Jersey it is roughly one-third. In California, for example, it's over 50 percent. Given the fact that these people pay a pretty hefty fee when you come right down to it, a monthly charge in most cases, to have those unlisted numbers, clearly, in my mind, no matter how much you're for Caller ID, those individuals have a strong desire for and an expectation of privacy, and they're paying for it. I feel that, under those conditions, we have to take a careful look at that. Because unrestricted Caller ID would put the anonymous nature of those calls at risk.

So when you say you're opposed to it, I think you have to respond to that concern. I would hope you would agree to look into that and feel that this committee has an obligation, as public servants, to come up with a public policy that is fair to people who pay a fee.

You know, I can't buy the argument you are paying one fee and will have per-call blocking, and let them pay another fee to block the call. I mean, you have to look at this with some degree of compassion.

Mr. BROWN. We will continue to work with you, Mr. Rinaldo.

Mr. RINALDO. You also stated in your testimony that you believe that unrestricted Caller ID would be the best model for adopting in your State of Illinois. Why do you discount the example of other jurisdictions in which some form of blocking is available, and yet there still is significant subscriber interest in the service?

Mr. BROWN. Well, it is true that if you look at the States to date, it's a pretty mixed bag. Almost as many, as I recall, of the States have initiated some form of blocking, usually on a per-call basis, as had been States where they've said let's try the service without blocking. So why the difference? And even some telephone companies are proposing a blocking method.

I think this is to try to have "laboratories" take shape that can really get at the issue of how much of this concern is founded and how much of this concern is unfounded. The issue of privacy gets

widely debated, but you really line up on the side of the customer who, in the privacy of their home, has a right to know who is trying to reach them. I think that's what Caller ID without blocking does.

Interestingly, my understanding of the New Jersey experience— although I come with a lot of data from Illinois—is that just the offering of Caller ID service without blocking, even though it is accepted as a service and paid for on a subscription basis by less than 10 percent of the subscribers, has had a tremendously positive effect on the population at large. Because if I have a deleterious motive in mind in calling you, I'm not really sure whether you have Caller ID without blocking or not. So the benefits get spread across the entire society.

Mr. RINALDO. Except that there are a lot of people and a lot of circumstances that really mitigate against the use of Caller ID without blocking. For example, the undercover agent who is operating out of a home, who doesn't want that number to be given away. The person in a case that I recounted yesterday, an individual who was utilizing the telephone to comparison shop, where an unscrupulous merchant, in effect, got hold of this lady's number and harassed her to death to try and get her to buy the product. The individual who makes a slip of the finger and a wrong phone call and perhaps that woman then is subjected to harassment by the person who gets that number.

What makes it even more dangerous without blocking is that, once people have the number, certainly the technology is there— and you want to offer the service—to give them the address also. So I think it is something that has to be handled judiciously and carefully, and that's what we're trying to do. I would hope that you would cooperate with us in that effort.

Mr. BROWN. We will certainly cooperate.

One comment, Congressman Rinaldo. We have been working very hard, in Illinois Bell in particular, to visit with stakeholder groups who have concerns about a no-blocking posture. We have interviewed over 500 such people, organizations and agencies. We have had public hearings across the State of Illinois involving hundreds of people who have come to testify. The fact is that, to date, there is not a sheriff's department in Illinois, or a police department, that has publicly opposed Caller ID without blocking. Once people understand the abilities they have to work with technology for that kind of protection, it seems to work.

The other forgotten element here, I think, is small business. In the Ameritech region, we have 800,000 small business customers. I think this is a big part of America's future. I think the small business advantages to Caller ID without blocking far outweigh the disadvantages these businesses would experience.

Now, certainly having the service in and working and seeing how this really comes to be is essential before I think final legislation can be responsibly undertaken. But we want to work with you.

Mr. RINALDO. I'm very familiar with it, having come from New Jersey.

I also just took a look at the poll that was mentioned by one of the panelists on the last panel, and it's interesting that 43 percent feel that we shouldn't even be allowed to sell it. When they were

asked do you feel this new service should be freely available, or that it should be regulated by law, or that should it be banned completely, in response to that question, 55 percent said Caller ID should be regulated by law, 25 percent said Caller ID should be banned completely, and 17 percent said Caller ID should be freely available. That's by a very respected pollster, Lou Harris. So I think there is substantial evidence, both substantive and anecdotal, to show that, at least in my view, this committee is on the right track.

Mr. BROWN. And I think, Congressman, you're right, in the sense that our own research would have some very different conclusions. So it just reinforces, I think, the need to take a good look at this.

Mr. RINALDO. The research may be a little more driven by economic considerations, also.

Mr. MARKEY. The gentleman's time has expired. The Chair recognizes the gentleman from Texas, Mr. Barton.

Mr. JOE BARTON. Thank you, Mr. Chairman.

I ask unanimous consent that Congressman Bliley's opening statement be included in the record.

Mr. MARKEY. Without objection, it will be included in the record at the appropriate point.

[The prepared statement of Mr. Bliley follows:]

### STATEMENT OF HON. THOMAS J. BLILEY, JR.

Mr. Chairman, I have serious reservations about H.R. 1305, the "Telephone Consumer Privacy Rights Act." The subject within the subcommittee's jurisdiction to which I have devoted the most time and energy over the years has been to keep the phone lines free of obscenity and indecency. While much of the battle in the past has focused on so-called dial-a-porn services, H.R. 1305 raises another side of the same problem.

Caller ID is a new telephone service which at last gives the victim of the obscene or prank caller a chance to fight back. Some of the most vulnerable people in our society, the elderly, the handicapped, single women—groups you customarily seek to protect, Mr. Chairman—stand to be the biggest beneficiaries of this new Caller ID technology. Yet, we have in front of us a bill which mandates, as a matter of Federal law, that telephone companies must offer the option of free per call blocking by the caller as a condition for being able to offer the basic Caller ID service. This means that the obscene caller will be given the right, by Federal law, to disarm the Caller ID device and strip away the protection they were getting when they purchased the service. Why on earth, Mr. Chairman, should Congress intervene on the side of the criminal perpetrators to counter the technological defense purchased by the victim?

The rush for Federal legislation is all the more puzzling because the States have been moving very actively in this area. It is not as though consumers around the country have been complaining bitterly about problems with Caller ID and their State regulators were turning a deaf ear. Several State public utility commissioners have required free per call blocking. I am happy that my home State of Virginia has not. But there certainly is no need to shove the States aside by Federal law when they are conscientiously and actively dealing with this issue.

Mr. Chairman, I think we need to study very carefully whose side we're taking and why we are moving to get the Federal Government into regulating Caller ID. Thank you, Mr. Chairman.

Mr. JOE BARTON. I have several factual question again, and primarily they're going to be to Mr. Brown because you're with the Bell Company.

Is it technically possible to differentiate in your switching—This is regarding some of the concerns about residential telephone callers calling commercial telephone numbers, that then the commercial number has Caller ID and uses this for business purposes.

Could you allow residential Caller ID without allowing commercial Caller ID? Is that possible? Could you differentiate that way?

Mr. BROWN. Well, I will give a qualified answer, Congressman, because I'm an English major, not an engineer. But I think that is possible to do. It would restrict for a universe of our consumer base, for our telephone base, the service at hand. But subject to verification with my engineers, I think that is doable.

Mr. JOE BARTON. Let me ask another question to try to address some of the concerns that Chairman Markey asked.

When somebody with an unlisted number calls another unlisted number that has Caller ID, would it be technically possible, when the call is placed, before it rings, for a little telephone voice to come on and say "the number you are calling has Caller ID"? That way, if the person didn't want the person they were calling to know they were calling, they could hang up.

Is that technically possible?

Mr. BROWN. Well, you're really pushing me to the limit. I have to say that I have confidence that that's probably something that our engineers in this industry could work out. I don't think that's what we want to do, and I don't think that's what the American people want, at least in the State of Illinois. But subject to verification, I think that sort of technology——

Mr. JOE BARTON. They always tell me when I used my credit card call, they thank me for using, you know, the service, and they always thank me very politely. So if it's possible to thank me before that kind of a call goes through, I was just sitting here thinking it might be possible to let the person know that the person they were calling had Caller ID. That way, if the person making the call didn't want them to know, they could terminate the call. Again, I'm trying to alleviate some of the problems.

Mr. BROWN. Congressman, in response to that also, I think as to who I think would use that, or who would like to see that feature, I think the bad guys would win out.

You also need to realize—and you probably do—that even with block-to-block, some of this technology isn't going to be usable ubiquitously for a number of years. So I have to qualify my technological yes with a question mark on the timeframe.

Mr. JOE BARTON. My final question, I think you make an excellent point when you say various States are approaching this problem in different ways and it is probably inappropriate at this time for the Congress to take a national perspective.

Having said that, if a State takes a different approach—let's say Illinois takes a different approach than Indiana—how do you handle interstate telephone calls if adjoining States, or for that matter, if California takes a different approach? How would you handle Caller ID in Illinois if California does it differently?

Mr. BROWN. You raise an excellent point. At the interstate level, or the Federal level, I think this is an issue that really has to be carefully looked at by the Federal Communications Commission. Because as a panelist in the earlier panel mentioned, while it is good to have States to have laboratories to assess the Caller ID issue, blocking versus nonblocking, there has got to be some Federal coordination. I don't have the answer for that, but it clearly needs to be addressed.

page 368
Exhibit 23

I think there are ways to have different States handle this issue in different ways and still have a unilateral Federal policy exist.

Mr. JOE BARTON. I thank the chairman.

Mr. MARKEY. The gentleman's time has expired.

The Chair recognizes the gentleman from Florida, Mr. Bilirakis.

Mr. BILIRAKIS. Thank you, Mr. Chairman. I apologize to you and to all of our witnesses for my late arrival. Right down the hall the Veterans' Affairs Committee is holding a hearing on medical care, on the 140 deaths that occurred in the North Chicago Medical Center over a period of 10 months. I just felt I had to stay there.

I want to welcome Commissioner Beard and Mr. Frawley, who are here from Florida. I believe Mr. Shreve has left. I have just basically one or two questions of Mr. Frawley, if I may.

In your opinion, how is the 1990 Florida bill, the Telephone Solicitation Act working at this point in time? How effective is it? I realize we don't have a very long history on it.

Mr. FRAWLEY. I'm not really sure how that's working. You know, when you deal with telemarketers, you are not always dealing with people that know what's going on in Tallahassee or, for that matter, in Washington. Many of them just indiscriminately attack blocks of numbers.

We haven't had any real serious threat with manual telemarketers. Of course, if a manual telemarketer calls and got a beeper number, he would know something was wrong and he would go elsewhere. We have had problems, though, with dial-up machines blocking up our numbers. We come in at 9 o'clock in the morning and find our switch locked up, and the telephone company and ourselves working together can't figure out why it happened. We can only assume it was a block of autodialers. We have no proof of it.

Mr. BILIRAKIS. I see. But that could have happened, and these may have been callers who were calling people who were not registered in accordance with the Florida bill; is that correct?

Mr. FRAWLEY. That's correct.

Mr. BILIRAKIS. How about the jurisdiction over interstate calling? Do you have any answer on that insofar as that legislation goes?

Mr. FRAWLEY. No. I thought that was a great question from Mr. Barton. Frankly, I hadn't thought about it.

Mr. BILIRAKIS. I'll talk to Commissioner Beard about it, but that in itself could be a reason to require Federal legislation, I would imagine.

Mr. FRAWLEY. The only thing I would mention is we Telecator folks, and the Florida Radio Telephone Association, are in the business of paging, and we have 10 million pagers in the country. Many of those pagers are numeric display pagers. The very purpose of it is, if a person gets a page or so, somebody can call in their number to be dialed back. That's exactly the service they're buying. So we do have to distinguish paging apart from the land line telephone.

Mr. BILIRAKIS. That's a good point.

Thank you, Mr. Frawley, and thank you very much, Mr. Chairman.

Mr. MARKEY. The gentleman's time has expired, and the time for the hearing, unfortunately, has expired as well.

I would note that, in conclusion, there are several issues that have not as yet been as fully probed as we would like. Mr. Mac-

Kenzie, Mr. Barton, and others I'm sure would have liked to have the opportunity to expand their comments.

Mr. Barton, I would have loved to explore with you the voluntary nature of the compliance and the protection of individuals in our country, and again the economically driven interests which direct marketers have in basically ignoring privacy rights in the pursuit of a buck. That is a serious tension that oft-times it is difficult for private sector individuals to monitor.

It is not that there aren't many good people in the direct marketing area. It is that 10 or 15 percent of the scam artists, the fly-by-night people, who can come in and basically, without any real protection, do some serious damage to the privacy rights of Americans and impugn an entire industry's reputation because of the lack of full protection.

So right down the line, there is a whole series of additional questions which we would love to be able to explore with you. But we're under a time constraint because we committed to empty this room out for the next event.

These are two very important bills, two very important issues. This is how technology touches people in their homes. This is the real life interaction with the technology. As a result, there is tremendous consumer interest in the subject. We do intend on moving forward, but we want to be informed with regard to the perspectives of each of you as we move forward. But we are going to move forward. So please stay close to us in terms of your interaction, so that we can fully incorporate all of your legitimate concerns in the legislation.

We thank you all very, very much. The hearing is adjourned.

[Whereupon, at 11:10 a.m., the subcommittee was adjourned.]

[The following material was received for the record:]

Response from Richard Barton
Senior Vice President for Government Affairs
Direct Marketing Association
to May 2, 1991 Written Questions from
The House Subcommittee on Telecommunications and Finance
Regarding DMA Testimony at the April 24, 1991 Hearing
on H.R.1304, H.R.1305 and H.R.1589

I.   SELF REGULATION

According to FCC statistics, there are about 121.5 million
telephone access lines in the United States. About 3.5 million
lines are located in Massachusetts, a State whose laws provide a
listing mechanism that allows any common carrier customer to elect
not to receive telephone calls from automatic dialing systems.
About 200,000 customers have done so. Extrapolating the
Massachusetts experience to the Nation leads one to expect about
7 million telephone subscribers would opt not to receive these
calls if a nationwide program existed.

Q1)  DMA's Telephone Preference Service lists people who do not
want to be solicited over the phone. Please explain how that
service works, how you go about notifying consumers that they can
participate in the service, how many consumers are currently listed
by the service, and how many individual telemarketing firms request
and use the list?

A1) The TPS was established in 1985 to assist consumers in removing
their names from nationally-based telephone solicitation lists.

Since its inception, the TPS has been promoted in broadcast and
print media regularly and frequently on a nation-wide basis. Action
Line Reports, which are issued to more than 700 broadcast and print
media 8 times each year, regularly feature information on this
service. Public information regarding the TPS is also disseminated
through literally thousands of media interviews and press inquiries
every year. Nationally syndicated columnists, such as Dear Abby,
Heloise, and Ann Landers, also regularly feature information on the
TPS in their columns.

Information on the TPS is also included in the "white pages" phone
books of the major Bell Operating Companies, and in informational
booklets on telephone shopping which are produced by the DMA and
other industry and consumer groups. Many telephone companies also
include information on the TPS in their customer billing notices.

The U.S. Office of Consumer Affairs' "Consumer's Resource Handbook"
contains information on how consumers can register with the TPS.
Over 1 million copies of the Handbook are distributed each year,
and many of the subscribers to the Handbook are consumer agencies
that further disseminate the information it contains on the TPS.

The DMA's Ethics and Consumer Affairs Department also promotes the
availability of the TPS to all federal, state, and local consumer

- 2 -

affairs and regulatory officials. Every "Better Business Bureau" in the United States annually receives information on the TPS.

TPS information is also distributed through the DMA's "Dialogues on Direct Marketing and Mail Order." These regional meetings between direct marketing professionals and consumer affairs & regulatory officials are held twice each year across the country. They provide exceptional opportunities for the participants to discuss issues of mutual concern, and to work together to provide a marketing environment that optimally serves both the consumer and the marketer. The consumer and regulatory participants in these meetings have been instrumental in disseminating information about the TPS to consumers and businesses on a local basis nation-wide.

Since the initiation of the TPS, the DMA has received over 400,000 consumer requests for name removal. Depending upon the extent and type of publicity regarding the TPS within a given time period, the TPS staff person processes somewhere between 3,000 to 15,000 name removal requests each month. Names are processed by a one-step procedure in which consumers who write to request name-removal are automatically registered with the service.

Consumer requests for name removal are processed in the DMA New York office. Requests are made through consumer correspondence, responses to public service magazine advertisements of the TPS, or consumer registration cards that the DMA makes available to consumer and regulatory agencies on a nation-wide basis. Although it is not encouraged, requests to be registered for the TPS are also accepted over the telephone. Second-party requests, however, are not accepted.

A DMA member volunteers its services at a discount rate to compile consumer names onto computer tapes. Consumer names are maintained as registered for a period of five years.

TPS tapes are sent to business subscribers on a quarterly basis in January, April, July and October of each year. Each update contains a complete file. The cost charged to subscribers is as follows:

| For 4 tapes per year | $175.00 |
| For 3 tapes per year | $150.00 |
| For 2 tapes per year | $100.00 |
| For 1 tape  per year | $ 50.00 |

Subscriber fees are kept as low as possible to ensure that cost is not a factor preventing companies from subscribing to the service.

The typical TPS subscriber is a "service bureau" which processes mail or telephone lists for solicitation purposes. The "service bureau" is a company which contracts with other companies to compare the TPS file with their solicitation lists in a process called "merge/purge." Through this process, TPS names and numbers found on a client company's lists are "flagged," or suppressed, so that the client company may use "clean" lists. The number of lists

- 3 -

used by each client of the service bureau varies widely and is dependent upon the nature of the client company's business.

Given this use of the TPS, it is the number of lists and names that are screened through comparison with the TPS file, rather than the number of companies subscribing to the TPS, which is indicative of the effectiveness of the TPS. Because of the national stature of the service bureaus that subscribe to the TPS and the marketing companies they represent, the DMA is confident that most of the nationally-based telemarketing solicitation lists are "cleaned" by reference to the TPS.

Q2)  What punitive action does DMA take against firms that fail to comply with the association's telemarketing standards and how often has it had to resort to such measures?

A2)  Because federal antitrust and unfair trade laws strictly limit the ability of a trade association to impose standards of conduct on its members, the DMA refrains from taking any "punitive" action against firms that fail to comply with its telemarketing standards. However, the DMA regularly utilizes other means, within the bounds of such legal constraints, to administer the TPS in a manner which promotes its effectiveness as a consumer service.

For example, the TPS is implemented within the context of the DMA Ethical Guidelines, which are administered by the DMA's Committee on Ethical Business Practice. The Committee is composed of sixteen high-level direct marketing executives from a cross-segment of the industry, and it meets ten times each year to review and update the Guidelines and to examine complaints referred by consumers, action line reporters, and industry members.

Over the years, the Committee has worked to counter ethical lapses which detract from the public's confidence in the legitimacy of the direct marketing industry. In so doing, it has applied the DMA Ethical Guidelines to hundreds of cases involving a variety of unfair business practices.

When the Committee learns of a solicitation or other practice which violates the Guidelines, it notifies the responsible company and offers the company an opportunity to correct the problem. Because peer pressure and competition among members of the industry tend to have a strong impact on matters of ethical propriety, a referral in this manner usually results in the company taking appropriate remedial action on its own.

However, if the company is not willing to work with the Committee to resolve the problem, the Committee has authority in compelling cases to recommend to the DMA Board of Directors that the company's membership be deferred, denied, or revoked. If the company refuses to cooperate in resolving the problem, and the Committee believes

- 4 -

that the practice at issue is illegal, the Committee's case file on the matter will be referred to the appropriate State or federal regulatory or law enforcement agency.

It has been the experience of the DMA that the majority of consumer complaints concerning the effectiveness of the TPS do not involve national telemarketing operations. Instead, they are about local businesses, nonprofit organizations, or companies that engage in sequential dialing with the use of autodial systems and prerecorded message machines. Such businesses do not consider themselves to be "telemarketers" and, typically, do not have technical capabilities to manage a "no calls" list.

Q3)  Given the relatively small size of the DMA list, and your testimony that a national data base might include tens of millions of telephone numbers, how can your association be confident that its self regulation preference would make more than a minor contribution toward solving telemarketing abuse problems across the country?

A3)  This question wrongly assumes that there is a clear, general consensus on the nature and extent of "telemarketing abuse problems across the country."

As we said in the DMA statement submitted to the Subcommittee for its recent hearing, anecdotal complaints arising from telemarketing uses of ADRMPs and FAX machines do not in any way justify the imposition of new, heavy-handed federal regulation on the widely-used practices of "live operator telephone solicitation."

The success that many legitimate businesses have enjoyed as the result of their telemarketing efforts confirms that large segments of the American people find telemarketing to be a convenient and inexpensive way to learn about or acquire goods or services that they need or want. We know of no empirical data demonstrating that American consumers are generally opposed to current "live operator telemarketing" practices, or that they are clamoring for a national "asterisk" law which would apply to a "telephone solicitation" for the called party's "business" but not to a "telephone solicitation" to obtain the called party's personal opinions, political support, or charitable donations.

If there are significant "telemarketing abuse problems across the country," the Federal Communications Commission should be directed to identify them and make specific recommendations for necessary and appropriate legislative and/or regulatory actions to remedy them. Congress should not rush forward to burden a legitimate business practice with a technically complex and constitutionally suspect scheme of regulation on the basis of nothing more than the vague allegation that some people regard it as an annoyance.

- 5 -

The DMA strongly believes that self-regulation in the telemarketing
industry makes more sense than the proposed scheme of federal list
regulation because the industry has built-in incentives to maintain
ethical practices. Clearly, no one recognizes better than the DMA
and its members that the success of telemarketing efforts depends
upon the consumer's understanding and acceptance of telemarketing
as a legitimate and convenient business practice. This incentive
to promote public acceptance, together with private industry's
ability to utilize the evolving technology more quickly and
economically than the federal government, commends the self-
regulatory approach of the TPS as likely to be more efficient and
effective than the scheme proposed in H.R.1304.

Q4)  Your testimony on the database provisions of H.R. 1304 states,
". . . there would be little assurance that the lists derived from
the data base could be maintained and made available to
telemarketers with any real degree of certainty regarding their
current accuracy and completeness . . ." How does DMA protect its
list from these deficiencies and why couldn't FCC or its contractor
exercise the same controls as DMA's voluntary program, or improve
upon them?

A4)  Perhaps the most significant distinction between the TPS and
the national data base proposed in H.R.1304 is that the latter
would consist only of telephone numbers, while the former consists
of telephone numbers matched with names and addresses. This is a
crucial distinction because the additional information is, in the
view of most professional telemarketers, absolutely necessary to
ensure that calls to objecting subscribers will be effectively
suppressed and that the data base -- and the lists derived from it
-- can be accurately updated and verified on a timely basis.

It should be noted that the Massachusetts "listing" statute, which
does not apply to all "telephone solicitations" but only to calls
from an automatic telephone dialing system, requires that common
carriers must make available to persons using such systems "the
names and telephone numbers" of persons who do not wish to receive
such calls. See MASS.GEN.LAWS c.159, Section 19C.

It is extremely doubtful that the proposed national data base can
be compiled, verified, updated and verified on a timely, cyclical
basis with only the telephone numbers as reference data. The
ability to accurately account for changes in the data base due to
subscribers who change their phone numbers, change their names,
change their addresses, develop multiple subscriber households, or
enter or exit the lists in response to changing attitudes toward
particular types of calls, is greatly suspect without the
availability of additional information.

- 6 -

Q5) Your testimony expresses a preference for DMA's self-regulatory approach which you state "from the standpoint of American business is much more fair and reasonable than a government regulatory approach placing telemarketers in constant jeopardy of penalties . . ." What is the rationale underlying DMA's testimony that its preference for consulting an obviously incomplete list of 300,000 telephone numbers is better public policy than a federal requirement to use a far more comprehensive list?

A5) Even if the proposed "national data base" would be far more extensive than the TPS, it is virtually certain that, like the TPS, it would also be "an obviously incomplete list." This has more to do with the limited but unclear scope of the bill's definition of "telephone solicitation" and the inertia of telephone subscribers than with whether or not the system is mandated by federal law.

However, the question, as framed, misses the point of the statement quoted from the DMA's testimony. In this context, the DMA prefers the self-regulatory approach of the TPS to the approach taken in H.R.1304 because we disapprove of civil liability for mistakes made by legitimate telemarketers who attempt in good faith to comply with any "opt-out" listing scheme.

H.R.1304 is cast as an amendment to the Communications Act of 1934, as amended, which would make it "unlawful" to violate mandated FCC regulations. Among other things, the bill requires that the FCC regulations "prohibit any person from transmitting a telephone solicitation to the telephone number of any subscriber contained on [the] list" compiled from the "national data base." Because the Communications Act establishes "forfeitures" for persons who violate any provisions of the Act, 47 U.S.C. 501, or any rule, regulation, restriction, or condition made or imposed by the FCC under the Act, 47 U.S.C. 502, the data base scheme created under H.R.1304 and implemented through FCC regulations would be subject to enforcement through the penalty provisions of the Act.

Although such penalties apply only to persons who "willfully and knowingly" violate the Act or any FCC regulation, the data base's susceptibility to inaccuracies and outdated data could place telemarketers at risk of violations and penalties notwithstanding their good-faith efforts to accomodate the "objecting persons" on the list. H.R.1304 provides telemarketers with no assurance that their utilization of the data base lists will immunize them from fines under the Act in cases where the lists, for whatever reason, proved to be inaccurate.

- 7 -

## II.  ELECTRONIC DATA BASE COSTS

Q1) DMA literature encouraging telemarketers to purchase the Association's Telephone Preference Service informs members that it "offers additional business advantage and prevents wasted sales dollars and efforts calling customers who have predetermined that they will not be receptive." If a far more comprehensive list were available at a comparable cost, would you support it as strongly? (Please explain your answer).

A1)  The DMA has repeatedly made clear that it supports the concept of the TPS for two reasons: One, because it builds good-will for telemarketing through the accommodation of the consumer's desire to "opt-out," and two, because it facilitates a sensible marketing strategy through better targeting of potential customers.

While cost and comprehensiveness are important, our support for "a far more comprehensive list ... available at a comparable cost" would obviously depend upon other factors as well, including our confidence in the integrity of the list and the reasonableness of any obligations and liabilities imposed upon the telemarketer in connection with its use. Apart from the fact that we doubt that the lists created under H.R.1304 would be available at a cost which would be "comparable" to the current price of the TPS, our concerns regarding the timely accuracy of the data base and the potential liability for telemarketers under the bill lead us to oppose the measure.

Q2)  The Subcommittee has received FCC's preliminary estimate of the cost of developing and maintaining a data base containing up to 10 million numbers.  It projected the cost of a minimal system developed and maintained by the Commission is as follows:
-- Systems hardware and software $1 million
-- Annual operating costs $300,000

Conservatively assuming the hardware and software costs would be amortized over a 5 year period at $200,000 per year, the annual cost to be recouped by the FCC would be $500,000.  Even if these costs were borne only by DMA's 3,000 members, the annual cost to DMA members would be about $167.00 -- over $100.00 less than the $275.00 the association charges new members for its Telephone Preference Service.  What data does DMA have to justify its contention that the cost of the database proposed in H.R. 1304 is excessive?

A2) Because of the unprecedented nature of H.R.1304's proposal for establishing and utilizing the "national electronic data base of objecting persons," the initial burden of fairly estimating its costs should rest with the scheme's proponents, not its critics.

- 8 -

The DMA believes that the FCC's preliminary estimates are extremely "low-ball" figures. Instead of calculating the cost of a "minimal" system, which is not likely to inspire the confidence of either the subscribers or the telemarketers, the FCC should be tasked to state in detail the costs it estimates for each stage of development and operation of a virtually flawless state-of-the-art system. The FCC should be required to specify what steps will be involved in the compilation, verification, maintenance, updating, protection, and utilization of the data base. Exactly how does the FCC calculate its startup costs and its costs for administration?  Without a full, meaningful breakdown of these costs, and some insight into the FCC's conceptualization of the completed system and its task in establishing and implementing it, the estimates cited above cannot be sensibly critiqued.

The cited FCC figures appear to be mere extrapolations from figures that the Subcommittee has cited with respect to implementation of the Massachusetts listing statute. The proposed data base under the bill, however, is likely to be of an entirely different magnitude than the one required by the State law. We suspect that consulting contracts with the variety of private firms which can be expected to be engaged by the FCC for a project of this kind will alone entail far greater funding than that which the FCC apparently has estimated for all of its startup costs.

Apart from these problems in responding to your question, we would also note that the TPS file, with all quarterly updates, costs a subscriber $175, rather than $275, and that not all of the 3,000 members of the DMA are primarily engaged in telemarketing. For these reasons, the extrapolations from the FCC's preliminary estimates, such as they are, represent a comparative distortion.

Q3)  In light of your response to the above questions, would DMA like to modify its testimony that the data base established in H.R. 1304 would have adverse bottom line impacts and lead to a loss of jobs for tens of thousands of individuals employed in telemarketing?  Please explain your answer?

A3)  The DMA's previous testimony expressed our concerns regarding adverse bottom-line impacts and the loss of jobs "for many of the tens of thousands" of individuals employed in telemarketing not as certifiable predictions but as feared possibilities in the context of our understanding of the implications of H.R.1304. Nothing that has been said about the bill at or since the Subcommittee's hearing has lead us to alter our previously-stated views.

STATEMENT OF CAROL KNAUFF

DIRECTOR - INBOUND APPLICATION SERVICES

AMERICAN TELEPHONE AND TELEGRAPH COMPANY

BEFORE THE

ENERGY AND COMMERCE COMMITTEE

SUBCOMMITTEE ON TELECOMMUNICATIONS AND FINANCE

THE UNITED STATES HOUSE OF REPRESENTATIVES

APRIL 24, 1991

H.R. 1305

My name is Carol Knauff.  I am the Director of Inbound
Application Services for AT&T.  My organization is responsible
for the product management of inbound application services for
AT&T's business customers.

Thank you for the opportunity to submit testimony on H.R.
1305, the Telephone Consumer Privacy Rights Act.  AT&T recognizes
that calling party identification (CPID) and related services
involve important public policy implications.  As these services
have become more widely available, the display of the calling
number has raised some concerns about the privacy interests of
both the party placing the call and the party receiving it.  A
related issue is whether and what type of consent should be
required before a called party may sell or disclose information
it has properly obtained about the caller's billing telephone
number.

AT&T's has historically been sensitive to privacy issues.
As a leader in the telecommunications industry, AT&T has a firm
policy to protect the privacy of the content of any information -
- voice or data -- that is transmitted over its facilities.  We
remain committed to that policy in the future.

AT&T was also a leader of the coalition that helped to pass
the Electronic Communications Privacy Act of 1986.  That

- 2 -

coalition included the Bell operating companies, other industry participants, law enforcement agencies and the American Civil Liberties Union.  We have also worked to educate and inform all interested parties about the technology under discussion today.

The bill now before the Committee would require a telephone company offering CPID service to give the calling party the option to restrict the presentation of his or her phone number on each call.  This is sometimes called "blocking" the display of the calling number.  The bill would also limit the called party's use or disclosure of automatic number identification (ANI) -- the caller's billing telephone number that automatically passes with the call to 700, 800 and 900 customers -- without the caller's affirmative consent.

AT&T believes that carriers' ability to offer CPID and related services represents a significant improvement in telephone service in this country.  Where they have been introduced, the services have already demonstrated their value in enabling business customers to offer new and more efficient and responsible services to their own consumers, in sharply reducing the levels of anonymous obscene and harassing calls, and in the provision of 911 and other emergency community services.  CPID services have finally given customers a measure of choice and control over their use of telephone service that was not available in the past.

- 3 -

AT&T therefore urges the Committee to do three things as part of its review of this proposal.

First, we ask that you do not enact legislation that unnecessarily impedes the development, deployment and uses of these new technologies. AT&T supports the widest availability of telecommunications products and services to give customers control of their communications services. This includes services such as Caller ID, which utilize calling party identification technology. Only with growing use will these services provide their full benefits to our society.

Second, in the event this Committee determines that restricting display of the calling number is required now, we urge you to exempt certain business services from this requirement. In addition, because CPID capabilities are critical to the evolving information industry, AT&T would strongly object to any "per line" blocking requirement, i.e., blocking the identifying digits on all calls from a particular telephone line.

Third, AT&T objects to the provision the bill that would restrict the use of ANI information by 700, 800 or 900 business customers unless the caller affirmatively consents. Although this provision does not appear to apply to carriers, AT&T would also strongly object to any interpretation that would impose a

- 4 -

consent requirement on carriers.  I would like to examine each of
these three points in slightly more detail.

On the first point, I urge the Committee not to adopt
legislation that would preclude the unencumbered development of
these innovative technologies.  Intelligent network services are
the foundation of the Information Age and are being used to help
achieve valuable social objectives.  The unrestricted flow of
information about the calling number is essential to these
evolving products and services.  In New Jersey, one of the first
states to permit Caller ID, the state recognized this, and
authorized Caller ID services without a blocking requirement.
The service, in existence since 1988, has been extremely well
received by the consumers in that state.

However, if the Congress were to adopt legislation mandating
optional per-call blocking of Caller ID services, we believe that
it should preempt the states from adopting more stringent
blocking options.  In California, for example, the legislature is
considering a bill to require per-line blocking, notwithstanding
that it has already approved free per-call blocking of Caller ID
services.  At the far end of the spectrum in Pennsylvania, the
courts are considering whether Caller ID is prohibited altogether
under the state wiretap statute. Per call blocking is far
preferable to these more restrictive approaches because it
affords the caller maximum flexibility and choice, _i.e._, to

- 5 -

decide on a case by case basis whether to transmit his or her telephone number, while recognizing the compelling privacy rights of the called party to know who is calling and to refuse to answer a blocked call.

My second point relates specifically to business services. AT&T strongly urges you to exempt certain business services from any blocking requirement.  To elaborate on why AT&T makes this recommendation, I would like to describe briefly some of our current service offerings.

AT&T offers a variety of specialized long distance services to our business customers.  Of particular interest in this discussion are our 700, 800 and 900 services and our virtual private network services.

Our 700 service is a conference call service, enabling people in multiple locations to participate in a single call. Our 800 service is used by businesses to allow their customers to call them toll-free, with the business paying for the full cost of the call.  900 service is an interactive service that permits callers to leave or receive a message with the 900 subscriber, which pays AT&T for the calls placed to the 900 number.  And virtual private network services are those AT&T services that allow customers to use the AT&T switched network as if it were their own private network.

- 6 -

AT&T also provides a service feature we call INFO-2 to our 800 and 900 customers.  AT&T's 800 and 900 customers are typically businesses with a large base of their own existing customers whom they serve on a repeat basis.  Examples of our 800 and 900 customers are medical insurance providers, hotel or motel chains, airlines, and credit card companies.  With INFO-2, the subscriber to 800 or 900 service can see the number of the calling party displayed as the call takes place.  Companies with this service can identify who their regular customers are, and can offer them more personalized service by responding to the call almost immediately.  Productivity is enhanced, and the calling customer is not subjected to needless waiting time while the business retrieves the proper file.

There are three primary reasons why we recommend that these business services should not be included in any mandate to restrict the presentation of the calling number.

First, our business customers are depending upon these services to provide their own customers with the fast, efficient and accurate service that their own customers demand and expect. These services, in short, are an increasingly important productivity and service improvement tool for businesses of all kinds.

- 7 -

By using the calling number as an identifier, for example, a major shipping firm speeds and enhances customer service -- and improves its competitive position and the competitive position of its own customers.  When a party calls the firm's toll-free number, the calling number is automatically matched up with the appropriate customer records.  The employee taking the call gets access to the customer information at the same time the call is received.  Wasted time, for both the customers and the employee, is eliminated.

A major automobile company also uses these services to provide its customers with a single nationwide 800 number for roadside assistance.  Based on the number from which the call is made, the motorist is put in contact with the nearest dealer or service establishment for emergency repairs.

A leading motel chain has found that these services enable travelers to make their reservations 20 percent more quickly than was previously possible.  Other applications are used in the insurance and banking industries (for example, to route the caller to his or her personal agent) and in other sectors providing consumer services.  One beneficial application is designed to "halt the hacker", i.e., the calling number is matched against an authorized user list to determine if someone tying to logon to a computer from a remote site is legitimate. The common denominator for all businesses is better, faster and

- 8 -

more responsive service to their consumers.

Occasionally, the payoff is even more significant.  A major consumer products company received a report on its toll-free 800 number that the anonymous caller had just tampered with one of the company's food products.  Because of the automatic identification of the calling number, authorities were able to arrest the caller within 30 minutes.  As a result, no one became sick from eating the tampered food and law enforcement resources were used more effectively.

Virtually all of our business customers which use CPID services report improved service and significant productivity gains.  We would certainly like to continue to provide these valuable features in accordance with our current tariffs and contracts.  If blocking of the calling number were required, it would clearly diminish productivity improvements and the value of these services to our customers, and to consumers generally.

The second reason that AT&T would urge the Committee to exempt these business services from blocking requirements is that calls to these services are, by their very nature, discretionary business calls.  Calls to 700 services are conference calls. Transmitting the telephone numbers of the parties on the conference would allow the participants to know who has joined the call and would help protect against inadvertent or deliberate

- 9 -

security breaches.  Calls to 900 numbers are for the purpose of exchanging information.  And calls to 800 numbers are business calls in which an essential part of the transaction is that the caller identify himself or herself.  Moreover, 800 calls are paid for by the recipient, not the calling party and thus are conceptually similar to collect calls.

Callers to business services are simply not subject to the specialized privacy concerns raised by CPID services in the residential market where certain kinds of callers -- e.g., an abused spouse, a person seeking drug or alcohol treatment -- may need protection from having their identity or location revealed. Indeed, the same information provided via INFO 2 (i.e., the caller's telephone number) would be available to the 800 or 900 customer as part of the normal bill detail.  Similar information is also available from a variety of other sources, such as magazine lists and warranty cards.

The bill already contains a well-founded exemption for calls within a limited communications system, including Centrex.  One function of such a system is to alert the called party who is part of the network as to who is calling.  We believe this exemption would cover calls within private networks and virtual private networks, but we suggest that the bill include express language to this effect.  Calls within private voice and/or data networks, including virtual private networks, are, like Centrex,

- 10 -

calls in which both the calling and called parties are both
within the same limited communications system (for example, a
firm with a private network serving multiple locations around the
country).

In all events, an exemption of 700, 800 and 900 business
services from any blocking requirement is essential because it is
not technologically possible today to restrict presentation of
the calling number on calls to 700, 800 or 900 services (or
within virtual private networks) on a selective basis.  The
technology which carries the signalling information -- in effect,
the command to display or to block display of a calling number -
- is what we call Signalling System Number 7, or SS7.  Before
blocking options could be implemented, the capability of passing
this signal from a local exchange company to an interexchange
carrier and then onto another local company (the so-called SS7
network interconnection) must exist nationwide.

Deployment of SS7 interconnections between local exchange
companies and interexchange companies, while not yet available,
is expected to begin in 1992, but will not be ubiquitous for
several years.  Given this technical impossibility, a specific
exemption is preferable to the time-consuming FCC waiver process
now contemplated in the bill.

To the extent any blocking options are ultimately mandated,

- 11 -

the duty to make them available should be on the local exchange company serving the area from which the call is originated. Those local carriers are technologically best positioned to offer a blocking option, which (when SS7 interconnections become available) would be passed along to the long distance carrier with the call.  The establishment of separate blocking options by multiple long distance carriers (even if feasible) would simply be uneconomical.

H.R. 1305 would also impose on the common carrier offering the Caller ID service the duty to notify its subscribers that their telephone numbers may be disclosed to the called party (Section 227(b)(3)).  Given the widespread media coverage of caller identification services, the proposed customer notification requirement is unnecessary.  If such a provision were nevertheless enacted, the duty to notify customers should not fall on interexchange carriers (IXCs).  A better approach would be for the local carriers to provide a general notice to their customers that if they call someone who subscribes to Caller ID services, under certain circumstances that person may be able to see the calling party's telephone number.

My final point concerns AT&T's objection to the requirement that business customers obtain the affirmative consent of the calling party before they can use information they are otherwise entitled to about the calling party's billing telephone number.

- 12 -

While this provision does not appear to apply to carriers, it is not clear. If the intent is to impose restrictions on carriers' use of ANI, AT&T strongly objects.

Insofar as carriers are concerned, such a restriction on the use of ANI is unnecessary. Carriers have had access to customer billing information for many years and have used it responsibly. In the strongly competitive market for long distance service, IXCs must be sensitive to privacy concerns or risk losing their customers.

In addition, telephone number information and marketing lists can be compiled from a variety of sources (e.g., magazine subscription lists, catalog sales, warranty cards and telephone directories), totally independent of calls to 800 or 900 services. Carriers that obtain electronic information about calling parties when a customer places a call to that firm should not be subject to more stringent restrictions than firms that compile information about their customers by other means. At the very least, therefore, the bill's affirmative consent requirement should be changed to a provision for notice and an opportunity to opt-out. This is particularly true since AT&T and other carriers have not abused the use of ANI information in the many years that it has been part of the network. Moreover, if customers were to object to carriers' use of ANI, the Federal Communications Commission already has the authority to act on those complaints.

- 13 -

For many of the same reasons cited above for carriers, carriers' business customers should not be required to obtain affirmative consent of their own customers with respect to their use of ANI information.   The better approach again, would be a notice and an opportunity to opt-out.  Obtaining affirmative consent during a call or by another method would significantly add to the time and cost of completing a call and would diminish the 800 or 900 service customer's ability to offer improved and more efficient services.  Enormous proof problems would also arise if customers were subject to such a provision.

As to the use of ANI information by AT&T's business customers, AT&T also strongly objects to the bill language (Section 227(c)) that would require telephone carriers to act as enforcement agencies for the government.  Public policy should encourage carriers to provide the best service to their customers, which is inconsistent with placing carriers in the role of policing the conduct of their own customers.

AT&T welcomes this opportunity to present its views on emerging new technology and the public policy concerns raised by that technology.  I assure you that we will provide our full support and cooperation as the Committee's work proceeds.

# # #

- 14 -

page 392
Exhibit 23

# KOLKER SYSTEMS, INCORPORATED

5751 PALMER WAY, BUILDING E, CARLSBAD, CA 92008
PHONE: 619-431-9633          FAX: 619-431-1866

*LEADING MANUFACTURER OF TELECOMPUTER PRODUCTS SINCE 1982*
PRESIDENT and CHIEF ENGINEER: Ray Kolker

April 22, 1991

Congressman Edward J Markey
U. S. House of Representatives
2133 Rayburn HOB
Washington, DC  20515

Subject: Testimony; amendment proposal to ADAD legislation, HR1304

Dear Congressman Markey:

My company, a San Diego County California based corporation, is the
leading manufacturer of those "computerized prerecorded sales
pitch" machines that everyone talks about.

It seems that legislators have little or no knowledge of current
day state-of-the art ADAD products being sold and used!  Todays
products DO disconnect upon called party hang-up, contrary to
claims made by many legislators!  Legislation in existance today is
based on 'ancient' technology!  And we are willing to demonstrate
and prove it!

Generally, most people are not aware that the majority of these
devices are used by small businessmen, housewives, senior citizens,
minorities, and the home-bound handicapped individuals who are
simply trying to put 'bread' on the table.  There is not a less
expensive method of advertising available, and just one day of
making phone calls gives the beginning entrepreneur immediate
access to customers, i.e., no need to place expensive advertising
and wait weeks for ads to break.

Billions of dollars 'flow' monthly as a result of using these
products, stimulating our great 'free-enterprise system'.  In fact,
many businesses find that they are able to 'recession-proof' their
business during these hard economic times through the use of these
products!

HR1304 would restrict ALL telemarketers, whether making live calls
or using automatic calling telemarketing computers, from making
unsolicited calls to telephone subscribers who wish to be listed in
a special national directory of numbers not-to-dial, maintained by
the Federal Communications Commission (FCC).  Telemarketers would
be obliged to purchase this directory, while at no charge,
telephone subscribers would simply need to check a box on their
phone bill to be placed in this directory.

page 393
Exhibit 23

Testimony:  amendment proposal to ADAD legislation, HR1304
Page 2

I am an electronics engineer with a number of domestic and foreign
patents to my credit, and have been manufacturing these products
for over eight years.  I feel that our industry should be consulted
about these matters here before us; as it affects our our business,
and the business of users of our products.  All we ask is to have
an opportunity to express our views on this matter.

Our company has developed a unique idea for a simple automatic
method of fully meeting the objective of the proposed HR1304
legislation.  It would eliminate the need of developing a massive,
extremely expensive multi-million dollar database of phone numbers
that are not to be dialed by telemarketers, by simply having the
telephone companies provide an automatic signalling system that
would cut-off all unsolicited calls to telephone subscribers who do
not wish to receive such calls. The called party would have no
knowledge of call attempts of this nature, and thus would not be
disturbed.  To provide an incentive for the telephone companies to
incorporate this function quickly into the network, I would
recommend that a small monthly fee of $0.50 be charged to those who
subscribe to this service.

Since this Committee is already cognizant of the Automatic Number
Identification (ANI) system, sometimes referred to as Caller ID,
currently being used in many states now; the technique of
'blocking' ADAD and live telemarketer phone calls from reaching
those who do not wish to receive them that I am about to describe
to you should be very familiar.

With Caller ID blocking, a subscriber dials *67, waits for a
stutter dial-tone, then dials the phone number to be called.  The
callers identity is then 'hidden' from the called party, and
Private Number, or other appropriate message appears on the called
partys' Caller ID display.

This technology is in operation in many parts of the country today.
Utilizing this known technology, a 'blocking' code that precedes
each phone number that an ADAD or live telemarketer calls when
making unsolicited calls, could easily be provided by the telephone
companies as a service.

Here is how it would work:

1.  telephone subscribers, who do not wish to receive unsolicited
calls, would pay a small monthly fee to 'block' such calls.

2.  the telephone company would then enable this service at the
request of the subscriber.  It could be provided on a per line
basis, per block of number basis, or per exchange basis (for
cellular phone service and the like) as required.

3.  live telemarketers and ADADs would be required to dial a
'blocking' code similar to *67 preceding each phone number dialed.
(Live telemarketers could use an inexpensive phone attachment
connected to the phone line that would automatically send this

Testimony:   amendment proposal to ADAD legislation, HR1304
Page 3

'blocking' code prior to each phone number dialed; and ADAD
products would also need to comply.  In the case of the live
telemarketers phone attachment, by default, it would automatically
precede each phone number with the 'blocking' code, and s/he would
be required to use a special code, internal to the phone attachment,
not to the network, to unblock calls on a per call basis, for
otherwise normal calling, to prevent accidental calling of numbers
not-to-be-dialed.)

4.  the called partys' 'line', upon receiving a call from a calling
party using said 'blocking' code, would automatically deny the call
completion and send back to the calling partys' 'line', a short
duration DTMF signal, such as a *.

5.  the live telemarketers phone attachment, or the ADAD, would
respond by detecting this signal, then disconnect automatically.

6.  the 'blocking' code would be ignored by phones of subscribers
that do not subscribe to this 'blocking' service, and thus calls
would be completed without delay.

It should be noted that thousands of users of these products would
be obliged under law to follow this directory they recommend.  Of
course, we know that some will simply ignore it; or even make
honest entry errors and 'innocently' be in violation of the law!
Enforcement would be nearly impossible!  The technology I have
described above is simple, nearly fool-proof, and simplifies
enforcement.  It is readily available technology; it's simply a
matter of implementation into the existing telephone network!
Thus,why not regulate the ADAD manufacturers and telephone
companies instead?  Why make it so complicated and expensive?

We taxpayers should not waste millions of dollars for a gigantic
computer; as one FCC employee put it, "the magnitude of that which
may only be exceeded by Social Security".  While I strongly agree
that some regulation of the industry is necessary, I do not believe
that this proposed legislation, as written, is easily enforced; and
that it is too expensive to implement and maintain.  Thus, I find
it quite impractical.

In closing, I would like to take this opportunity to thank you
very much for taking your valuable time to read this letter, and I
hope you find it informative and enlightening.


Sincerely,

Ray Kolker
President



THEODORE V. MORRISON, JR.
CHAIRMAN

THOMAS P. HARWOOD, JR.
COMMISSIONER

PRESTON C. SHANNON
COMMISSIONER

**COMMONWEALTH OF VIRGINIA**

WILLIAM J. BRIDGE
CLERK OF THE COMMISSION
P. O. BOX 1197
RICHMOND, VIRGINIA 23209-1197

**STATE CORPORATION COMMISSION**

April 24, 1991

The Honorable Edward J. Markey, Chairman
Telecommunications and Finance Subcommittee of
   the Energy and Commerce Committee
United States House of Representatives
H2-316 House Office Building Annex II
Washington, D. C.  20515-2107

Dear Congressman Markey:

   I respectfully request that the following comments be made part of
the record in the matter of H.R. 1305, which will be considered by the
Telecommunications and Finance Subcommittee of the Energy and Commerce
Committee on April 24, 1991.  As a member of the Virginia State
Corporation Commission, I unequivocally support unrestricted Caller ID
and the importance of preserving each state's freedom to provide intra-
state telecommunications services in a manner appropriate for that state.

   Caller ID has been offered without blocking in Virginia for well
over a year and is a very popular service.  There is overwhelming evidence
that Caller ID is an effective deterrent to annoying and obscene calls,
false fire alarm calls, bomb threats and other crimes.  I have read and
heard the many anecdotes from citizens, businesses, schools, public
safety agencies and other parties who have praised Caller ID's ability
to help solve their critical problems.

   It is the uniqueness of each situation for which Caller ID has been
deployed in Virginia which convinces me that federal legislation re-
stricting the service is not in the best public interest.  Both the
Virginia State Corporation Commission and Virginia Legislature have
thoroughly examined the service and its provisioning options, and have
decided that Caller ID with no restrictions is the best way to offer the
service in Virginia.  I know of no bad experiences resulting from our
decision to provide Caller ID without blocking.  We are, moreover,
working with groups having unique needs, such as crisis intervention
centers and law enforcement officials.

   It is vitally important that Virginia and every other jurisdiction
remain free to choose the appropriate means by which Caller ID and other
intrastate telecommunications services are provided based upon the needs

page 396
Exhibit 23

The Honorable Edward J. Markey
Page 2
April 24, 1991


of its citizens and the legal, political, technical and regulatory
environment in the state.  The National Association of Regulatory
Utility Commissioners (NARUC) recognized this principle by remaining
neutral on the issue of how Caller ID should be provided in each state.

I hope you and your colleagues will continue to respect the rights
of each state to regulate intrastate telecommunications services in an
appropriate manner.  I also hope you will consider the thousands of
individuals in our state who now depend on unrestricted Caller ID.  To
require blocking with Caller ID would degrade the service of these
satisfied customers.

Sincerely,

Preston C. Shannon


cc:  Virginia Congressional Delegation:

Hon. Charles S. Robb
Hon. John W. Warner
Hon. Herbert H. Bateman
Hon. Thomas J. Bliley, Jr.
Hon. Frederick C. Boucher
Hon. James R. Olin
Hon. James P. Moran
Hon. Lewis F. Payne, Jr.
Hon. Owen B. Pickett
Hon. D. French Slaughter, Jr.
Hon. Norman Sisisky
Hon. Frank R. Wolf



**GTE Corporation**

Samuel F. Shawhan
Vice President-Government Affairs

1850 M Street, N. W., Suite 1200
Washington, D. C. 20036
202  463-5201

May 1, 1991

The Honorable Edward J. Markey
Chairman
Telecommunications and Finance Subcommittee
316 House Annex II
Washington, DC  20515-6119

Re:  H.R.1305, Telephone Consumer Privacy Rights Act

Dear Chairman Markey:

Since GTE Telephone Operations ("GTE") did not testify during the recent hearing on H.R.1305, I would like to have you add GTE's Comments to the record in hopes that they may be helpful in your Subcommittee's analysis of the issues.

We agree that there are important public policy issues that need to be resolved. However, GTE agrees with those witnesses who testified that it may be premature to make the public policy decisions about Caller ID this early in its introduction since the telephone companies, their customers, the state public utility commissions, and others are just now beginning to educate one another about the benefits and some of the concerns relating to this new service.  As you can see from the enclosed filing with the Federal Communications Commission ("FCC"), GTE urged the FCC to launch its own Inquiry into these issues, so it can create a record of the policy, legal, and technical issues surrounding these topics.

Although GTE believes Caller ID is not prohibited under the Electronic Communications Privacy Act ("ECPA") since consent of the user is involved, some parties have cast a cloud of concern over the illegality issue.  GTE could support legislation to remove this cloud and would also support legislation that empowered the FCC to undertake a review of the issues and make a report to Congress on its findings.

If your analysis concludes that Federal Caller ID legislation is required, then GTE urges that the following points be addressed:

1. The public policy should balance the privacy concerns of all users of the network and promote the development of a widely-available advanced telecommunications/information network infrastructure.  For example, in 1989,

page 398
Exhibit 23

2

GTE had over 75,000 annoyance call complaints and installed almost 22,000 traps.  GTE believes Caller ID enhances the called party's right of privacy.

2.  Regulation should be applied only when necessary and targeted to address specific, actual privacy abuses.  GTE has found that when consumers try the service and experiment with it, their perceptions change.  GTE encourages market trials to give subscribers real world experience and not just spend time discussing hypothetical issues.

3.  GTE joins with the Information Industry Liaison Committee ("IILC"), various police associations, and others who believe the public interest is best served if some form of calling party identification is delivered to the called party on virtually all calls.  In addition to restoring a balance in the level of privacy between calling and called parties and contributing to public safety, such delivery will permit new and innovative services to be added to our communications infrastructure and increase our Nation's competitiveness.

4.  If legislation similar to that proposed by H.R.1305 is enacted to require blocking of calling number identification, the language should specify that such blocking be provided on a per-call basis upon customer request, that emergency assistance lines be exempted from the blocking requirement, and that Automatic Number Identification ("ANI") be subject to blocking exemptions -- due to the technical issues.  If such legislation is to be applicable to intrastate services, then uniform Federal rules should enabled nationwide to provide a standard method of operation.  ECPA amendments should also be made uniform across the states.

Should you or any of the other Representatives or members of the Staff have any questions about GTE's position, do not hesitate to give me a call.

Sincerely,

Samuel F. Shawhan, Jr.


Attachment

GTE TELEPHONE OPERATING COMPANIES'

COMMENTS ON PROPOSED LEGISLATION

TELEPHONE CONSUMER PRIVACY RIGHTS ACT

H.R. 1305

Before the Telecommunications and Finance Subcommittee

of the

Committee on Energy and Commerce

of the

United States House of Representatives

April, 1991

GTE TELOPS COMMENTS ON PROPOSED LEGISLATION

TELEPHONE CONSUMER PRIVACY RIGHTS ACT

H.R. 1305

## I.   General Position Statement

GTE Telephone Operations ("Telops") has historically
protected the privacy of its customers and will continue to
ensure protection of those interests by maintaining appropriate
technological, operational, and security measures.   GTE Telops
believes that telecommunications public policy should balance the
privacy concerns of all users of the public telephone network and
promote the development of a widely-available advanced
telecommunications/information network infrastructure.

While public policy makers must be sensitive to legitimate
privacy concerns which may arise from emerging technologies, they
must also be sensitive to the broader social and economic
benefits -- which include increased privacy protection -- that
are made available by technological   developments.   Regulation
should be applied only when necessary and targeted to address
specific, actual privacy abuses, and not in a broad way that will
unnecessarily inhibit information flow or discourage the
innovation of new technologies.

The proposed bill appears to mandate that the calling
party's right to anonymity is superior to the called party's
right to privacy.   In effect, the premise of the bill is that it
is acceptable for the calling party to know and use the called
party's telephone number, but unacceptable for the called party
to know the calling party's number, if the calling party chooses
to withhold it.   Presumably, the calling party chooses to
withhold the number to avoid receiving unsolicited calls in the
future.   Thus, in the name of preventing unsolicited telephone
calls, the right to make unsolicited anonymous calls is mandated.

The dilemma is that calling parties are also, at one time or
another, called parties whose interests may not be best served if
the number is blocked.   If a telephone call results in an
intrusion on a consumer's privacy, that intrusion is always
caused by the calling party, because the calling party always
initiates the call.   The called party never creates the
intrusion, and yet the statute mandates a blocking service that
could limit protection of privacy to all consumers receiving
telephone calls.   Based on this conceptual view, a "Telephone
Consumer Privacy Rights Act" might more appropriately prohibit
blocking of calling number identification to protect the consumer
who is intruded upon by those who initiate telephone calls.

-2-

GTE Telops believes that the public interest is best served if some form of calling party identification (sometimes referred to as CPID) is delivered to the called party on virtually all telephone calls.  Such delivery will restore a balance in the level of privacy between the calling and the called party, contribute to increased public safety, and permit new and innovative services to be brought to the marketplace.

With respect to calling number identification service, GTE Telops believes that general blocking of calling number delivery to the called party will diminish the value of this new technological capability to society in general, both now and in the future.  For those limited special cases in which sufficient justification for not delivering the calling number exists, alternatives currently are available and new technical and other mechanisms can be developed to control calling number  delivery. GTE Telops will continue to work with regulators, telecommunications equipment manufacturers, and the industry to explore technical and other alternatives to the delivery of the calling telephone  number that might be used when alternative approaches are required.

GTE Telops believes H.R. 1305 is premature.  GTE Telops suggests that a federal policy on caller identification service and blocking should not be "etched in legislative stone" based on hypothetical arguments about the adverse effects of caller identification service on privacy.  The advantages and disadvantages of caller identification service will not be fully understood until the service is actually being used on a broader basis in the various states.

GTE Telephone Operations believes that Congress should instruct the Federal Communications Commission to monitor caller identification service activities in the various states, assess the privacy, public policy, and technological issues involved, and report back to Congress on its findings and recommendations. GTE has urged the FCC to take the initiative and conduct a Notice of Inquiry on these issues and a copy of GTE's filing is attached as Exhibit A.

## II.  Background

Emerging technologies will have great social and economic benefits, but they also have the potential to affect users of telecommunications and information services in previously unanticipated ways, particularly with respect to privacy or anonymity concerns of customers.

Some opponents of caller identification service have argued that customers should have a choice about forwarding their number and that blocking is the only viable solution.  They believe that callers will no longer be able to control when and to whom they give their telephone numbers, since caller identification service

-3-

will make the decision for them.  If called parties do not want
to receive calls for which the number has been blocked, it is
argued, they have the right not to answer.

Other parties have argued that telephone numbers for
nonpublished/unlisted customers should not be delivered to the
called party, since their telephone number would be made known to
the called party.  In addition, a number of groups, such as "hot
line" organizations, spousal abuse groups, some law enforcement
undercover agencies, have argued that caller identification
service can compromise their confidentiality, security, or safety
by revealing the telephone number from which they are calling.

The response of public policy makers to caller
identification service  has been diverse.  Some states have
required that calling numbers be delivered without blocking.
Other states have required that customers be permitted to block
delivery of their telephone number, without any real experience
with the service.  Still others have adopted limited blocking.

### III. GTE Telops Position

GTE Telops is sensitive to privacy concerns which may arise
from emerging technologies, but urges that public policy makers
not overly emphasize these concerns at the expense of the privacy
and security benefits accruing to other customers or the broader
social and economic benefits that can result from these
technologies.

In effect, the premise of H.R. 1305 is that it is acceptable
for the calling party to know and use the called party's
telephone number, but unacceptable for the called party to know
the calling party's number, if the calling party chooses to
withhold it.  Presumably, the calling party chooses to withhold
the number to avoid receiving unsolicited calls in the future.
Thus, in the name of preventing unsolicited telephone calls, the
right to make unsolicited anonymous calls is mandated.

The dilemma is that calling parties are also, at one time or
another, called parties whose interests may not be best served if
the number is blocked.  Although some parties may argue that the
caller should have a choice about forwarding the number, that
caller identification service should not make the decision for
them, and that called parties have the right not to answer, an
analogous argument could be made on behalf of the  called party.
For example, called parties should have a choice about whether
they can see the number of the calling party before they answer.
Callers can still control when and to whom they give their
telephone numbers, by simply not placing calls to those parties
to whom they do not wish their numbers to be delivered.  They
have the right not to place the  call.

-4-

Nonpublished and/or unlisted number services are services that permit a customer to control the release of his or her telephone number to the public at large. Customers subscribing to these services are assured that their telephone numbers will not to be disclosed via directory assistance or in published telephone directories. These services, thus, can protect the customer's privacy, to a degree, by restricting the availability of the telephone number from third parties who might otherwise make unsolicited calls to that customer. (In contrast, caller identification service provides the customer with the direct ability to avoid unsolicited or unwanted calls.)

The premise of the argument against disclosing nonpublished/unlisted numbers via caller identification service appears to be that the telephone number for these customers should not be disclosed to any third party, even when these customers initiate calls to that third party. In effect, the argument is that it is acceptable for the calling party to know and use the called party's telephone number, but unacceptable for the called party to know the calling party's number. In other words, a person should be able to make unsolicited telephone calls and prevent the called party from either knowing that the call is unsolicited or who made the call. Thus, in the name of preventing unsolicited telephone calls, people will be given the right to make unsolicited anonymous telephone calls.

Privacy involves the right to be let alone, not the right to remain anonymous. GTE Telops believes that the called party's right to privacy is superior to the calling party's right to anonymity. The calling party always creates the intrusion on a consumer's privacy by initiating the call. The called party never creates the intrusion, and yet H.R. 1305 mandates a blocking service that could limit protection of privacy to all consumers receiving telephone calls.

GTE Telops believes that current public policy debates on privacy should focus on solutions that address information misuse, rather than information control. The right to privacy should not be premised on the ability to preclude the communication of information, but rather is more properly associated with the misuse of communicated information. If statutory limitations are to be effected for caller identification service, they should be more appropriately directed to prohibit or limit the misuse of caller identification information, rather than to limit the flow of that information.

As a general principle, GTE Telops believes that the public interest is best served if a form of calling party identification is delivered to the called party on virtually all telephone calls. Widely-available calling party identification enhances privacy in general and, at the same time, promotes the development and deployment of a widely-available advanced telecommunications and information network infrastructure.Examples of the types of new and innovative

-5-

services that could be made available with such an infrastructure
with calling party identification capability are listed in
Exhibit B.

While GTE Telops believes that the public interest is best
served if caller identification service blocking is not made
available on a general basis, it is sensitive to the concerns
that have been expressed by various customer groups.  GTE Telops
plans to work with these groups to develop solutions to their
concerns with caller identification service display, and it
believes that most of the concerns can be alleviated through
existing or future network capabilities, without making caller
identification service blocking available on a general basis.
For example:

    - Caller identification service blocking might be made
    available on a limited basis to address the concerns of
    special groups;

    - Currently available services that forward special
    telephone numbers might provide police undercover agents
    or other limited groups the ability to control delivery of
    their "real" number;

    - The concerns of some social service organizations (such
    as "hot lines") that the confidentiality of callers will
    be compromised might be addressed by simply not
    subscribing to the caller identification service and
    publicizing that fact;

    - For others with a special interest in controlling
    delivery of their number, operator-handled calls, credit
    card calls, and coin telephone calls may be viable
    solutions; and

    - In the future, coded identifiers or calling party name
    may provide workable solutions, and GTE will support
    industry efforts to develop such alternative solutions.

Although the specific solution to the concerns of special
groups will  vary, it is clear that workable solutions other than
general blocking are possible, because such solutions have
already been formulated in several states.

A full understanding of the potential uses of calling party
identification by the general public is limited today, simply
because the  service has not been made available on a broad
basis.  GTE Telops expects  that as calling party identification
becomes more widely available, it will stimulate the development
of numerous services not yet imagined that will benefit the
consuming public and the U.S. economy in the future.  To the
extent that caller identification service blocking is made
available on a general basis, GTE Telops believes that the public
benefits that result from the service will be diminished.

GTE Telops suggests that calling party identification policy should not be "etched in stone" based on hypothetical arguments about the adverse effects of caller identification service on privacy. The advantages and disadvantages of delivery of caller identification service cannot be fully understood or appreciated until the service is actually being used more broadly by the general public. GTE Telops, therefore, supports market trials and experiments to gain experience with public acceptance of caller identification service and to more fully understand the consequences of general caller identification service delivery.

Market trials are now underway in various states, using various approaches to privacy concerns. GTE Telops suggests that federal legislation should not effect rules with respect to caller identification service before a more complete record of its advantages and disadvantages has been established.

The most important need for federal legislation at this time is to remove the uncertainty associated with trace and trap statutes and the Electronic Communications Privacy Act with respect to calling party identification. Attorney Generals have split on their views of illegality and the Congressional Research Service has opined on both sides of the issue. Such clarification would also benefit the provision of Enhanced 9-1-1 services nationwide.

If federal legislation is enacted, it should, therefore, limit itself to removing the cloud of illegality from caller identification service and empower the FCC to work with the states to establish criteria for tests of calling party identification services, to analyze the results, and to recommend to the Congress whether and what federal legislative steps should be taken with respect to the services.

## IV. Specific H.R. 1305 Legislative Language

If legislation similar to that proposed by H.R. 1305 is to be enacted to require blocking of calling number identification, the language should specify (as H.R. 1305 does) that:

- Such blocking be provided on a per-call basis;

- Calls to emergency assistance lines are exempted from the blocking requirement;

- Automatic Number Identification (ANI) be subject to certain blocking exemptions.

In addition, if such legislation is to be applicable to intrastate services, then uniform Federal rules should be enabled nationwide, to provide a standard method of operation. The Electronic Communications Privacy Act also should be amended to

remove any cloud of illegality and this change should also be made uniform across the states.

If a form of caller identification blocking is to be legislated, GTE Telops believes blocking on a per-call basis, as proposed by H.R. 1305, represents the most reasonably balanced solution to the problems attributed to caller identification service.   GTE Telops strongly opposes a requirement to offer per-line blocking for a number of reasons.  Used on a broad basis, per-line blocking could seriously affect the viability of caller identification service and thereby potentially deny the enhanced privacy benefits of this service to American consumers.   A requirement for per-line blocking will unquestionably affect the deployment of caller identification service.  Per-line blocking on a broad basis will also have a chilling effect on the introduction of other  new services based on caller identification technology.

Per-line blocking would offer little reason for the calling party to gain experience with caller identification and related services.   Concerns will remain hypothetical until consumers actually gain experience with the service.  Once per-line blocking is in place, the status quo is preserved, and consumers will have little incentive to determine for themselves whether the evils of caller identification service are real or imaginary. Per-call blocking would facilitate consumer flexibility in retaining control over telephone number disclosure, without unnecessarily discouraging consumer experience with caller identification service.

However, the language should not imply an obligation to equip all customer lines for per-call blocking.  If blocking is to be provided, it should be provided in response to a request from the customer.  GTE Telops believes the provision of per-call blocking capability to all customers, whether or not they want the service, is unnecessarily costly and not in the public interest.   The language, therefore, should specify that blocking would be provided at an individual customer's request.

Clearly, the public interest is best served if caller identification to emergency assistance lines is exempted from any blocking requirement.   In fact, the public interest might be even better served if such blocking were specifically prohibited.

ANI, as defined by H.R. 1305, should be specifically exempted from a blocking requirement.  ANI has traditionally been used by both exchange carriers and interexchange carriers to identify telephone numbers for billing and collection and completion of the customer's call.  GTE telephone operating companies are currently required by the GTE Consent Decree and the FCC to provide ANI to interexchange carriers under exchange access service tariffs.  Because of the ANI obligation under the GTE Consent Decree and FCC Rules, ANI must be delivered if the customer purchasing access services desires delivery.  Because of

-8-

this obligation and current technical limitations, ANI cannot be
blocked at the option of the calling party.

H.R. 1305 would recognize and accommodate this obligation
and these technical limitations and would appropriately target
its restrictions toward the misuse of ANI information, rather
than attempting to prohibit or restrict ANI information flow.  In
general, the language would limit ANI use to billing and
collection purposes or other purposes to which the call
originator consents.  Although GTE Telops supports the exemptions
made for ANI, certain other provisions would create unnecessarily
onerous  obligations for the local telephone companies.  In
subsection (c), paragraph (1), the bill requires that any common
carrier providing ANI offer the service under a contract or
tariff that:

> (A) permits the ANI recipient to use the telephone
> number and billing information for billing and collection,
> completion of the customer's call or transaction, or for
> services directly related to the call or transaction;

> (B) prohibits the ANI recipient from reusing or selling
> the telephone number or billing information without the
> customer's affirmative consent;

> (C) prohibits the ANI recipient from disclosing,
> without the affirmative consent of the customer, any
> information derived from ANI or any information derived from
> the analysis of the characteristics of a call (e.g., calling
> patterns and locations, transmission speeds, and transaction
> profiles) for any purpose other than:

>> (i) performing the services or transactions that
>> are the subject of the call,

>> (ii) ensuring network performance, security, and
>> effectiveness of call delivery,

>> (iii) compiling, using, and disclosing aggregate
>> information, and

>> (iv) complying with applicable law or legal
>> process.

The language of subparagraph (C) could be interpreted to
mean that information derived from the analysis of the
characteristics of a call (e.g., calling patterns and locations,
transmission speeds, and transaction profiles) could not be used
for purposes other than those specified, regardless of whether
the ANI recipient obtained the information from the carrier.
Under this interpretation, use of customer transaction profile
information compiled by a data base provider, for example, which
has no relationship to information provided by the local
telephone company, could be prohibited.  This provision is

-9-

especially troublesome because paragraph (3) requires the local telephone company to police the use of this information, whether or not the information is provided by the telephone company.

Paragraph (2) permits the ANI recipient to use such information to offer to any customer with which the recipient has an established customer relationship a product or service that is directly related to the product or services previously acquired by that customer from the ANI recipient. Again, because of the obligations of paragraph (3), the local telephone company is effectively required to police activities over which it has no control. The local telephone company has no way of knowing whether the ANI recipient has an established customer relationship or whether a product or service is directly related to a product or service previously acquired by that customer from the ANI recipient.

In paragraph (3), each common carrier is required to receive and transmit to the FCC customer complaints concerning violations of the ANI requirements and submit to the FCC periodic reports on actions taken by the carrier to obtain compliance with the requirements. The local telephone company should not be obligated to police the use of this information by ANI recipients in the first instance, and clearly, should not be obligated to police the use of customer information it does not provide. If the FCC is to be given authority to regulate the provision of caller identification services by non-carriers in subsection (b)(1), presumably it should also be given direct jurisdiction to directly regulate the use of customer information by both carriers and non-carriers, thereby not obligating the local telephone company to police activities it does not and cannot control.

EXHIBIT A

Before the
FEDERAL COMMUNICATIONS COMMISSION RECEIPT
Washington, D.C. 20554

In the Matter of                        )
                                        )
CALLING NUMBER DELIVERY                 )    RM No. 7397
                                        )
Request by Joseph Baer for              )
Rulemaking in order to Establish        )
Uniform, Nationwide Rules for           )
Calling Number Delivery                 )

## COMMENTS

GTE Service Corporation, on
behalf of its domestic
affiliated telephone,
equipment, and service
companies

Daniel L. Bart
Suite 1200
1850 M. Street, N.W.
Washington, D.C. 20036
202-463-5212

August 17, 1990                  THEIR ATTORNEY

- iii -

## SUMMARY

GTE believes the issues raised in the Petition are
important and deserve attention by the FCC.  GTE urges the
Commission to issue a Notice of Inquiry ("NOI") to generate the
data on how local exchange carriers, their customers, and state
public utility commissions are addressing the concerns raised
by the introduction of Caller ID.  This will allow the
Commission to respond to inquiries that may be generated by
Congress as it also addresses these concerns.

GTE believes the public interest is best served by delivery
of calling party identification on virtually all telephone
calls.  GTE is willing to work with others, including its
equipment manufacturers, to come up with alternatives that meet
identified concerns when deploying these new services.  GTE is
concerned that the proper balance be struck in safeguarding the
privacy of the called party.  The FCC in the past has agreed
with the position that the identity of the party making the
call is not a protected "right" and, thus, has authorized
tariffs requiring this condition or providing this as a
service.  The FCC is also aware of the legal requirements for
the provision of Automatic Number Identification to interstate

– iv –

access customers, and the current technology in use in the
network to provide this capability.

GTE supports some aspects of the Petition and has provided
comments on some of the proposals.  However, there are unknown
issues about the technical capability of the network to support
some of the Petition's proposals.  GTE believes the FCC needs
more data about this specific proposal and other proposals
before it makes any tentative decisions.

Thus, GTE urges the FCC to issue an NOI to gather the facts
necessary to make any decisions.

Before the
**FEDERAL COMMUNICATIONS COMMISSION**
Washington, D.C. 20554

In the Matter of                        )
                                        )
CALLING NUMBER DELIVERY                 )     RM No. 7397
                                        )
Request by Joseph Baer for              )
Rulemaking in order to Establish        )
Uniform, Nationwide Rules for           )
Calling Number Delivery                 )

## COMMENTS

GTE Service Corporation, on behalf of its affiliated domestic telephone, equipment, and service companies ("GTE"), offers its Comments to the Petition of Joseph Baer for Rulemaking regarding Calling Number Delivery filed March 16, 1990 ("Petition") and set out for public comment by a Public Notice released June 18, 1990, Report No. 1817. In his Petition, Mr. Baer proposes that the FCC establish uniform, nationwide Rules for the delivery of calling numbers by providing that

> any non-business telephone subscriber who has taken telephone service on an unlisted basis [be provided] the means, at reasonable charges, of substituting a confidentially registered alphanumeric designation for the billing number on a call-by-call basis ...
> (Petition, Annex A)

Absent invoking this capability, which Mr. Baer designates Alternate Identity ("AI"), the network should deliver the normal directory number of the line, which Mr. Baer refers to as the Default Identity ("DI"). (Petition, pp. 11-12) Further, Mr. Baer asks the Commission to request the states to withhold any action on state-related proceedings until the FCC acts on the Petition. (Petition, p. 1)

- 2 -


### INTRODUCTION


GTE uses the term CPID -- Calling Party Identification --
as a generic name covering many means of identification of the
calling party.  Some of the specific subparts of CPID, may be
Calling (or Directory) Number Identification ("CNI"), Automatic
(or Billing) Number Identification ("ANI"), Calling Number
Delivery ("CND") Service (often called CallerID), and other
identification means such as Calling Name Delivery, Special
Coded Identifiers, Speaker Dependent Voice Recognition, etc.

Over the past several years numerous new services have
evolved from the diverse telecommunications network.  One of
the services which has moved to the forefront is Calling Party
Identification where the number (or possibly name or other
identifier) of the calling party is provided electronically to
the party receiving the call.  As this is a new and innovative
service, it is being closely scrutinized by state commissions,
state legislatures, and Congress.  GTE believes that in order
to provide a forum to air views and allow for the
implementation of the service and associated features on a
national level, the FCC should initiate a Notice of Inquiry
("NOI").  The NOI would bring together information pertaining
to both the technological requirements and the legal
considerations.  GTE believes this type of proceeding could
also address proposals similar to, and including, those
presented by Mr. Baer in his Petition.  Once the NOI has been

- 3 -

completed, the FCC could determine whether or not interstate
Rules are necessary, or if policy direction alone would
suffice.*/  The record from such a proceeding would also give
the Commission information to reply to Congressional concerns
as evidenced by the introduction of S.2030 and H.R.4340.

GTE believes that the public interest is best served if a
form of CPID is instituted on virtually all calls.  GTE is
concerned, however, that the privacy implications associated
with CPID are often mis-characterized and, as a policy matter,
should be resolved through solutions satisfactory to all
affected parties.  GTE presents its position on CPID below and
recommends that these issues be addressed in an FCC NOI.  At
the conclusion of this discussion, GTE will outline some
specific comments and concerns it has regarding Mr. Baer's
proposals.

## DISCUSSION

### Calling Party Identification and how it
### is utilized by carriers and customers.

CPID can be generically defined as a capability that allows
a called party to automatically identify the calling party, the
telephone station or line, or the telephone number from which
the call is originated.  Currently, CPID is provided over the
public network using either Automatic Number Identification

---

*/  In early-filed Comments, Rochester Telephone Corporation
has requested the FCC to issue a National Policy
Statement.  (See, Rochester Comments filed July 18, 1990,
pp. 6-7)

- 4 -

("ANI") or Calling Number Delivery ("CND") which provides CNI.
ANI has traditionally been used by both Local Exchange Carriers
("LECs") and Interexchange Carriers ("IXCs") to identify
telephone numbers for billing purposes.  Currently, ANI is also
being used by IXCs for non-billing purposes and by customers of
IXCs and LECs for customer account verification and other
purposes.[*]/

CND in the public telephone network is a service made more
widely available by deployment of Signaling System 7 ("SS7") to
exchange carrier end offices and provides the capabilities
required to provide Custom Local Area Signaling Services
("CLASS").  With SS7, CNI is delivered from the telephone
switching office serving the calling party to the office
serving the called party and from the called party's serving
office to the called party's telephone equipment, where it can
be displayed or used for other purposes.  To provide CND
service, the office serving the calling party, the office

---

[*]/  The ability to identify the calling party for billing and
other purposes was one of the most requested features by
Enhanced Service Providers ("ESPs") as part of the
Commission's Open Network Architecture ("ONA")
proceedings.  In order to define the technical capabilities
and uses of ANI, CND and CPID, the Information Industry
Liaison Committee ("IILC") -- the entity recognized by the
FCC as the appropriate forum to address ESP/LEC issues --
undertook four separate projects related to these issues.
These included technical papers on methods of delivery and
control or suppression of CPID and a non-technical paper on
uses and regulatory issues related to CPID.  Since the FCC
monitors these meetings it is well-aware of the work that
went into preparation of these reports.  Although the
Petition and Rochester's Comments identify some of the uses
of CPID, GTE refers the FCC to these IILC reports for a
comprehensive list of the currently identified uses of CPID
and some of the technical issues related to delivery or
control of CPID.

serving the called party, and the interoffice telephone facilities must be equipped and interconnected with SS7 capability. For the calling number to be delivered and displayed at the called party's telephone equipment, that equipment must be capable of receiving and interpreting the calling number delivered.

A technical option exists that permits a privacy indicator to be sent by the calling party's serving office along with the CNI to the called party's serving office for use in deciding whether the CNI should be delivered to the called party's telephone equipment. This option is sometimes referred to as "CND blocking."

### GTE believes CPID should be delivered to the called party on virtually all telephone calls.

As a general principle, GTE agrees with the conclusion reached by the IILC and believes that the public interest is best served if a form of CPID is delivered to the called party on virtually all telephone calls. A widely-available offering enhances privacy rights in general and, at the same time, promotes the development and deployment of a widely-available advanced telecommunications and information network infrastructure. Any extensive offering and use of services that block CPID delivery will significantly reduce the level of privacy available to the called party, the utility of CPID-based services to business subscribers, and the economic viability of CPID-based services in general.

173

- 6 -

GTE believes that current public policy debates on privacy should focus on solutions that address information misuse, rather than information control.  GTE believes that the right to privacy should not be premised on the ability to preclude the communication of information, but rather that this right is more properly associated with the misuse of communicated information of a personal nature.

CPID should not be repressed on privacy grounds for several reasons.  First, the information actually communicated, initially CNI, is not so deeply personal as to warrant the repression of telecommunications technology that will benefit consumers in general.  CNI is merely a number assigned to a telephone at a specific location, and is no more "personal" or "private" than a street address assigned to a home or a license plate number assigned to a vehicle.  The "information" communicated by CND should not be considered private because telephone users, in general, should know that such information is already used and recorded by third parties (for example, LECs and IXCs for billing purposes), and is widely available in commercial databases containing customer information.

The Commission has ruled on the non-private nature of telephone numbers in the past in its decision in the Info-2 Order, 3 FCC Rcd 4407, approving AT&T's tariff where it stated it could find no reason to reject AT&T's tariff, which makes telephone numbers available, even though two complaints were made on the basis of privacy.

174

- 7 -

GTE will continue to work with telecommunications
equipment manufacturers in the future to explore alternatives
to delivery of the calling telephone number, such as special
coded identifiers or solutions like Alternate Identity as
proposed by Baer, that might be utilized in those situations in
which other approaches may be warranted.  The economics,
technical capabilities, and degree of reliability of any such
potential alternative must be carefully assessed and weighed
against other alternatives to assure that any alternatives
chosen are in the best interests of society and are technically
practical.

Based on current knowledge, however, the use of a special
coded identifier or an alternative number as a substitute for
both ANI and CND conceptually appears to be a viable
alternative for those customers who do not want their telephone
numbers delivered to parties they call.  The coded identifier
would have to be used for both ANI and CNI, since either could
be delivered to the called party.  This solution is not
currently available and would require development of technical
capabilities in telephone switches, as well as changes in
network billing systems.  However, GTE believes that this
solution may be the most comprehensive in the long term and
supports its further study.  In the interim, other approaches
may be used on a limited basis to alleviate concerns of
particular customers who have a specific need to control
delivery of their primary telephone number.  GTE is field

- 8 -

testing the delivery of an alternate directory number from the customer's primary directory number.   GTE calls this offering "Protected Number Service."   If a call is made to the nonpublished "Protected Number" the customer is alerted with a distinctive ring and can take appropriate action.

### GTE believes that a policy of permitting any calling party, nonpublished or published, to control CND delivery directly conflicts with the same subscriber's rights to receive the calling number.

The "rights" associated with nonpublished and unlisted number service, that preclude disclosure of telephone numbers to the general public, should not be equated with any "right" to make anonymous telephone calls.   In fact, tariffs have for many years advised customers that as a condition of using their telephone service (at least on an interstate basis), their identity must be disclosed to the called party.[*/]   Required disclosure of actual identity might be considered more personal than mere disclosure of the telephone number assigned by the telephone company.   Even so, no "legitimate" expectation of anonymity should currently exist when a call is initiated by a caller and placed to another party.

In that context, the New Jersey Board of Public Utilities, in its decision on Bell Atlantic's CLASS offering, concluded

---

[*/]   For example, GTE's Tariff FCC No. 2, Section 2.3.1 provides:
> The calling party shall establish his identity in the course of any communication as often as may be necessary.
Also see, AT&T Tariff F.C.C. No. 1, Section 2.4.1.C.1.

- 9 -

that a nonpublished listing service feature did not guarantee
anonymity:

> [N]onpublished Listing Service was originally
> conceived and tariffed as a discretionary service
> which permits, for an additional fee, the right to
> have a subscriber's telephone number shielded from
> disclosure by directory assistance operators and
> excluded from the printed white pages directory
> listing.  It was not intended to create any other
> expectations of privacy in the subscriber's telephone
> number and certainly was not intended to preclude the
> institution of advance technology such as the Caller
> Identification feature presently petitioned by NJ
> Bell.  Nonpublished Listing Service does not provide,
> and has never been intended to provide complete
> anonymity.
> (Order, In the Matter of Filing by New Jersey Bell
> Telephone Company of a Revision of Tariff B.P.U.-N.J.
> No. 2 as Listed in the Appendix. Providing for the
> Introduction of CLASS$^{SM}$ Calling Service on a Limited
> basis, Docket No. TT87070560, Sept. 25, 1987, at 3)

GTE believes that a public policy that permits
nonpublished, unlisted, or any other general class of customers
to preclude the delivery of CND to the called party is
tantamount to concluding that the anonymity interest of the
calling party is more important than the privacy rights of the
called party.  Any telephone customer, including a nonpublished
or unlisted customer, can be either a called party or a calling
party on any given call.  GTE believes a policy of permitting a
particular calling party to control CND delivery directly,
therefore, conflicts with that same subscriber's right to
receive the calling number.

The broad delivery of CPID in conjunction with CLASS
services such as Call Blocking, Call Trace, and Automatic Call
Return provides customers with even greater control over

- 10 -

incoming calls and would in many ways enhance their privacy.
However, these features are not a replacement for CND as some
parties advocate.  Since Call Trace involves Telephone Company
security personnel and law enforcement personnel, many
subscribers do not want to use it for a merely annoying call
placed by a child as a prank.  Overuse would also burden law
enforcement for calls that may not be criminal violations.
Call Trace is best used for serious, illegal calls.[*]/

### GTE supports anonymity solutions for special situations.

Alternatives are currently available that can serve the
need for anonymity in those narrow and unusual circumstances in
which the calling party has a compelling reason to preserve
anonymity.  For example, CNI is not delivered for
operator-handled and credit card calls, and CND for coin
telephone calls would not reveal information that would
compromise the anonymity of the calling party.

In social service situations that involve hotlines, wherein
callers may be deterred from seeking help because of CPID
delivery, the social service organizations could simply not
subscribe to CPID delivery service and publicize that fact to
the general public.  Any social service organization should

---

[*]/  GTE keeps track of annoying and obscene calls reported to
it in its network and can provide a GTE-wide statistic of
75,848 annoyance call complaints in 1989, traps were
installed to trace calls in 1989 21,765 times, and 9,369
traps were successful.

178

– 11 –

have sufficient incentive to take such action and honor its commitment, since it presumably cannot afford to violate the public trust and still remain in business. However, even here the public debate is divided since some suicide prevention hotlines want to have CPID and advertise that fact in order to save lives.

For those limited numbers of subscribers with compelling security concerns, such as authorized violence intervention and law enforcement personnel, use of special identifying codes, caller-activated blocking of CND delivery, and other mechanisms might be made available to enhance inaccessibility for some types of calls. Currently, however, no technical means exists to control ANI delivery. Additionally, GTE is required by its FCC Tariffs and its Consent Decree to provide ANI to its interstate customers.

### GTE supports Baer's proposal to separate the tariff offerings of ANI and CND.

Mr. Baer has suggested that ANI and CND be offered in separate tariffs. He proposes to make ANI available only to IXCs and LECs through access tariffs "...for the purposes of call-setup, call management, billing and maintenance." (Petition, at 10) All other entities would be offered CND via a tariff for the use of the service to deliver the calling party's number to the called party.

If the Commission determines through its NOI process that the public interest is served by limiting the availability of

- 12 -

ANI on an interstate basis to IXCs and LECs for specific
network and billing purposes, tariff restrictions may be a way
of achieving that public interest objective on an interim
basis.  However, the Commission should recognize that tariff
use and user restrictions that depend on the identity or
classification of the customer generally are effective only on
an interim basis.  They are especially ineffective when such
restrictions are at odds with marketplace forces.  As an
alternative to imposing constraints on the use of ANI for
legitimate network management and billing purposes, however,
interim use and user restrictions are clearly more desirable.
As the necessary technology becomes available, any use and user
restrictions imposed should be eliminated in favor of solutions
such as Alternate Identity ("AI"), as suggested by the Petition.

### GTE supports the concept of Alternate Identity but is concerned whether the LECs and IXCs have the technical ability to incorporate it into the network.

GTE stated previously that special coded identifiers, such
as Alternate Identity ("AI"), are viable alternatives for
customers who do not want their telephone numbers delivered to
parties they call.  GTE is concerned whether LECs and IXCs,
however, have the technical capability to implement AI.  GTE is
unsure of all of the details of the Baer proposal and, thus,
cannot determine whether the current technology is
sophisticated enough to accommodate alpha characters and
whether AI will work with SS7.  The NOI may provide the answers
to these technical issues.

180

– 13 –

The Baer proposal does offer some advantages over the use of alternate directory numbers to provide privacy protection. If such directory numbers are used in large volume, there would be an impact on the resources of the North American Numbering Plan. The use of alphanumerics would alleviate that problem.

GTE would further amend the Baer proposal to have the AI consist of the 3-digit area code, followed by the 3-digit Office Code, then the name or mnemonic field. This has the advantage of providing for administration on an Office Code basis, allows some parties to derive value from just the receipt of the Area Code ("NPA") and Office Code, provides for greater uniqueness (e.g., 202-463-JohnDoe is unique from 202-221-JohnDoe), and for annoying or obscene calls where a party invokes AI, the called party would have the value of knowing whether the caller was nearby through the Office Code indication. In testimony on S.2030 by a woman who received such calls, knowing the approximate location of the obscene caller was important to identifying the degree of threat.

Another concern is who would be responsible for the administration of the alphanumeric identities for AI. GTE believes that AI may be a sound concept but all the technical details would have to be resolved before GTE could support implementation.

– 14 –

### CONCLUSION

GTE believes the FCC should initiate a NOI to address the issues related to CPID including those presented in Mr. Baer's Petition. GTE supports CPID and believes that the public interest is best served if some form of CPID is delivered to the called party on virtually all telephone calls.  Such delivery will enhance the privacy of the called party, contribute to increased public safety, and permit new and innovative services to be brought to the marketplace.  For those limited special cases in which sufficient justification for anonymity exists, alternatives currently are available and new mechanisms can be developed to enhance inaccessibility. GTE supports the concept of AI as an alternative to enhance inaccessibility, however, GTE is concerned with the technical details of the application of AI and recommends further clarification of the service be obtained prior to implementation.

> Respectfully submitted
>
> GTE Service Corporation, on
> behalf of its domestic
> affiliated telephone,
> equipment, and service
> companies
>
> By: _Daniel L. Bart_
>     Daniel L. Bart
>     Suite 1200
>     1850 M. Street, N.W.
>     Washington, D.C. 20036
>     202-463-5212

August 17, 1990          THEIR ATTORNEY

182

## CERTIFICATE OF SERVICE

I, Margaret K. Wisdom, hereby certify that copies of the
foregoing "Comments" of GTE Service Corporation have been
mailed postage prepaid, by first-class U.S. mail on this 17th
day of August, 1990 to the following parties:

Joseph Baer
555 Broadway, 4-G
Hasting-on-Hudson, NY 10706

Peter M. Andersen, Esq.
430 State Street
Brooklyn, NY 11217
    Counsel for Joseph Baer

Josephine S. Trubek, Esq.
Rochester Telephone Corporation
Rochester Tel Center
180 South Clinton Ave.
Rochester, NY 14646-07000

By _Margaret K. Wisdom_
Margaret K. Wisdom

## Potential Uses of Calling Party Identification

a.  **Residential Applications**

Residential customers will benefit from the delivery of calling party identification in several ways. For example, residential customers could use calling party identification to screen and block calls, to prioritize calls, track annoying or obscene telephone calls, and to identify callers who might refuse to identify themselves. They may also use it to receive other calling party identification-based services such as automatic call return, call blocking, or special call acceptance where the customer identifies in advance those numbers she/he wants to receive and all other callers receive an announcement stating that the customer is not accepting calls at this time.

b.  **Public Safety Applications**

One of the most convincing arguments for widely-available calling party identification results from its security and public safety benefits. Calling party identification can be used by customers not only to track nuisance or obscene callers, but also to track bomb threats and   false fire alarms. Emergency service personnel currently use calling party identification as part of E911-type services, but calling party identification could also improve the effectiveness of law enforcement and other public safety organizations. Some states are considering forwarding calling party identification to Telecommunications Device for the Deaf ("TDD") Relay centers so that the information would be available for an emergency or for calls subsequently sent to 911 centers, in addition to its use for billing purposes. The National Association of the Deaf recently endorsed caller identification service since it can       help the hearing impaired lead more normal and productive lives.

c.  **Business Applications**

In addition to interexchange carriers and Enhanced Service Providers ("ESPs") -- who ranked identification of the calling party as their most important feature requirement to be delivered from the network, local telephone companies will continue to use calling party identification (in the form of ANI) for customer billing purposes.

Business applications of calling party identification could be used in various ways to improve business productivity:

- An insurance agency can use calling party identification for call distribution. When a call is received by the main number, it can be routed by NXX or specific telephone number to the appropriate representative and by matching to the insurance company data base, the insurance agent can have the customer's account information and profile in front of her/him before taking the call. This yields more productivity, faster responses, and more accurate responses since keying errors would be eliminated.

- A law firm can automatically route incoming calls to the designated attorney by the appearance of the incoming phone number, thereby eliminating the intermediary step of the receptionist. And, when the lawyer is in conference, she/he may choose to interrupt the conference to answer an urgent call.

- Newspapers may use calling party identification for the classified advertisements to verify phone numbers just as a pizza parlor may verify phone numbers for deliveries to eliminate prank orders and falsified information.

- A doctor's office may use calling party identification to track lost calls for those callers who are reluctant to leave messages on a voice messaging service or answering machine.

- A consumer product firm may use calling party identification to create focused mailing lists, identify specific markets, develop marketing tools, and to assess its customer base, thus reducing the amount of "junk mail" and unsolicited calls because of more closely focusing marketing efforts to customers who are likely to desire the specific product or service.

- In some cases, calling party identification information may be matched or translated to location data to provide additional applications. A bank, for example, could indicate automatically via a Voice Response Unit ("VRU") to a caller calling from a pay telephone the location of the closest Automatic Teller Machine ("ATM"). At the MCI ANI Developers Conference, one trucking firm described its requirement to know at all times the location of its trucks. The firm plans to use calling party identification from pay telephones along the routes driven to determine the location of its fleet. This will be faster than their current method of having drivers call in and key the numbers, prevent driver keying errors, and circumvent drivers who are untruthful about location. The

speaker estimated there are 300,000 trucking firms
nationwide that have similar needs.  The end result is
faster delivery of goods to the American public.

Calling party identification can be used for improved
verification capability and security:

- Calling party identification coupled with Personal
  Identification Numbers ("PINs") or passwords will provide
  secure access to programs or capabilities.  It can be used
  as a primary or secondary determinant of whether an
  incoming caller should be allowed to access or activate a
  service.  Calling party identification becomes a network-
  provided "password" to the service and has advantages in
  that network information is reasonably safe from
  tampering, falsification or theft by unauthorized users.

- Calling party identification can allow an ESP to apply
  different levels of security by identifying what type of
  user originates a call.  For example, an ESP may handle
  coin calls differently from hotel calls.

- For Cable TV companies, calling party identification will
  permit verification of accounts, customer telephone
  numbers, and individual requests for pay-per-view
  services.

Calling party identification can also be used for improved
account management and customer service:

- Calling party identification can provide identifying
  information to determine what services should be made
  available to incoming callers, thereby customizing
  offerings for individual end users.

- Calling party identification can provide the basis for
  determining what services have been selected by the
  incoming caller allowing the call to be routed to an
  appropriate ESP program or facility, much as an audiotex
  provider would do for a user choosing "weather" vs.
  "sports."

- Through association of calling party identification and
  other customer account status information, incoming
  callers' access to certain ESP services could be blocked.

- Calling party identification could be used in a customer
  service organization to automatically open a mechanized
  customer account record to enable a customer service
  representative to quickly help a customer who has just
  called in for assistance.  This application would reduce
  the time spent helping the customer, improve customer
  handling efficiencies, and improve customer satisfaction.

- Calling party identification can give a business
  additional information about the origin of a call and its
  customer type (class of service).  Marketing efforts could
  then be targeted at specific geographic areas based upon
  calling party identification and call rates.

*Public Service Commission*
*Of West Virginia*



201 Brooks Street, P. O. Box 812
Charleston, West Virginia 25323

Boyce Griffith
Chairman

April 22, 1991

Congressman Markey, Chairman
c/o Subcommittee on Telecommunications and Finance of the
    Committee on Energy and Commerce
U. S. House of Representatives
H2-316
House Office Building Annex II
Washington DC 20515

Re: H.R. 1305/Telephone Consumer Privacy Rights Act

Dear Congressman Markey:

I would like to express the position of the West Virginia Public Service Commission and request that it be made part of the record in the matter of HR1305 which is to be the topic of debate on April 24.

On December 1, 1989, The Chesapeake and Potomac Telephone Company of West Virginia (C&P) made unrestricted Caller ID available to approximately 12% of their access lines. Availability of Caller ID has now increased to approximately 50% of C&P of West Virginia's access lines, with approximately 8000 subscribers. The service has obviously been very popular with West Virginia residents, and moreover, we have received only three complaints on the service.

On the other hand, there have been over thirty letters of support received from law enforcement, local government and emergency service agencies as to the benefit of the service. One specific instance involved a local emergency squad which was receiving as many as 10 false alarms a day. These have all been eliminated since they subscribed to Caller ID. This drastically reduces the lost time spent in tracking down false alarms and frees up the squad to respond to legitimate emergencies.

It was our opinion at the outset of the Caller ID offering, that the service should be offered in an unrestricted manner, i.e., without per call blocking. An important benefit which results is the significant decrease in harassing calls. A harassing caller is less likely to place such a call if there is a chance that the victim has subscribed to Caller ID. For this reason, the public is best served when Caller ID is offered without per call

187

blocking.  The public experience has so far borne this out.  Numerous harassing situations have been resolved, there has not been any significant negative impact, and at least one life has been saved.

For all of the reasons discussed above, I am convinced that this Commission has established regulations concerning Caller ID which best meet the needs of the people of this State.  I understand that other states have taken different positions, at least partially because of differences in state laws.  Individual states should remain able to adopt regulations which will meet the needs of the telephone customers in their jurisdictions, and there is no need for the Federal Government to adopt uniform guidelines which may not be appropriate for specific situations.

In summary, our experience in West Virginia with unrestricted Caller ID has been positive and we *do not support federally mandated restrictions.*   I appreciate the opportunity to share the Commission's views on this subject.

Sincerely,

Copy to:   Copies are included for distribution to members of the Subcommittee
            Members of the West Virginia Delegation

2

### TESTIMONY OF EDWARD M. HOLLAND
### ON H.R. 1305, TELEPHONE CONSUMER PRIVACY RIGHTS ACT

My name is Edward M. Holland.  I am currently serving my fifth term as a Virginia State Senator representing the 31st district in Arlington, Virginia.   In addition, I am a satisfied user of C&P of Virginia's Caller ID service. Caller ID has been helpful in both my public and private life.   I am speaking today on behalf of the rights of the states to examine and determine the appropriate public policies dealing with Caller ID services. In addition, I will speak about my personal experiences and the experiences of others in my state with unrestricted Caller ID.

The Virginia Senate has previously considered legislation to require the option of blocking and decided, in committee, not to pass such legislation.   The unrestricted use of Caller ID is working very well in Virginia and we, as a state, see no reason to change it.   We believe that the service would be far less effective with per call blocking.

I firmly believe that each state should be free to adopt the regulatory policies that are best suited to the needs of its residents.   This is an issue that is being debated and decided in many states at the moment.   I believe there is no need for federal action that would preempt states' rights.

As a public official, I also can recount that the service has been of tremendous value to many of my constituents in Arlington County.   Before the introduction of Caller ID services in our area, the school system used to receive one

or two bomb threats per week. These were typically prank calls but the school system had to take each call seriously, using time of the staff and the police, as well as possibly clearing a school, until the threat had been fully checked out. With the introduction of Caller ID service, these types of calls have been almost eliminated.

Also, the Arlington police have found Caller ID extremely useful in helping recipients of obscene and threatening calls handle such situations on their own. Frequently, the recipients do not want to prosecute but simply want the calls to stop. When the police receive complaints from recipients of such calls, they now suggest that the individuals subscribe to Caller ID. The police loan these individuals the devices needed to read the number of the caller. Having the telephone number of the person making the obscene or threatening calls permits recipients to handle the situation directly with the caller or the caller's parents, in the case of juveniles. When citizens are able to stop further calls without police intervention, the police are free to devote their time to more life threatening situations. In an era of tight resources and reduced budgets, a service that allows the police to use their personnel more effectively is extremely beneficial.

In my opinion, each time a caller's telephone number is blocked, the value of Caller ID is diminished for the individual receiving the call and for society as a whole. I understand that other new services also are available to deal with prank and obscene calls. However, these services are less effective in allowing recipients to handle the problem themselves. They still require intervention by the telephone company or the police. Thus, the drain on public resources is not alleviated.

For those who are concerned that unrestricted Caller ID may threaten the security of police and others whose confidentiality needs protection, I can state that C&P of Virginia has been very cooperative in making any arrangements needed to protect the confidentiality of law enforcement officials and others with special needs. I do not view this situation as a reason to alter the nature of the service offering.

As a user, I can attest to the value of Caller ID in controlling how my family and I use our telephone service. As a parent with teenage children and a public servant, my household receives a great many calls. Sometimes these calls come at times when it is not convenient to respond. By knowing the telephone number of the person calling, I know whether the call is from a family friend or a stranger. With this service, my household can decide whether to accept the call when it comes in or to return it at a more convenient time. I like the service and appreciate being able to see every caller's number.

These are the issues pertaining to Caller ID that the states have dealt with and continue to address. I believe we are meeting our constituents' needs and can continue do so. I see no need for federal legislation in this area.

O